1322-CC10219

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

STATE OF MISSOURI          )
                           )     SS
CITY OF ST. LOUIS          )

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


DENNIS BRIAN ANDERS AND LARA          )
ANDERS; REGINA AUTREY; DIANA          )
BANKS-JOINER; CATHERINE BARBEE        )
AND MARK BARBEE; EULA BERRY; LINDA    )
BETCHER; SHEILA BOTTORF; MARGARET     )
BROWN AND EDDIE BROWN; BRADLEY        )
BURDETTE; WESTLEY CHRISTIAN AND       )
TRACY CHRISTIAN; LISA CONROY AND      )     Division No.
JEFFREY CONROY; LINDA COOMBS AND      )
DONALD COOMBS; CAROLYN DAVIS AND      )
RICKEY DAVIS; JOSEPH DRESSLER, JR.;   )
MARK DURAND AND TRACIE DURAND;        )
ANGELA EDWARDS AND MICHAEL HELLER;)
JOHN FAIRLEY AND CLARA                )     JURY TRIAL DEMAND
BRIDGET-FAIRLEY; JOHN FOWLER AND      )
JENNIFER FOWLER; LESLIE FOXWORTH;     )
KAREN FREEMAN; MELL FURMAN AND        )
RICHARD FURMAN; JULIA GABINO;         )
CLIFTON GROVES; HORACE HARSHAW;       )
RONALD HATCHELL AND SONDRA            )
HATCHELL; JASON HATCHER AND CYNTHIA)
HATCHER; ANTHONY HAWKINS AND          )
DELORES HAWKINS; JEROME HICKS;        )
TAMMY JEANS AND JASON JEANS;          )
LORENZO JOHNSON AND MARION            )
JOHNSON; AMANDA KEETON; TRISHA KEIM;)
WESLEY KERCHEVAL; DOUGLAS KOLHOFF; )
JASON KOST AND MOLLY SAVAGE-KOST;     )
WALTER LACROIX; STEVEN LENHART AND    )
TAMMY JONES-LENHART; MARK LESTER;     )
MOZELL LYNCH; MAYME MARTIN;           )
SOPHRONIA MCCORD; GWENDOLYN           )
MENARD AND JOSEPH FLEMING; DENNIS     )
MOJICA AND GRISMILDA MOJICA; WILLIAM)
MUIRHEAD AND JENNY MUIRHEAD;          )
JUVENAL NIEVES; CALDONIA PATRICK;     )
DONNA POOLE AND JOEY POOLE; LERISCE   )

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

POWELL AND ERICK POWELL; DORIS )
RANDLE AND WALTER RANDLE, JR.; EDDIE )
ROBERSON AND JESSICA ROBERSON; )
KENDRA WILLIAMS RUSSELL-EL AND JOHN )
RUSSELL-EL; JENNIFER SHANEDLING; )
SHARON SHARP; SCOTT SHEPHERD AND )
TAMMY LYNN SHEPHERD; STEPHEN )
SPARAGNO AND MARGIE SPARAGNO; )
WILBUR SPAULDING, RICHARD STEINMAN, )
JR. AND SANDRA STEINMAN; DELLARINE )
TAKIEDDINE; CYNTHIA TAYLOR; LINDA )
TINNEY AND JAMES TINNEY; TREVER )
TOWNE; REGGIE WADDLE AND BARBARA )
WADDLE; SHERYL JACQUELINE WHITMIRE; )
DANIEL WILLIAMS; LEAH WINZER AND )
CHRISTOPHER WINZER; THOMAS )
YELLOWWOLF, JR. )
                                                    )

       Plaintiffs )
                                                      )

-vs- )
                                                      )

MEDTRONIC, INC. )
(Serve: )
Registered Agent )
The Corporation Company )
120 South Central )
Clayton, Missouri 63105) )
                                                     )

and )
                                                     )

MEDTRONIC SOFAMOR DANEK USA, INC. )
(Serve: )
Registered Agent )
CT Corporation Systems )
120 South Central )
Clayton, Missouri 63105) )
                                                     )

and )
                                                     )

DOES 1 – 100 )
                                                     )

       Defendants )
                                                     )

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

**TABLE OF CONTENTS**

I.   INTRODUCTION…………………………………………………..…..……10

II.  PARTIES…………………………………………………………….………12

III. JURISDICTION AND VENUE…………………………………………17

IV.  SUMMARY OF THE ALLEGATIONS…………………………..……..….18

V.   FACTS …………………………………………………………………27

  A.  THE INFUSE® BONE GRAFT DEVICE…………………………..……27

  B.  BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE®
      BONE GRAFT……………………………………………….……………28

  C.  BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF
      INFUSE®……………………………………………………………………29

  D.  REGULATORY FRAMEWORK…………………………………….……30

      1.  The Premarket Approval (PMA) Application Process For Class III Medical
          Devices……………………………………………………………31

      2.  The Food And Drug Administration (FDA) Applications Are Limited By
          The Applicants' Claimed "Intended Use"………………………….....34

      3.  The Premarket Application Process Includes Not Only The Medical Device
          Itself But Also The Product Labeling…………………………....................35

      4.  The FDA, By Its Regulations And PMA Process, Restricts Manufacturers
          From Promoting "Off-Label" Non-Intended Uses……………………….....36

      5.  The FDA, By Its Regulations And PMA Process, Restricts Manufacturers
          From Distributing Products For "Off-Label" Non-Intended Uses………………40

      6.  The FDA Regulations And PMA Requires A Manufacturer To File A
          Supplemental Application For "Off-Label" Non-Intended Uses………………..41

      7.  The FDA, By Its Regulations And PMA Process, Prohibits Misleading Or
          False Promotion And Marketing Activities…………………………..….…43

      8.  After A Medical Device Is Approved, The Manufacturer Still Has
          Requirements Including General Reporting Requirements To The FDA,
          Mandated By FDA Regulations And the PMA Approval Process………………45

      9.  Post Approval, The FDA, By Its Regulations And PMA Process, Requires
          A Manufacturer To Follow Good Manufacturing Practices……………………..47

      10. If A Manufacturer Markets A Medical Device For Off-Label Uses
          That Have Not Been Approved By the FDA, Then The Manufacturer
          Does Not Get The Protection Afforded To FDA Approved Medical
          Devices By The Medical Device Amendment (MDA) Of 1996 (i.e. If It's

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Not Approved, It's Not Protected) ........................................................................49

E. THE FDA'S LIMITED APPROVAL HISTORY OF INFUSE®………………....…….53

    1. The FDA Advisory Committee Hearing Prior To Approval Expressed Serious Concerns Regarding Unapproved Uses Of Infuse®…………………… 53

    2. As A Result Of Those Serious Concerns, The FDA Narrowly Tailored The Approval Of Infuse®…………......................................................................57

    3. After The Limited FDA Approval Of Infuse®, Medtronic Published A "Fact Sheet" About Infuse®…………………………………………………….61

F. ANY INFUSE® USES THAT WAS NOT SET FORTH IN MEDTRONIC'S PREMARKET APPLICATION AS THE "INTENDED USE" HAVE NOT BEEN APPROVED BY THE FDA AND ARE "OFF-LABEL" USES ………………..62

    1. Description Of "Off-Label" Infuse® Uses…………………………….…….63

    2. Medtronic Deliberately Breached Its Duties Imposed By The FDA Regulations And PMA Process, To Seek Supplemental FDA Approval For Non-Intended Off-Label Uses……………………………………...…….66

    3. Medtronic Failed To Satisfy Its Duties Imposed By The FDA Regulations And PMA Process, To Adequately Warn The FDA, Physicians, And Patients Of The Increased Risks, Dangers, And Adverse Events Associated With The "Off-Label" Use Of Infuse®……………68

G. WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A DRUG – NOT A MEDICAL DEVICE -UNDER THE NAME INDUCTOS®), BUT MEDTRONIC AND WYETH FAILED TO TAKE SIMILAR ACTION IN THE UNITED STATES…………………………………………………...…….68

H. IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL" USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE………………..…..70

I. THE "OFF-LABEL" SALE OF INFUSE® IS A VERY PROFITABLE PART OF MEDTRONIC'S BUSINESS AND PROVIDES LUCRATIVE COMPENSATION TO WYETH/PFIZER…………………………………….....72

J. MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE®………73

    1. Despite Medtronic's Settlement With The Department Of Justice ("DOJ"), Medtronic's Secret Agent Colonel Timothy Kuklo, M.D. Was Found To Have Published A Falsified Study On The Experimental Use Of Infuse® On War Veterans Without Their Knowledge Or Consent Nor The Knowledge Or Consent Of The United States Army Regarding Infuse®

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

While Secretly Consulting For Medtronic And Without The Knowledge
Of Walter Reed National Military Medical Center…………………………..………76

K.  MEDTRONIC PAYS $85 MILLION TO SETTLE A LAWSUIT BROUGHT
BY ITS SHAREHOLDERS REGARDING ALLEGATIONS OF AGGRESSIVE
MARKETING AND PROMOTION OF THE "OFF-LABEL" USE OF INFUSE®………81

1.  Medtronic Engaged In Active, Systematic "Off-Label" Over-Promotion
Through Its Employees And Agents Without Seeking Prior Approval From
The FDA Or In Furtherance Of The Safe Harbor Provisions…………………..…….83

a.  Medtronic sponsored physician meetings and corporate visits
focused on "off-label" training……………………………………….…83

b.  Medtronic instructed its sales representatives on particular
dosage requirements for various "off-label" uses of Infuse®……...…….…84

c.  Medtronic sales representatives would cite data from Medtronic-
sponsored published literature promoting "off-label" use and provide
techniques for "off-label" procedures…………………………….……...84

d.  Medtronic sales representatives routinely directed doctors
inquiring about the "off-label" use of Infuse® to surgeons who
had previously used Infuse® "off-label"…………………………...…….85

e.  Medtronic routinely informed surgeons regarding the dosage of
Infuse® for "off-label" procedures in the cervical spine……………..…….85

f.  Medtronic representatives showed doctors how to roll the
absorbable collagen sponge (ACS) "like a burrito" or "like a taco"
to be placed in the spine for  "off-label" procedures……………….…….87

g.  The vast majority of Infuse® sales (over 85-90%) were from
"off-label" uses…………………………………………………….……87

h.  Medtronic packaged, sold, and distributed Infuse® and the
LT-Cage separately, therefore knowing that Infuse® far out-sold
the FDA required LT-Cage…………………………………………...…..88

i.  Medtronic set Infuse® sales quotas for its representatives that
could not have been achieved without an aggressive, illegal
"off-label" promotional campaign……………………………………….88

j.  Medtronic trained its sales representatives to provide step-by-step
instructions to doctors conducting "off-label" surgeries using
Infuse® and in fact encouraged its representatives to attend
"off-label" Infuse® surgeries in operating rooms across the country……...89

k.  Medtronic secret agents Defendant Lawrence G. Lenke, M.D.
and Defendant Keith H. Bridwell, M.D. from Washington
University St. Louis would train surgeons on the use of Infuse®,
85-90% of which was "off-label" uses…………………………………90

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

    2.   U.S. District Court Judge Paul Magnuson Determined That Statements Made By Confidential Witnesses Supported Allegations Of Medtronic's "Off-Label" Promotion Activities……………………………………………91

L.  "OFF-LABEL" USE OF INFUSE® IN THE LUMBAR SPINE IS NEITHER SAFE NOR EFFECTIVE AND IS UNREASONABLY DANGEROUS AND DEFECTIVE…………………………………………………………..92

M. DESPITE THE LACK OF SAFETY AND EFFECTIVENESS AND THE UNREASONABLY DANGEROUSNESS OF "OFF-LABEL" USE OF INFUSE®, MEDTRONIC PROMOTED AND MARKETED "OFF-LABEL" USE OF INFUSE® TO PHYSICIANS, INCLUDING THROUGH KEY OPINION LEADERS, WITHOUT OBTAINING FDA APPROVAL TO DO SO………………………………94

N.  MEDTRONIC DIRECTLY "OFF-LABEL" MARKETED, WARRANTED, AND MISREPRESENTED THE SAFETY AND EFFICACY OF "OFF-LABEL" USE OF INFUSE® ON MEDTRONIC-OWNED WEBSITES, WITHOUT OBTAINING FDA APPROVAL ……………………………………….…………………95

    1.   Medtronic Misrepresented The Efficacy Of Infuse® On Medtronic.com And Infusebonegraft.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®……………………………………...95

    2.   Medtronic Directly Marketed The "Off-Label" Use Of Infuse® On Back.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®……………………………………………96

    3.   Medtronic Directly Marketed And Misrepresented The Safety Of "Off-Label" Use Of Infuse® On Necksurgery.com, Another Medtronic-Owned Website, Which Was A Violation Of Federal Law And The PMA Received For Infuse®……………………………………99

O.  LEADING SPINE EXPERTS REPUDIATE MEDTRONIC STUDIES…………………100

    1.   *The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agent Physicians Who Acted As Ostensibly as "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"…………………………………………103

    2.   Medtronic-Sponsored Studies Exaggerated The Morbidity Of Traditional Auto-Graft Harvesting Fusion, Thereby Exaggerating The Relative Benefits Of Infuse®……………………………………………104

    3.   Medtronic, In Their Sponsored Studies, Engaged in Various Activities That Resulted In The Published Studies Failing To Disclose The Actual Serious, Sometimes Life-Threatening Or Life-Altering Side-Effects Actually Observed In Those Medtronic-Funded "Studies"…………………………104

P.  MEDTRONIC, IN VIOLATION OF FEDERAL LAW AND THE INFUSE® PMA, CONCEALED AND/OR FAILED TO ADEQUATELY WARN OF THE SERIOUS

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

ADVERSE EVENTS, DANGERS, AND INCREASED RISKS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE®……………………………………………..106

    1.  In Fact, A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)………………………………………………..106

    2.  Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption, And Loss Of Alignment Related To The Use Of Infuse®………………………………………107

    3.  Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®………………………………………………………………………109

    4.  Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®…………………………110

    5.  Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG…….111

    6.  Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify", A Higher Dosed rhBMP-2 (Infuse®) Product………………………………………………..112

Q.  UNITED STATES SENATORS QUESTION MEDTRONIC ABOUT UNREPORTED SIDE EFFECTS, FINANCIAL TIES TO CLINICAL INVESTIGATORS, AND "OFF-LABEL" PROMOTION AND MARKETING OF INFUSE®………………………………………………………………………113

    1.  Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse® "Off-Label" Sales Prompts Individual Inquiries From United States Senators…………………………………………………………………...114

    2.  The U.S. Senate Committee On Finance Launched An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events………………………………………………..116

    3.  The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events………………………………...117

R.  UNITED STATES SENATORS BAUCUS AND GRASSLEY'S INVESTIGATION OF MEDTRONIC REVEALS IN A U.S. SENATE REPORT RELEASED OCTOBER 2012 THAT MEDTRONIC MANIPULATED SCIENTIFIC STUDIES RELATING TO INFUSE® AND DISCLOSED THE PAYMENTS OF HUNDREDS OF MILLIONS OF DOLLARS IN PAYMENTS TO THE "RESEARCHERS"…………118

    1.  High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Adverse Events From Medtronic-Funded Published "Studies"……………………127

2. Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies"…..………..……128

3. Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies"……………………………………….............................................131

S. THE YALE STUDY, PUBLISHED IN JUNE 2013, FUNDED WITH MILLIONS OF DOLLARS FROM MEDTRONIC, CONFIRMS THE LACK OF SCIENTIFIC INTEGRITY OF PREVIOUS COMPANY SPONSORED "STUDIES" OF MEDTRONIC'S INFUSE®…………………………………………………………135

T. RECENT STUDIES, RELEASED SEPTEMBER 4, 2013, RECOGNIZED RHBMP-2 EXPOSURE LEADS TO A FIVE-FOLD INCREASE IN CANCER…………145

U. ARTICLES FROM THE RECENT SEPTEMBER 2013 ISSUE OF THE SPINE JOURNAL DISCUSSES THE LACK OF EFFICACY, INCREASED RISKS, SAFETY CONCERNS, AND THE CORRUPTED INFUSE® STUDIES……………........146

V. MEDTRONIC'S PARTICIPATION IN THE COVERING UP OF AND FAILURE TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE® CAUSED PLAINTIFFS' INJURIES………………....149

VI.   EQUITABLE TOLLING/FRAUDULENT CONCEALMENT…………………………152

VII.  GENERAL ALLEGATIONS………………………………………………………153

VIII. SPECIFIC PLAINTIFF ALLEGATIONS……………………………………….....156

IX.   PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES……………………....228

X.    CLAIMS FOR RELIEF……………………………………………………………228

A. FIRST CAUSE OF ACTION – Negligence…………………………………………228

B. SECOND CAUSE OF ACTION - Negligence Per Se………………………………...234

C. THIRD CAUSE OF ACTION - Negligence – Misrepresentation …………………………237

D. FOURTH CAUSE OF ACTION - Strict Liability – Failure to Warn………………………239

E. FIFTH CAUSE OF ACTION - Strict Liability – Design Defect…………………………...243

F. SIXTH CAUSE OF ACTION - Strict Liability – Manufacturing Defect………………......249

G. SEVENTH CAUSE OF ACTION - Common Law Fraud…………………………….....257

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

H.  EIGHTH CAUSE OF ACTION - Constructive Fraud……………………………….....259

I.  NINTH CAUSE OF ACTION - Fraudulent Concealment………………………………..261

J.  TENTH CAUSE OF ACTION - Breach of Express Warranty……………………………262

K.  ELEVENTH CAUSE OF ACTION - Breach of Implied Warranty………………………266

L.  TWELFTH CAUSE OF ACTION - Violation of Consumer Protection Laws……………269

M.  THIRTEENTH CAUSE OF ACTION - Violation of Missouri Merchandising Practices Act…………………………………………………………………………….273

N.  FOURTEENTH CAUSE OF ACTION - Loss of Consortium…………………………….275

O.  FIFTEENTH CAUSE OF ACTION - Gross Negligence/Punitive Damages…………….276

**PRAYER FOR RELIEF**…………………………………………………………...279

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

## PETITION FOR DAMAGES

COMES NOW, the above named Plaintiffs by and through their undersigned counsel, and states as their Petition for Damages against MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK USA, INC., and DOES 1-100 (collectively herein referred to as "Medtronic" or "Defendants") as follows:

## I. INTRODUCTION

1.      This is an action for product liability and fraud against Medtronic Inc. and its wholly owned subsidiary Medtronic Sofamor Danek, USA, Inc. ("Medtronic"). In 2002 Medtronic applied for and received a very narrow and limited Food and Drug Administration (FDA) approval for permission to sell Medtronic Infuse® Bone Graft LT-Cage® ("Infuse") for a specific intended use.  Recognizing that the strict limitations greatly reduced the potential market and ultimate sales of Infuse®, instead of seeking an expanded FDA approval through a supplemental Pre-Market Approval (PMA) as is required by the Federal Food, Drug, and Cosmetic Act (FDCA) and the Infuse® PMA, Medtronic embarked on an illegal, false and deceptive marketing scheme to promote the sale of Infuse® for unapproved uses ("off-label uses").

2.      In furtherance of this illegal promotional campaign, in 2002 Medtronic published a "Fact Sheet," that summarized and promoted the results of scientific studies that they sponsored, many of which were performed after the limited FDA approval of Infuse®.[1] However, it was only recently revealed that in the "Fact Sheet" as well as in the scientific studies themselves, Medtronic intentionally concealed important and material safety information in violation of federal law and the Infuse® PMA. First of all, Medtronic hid the fact that the studies that they were promoting as "outside objective reports" were in fact written or rewritten by their own secret agents that they paid hundreds of millions of dollars to write these studies.  Second, Medtronic hid the fact that Medtronic itself was actively involved in the writing and editing of the articles, including making the ultimate decisions on whether to include and/or exclude important health and safety information.  Third, Medtronic hid the fact that in these articles, Medtronic intentionally omitted and actively concealed material information about serious adverse events that were found in these studies.  All of the above activities of Medtronic are in violation

---

[1] Medtronic, Fact Sheet (2002) *available at http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf* (also attached hereto as Exhibit "A").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

of federal law and the Infuse® PMA.

3.      Medtronic knew that the off-label non-intended uses of Infuse® were unreasonably dangerous and exposed patients to serious risks of increased injury and harm. Medtronic's false and deceptive marketing scheme was so effective, however, that 85-90% of all Infuse® sales were from off label non-intended uses.  An "off-label" use rate of 85-90% can never be realized without significant "off-label" promotion, all in violation of federal law and the PMA.  Medtronic received several billions of dollars of ill-gotten gains stemming from their false, deceptive, and illegal Infuse® marketing scheme.

4.      As a result of Medtronic's fraud and wrongful actions, non-Medtronic paid physicians were deprived of material information regarding what Medtronic, Medtronic's clinic trial physicians, Medtronic's paid authors, and Medtronic's Key Opinion Leaders (KOLs), knew concerning not only the lack of efficacy but the truth concerning the significant and serious adverse events posed by the off-label non-intended use of Infuse®. This deception precluded the non-Medtronic paid physicians from being learned or informed of the lack of efficacy or the significant dangerous risks and propensities stemming from the off-label use of Infuse®.  Medtronic concealed the increased risks of using Infuse® off-label by funding biased studies and articles by Key Opinion Leaders published in key medical journals that showed a lower incidence of adverse effects.

5.      Medtronic concealed critical safety information including adverse events and serious increased risks (estimated by the authors of a peer reviewed article published in *The Spine Journal* to be as high as 50 times more than Medtronic reported) from the use of Infuse®.  Further, evidence of Medtronic's illegal acts are well documented by many other highly respected sources including additional articles and editorials in *The Spine Journal*, the United States Senate Report of October, 2012 and the YODA studies published in June, 2013.  Medtronic, via their illegal actions, clearly prevented Plaintiffs' physicians, from being adequately warned and informed about the serious dangers of off-label use of Infuse®.  Plaintiff and Plaintiffs' physicians detrimentally relied upon Medtronic for truthful and accurate information, which Medtronic never provided them.   Therefore, Medtronic restricted physicians from becoming learned intermediaries and misled the physicians and ultimately the patients

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

to their detriment and damage.

6.     Independent studies have only recently revealed that the allegedly "scientific studies", which Medtronic and its secret physician agents (who received undisclosed compensation exceeding $210 million dollars, disguised as "royalties" but were actually illegal kickbacks) promoted to reliant physicians and patients as confirming the safety and efficacy of Infuse®, were in fact fraudulent and false.  The original Medtronic sponsored studies when analyzed by truly independent experts including those who took part in the Medtronic funded YODA studies, *The Spine Journal,* and the U.S. Senate Report confirmed that Infuse® provided no additional benefits to patients and, in fact, exposed patients to serious and undisclosed increased risks and complications.

7.     Medtronic's fraudulent scheme was undertaken in conscious disregard of the health and safety of Infuse® patients and in violation of federal law and the PMA. Thousands of vulnerable and unsuspecting patients, including the Plaintiffs herein, have been seriously and permanently injured as a result of Medtronic's wrongful, illegal and immoral actions.


## II. PARTIES

### A. Plaintiffs

8.     Below is a list of each Plaintiff who is bringing his or her own case against Defendants:

9.     Plaintiffs Dennis Brian Anders and Lara Anders reside in Jonesboro, Arkansas.  Plaintiff Dennis Brian Anders was first injured in the city of St. Louis, Missouri as he was exposed to Infuse® in a surgery he had at Barnes Jewish Hospital in St. Louis, Missouri.

10.     Plaintiff Regina Autrey resides in Moore Haven, Flordia.

11.     Plaintiff Diana Banks-Joiner resides in Jackson, Michigan.

12.     Plaintiffs Catherine Barbee and Mark Barbee reside in Taylor, Michigan.

13.     Plaintiff Eula Berry resides in Providence, Rhode Island.

14.     Plaintiff Linda Betcher resides in Inkster, Michigan.

15.     Plaintiff Sheila Bottorf resides in Aurora, Nebraska.

16.     Plaintiffs Margaret Brown and Eddie Brown reside in Laurel, Mississippi.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

17.    Plaintiff Bradley Burdette resides in Union City, Michigan.

18.    Plaintiffs Westley Christian and Tracy Christian reside in Live Oak, Florida.

19.    Plaintiffs Lisa Conroy and Jeffrey Conroy reside in Livonia, Michigan.

20.    Plaintiffs Linda Coombs and Donald Coombs reside in New Bern, North Carolina.

21.    Plaintiffs Carolyn Davis and Rickey Davis reside in North Little Rock, Arkansas.

22.    Plaintiff Joseph Dressler, Jr. resides in Point Pleasant, West Virginia.

23.    Plaintiffs Mark Durand and Tracie Durand reside in Billings, Montana.

24.    Plaintiffs Angela Edwards and Michael Heller reside in Butte, Montana.

25.    Plaintiffs John Fairley and Clara Bridget-Fairley reside in Lumberton, Mississippi.

26.    Plaintiffs John Fowler and Jennifer Fowler reside in Clifton Park, New York.

27.    Plaintiff Leslie Foxworth resides in Cottondale, Florida.

28.    Plaintiff Karen Freeman resides in Charleston, South Carolina.

29.    Plaintiffs Mell Furman and Richard Furman reside in Lady's Island, South Carolina.

30.    Plaintiff Julia Gabino resides in Richland, Washington.

31.    Plaintiff Clifton Groves resides in Jackson, Mississippi.

32.    Plaintiff Horace Harshaw resides in Lenoir, North Carolina.

33.    Plaintiffs Ronald Hatchell and Sondra Hatchell reside in Darlington, South Carolina.

34.    Plaintiffs Jason Hatcher and Cynthia Hatcher reside in Clinton, Indiana.

35.    Plaintiffs Anthony Hawkins and Delores Hawkins reside in Rock Hall, Maryland.

36.    Plaintiff Jerome Hicks resides in Miami, Florida.

37.    Plaintiffs Tammy Jeans and Jason Jeans reside in Jacksonville, Florida.

38.    Plaintiffs Lorenzo Johnson and Marion Johnson reside in Scooba, Mississippi.

39.    Plaintiff Amanda Keeton resides in Casa Grande, Arizona.

40.    Plaintiff Trisha Keim resides in Albuquerque, New Mexico.

41.    Plaintiff Wesley Kercheval resides in Miles City, Montana.

42.    Plaintiff Douglas Kolhoff resides in Sioux Falls, South Dakota.

43.    Plaintiffs Jason Kost and Molly Savage-Kost reside in Astoria, Oregon.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

44.     Plaintiff Walter LaCroix resides in Lapeer, Michigan.

45.     Plaintiffs Steven Lenhart and Tammy Jones-Lenhart reside in Saginaw, Michigan.

46.     Plaintiff Mark Lester resides in Helena, Montana.

47.     Plaintiff Mozell Lynch resides in Castalia, North Carolina.

48.     Plaintiff Mayme Martin resides in Turners Station, Kentucky.

49.     Plaintiff Sophronia McCord resides in Mitchellville, Maryland.

50.     Plaintiffs Gwendolyn Menard and Joseph Fleming reside in Agawam, Massachusetts.

51.     Plaintiffs Dennis Mojica and Grismilda Mojica reside in Vineland, New Jersey.

52.     Plaintiffs William Muirhead and Jenny Muirhead reside in Vicksburg, Mississippi.

53.     Plaintiff Juvenal Nieves resides in Tampa, Florida.

54.     Plaintiff Caldonia Patrick resides in Carthage, Mississippi.

55.     Plaintiffs Donna Poole and Joey Poole reside in Amory, Mississippi.

56.     Plaintiffs Lerisce Powell and Erick Powell reside in Greenville, Mississippi.

57.     Plaintiffs Doris Randle and Walter Randle, Jr. reside in Woodland, Mississippi.

58.     Plaintiffs Eddie Roberson and Jessica Roberson reside in Lynchburg, South Carolina.

59.     Plaintiff Kendra Williams Russell-El and John Russell-El reside in Omaha, Nebraska.

60.     Plaintiff Jennifer Shanedling resides in Stillwater, Minnesota.

61.     Plaintiff Sharon Sharp resides in Wyandanch, New York.

62.     Plaintiffs Scott Shepherd and Tammy Lynn Shepherd reside in Marcellus, Michigan.

63.     Plaintiffs Stephen Sparagno and Margie Sparagno reside in Moses Lake, Washington.

64.     Plaintiff Wilbur Spaulding resides in Whiteville, North Carolina.

65.     Plaintiffs Richard Steinman, Jr. and Sandra Steinman reside in Carleton, Michigan.

66.     Plaintiff Dellarine Takieddine resides in South Lyon, Michigan.

67.     Plaintiff Cynthia Taylor resides in Wilson, North Carolina.

68.     Plaintiffs Linda Tinney and James Tinney reside in Gibsonton, Florida.

69.     Plaintiff Trever Towne resides in Sheridan, Michigan.

70.     Plaintiffs Reggie Waddle and Barbara Waddle reside in Fulton, Mississippi.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

71.    Plaintiff Sheryl Jacqueline Whitmire resides in Myrtle Beach, South Carolina.

72.    Plaintiff Daniel Williams resides in North Charleston, South Carolina.

73.    Plaintiffs Leah Winzer and Christopher Winzer reside in Newport News, Virginia.

74.    Plaintiff Thomas Yellowwolf, Jr. resides in Bismark, North Dakota.

### B. Defendants

75.    Defendant MEDTRONIC, INC. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.

76.    Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.  Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a wholly owned subsidiary of Defendant MEDTRONIC, INC.

77.    Defendants MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK USA, INC., and DOES 1-100 shall be collectively referred to herein as "Medtronic" and/or "Defendants").

78.    The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of DOES 1 through 100, inclusive, are unknown to Plaintiffs at this time, who therefore sue defendants by such fictitious names.  Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs.  Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when that same is ascertained.

79.    Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the DOE Defendants were the agent, servant, employee and/or joint venturer of the other co-defendants and other DOE Defendants, and each of them, and at all said times, each Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

80.    At all times herein mentioned, the officers and directors of Defendants authorized and directed the production and/or participated in the "off-label" promotion of Infuse® when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the "off-label" use of Infuse®, and thereby actively participated in the tortious conduct which resulted in the physical injuries described herein.

81.    There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants, and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

82.    At all times herein mentioned, each Defendant was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiffs.

### III. JURISDICTION AND VENUE

83.    The Court has personal jurisdiction pursuant to § 506.500 R.S. Mo. over Defendants because at all relevant times they have engaged in substantial business activities in the State of Missouri. At all relevant times the Defendants transacted, solicited, and conducted business in Missouri through their employees, agents, and or sales representatives and derived substantial revenue from such business in Missouri.  Jurisdiction in this court is also proper as defendants committed torts in whole or in part against plaintiffs in Missouri.  Further, there is no federal subject matter jurisdiction because no federal question is raised and there is no diversity jurisdiction.

84.    There is no federal diversity jurisdiction because both Plaintiff Jennifer Shanedling and Defendant MEDTRONIC INC. are Minnesota residents.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

85.     Venue is proper in this Court pursuant to § 508.010(4) R.S. Mo., as the conduct which gave rise to plaintiff Dennis Brian Anders and Lara Anders's action occurred in the city of St. Louis, Missouri.

86.     The plaintiffs herein are all properly joined in this action pursuant to 507.040 R.S. Mo as they assert a right to relief under the same series of occurrences and questions of law and fact are common to all plaintiffs in this action.

## IV. <u>SUMMARY OF THE ALLEGATIONS</u>

87.      This is an action for the serious and permanent injuries incurred by the Plaintiffs resulting from the "off-label" use of an unreasonably dangerous and defective combination medical device product known as Infuse® Bone Graft and LT Cage® Device ("Infuse®").

88.      Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic.

89.     The FDA approved Infuse® on July 2, 2002 for a specific "intended use".

90.     The "intended use" approved by the FDA in 2002 was a single-level anterior lumbar interbody fusion ("ALIF") to be used only in conjunction with a titanium metallic cage device known as the LT-Cage—meaning that Infuse® was only approved by the FDA for use in spinal fusion surgeries that were performed from a frontal (i.e. anterior) procedure in a specific level(s) of the spine. The 2002 approval restricted the use of Infuse® for ALIF procedures to the spinal region from L4-S1.[2]

91.     In 2004 the FDA approved a supplement expanding the "intended use" of Infuse® to L2-S1.

92.     To date, Infuse® has NOT been approved for posterior lumbar fusions.

93.     To date, Infuse® has NOT been approved for lateral lumbar fusions.

---

[2] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B"); *see also* Infuse® Label, "These components <u>must</u> be used as a system.  The Infuse® Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component." *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

94.     To date, Infuse® has NOT been approved for use without an approved Cage.

95.     To date, Infuse® has NOT been approved for use in regions of the spine other than L2-S1.

96.     Uses other than those intended uses approved by the PMA are non-approved "off-label" uses.

97.     Medtronic never applied to the FDA for approval of Infuse® for these off-label non-intended uses.

98.     Medtronic never asked the FDA to make a determination as to whether the off-label use of Infuse® via other surgical approaches, methods or involving other areas of the spine is safe and effective.

99.     Medtronic never formulated adequate directions and warnings for such off-label non-intended uses of Infuse®.

100.     Medtronic never provided adequate directions and warnings for such off-label non-intended uses of Infuse®.

101.     Because the FDA never approved such off-label uses, there were <u>no</u> FDA-imposed requirements specific to the non-approved uses of Infuse® and therefore <u>no</u> FDA- approved labeling for such off-label uses.

102.     Medtronic knew that the FDA did not approve such off-label non-intended uses.

103.     Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in their premarket application.

104.     Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in the PMA approval of Infuse®.

105.     Medtronic knew that they were prohibited by federal law and the PMA received from the FDA, from promoting unapproved "off-label" uses of Infuse®.

106.     Medtronic knew it was and is illegal for Medtronic to promote Infuse® for uses other than "intended uses".

107.     It is illegal for Medtronic to distribute Infuse® with knowledge and/or notice that

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Infuse® was going to be used in an "off-label" manner.

108.    Medtronic was aware that a PMA approved Class III medical device promoted for unapproved "off-label" use, is deemed a misbranded medical device in violation of 21 U.S.C. § 352(f) (2012).

109.    Medtronic was aware that a PMA approved Class III medical device distribution of a misbranded medical device is prohibited pursuant to 21 U.S.C. §§ 331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

110.    However, Medtronic recognized that the limited FDA approval obtained for Infuse® in 2002, severely restricted the potential market for Infuse® and consequently the ultimate sales volume and profit to be achieved.

111.    Instead of submitting a PMA Supplement as required by the FDCA and the PMA, Medtronic devised a well-financed and extensive scheme to promote and market Infuse® for non-approved, off-label uses.  Medtronic devised and intended to devise a scheme to defraud physicians, hospitals and patients by means of false and fraudulent pretenses, representations and concealments of material facts.

112.    Medtronic knew that their promotion of Infuse® for non-FDA approved uses was illegal.

113.    Medtronic knew that the unapproved "off-label" use of Infuse® exposed patients to serious dangers and greatly increased adverse risks.

114.    Despite knowing that the "off-label" promotion of Infuse® was not only illegal but extremely dangerous to the health and safety of its consumers, Medtronic in conscious disregard for the safety of the patients, including Plaintiffs, successfully carried out their false and unlawful marketing and promotional scheme.

115.    These illegal promotional efforts proved to be highly effective and eventually more than eighty-five to ninety percent (85-90%) of all Infuse® sales involved "off-label" uses generating billions of dollars in ill-gotten sales revenue.

116.    As alleged herein in detail, in order to unlawfully enhance Infuse® sales, Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities to

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

encourage physicians to use Infuse® for dangerous and unapproved/"off-label" procedures.

117.    While Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities they violated their duty owed to the physician and patients, in concealing and failing to warn the physicians and patients of the known serious increased risks and complications stemming therefrom.

118.    Medtronic's wrongful, illegal, and immoral conduct has become the subject of investigation, action and/or sharp rebuke, by the Department of Justice, the United States Senate, the authors of *The Spine Journal*, the authors of the two (2) independent papers constituting the YODA study as well as many other respected physicians and peer reviewed publications.  Further, the media such as the Wall Street Journal, New York Times and Medtronic's own home town, Star Tribune, has published a significant number of in-depth, investigative articles concerning Medtronic's wrongful conduct causing the Infuse® catastrophe.

119.    According to articles in the June 2011 issue of *The Spine Journal* (an internationally recognized medical journal that publishes peer-reviewed research articles related to evidence-based spine care), wrote that Medtronic-sponsored studies and articles failed to disclose, or inaccurately reported, the safety of Infuse® by concealing and/or underestimating its increased risks and dangers. *The Spine Journal* revealed that Medtronic-sponsored articles failed to disclose the life threatening and completely debilitating serious adverse effects seen in its earliest trials of Infuse®.  *The Spine Journal* also revealed that the actual rate of incidence of these serious side effects is much greater than the rate disclosed by Medtronic and the Medtronic-sponsored studies to physicians and to the public.  *The Spine Journal* reported that the actual rate of incidence of certain side effects of Infuse® was up to **FIFTY TIMES** more than what was reported by Medtronic.  Finally, *The Spine Journal* found that all of the "researchers" who wrote the original articles touting the perfect safety profile of Infuse® without disclosing the adverse events, were paid hundreds of millions of dollars by the Medtronic and that these payments were, at that point, never disclosed to the public.

120.    *The Spine Journal* demonstrated how far Medtronic would go in their aggressive "off-label" campaign.  Medtronic paid their secret agents outrageous amounts of compensation, so large in

fact that one can only interpret the payments as kickbacks or more appropriately, payoffs, to underreport the adverse effects of Infuse® in their studies. These highly paid secret agents acted as agents and were in fact agents for Medtronic. These secret agents wrote fraudulent studies about using Infuse® "off-label" while illegally and acting in concert with Medtronic to hide the adverse events from its consumers and surgeons. The fact that they were receiving extraordinary compensation from Medtronic, for their published "studies", all under the supervision and instruction of Medtronic, was concealed from physicians and patients.

121.    Following *The Spine Journal*, the United States Senate Finance Committee began an investigation into Medtronic concerning Infuse®. After the completion of the extensive investigation, the United States Senate Finance Committee published an official report confirming the independent findings of *The Spine Journal*. The U.S. Senate Report officially found that Medtronic falsely manipulated the studies, under reported adverse events, paid their secret agents enormous sums of money, and directly participated in the writing of the false and misleading studies, without any indication in the articles that Medtronic had any role in writing or editing the published work. The U.S. Senate Report exposed Medtronic for their fraudulent activity.

122.    Not only did Medtronic illegally promote using Infuse® "off-label", but they knowingly promoted materially false information about the "off-label" use of Infuse®. Medtronic heavily used these Medtronic-sponsored studies that *The Spine Journal* criticized in the promotion of Infuse®. Following the limited FDA approval of Infuse® in 2002, Medtronic published a "Fact Sheet." The Medtronic Fact Sheet represented, in part, the following:

> **Fact Sheet**
>
> ***INFUSE® Bone Graft/LT-CAGE*®** Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures**, without the need for the additional surgery to harvest bone from the patient's hip. Scientists determined that rhBMP-2, with an absorbable collagen sponge as the carrier, (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative

21

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

disc disease patients implanted with INFUSE® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy and therapeutic benefits of the new procedure as compared to traditional autograft procedures**… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complication**s that would require follow-up visits…[3] (emphasis added).

123.     Medtronic knew when they made these representations that these "facts" were materially false, and misleading and illegal, as they violated federal law and the PMA.  Medtronic actively concealed the truth related to the study results and concealed material information related to the safety and efficacy of Infuse® from the physicians and patients. In the wake of the storm of controversy, discussed herein, related to the safety of Infuse, Medtronic was belatedly forced by the ever-mounting public pressure to disclose the underlying data from the Infuse® studies for independent YODA examination.

124.     Medtronic subsequently commissioned a review of the prior Medtronic-sponsored Infuse® studies to be led by Yale University. Medtronic paid Yale University over 2 million dollars to reanalyze and what Medtronic was hoping, would rebut *The Spine Journal* findings. Yale supervised the study, under their YODA program.  It took over two years.  The study was performed by 2 independent medical facilities, one in the United States and one in the United Kingdom, each reviewing the same data.  However, at the end of the day, the YODA studies confirmed that *The Spine Journal* was right. The YODA findings questioned the scientific integrity of those prior Medtronic sponsored studies and also confirmed that Medtronic wrongfully hid known serious adverse events.  The YODA reports pointed out that the Medtronic studies downplayed the adverse events actually observed with the use of Infuse® while improperly accentuating the adverse events when an autograft was used.  In fact the authors of the YODA study found that evidence suggested that some of the data related to previous Medtronic-sponsored studies were intentionally omitted.  The YODA study showed that not only did Infuse® lack <u>any</u> clinical benefit over alternative spine fusion procedures, but that Infuse® was associated with a greater prevalent risk of very serious injuries, including cancer.

---

[3] Medtronic, Fact Sheet (2002) *available at* *http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf*. (also attached hereto as Exhibit "A").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

125.    The results of the YODA study, published in June of 2013, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were false, misleading and deceptive.

126.    The results of the YODA study, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were therefore illegal and in violation of federal law, the PMA, and state common laws.

127.    Physicians and their patients relied upon the honesty, integrity and truth of Medtronic's (as well as Medtronic secret agents) representations regarding the safety of Infuse® to their detriment.

128.    Hundreds of thousands of vulnerable and unsuspecting patients, including the Plaintiffs, have become victims of Medtronic's ongoing campaign of fraud, deceit, illegal, and immoral conduct.

129.    The lead editorial of the July 6, 2013 edition of the Chicago Tribune accurately described this shocking debacle with their headline: "The Danger of Rigged Medical Research."[4]

130.    Caught in the midst of this tangled web of wrongful conduct, fraud, and deceit are the unsuspecting and vulnerable victims —the patients. Tragically, the Plaintiffs are such victims.

131.    When used "off-label" in spine surgery, Infuse® has often failed to function in a safe and effective manner, thereby causing serious medical problems and, in some patients, like Plaintiffs, serious, permanent, and/or catastrophic injuries.

132.    The "off-label" use of Infuse® can cause serious physical injuries and/or death.

133.    When Infuse® is used off-label in spinal surgery, it often causes "ectopic" or "exuberant" bone growth.  This ectopic/exuberant bone growth results from Infuse®'s very mechanism of action.  In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing – i.e. into or against the spinal cord or other spinal nerves.

134.    Ectopic/exuberant bone growth can create nerve compression, which can cause the patient to experience any number of adverse effects, including intractable pain, paralysis, spasms, cramps in limbs, and in some cases even leads to death.

---

[4] Editorial: The danger of rigged medical research, Chicago Tribune, July 6, 2013, *available at* http://articles.chicagotribune.com/2013-07-06/opinion/ct-edit-medtronic-20130706_1_bone-growth-research-infuse (also attached hereto as Exhibit "D").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

135.    In "off-label" spine surgeries, Infuse® also can lead to many other serious and significant adverse events including severe inflammatory reactions, fluid collections, bone resorption (bone destruction), osteolysis (active resorption of bone matrix), subsidence (sinking of the cage), implant displacement, radiculitis, retrograde ejaculation, urinary and/or bowel retention or incontinence, seroma, infections, sterility, cancer, and even death.  These debilitating and life threatening adverse events, often result in poorer global outcomes often resulting in the patient being in a significantly worse physical condition than they were in prior to the surgery, as a result of the off-label use of Infuse®, as in Plaintiffs' cases.

136.    Indeed, many adverse events associated with the use of Infuse® result from off-label use of the product by surgeons who did not fully understand the highly potent nature of rhBMP-2 as they were never fully informed by Medtronic of the increased risks and dangers stemming from its off-label use.

137.    As discussed *infra* the learned intermediary doctrine provides that if the manufacturer fails to provide physicians with an adequate warning of the risks associated with their medical device and if the physician did not have independent knowledge of the risks, then the manufacturer's failure to adequately warn is the proximate cause of a patient's injuries.

138.    It goes without saying, but yet we must, that an intermediary cannot be "learned" if they are not warned of the serious dangers and increased risks that can arise out of the use of a medical device.

139.    Plaintiffs' physicians were not adequately warned by Medtronic of the increased risks and serious dangers of using Infuse® "off-label".

140.    Plaintiffs' physicians could not have acquired independent knowledge of the increased risks and dangers as Medtronic intentionally concealed these increased risks and dangers so as to maximize their own financial gains.

141.    Medtronic, by their actions, prevented Plaintiffs' physician from fulfilling their role as a learned intermediary.

142.    A reasonably prudent physician would not select (nor would a patient consent to the use

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

of) a product if they knew that there were important, life-altering serious health risks that were being concealed by the manufacturer.

143.    Likewise, a reasonably prudent physician (nor would a patient consent to the use of) would not select a product that has no additional benefits, but has increased risks of serious, life-altering, physical injuries.

144.    The Plaintiffs do not complain herein of fraud on the FDA in the PMA process. Further, Plaintiffs are not seeking to enforce the Federal Regulations in this action or are suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws. Plaintiffs, individually, claim that they (and their treating physicians) were deceived, misled, defrauded, and as a result, injured by Medtronic's and Medtronic's secret agents' deceptive, false, and illegal promotion and distribution of Infuse® for unapproved off-label uses.

145.    Medtronic's fraudulent conduct includes, but is not limited to:

    a. promoting Infuse® for unapproved "off-label" uses outside of the "intended uses" as set for in the premarket application and the PMA;

    b. utilizing highly paid consultants/agents to canvas the country in presentations illegally promoting and marketing unapproved off-label uses of Infuse®;

    c. ghostwriting and editing "scientific studies" to falsely tout that Infuse® that had a perfect safety record by intentionally deleting the adverse events, when in fact Medtronic knew this was not true and the underlying data did not support this claim;

    d. publishing these "scientific studies" in leading medical journals, touting the success of Infuse® which appear to be authored by neutral physicians when in fact it was written by Medtronic secret agents who received in excess of $200 million dollars in undisclosed compensation/kickbacks and/or disguised "royalties"

    e. summarizing and promoting the results of these fraudulent "scientific studies" on their direct to consumer "informational" websites, including but not limited to, Medtronic's Fact Sheet referenced herein.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

f. failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted "off-label" unapproved uses of Infuse® by requiring the physicians and others conducting the "studies" to publish accurate, truthful and undistorted results of those "studies";

g. failing to prohibit their employees and agents from manipulating the published materials concerning the actual adverse events found in those "studies";

h. failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted off-label unapproved uses;

i. by not submitting a PMA Supplement as required by the FDCA and the PMA for the "off-label" unapproved uses Medtronic and their agents were illegally promoting and/or marketing;

j. creating and distributing false and misleading advertising regarding the safety of Infuse®;

k. knowingly making misleading, false and deceptive statements regarding the safety of Infuse®;

l. knowingly failing to provide/concealing material information regarding the increased risks and dangers of Infuse®;

m. promoting and distributing an unreasonably dangerous and defective product.

n. failing to report adverse events to the FDA and failing to warn of increased adverse events related to Infuse®.

146.    In doing the acts alleged herein, Medtronic (a) did not act reasonably with regard to the foreseeable harm to patients, including the Plaintiffs; (b) did not act as a responsible manufacturer of a Class III medical device; (c) acted unlawfully, in violation of the PMA; (d) acted unlawfully, in violation of the FDA regulations; and (e) violated state common law duties, all of which parallel FDA and federal requirements.

147.    Plaintiffs bring this action for full redress for the injuries and damages they have proximately incurred and will incur as a result.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

## V. FACTS

### A. THE INFUSE® BONE GRAFT DEVICE

148.     Medtronic manufactured, designed, marketed, promoted, and sold Infuse® for use in lumbar spine fusion surgeries.

149.     Infuse® is a bioengineered bone-protein known as recombinant bone morphogenetic protein-2 ("rhBMP-2"), and it is used as an alternative to bone grafting, which involves the transplantation of a piece of bone from the patient's own hip (or bone from a cadaver) to the spine to promote bone growth.  The purported goal of Infuse® is to achieve the ultimate outcome of a bone transplantation by stimulating bone growth with the use of rhBMP-2 without producing the possible adverse side effects of a bone grafting procedure, which can be pain at the donor site.

150.     As an alternative to grafting/transplantation procedures, Infuse® uses a protein known as rhBMP-2 (extracted from genetically-engineered cells which originate from the ovaries of Chinese Hamsters) to facilitate the fusion of vertebrae.

151.     The Infuse® "device" is a combination product and consists of three components compartmentalized into two parts: (1) a metallic spinal fusion cage; and (2) a drug consisting of the bone protein, rhBMP-2, as well as an absorbable collagen sponge (ACS), which acts as a carrier or scaffold that is manufactured from bovine collagen and used as a carrier for the protein and placed inside the fusion cage.



152.     The LT fusion cage allegedly maintains the spacing between vertebrae and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone,

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

with the goal of permanent stabilization (fusion) of the spine.

153.     During surgery, rhBMP-2 is soaked onto and binds with the absorbable collagen sponge that is designed to resorb, or disappear, over time.  As the sponge dissolves, the rhBMP-2 is designed to stimulate the cells to produce new bone.

## B. BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE® BONE GRAFT

154.     Surgeons have for decades employed spinal fusion – a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them – to treat a number of spinal conditions and deformities.

155.     Spinal fusion is similar to the concept of welding.

156.     For years, autologous bone graft has been considered the "gold standard" in spinal fusion surgery.  In an autologous bone graft, or "autograft," the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where fusion is desired.  As the harvested bone exhibits all the properties necessary for bone growth – including osteogenic, osteoconductive and osteoinductive properties – successful fusions occur at significantly higher rates in autograft procedures.

157.     As an alternative to autograft, patients can undergo an allograft procedure, in which bone is taken from the cadavers of individuals who have donated their bone to so-called "bone banks." Although healing and fusion is not as predictable as with the patient's own bone, an allograft eliminates the need for, as well as the pain and patient risk associated with, the harvest procedure required in autograft.

158.     Consequently, studies revealing the ability for biologically manufactured protein to generate bone growth in laboratory animals represented a potential to provide a third surgical option to traditional bone graft procedures. The theory was that, if fusion could be accomplished through the use of biologically manufactured proteins, patients could forego the harvest surgery required in an autograft, but could still benefit from the superior fusion rates associated with autograft procedures.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

## C. BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF INFUSE®

159.    Genetic Institute, Inc. identified, isolated, purified and cloned the bone morphogenetic protein known as BMP-2.

160.    Attempting to seize on this potentially lucrative opportunity to develop an alternative spinal fusion procedure, Sofamor Danek Group, Inc., a Memphis, Tennessee based spinal device maker ("Sofamor Danek"), acquired the exclusive rights to the recombinant human bone morphogenic rhBMP-2 for spinal applications in the United States from Genetics Institute in February 1995.

161.    Under the agreement, Sofamor Danek acquired the exclusive right in North America to develop and commercialize these products for spinal applications.  Sofamor Danek paid Genetics Institute, Inc. $12.5 million in license fees in 1995 and was obligated to pay up to $37.5 million between 1996-1998.  Genetics Institute, Inc. retained the exclusive right to manufacture rhBMP-2 for supply to Sofamor Danek.  Genetics Institute, Inc. and Sofamor Danek agreed to equally share revenues.[5]

162.    Wyeth Pharmaceuticals, shortly after this agreement, acquired Genetic Institute, Inc. and the rights to BMP-2 in 1996.[6]

163.    In October 1996, Sofamor Danek filed an application for an Investigational Device Exemption with the FDA to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to commercially market BMP-2.[7]

164.    In January 1999, Medtronic purchased Sofamor Danek for $3.6 billion.[8]

165.    In 2009, Pfizer acquired Wyeth for $68 billion[9]

---

[5] Genetics Institute and Sofamor Danek to Collaborate on Spinal Indication for rhBMP-2, (Feb 16, 1995), *available at* http://www.thefreelibrary.com/GENETICS+INSTITUTE+AND+SOFAMOR+DANEK+TO+COLLABORATE+ON+SPIN AL...-a016518853 (also attached hereto as Exhibit "E").

[6] Wyeth Quietly Turns Itself Into A Biotech Power (Nov 23, 2007), *available at* http://www.blnz.com/news/2008/02/19/Wyeth_Quietly_Turns_Itself_Into_7301.html (also attached hereto as Exhibit "F").

[7] Bone Morphogenic Proteins: Applications in Spinal Surgery (Sep 2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504139/ (also attached hereto as Exhibit "G").

[8] Medtronic to Buy Maker of Spine Implants for $3.6 Billion, *LA Times,* (Nov 3, 1998), *available at* http://articles.latimes.com/1998/nov/03/business/fi-38827 (also attached hereto as Exhibit "H").

[9] Wyeth was subsequently purchased by Pfizer in 2009 for $68 billion. *see* Aaron Smith, *Pfizer to buy Wyeth for $68 billion*, CNNMoney.com (Jan. 30, 2009) *available at* http://money.cnn.com/2009/01/26/news/companies/pfizer_wyeth/ (also attached hereto as Exhibit "I").

## D. REGULATORY FRAMEWORK

166.    To understand the full scope of the allegations contained in this Complaint, a brief general background regarding the applicable FDCA provisions is warranted, as well as an application of those laws to the present case.[10]

167.    The United States Food and Drug Administration ("FDA") is the federal agency of the United States of America that is charged with safeguarding the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* (2012) (the "FDCA").[11]

168.    The FDCA was passed in 1933 to protect patients.  Congress realized that there were drug manufacturers selling drugs that were neither effective nor safe.  Congress felt that there regulations were necessary to protect patients by making the drug manufacturers go through an approval process before they can promote their drugs for specific indications.

169.    In 1976, there were the Dalkon Shield contraceptive tragedies where numerous patients were harmed by that medical device.  Congress responded to these tragedies by enacting the Medical Device Amendments of 1976 ("MDA") to extend the coverage of the FDCA to medical devices.  The MDA was passed to protect patients with the idea that medical devices should be subjected to a rigorous approval process *for specific indications* and before medical device manufacturers are allowed to market them.  Therefore, the FDA has authority over drugs and medical devices under the FDCA and the MDA.

170.    The MDA established three regulatory classes for medical devices. The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective according to user risk.  Class I medical devices pose the least risk, whereas Class III medical devices pose the greatest risk to the users.[12]

171.    Class I devices are subject to "general controls" such as labeling requirements.[13]  Class II devices are subject not only to "general controls," but also to "special controls" such as "performance

---

[10] Plaintiffs are not seeking to enforce these provisions in our action.  Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions.  Rather Plaintiffs are alleging that Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws.
[11] The ultimate responsibility for the safety of a medical device, of course, rests with the Manufacturer.
[12] 21 U.S.C. § 360c(a)(1) (2012).
[13] 21 U.S.C. § 360c(a)(1)(A) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

standards, postmarket surveillance, [and] patient registries."[14]  If a device cannot be determined to provide a reasonable assurance of safety and effectiveness under Class I or II controls and is either marketed as a life supporting device or may cause an unreasonable risk of illness or injury, then it rises to the level of a Class III medical device.[15]

172.    Class III medical devices are the most regulated. The MDA defines a Class III medical device as one that supports or sustains human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury.[16]

173.    Class III medical devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, and several types of implantable orthopedic devices for spine and hip surgery.

### 1. The Premarket Approval (PMA) Application Process For Class III Medical Devices

174.    The MDA imposes detailed federal oversight on the introduction of new medical devices onto the market. The level of federal oversight varies depending on the risks the devices present. Class III medical devices are given the greatest oversight in the pre-market approval process ("PMA") by the FDA.[17]

175.    Before a company can market a Class III medical device, the company is required to submit a premarket application to the FDA supported by data that provides the FDA with a reasonable assurance that the medical device is safe and effective for its *intended use*.[18]  In order to show safety and effectiveness, the applicant is required to submit evidence to the FDA, typically in the form of clinical trial results.

176.    Without a premarket application, there is insufficient information about Class III medical devices so that performance standards (Class II) or general controls (Class I) cannot provide reasonable assurance that the medical device is safe and effective for its specific intended use.

---

[14] 21 U.S.C. § 360c(a)(1)(B) (2012).
[15] 21 U.S.C. § 360c(a)(1)(C) (2012).
[16] *Id.*  Medtronic Infuse® is a Class III medical device.
[17] 21 U.S.C. § 360c(a)(1)(C) (2012).
[18] 21 U.S.C. §§§ 360e(a)(2), 360e(d)(1)(B)(iii)II, 360e(d)(2)(A) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

177.    Under Section 515 of the FDCA, all medical devices placed into Class III are subject to premarket approval requirements. Premarket approval by FDA is the required process of scientific review in order to provide reasonable assuredness of the safety and effectiveness of Class III devices for their _intended uses_.[19]

178.    The applicant must provide, among other things: 1) "a detailed description of the proposed conditions of use of the device,"[20] 2) a sample label, which must include the _intended uses_ or conditions of use[21], and 3) "full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective."[22]

179.    To determine if a medical device is safe and effective, the FDA reviews the scientific evidence regarding the medical device submitted by the applicant, including "evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device _under its conditions of use_."[23]

180.    "There is reasonable assurance that a device is safe when it can be determined, based upon valid scientific evidence, that the probable benefits to health from use of the device for its _intended uses_ and conditions of use, when accompanied by _adequate directions and warnings against unsafe use_, outweigh any probable risks.  The valid scientific evidence used to determine the safety of a device shall adequately demonstrate the absence of unreasonable risk of illness or injury associated with the use of the device for its intended uses and conditions of use."[24]

181.    "[T]he safety and effectiveness of a device are to be determined (A) with respect to the persons for whose use the device is represented or intended, (B) with respect to _the conditions of use_

---

[19] 21 U.S.C. § 360e (2012).
[20] 21 U.S.C. § 360c(a)(3)(D)(i) (2012).
[21] 21 U.S.C. § 360e(c)(1)(F) (2012); see also 21 U.S.C. § 360c (2)(B) (2012).
[22] 21 U.S.C. § 360e(c)(1)(A) (2012).
[23] 21 C.F.R. § 860.7(c)(2) (2012) (emphasis added).
[24] 21 C.F.R. § 860.7(d)(1) (2012) emphasis added).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

prescribed, recommended, or suggested in the labeling of the device, and (C) weighing any probable benefit to health from the use of the device against any probable risk of injury or illness form such use."[25]

182.    After the FDA finishes review of the premarket application, it then denies, approves, or approves with conditions on distribution, marketing, or sale.[26]

183.    "In making the determination whether to approve or deny the application, the Secretary shall rely on the conditions of use included in the proposed labeling as the basis for determining whether or not there is a reasonable assurance of safety and effectiveness."[27]

184.    After the FDA approves a Class III medical device through the premarket application process, the FDA essentially grants the applicant permission to market and sell a particular medical device for its *specific approved use* (i.e. its "*intended use*").

185.    "*A device may not be manufactured, packaged, stored, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.*"[28]

## 2. The Food And Drug Administration (FDA) Applications Are Limited By The Applicants Claimed "*Intended Use*"

186.    The PMA is based on the manufacturer disclosing all of the pertinent information about the medical device for the FDA to review. One of the most significant parts of the premarket application is the medical device's claimed "*intended use*" as these are the only uses that are evaluated by the FDA in their premarket approval process for efficacy and safety.[29]  The Code of Federal Regulations (C.F.R.), Title 21, Chapter I, Subchapter H—Medical Devices, § 801.4 (2012) (Meaning of intended uses.), defines "intended use" in terms of "objective intent" of the manufacturer in a medical device approval setting:

---

[25] 21 U.S.C. § 360(a)(2)(A-B-C) (2012) (emphasis added).
[26] 21 U.S.C. § 360e(d) (2012); 21 C.F.R. § 814.82 (2012).
[27] 21 U.S.C. § 360e (d)(1)(A) (2012).
[28] 21 C.F.R. § 814.80 (2012).
[29] 21 U.S.C.§ 360e(c)(2)(A)(iv) (2012); *see* also 21 U.S.C. § 360c(a)(2)(A-B) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

The words intended uses or words of similar import in 801.5, 801.119, and 801.122 refer to the objective intent of the persons legally responsible for the labeling of devices.  The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. **This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives.**  It may be shown by the circumstances that the article is, **with the knowledge** of such persons or their representatives, **offered and used for a purpose for which it is neither labeled nor advertised**. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer…But **if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses** to which the article is to be put.[30]

187.     The FDCA requires Class III medical devices to be demonstrated to be safe and effective for each *intended use*.[31]

188.     The FDA ensures that medical devices intended for use in humans are demonstrated by the manufacturer to be safe and effective for each of their *intended uses* and that the labeling of such medical devices bore true and accurate information concerning their intended use.[32]

189.     The FDA determines what is on label on the basis of a product's "intended use."[33]

190.     The "intended use" of a medical device is defined at 21 C.F.R. § 801.4 (2012) as "the objective intent of the persons legally responsible for the labeling of devices…"  "The intended use or uses of a medical drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source."[34] Manufacturers must obtain FDA approval for each intended use.[35]

---

[30] 21 C.F.R. § 801.4 (2012) ("Meaning of 'Intended Uses'" Under the "General Labeling Provisions" for the "Labeling" section.) (emphasis added). (emphasis added).
[31] *See* 21 U.S.C. § 360c(2)(B) (2012).
[32] *Id.*
[33] *Id.*
[34] 65 Fed. Reg. § 14286 (Mar. 16, 2000).
[35] 21 U.S.C. § 360c(2)(B) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 3. The Premarket Application Process Includes Not Only The Medical Device Itself But Also The Product Labeling

191.     Not only is the medical device itself part of the premarket application process, but the labeling and packaging that comes with it. Each premarket submission must also include all proposed "labeling" for the medical device and *its intended use*.[36]

192.     The FDCA requires that a submission for approval of a device include proposed labeling for the proposed *intended uses* of the medical device that includes, among other things, the conditions for therapeutic use.[37]

193.     In order to be approved by the FDA, an applicant for premarket approval of a Class III medical device must demonstrate its safety and effectiveness for "the persons for whose use the device is represented or intended" and "with respect to the conditions of use prescribed, recommended, or suggested in the label…"[38]

194.     The FDA performs a risk-benefit assessment of the medical device and then determines the adequacy of the manufacturer's proposed label.  When the FDA approves a premarket application, the FDA finds that based on the information supplied by the manufacturer, a device is safe and effective under the specific and limited conditions of use included on the label and that the label is not false or misleading.[39]

195.     A manufacturer is required to give adequate directions for the use of a medical device such that a "layman can use a device safely and for the purposes for which it is intended"[40], and conform to section 801.15 requirements governing the appearance of the label.[41]

> **Adequate directions for use means directions under which the layman can use a device safely and for the purposes for which it is intended.** Section 801.4 defines intended use. Directions for use may be inadequate because, among other reasons, of omission, in whole or in part, or incorrect specification of:

---

[36] *Id.*
[37] *Id.*
[38] 21 U.S.C. § 360c(a)(2)(A)-(B) (2012).
[39] 21 U.S.C. § 360e(d)(1)(A), (d)(2) (A-B-C-D) (2012).
[40] 21 C.F.R. § 801.5 (2012).
[41] 21 C.F.R. § 801.15 (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

(a) **Statements of all conditions, purposes, or uses for which such device is intended, including conditions, purposes, or uses for which it is prescribed, recommended, or suggested in its oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the device is commonly used**…
(b) Quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions…
(f) Route or method of administration or application.[42]

196.    "Labeling" encompasses all written, printed or graphic material accompanying the drug or device[43], and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.[44]

197.    Labeling includes the intended purpose as well as any advertised or promoted purposes.

Labeling on or within the package from which the device is to be dispensed bears **information for use, including indications**, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and **for the purpose for which it is intended, including all purposes for which it is advertised or represented**: Provided, however, That such information may be omitted from the dispensing package if, but only if, the article is a device for which directions, hazards, warnings, and other information are commonly known to practitioners licensed by law to use the device. Upon written request, stating reasonable grounds therefor, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso."[45]

198.    "Most, if not all, labeling is advertising.  The term "labeling" is defined in the Act [FDCA] as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[46]

## 4. The FDA, By Its Regulations and PMA Process, Restricts Manufacturers From Promoting "Off-Label" Non-Intended Uses

199.    When the FDA approves a medical device, the agency approves the device for the specific intended use set out in the product's approved labeling.  A use approved by the FDA is usually

---

[42] 21 C.F.R. § 801.5 (2012).
[43] *Id*. 65 Fed. Reg. 14286 (March 16, 2000).
[44] 21 C.F.R. § 801.109(c) (2012).
[45] 21 C.F.R. §801.109 (c) (2012).
[46] *U.S. v. Research Labs.*, 126 F.2d 42, 45 (9th Cir. 1942).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

referred to as an "approved", "labeled" or "intended use". <u>A use that does not appear in the labeling is not approved as safe and effective as it never went through the FDA's premarket approval review.</u>  It is known as an "unapproved," "off-label," or "new use."  For the sake of consistency, in this complaint, Plaintiffs refer to such unapproved uses as "off-label" or "unintended" uses.

200.    A medical device manufacturer is not permitted to promote and/or market a new medical device submitted to the FDA under the premarket approval process until it had an approval for its intended use, including approval for the proposed labeling. Moreover, if approved, the medical device manufacturer is permitted to promote the medical device only for the medical conditions or *indicated uses* specified in the approved labeling. Therefore, a medical device manufacturer is not permitted to promote a medical device in an "off-label" manner, since the FDA did not approve the medical device for that medical condition or use.

201.    A central feature of the FDCA is that it prohibits medical device companies from promoting their devices for "off-label" uses.[47]

> The Federal Food, Drug, and Cosmetic Act of 1938 (FDCA), as amended, **generally prohibits the manufacturer of a new drug or medical device from distributing a product in interstate commerce for any intended commerce for any intended use that FDA has not approved as safe and effective.**  The intended use or uses of a drug or device may be set forth in, among other things, its label or "labeling," which includes written, printed, or graphic matter affixed to or "accompanying" the product.  See 21 U.S.C. 321(m); 21 C.F.R. 202.1(1)(2); see also 21 C.F.R. 201.128, 801.4.  The intended use or uses of a drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source.  *Action on Smoking and Health v. Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980); see also 21 C.F.R. 201.128 and 801.4.

---

[47] Congress created a very limited "safe harbor" for certain "off-label" promotion between 1997 and 2006.  The "safe harbor" allowed manufacturers to provide copies of peer reviewed scientific articles to physicians.  See 21 U.S.C. §§ 360aaa, 360aaa-1 (2012) (these regulations had a sunset clause of September 30, 2006 and were never renewed, see 21 C.F.R. §§ 99.101 (2012) (current FDA regulations on this issue).  As further discussed herein, Plaintiffs, however, allege that Medtronic's "off-label" promotional efforts far exceeded these "safe harbor" activities (i.e. redistribution of peer reviewed articles) and included other impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, in-house corporate paid doctors operating phone banks to instruct outside surgeons over the phone when they call Medtronic headquarters on how to perform "off label" procedures, as well as drafting, editing and ghostwriting the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse®.

**When FDA approves a drug or medical device, the agency approves the product for each use set out in the product's approved labeling.**  A use that FDA approves is thus sometimes referred to as an "approved" or "labeled" use.  A use that does not appear in the labeling is not approved as safe and effective by FDA and is known as an "unapproved" or "off-label" use.

A central feature of the FDCA is that it generally prohibits interstate commerce in new drugs and devices for "new uses"… **Similarly, a medical device that is distributed for a "new use" is "adulterated," see 21 U.S.C. 351 (f), and "misbranded," see 21 U.S.C. 352(f).  An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. 331(a), (k))**…[48]

202.    "[O]ne of the [FDCA's] core objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use."[49]

203.    A medical device that is promoted for non-intended "off-label" uses is deemed "misbranded" in violation of 21 U.S.C. § 352(f) (2012) (misbranding).

204.    "**Among representations in the labeling of a device which render such device misbranded is a false or misleading representation with respect to another device or a drug or food or cosmetic.**"[50]

205.    Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label; otherwise the medical device is misbranded.[51]

206.    A product is "misbranded" when the directions and indications for the unapproved uses that the manufacturer "intends" the product to be used for have not been included on the label.[52]

207.    The FDCA's accompanying regulations require that medical devices sold by manufacturers have adequate directions for use[53], and failure to have adequate instructions for use is considered "misbranding,"[54] which is prohibited.[55]

208.    The FDCA requires medical device manufacturers to disclose all material facts in

---

[48] 65 Fed. Reg. § 14286 (March 16, 2000). (Emphasis added).
[49] *United States v Caronia*, 703 F3d 149, 166 (2nd Cir. 2012) quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, (2000).
[50] 21 C.F.R. §801.6 (2012).
[51] 21 C.F.R. § 801.4 (2012).
[52] 21 C.F.R. § 801.4 (2012).
[53] 21 C.F.R. § 801.5 (2012).
[54] 21 U.S.C. § 352 (f) (2012).
[55] 21 U.S.C. § 331(b).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

advertising and labeling[56], and false or misleading labeling is considered "misbranded"[57], which is prohibited.[58]

209.    The distribution of a "misbranded" medical device is prohibited pursuant to 21 U.S.C. § 331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

210.    The FDCA provides that a medical device is misbranded if, among other things, the labeling did not contain adequate directions for use.[59]  Adequate directions for use could not be written for medical indications or uses for which the medical device has not been approved, and accordingly, directions for "off-label" use cannot be included in the approved labeling.

211.    "Similarly, a medical device that is distributed for a 'new use' is 'adulterated,' see 21 U.S.C. 351(f), and 'misbranded,' see 21 U.S.C. § 352(f).  An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. § 331(a), (k))…"[60]  The reason a medical device that is distributed for an unapproved new use is considered 'misbranded' is that the device fails to include adequate directions and warnings.

212.    "Off-label" use of a medical device is a use that was not approved by the FDA, including different applications or surgical approaches, different dosages, different patient populations, or different conditions from those stated in the label.

213.    The FDA prohibits medical device manufacturers from promoting any "off-label" uses through advertisement, recommendations, or suggestions.

214.    A manufacturer is prohibited from promoting a use of the product that is not the specified use in the PMA or the label.[61]

215.    A manufacturer who wishes to modify the labeling, packaging, design, or indications for use of its device has to comply with a supplemental PMA process.[62]

216.    The FDA strictly regulates manufacturers based on the intended use of the device, and

---

[56] 21 U.S.C. § 321 (n) (2012).
[57] 21 U.S.C. § 352 (a),(q)(1) (2012).
[58] 21 U.S.C. § 331(b).
[59] 21 U.S.C. § 352(f)(1) (2012); *See also* 21 C.F.R. § 801.5 (2012).
[60] Fed. Reg. § 14286 (Mar. 16, 2000).
[61] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a "device may not be… advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order to the device.")
[62] 21 C.F.R. § 814.39(a) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

manufacturers cannot deviate from those specifications without permission.  If a manufacturer wants to change the intended use for a device, it must follow the FDA's established procedure.[63]

217.    Federal law requires a manufacturer to ensure that any warranty statements it voluntary makes are truthful, accurate, not misleading, and consistent with applicable federal and state law.[64]

218.    Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label otherwise the device is misbranded.[65]

219.    Under the FDCA, medical device manufacturers are prohibited from introducing the adulteration or misbranding of any medical device into interstate commerce.[66]

220.    A Class III device that fails to meet and/or comply with the requirements of the PMA is considered to be adulterated under Section 501(f) of the FDCA and cannot be marketed. A device may also be adulterated or misbranded because it lacks requisite FDA clearance or approval.[67]  Furthermore, "[l]isting of unapproved uses in the... advertising... results in an adulterated medical device."[68] Marketing the device for an unapproved intended use thus makes the device both misbranded and adulterated.

221.    The FDCA prohibits the introduction into interstate commerce of any medical device that is misbranded[69], and also prohibits the alteration of any part of the labeling, advertising, or promotional material for a medical device while the device is held for sale after shipment in interstate commerce that results in the device being misbranded.[70]

222.    A medical device manufacturer may not tell the FDA that its device should or will be used only in certain procedures, and then actively encourage physicians to use the device in other procedures.  By promoting and/or advertising the medical device to physicians for a new unapproved

---

[63] *See* 21 C.F.R. § 814.39(a) (2012) (specifying how a manufacturer can add new indications for use through the supplemental PMA process); 21 U.S.C. § 360e(d)(6) (2012).

[64] 21 U.S.C. § 331(b) (effective 2013).  It should be noted that the FDA approval letter for Infuse® specifically states that the FDA "…does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws." *See* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

[65] 21 C.F.R. § 801.4 (2012).

[66] 21 U.S.C. § 331(b) (effective 2013).

[67] FDCA §§ 501(f), 502(o), 21 U.S.C. §§ 351(f), 352(o).

[68] 59 Fed. Reg. 59821 (Nov. 18, 1994).

[69] 21 U.S.C. § 331(a) (effective 2013).

[70] 21 U.S.C. § 331(k) (effective 2013).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

use the medical device manufacturer has shown that the intended use of the device has changed.  Off-label promotion violates federal law, the PMA and may carry criminal penalties.[71]

### 5. The FDA, By Its Regulations And PMA Process, Restricts Manufacturers From Distributing Products For "Off-Label" Non-Intended Uses

223.    The FDA "generally prohibits the manufacturer... from distributing a product... for any intended use that the FDA has not approved as safe and effective..."[72]

224.    "If a manufacturer knows, or has knowledge of facts that would give him notice that a device… is to be used for conditions, purposes, or uses other than the ones for which he offers it, the manufacturer is required to provide adequate labeling for such other uses."[73]

225.    FDA regulations prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[74]

226.    Thus, a manufacturer that knows a device is being used for "off-label" uses is required to notify the FDA and obtain approval for labeling modifications consistent with the alternate use.  Failure to do so renders the device adulterated and misbranded.

227.    The FDCA prohibits the introduction, or delivery for introduction, into interstate commerce of any device that is adulterated or misbranded.[75]

228.    FDA regulations also prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[76]  Any manufacturer's

---

[71] *See* 21 U.S.C. § 333(a) (2012).  This conduct also violates State parallel common laws.  The Second Circuit held that "off-label promotion that is false or misleading is not entitled to First Amendment protection." *United States v. Caronia*, 703 F.3d 149, 160-69 (2d Cir. 2012).  Further, the Ninth Circuit has assumed that "off-label" promotion violates federal law. *Carson v. Deput Spine, Inc.*, 365 Fed. App'x 812, 815 (9th Cir. 2010).

[72] 65 Fed. Reg. § 14286 (Mar. 16, 2000).

[73] 21 C.F.R. § 801.4 (2012). An example of direct knowledge would be when the manufacturer has a sales representative in the operating room.  An example of notice would be when the manufacturer has a majority of sales for non-intended off-label uses.

[74] 21 C.F.R. §§ 201.100, 201.128 (2012); *see* 21 U.S.C. § 352(f)(1) (2012).

[75] 21 U.S.C. § 331(b) (2012).

[76] *See* 21 C.F.R. §§ 201.100, 201.128; *see also* 21 U.S.C. § 352(f)(1).  Medtronic routinely had Corporate Sales Representatives directly in the operating room during "off-label" surgeries.  These Corporate Sales Representatives had direct knowledge of the "off-label" use of Infuse®, which is imputed to Medtronic.  As further discussed herein, Medtronic's sales of Infuse® were over 85-90% "off-label".  This staggering high statistic is sufficient evidence to not only put Medtronic on notice of the "off-label" use, but it also highlights how successful Medtronic were with their illegal over promotional campaign for "off-label" uses.  *See Minneapolis Firefighters*, 278 F.R.D. at 456 discussed further herein. (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

statement, whether true or not–and even mere knowledge of use–can create a new "intended use," and thus a misbranded or adulterated product.

229.    The FDA regulations make it plain that it does not regulate the practice of medicine. However the FDA regulations have also made it crystal clear that this is wholly separate and apart from the restrictions the FDA has placed on a manufacturer for promoting or distributing an unapproved product.

> Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient… **Further, this section shall not change any existing prohibition on the promotion of unapproved uses of legally marketed devices.**[77]

230.    Therefore, although the FDA does not regulate the practice of medicine,[78] the FDCA does prohibit a manufacturer from promoting a use of the product that is not the specified approved use.[79]

231.    Should a manufacturer wish to market a device "for a new or different indication for use, the premarket notification submission must include appropriate supporting data to show that the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[80]

## 6. FDA Regulations And PMA Requires A Manufacturer To File A Supplemental Application For "Off-Label" Uses

232.    In addition to limiting premarket approval to only those devices demonstrated to be safe **and** effective, the actual stated purpose of premarket approval is "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe **and** effective or that do not otherwise meet the statutory criteria for approval."[81]

233.    This prohibition in the FDCA is intended to protect patients and consumers by ensuring

---

[77] 21 U.S.C. § 396 (emphasis added).
[78] 21 U.S.C. § 396.
[79] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a device "may not be … advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")
[80] 21 C.F.R. § 807.87(g) (2012).
[81] 21 C.F.R. § 814.2 (2012).

that manufacturers do not promote devices that are unsafe or ineffective based on the FDA's standards and review.

234.    The terms of 21 C.F.R. § 801.4 render any device "adulterated" or "misbranded" when the manufacturer knew or should have known ("knowledge of facts that would give him notice") that the doctor/hospital/etc. to which the device was sold was going to use it in an "off-label" manner.

235.    Under 21 C.F.R. § 801.4, the FDA regulations state that "if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put."

236.    Consequently, federal law requires that a medical device manufacturer, who has knowledge or even notice of "off-label" use, is required to provide adequate labeling.

237.    The manufacturer must seek "adequate labeling for such a device which accords with such uses to which the article is to be put."

238.    If such a device does not have the required "adequate labeling" the medical device is "adulterated" and "misbranded."

239.    "Off-label" use is not approved by the FDA as "safe and effective," which approval is a prerequisite to placing any material on the labeling concerning any use.  A manufacturer must seek a PMA supplement for the new, unapproved, "off-label" use.

240.    21 C.F.R. § 814. 39(a) (2012) requires a manufacturer to file a PMA Supplement for changes that affect the safety or effectiveness of a device.  This section expressly requires that a manufacturer file a PMA for any "new indications for use of the device."  This is not a permissive choice, but rather a federally mandated requirement, as shown by the use of the term "**shall**" in the federal regulation.

241.    After FDA's approval of a PMA, an applicant **shall** submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA … While the burden for determining whether a supplement is

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

required is primarily on the PMA holder, **changes for which an applicant <u>shall</u> submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device**:

 (1) <u>**New indications for use of the device**</u>

 (2) <u>**Labeling changes**</u>…[82]

242. A manufacturer must submit a PMA Supplement to the FDA for review/approval changes affecting safety and effectiveness of a device (specifically including new indications)[83]; a manufacturer who desires to market or distribute a device "for a new or different indication for use, the premarket notification must include appropriate data to show the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[84]

243. If a manufacturer wishes to obtain approval for a new or different intended use, the manufacturer must go through a lengthy and expensive process to obtain FDA approval for the new use, either by filing a PMA Supplement application pursuant to § 814.39, or by filing a new PMA application.

244. Any changes the manufacturer believes could affect the safety and effectiveness of the device, including any intention to promote the device for new, unlabeled uses, must be submitted, via a "PMA Supplement," to the FDA for approval. "After FDA's approval of the PMA, an applicant shall submit a PMA supplement for review and approval by FDA before making a change affecting the safety and effectiveness of the device for which the applicant has an approved PMA… While the burden for determining whether a supplement is required is primarily on the PMA holder, changes for which an applicant *shall* submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device: (1) *New indications for use of the device*…"[85]

---

[82] *See* 21 C.F.R. § 814.39(a) (2012) "PMA Supplements" (emphasis added).
[83] 21 U.S.C. § 814.39(a) (2012).
[84] 21 C.F.R. § 807.87(g) (2012).
[85] 21 C.F.R. § 814.39(a) (2012) (emphasis added).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 7. The FDA, By Its Regulations and PMA Process, Prohibits Misleading Or False Promotion And Marketing Activities

245.     Under the FDCA and FDA's implementing regulations, labeling, promotional advertisements, and making claims about medical devices are deemed misleading if they fail to disclose certain information about the product's risks.[86]

246.     Generally, to comply with the FDCA and FDA's implementing regulations, and therefore the PMA, such promotional pieces:

a. Cannot be false or misleading in any particular;[87] and

b. Must reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in the promotional piece;[88]

c. Must be about only approved intended uses.[89]

247.     The FDA regulates the manufacture, sale, and distribution of medical devices in the United States under the authority of the FDCA.  This authority includes oversight of labeling and advertising for all medical devices.[90]

248.     A medical device shall be deemed to be misbranded if its labeling is false or misleading in any particular.[91]  Labeling or advertising may be considered misleading if it fails to reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in a promotional piece.[92]

249.     "In the case of any restricted device distributed for sale in any State, if (1) its advertising is false or misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section 520(e)."[93]

---

[86] Infuse® was initially approved as a combination medical product which contained a device (the LT-Cage) and a collagen sponge made up of BMP-2 (a Drug).  The FDA classified this combination product as a medical device.  Medtronic often sold the collagen sponge (drug) separately from the LT-Cage (the device).

[87] Drugs and devices are misbranded under the Act if their labeling is false or misleading in any particular. 21 U.S.C. § 352(a) (2012).

[88] 21 U.S.C. § 321(n) (2012); 21 C.F.R. § 1.21(2012).

[89] 21 C.F.R. § 801.4 (2012).

[90] *See* 21 U.S.C. § 352(a), (n), (q), & (r) (2012).

[91] 21 U.S.C. § 352(a) (2012).

[92] *See* 21 U.S.C. § 321(n) (2012).

[93] 21 C.F.R. § 502 (q) (2012).

250.      Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications…"[94]

251.      Restricted device advertisements must not be false or misleading[95] and must reveal facts that are material about the product being advertised, including facts about the consequences that can result from use of the product as suggested in an ad.[96]

**8. After A Medical Device Is Approved, The Manufacturer Still Has Requirements, Including General Reporting Requirements To The FDA, Mandated By FDA Regulations And PMA Approval Process**

252.      A Medical device manufacturer's obligations do not end with Premarket Approval.

253.      Even after premarket approval issues, manufacturers are required to continually monitor the product and report to the FDA "no later than 30 calendar days after the day: the manufacturer receive[s] or otherwise become[s] aware of information, from any source, that reasonably suggests that a device" marketed by the manufacturer:

(a) May have caused or contributed to death or serious injury; or

(b) Has malfunctioned and this device or a similar device [likewise marketed by the manufacturer] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.[97]

254.      In addition, manufacturers are required to make periodic reports to the FDA regarding approved devices, such reports to include summaries of:

(a) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant.

(b) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.[98]

---

[94] *See* 21 U.S.C. § 352(r)(2) (2012).
[95] 21 U.S.C. § 352(q)(1) (2012).
[96] 21 U.S.C. § 321(n) (2012).
[97] 21 C.F.R. § 803.50(a); *see also* 21 U.S.C. § 360i(a) (further detailing the post approval reporting requirements applicable to device manufacturer).
[98] 21 C.F.R. § 814.84(b)(2).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

255.     Once the FDA has approved a medical device through the PMA application process (such as Infuse®), the manufacturer/applicant is required to comply with the standards set forth in the PMA approval letter. "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device."[99]

256.     Under federal law, a medical device manufacturer has a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product.

257.     Following approval, a medical device manufacturer is required to report adverse events associated with the use of the product, *i.e.* those that may have caused serious injury or death or has malfunctioned and would likely cause or contribute to death or serious injury if recurred.[100]

258.     The medical device manufacturer is required to report any incidents or information that reasonably suggests that the device (1) "[m]ay have caused or contributed to a death or serious injury" or (2) "[h]as malfunctioned" in a manner that would likely "cause or contribute to a death or serious injury" if it recurred.[101]

259.     "*Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary.* When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate."[102]

260.     "*Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated*, unless such investigation has already been performed for a similar complaint and another investigation is not necessary."[103]

261.     "Any complaint that represents *an event which must be reported to FDA* under part 803

---

[99] 21 C.F.R. § 814.80 (2012).
[100] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[101] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[102] 21 C.F.R. § 820.198(b) (2012).
[103] 21 C.F.R. §820.198(C) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of:

> (1) Whether the device failed to meet specifications;
>
> (2) Whether the device was being used for treatment or diagnosis; and
>
> (3) *The relationship, if any, of the device to the reported incident or adverse event.*"[104]

262.    Another general reporting requirement for Class III medical devices after PMA approval is that the manufacturer is obligated to inform the FDA of new clinical investigations or scientific studies concerning the device about which the manufacturer knows or reasonably should know.[105]

263.    Further, the FDCA subjects approved devices to reporting requirements.[106]  For example, the manufacturer must update the FDA when it learns of investigations or scientific studies concerning its device[107], or incidents where the device used in any manner "[m]ay have caused or contributed to a death or serious injury," either due to malfunction or normal operation.[108]  The FDA can revoke its approval based on these post-approval reports.[109]  The manufacturer must establish internal procedures for reviewing complaints and event reports.[110]

264.    Medical device manufacturers are required by federal regulation to "establish and maintain" an adverse event database.[111]

### 9. Post Approval, The FDA, By Its Regulations And PMA Process, Requires A Manufacturer To Follow Good Manufacturing Practices

265.    Under 21 C.F.R. § 820.1(a) (2012) of the Quality System (QS) Regulation for Medical Devices, current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation. The requirements in this part govern the methods used in, and the facilities and controls

---

[104] 21 C.F.R. §820.198(d) (2012).
[105] 21 C.F.R. § 814.84(b)(2) (2012).
[106] 21 U.S.C. § 360i (2012).
[107] 21 C.F.R. § 814.84(b)(2) (2012).
[108] *Id*. § 803.50(a) (2012).
[109] 21 U.S.C. §§ 360e(e)(1), 360h(e) (2012).
[110] 21 C.F.R. § 820.198(a) (2012).
[111] *See* 21 C.F.R. § 803.1(a) (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. The requirements in this part are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act (FDCA). This part establishes basic requirements applicable to manufacturers of finished medical devices.

266.    21 C.F.R. § 820.5 (2012) "Quality Systems", the FDA regulations state, "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

267.    21 C.F.R. § 820.30 (2012) "Design controls" state (i) *Design changes.* Each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

268.    21 C.F.R. § 820.3(z)(2) (2012) *Design validation* means establishing by objective evidence that device specifications conform with user needs and intended use(s).

269.    21 C.F.R. § 820.22 (2012): "Quality Audit" states: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system."

270.    21 C.F.R. § 820.160(a) (2012): "Distribution" states: "**Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed**..."  In other words, a manufacturer is only permitted to distribute a medical device that is approved.  Therefore, if a medical device is going to be used for a use outside of the approved intended uses, then the manufacturer is not permitted to distribute it.

271.    21 C.F.R. § 820.170(a) (2012): "Installation" states: Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures. Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation. The manufacturer shall

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device.

272.    21 C.F.R. § 803 (2012), states: Manufacturers must include information that is reasonably known to the manufacturer, timely make Medical Device Reporting ("MDR") submissions, define the procedures for implementing corrective and preventative actions, and review sampling methods for adequacy of their intended use.

273.    21 C.F.R. § 820.100 (2012) "Corrective and Preventive Action" states: (a) [e]ach manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

a. Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

b. Investigating the cause of nonconformities relating to product, processes, and the quality system;

c. Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

d. Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; and

e. Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems.

**10. If A Manufacturer Markets A Medical Device For Off-Label Uses That Have Not Been Approved By The FDA, Then The Manufacturer Does Not Get The Protection Afforded To FDA Approved Medical Devices By The Medical Advice Amendment (MDA) (i.e. If It's Not Approved, It's Not Protected)**

274.    Manufacturers that promote or distribute their products for "off-label" uses not only are not granted authority to do so by the FDA, but also are not afforded any of the protections or privileges

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

of the FDCA or the MDA, including preemption of any kind or immunity from liability.

275.    In light of Medtronic's promotion of "off-label" uses – the uses not set forth in the premarket application as "intended uses" - the warning approved by the FDA for "on-label", indicated uses, was inadequate and harmful to Plaintiffs when Plaintiffs underwent an "off-label" use promoted by Medtronic.  21 U.S.C. § 352 (2012), 21 U.S.C. §§ 352(q), (r) (2012).

276.    In the absence of federal approval of the new intended use(s), there is nothing to preempt state law requirements as the FDA has not reviewed, approved, or passed on those uses not set forth in the premarket application.

277.    Medtronic's aggressive promotion of Infuse® for "off-label" non-intended uses and obfuscation of the true facts and increased risks and dangers of Infuse®, has led to widespread acceptance among spinal surgeons of such uses as these surgeons mistakenly relied on Medtronic to tell them the truth and/or not corrupt the science being published in peer-reviewed medical journals. Plaintiff's physician's "off-label" use of Infuse® resulted from Medtronic's active promotion of that "off-label" use and corruption of the published literature.  Plaintiff seeks to hold Medtronic liable for injuries that trace back to its illegal conduct.

278.    The FDA has not approved the way in which Infuse® was used in the Plaintiffs as it was not set forth in the premarket application and therefore it is not an "intended use" and therefore, there are no applicable federal regulations or need to establish a parallel claim.[112]

279.    There is a presumption against federal preemption of state laws that operate in traditional state domains. "In all preemption cases, and particularly those in which Congress has 'legislated... in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"[113]  Parties seeking to invalidate a state law based on preemption "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'"[114] "[T]he historic police powers of the State include the regulation of health and safety."[115]

---

[112] Plaintiff claims are premised on Medtronic's "off-label" promotion of Infuse® and the resulting injury.  "Off-label" promotion violates federal law.  21 U.S.C. § 331(a) (effective 2013); 21 C.F.R. § 814.80 (2012).
[113] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).
[114] *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814, (1997).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

"Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, and historically, ... matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"[116]

280.    "Nothing in § 360k denies [the states] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."[117]

281.    As the Supreme Court held in *Reigel v. Medtronic, Inc.*, "State requirements are pre-empted under the MDA only to the extent that they are "different from, or in addition to" the requirements imposed by federal law. § 360k(a)(1). Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements."[118]

282.    "The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of federal law that hurt patients is, to say the least, counter-intuitive."[119]

283.    "Medical device manufacturers who subject their Class III devices to the rigorous premarket approval process are protected by federal law from civil liability so long as they *comply* with federal law.  That protection does not apply where the patient can prove that she was hurt by the manufacturer's *violation* of federal law."[120]

284.    Claims for failure to warn are not preempted.  "Failure to warn claim is neither expressly nor impliedly preempted by the MDA to the extent that this claim is premised on [the defendant manufacturer]'s violation of FDA regulations with respect to reporting [adverse outcomes] caused by the device."[121]

285.    "A claim that promotion of off-label use beyond the safe harbor was coupled with a

---

[115] *Id.*
[116] *Medtronic v. Lohr*, 518 U.S. at 475.
[117] *Id.* at 495.
[118] *Riegel v. Medtronic*, 552 U.S. 312, 330 (2008).
[119] *Bausch v. Stryker Corp.*, 630 F.3d 546, 549-550 (7th Cir. 2010).  See also *Bausch* quoted with approval by the 9th Circuit in *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013) (*en banc*).
[120] *Id.* at 550 (italicized emphasis original).
[121] *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 776 (5th Cir. 2011)

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

failure to warn would not be preempted."[122]

286.      "But we do hold, under *Lohr*, *Buckman*, and *Reigel*, that this claim is not preempted, either expressly or impliedly, by the MDA.  It is a state-law claim that is independent of the FDA's pre-market approval process that was at issue in *Buckman*.  The claim rests on a state-law duty that parallels a federal-law duty under the MDA, as in *Lohr*…  [W]e conclude that the MDA does not preempt… state-law failure-to-warn claim[s]…"[123]

287.      Likewise, claims for fraud are not preempted either.  "…[T]he *Cipollone* Plaintiff's fraud claim… fell outside of the Labeling Act's pre-emptive reach…." Preemption "does not include the more general duty not to make fraudulent statements… We conclude, as we did in *Cipollone*, that the Labeling Act does not pre-empt state-law claims like respondents' that are predicated on the duty not to deceive."[124]

288.      In a recent Federal District Court case regarding Infuse®, the court held that claims based on general state law duties are not preempted either.  "*Lohr* and its progeny contemplate two types of "parallel" state-law claims that escape express FDCA/MDA preemtion: (i) state-law claims that are premised on conduct that both violates the FDCA and is independently actionable under state law… and (ii) state-law claims that are premised on conduct that contravenes state-law duties of such generality as not to present any risk of interference with the federal medical-device regulatory scheme."[125]

289.      The generality of state-law duty to warn claims was an important distinction in the Supreme Court's analysis in *Lohr v. Medtronic.* The Court wrote: "[T]he predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. Th[is] general obligation[ ][is] no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force.[126]  The state-law duties upon which the Lohrs relied escape preemption "because their generality leaves them outside the category of requirements that §

---

[122] *Cornett v. Johnson & Johnson*, 998 A.2d 543 (N.J. App.Div. 2010).
[123] *Stengel v. Medtronic, Inc.*, 704 F.3d at 1226-27.
[124] *Altria Group, Inc., et al., v. Good Et al.*, 555 U.S. 70 (2008).
[125] *Alton v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 3:13-CV-409-PK at 42.
[126] *Lohr v. Medtronic, Inc.*, at 501–02.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

360k envisioned to be 'with respect to' specific devices such as pacemakers."[127]

290.    In another recent federal district court case regarding Infuse®, the court stated that if the manufacturer remained in compliance with the federal scheme and promoted only the uses anticipated by the PMA, the manufacturer has, to some extent, shielded itself from such state law claims.  But the shield totally drops when the manufacturer violates federal law.[128]  The court went on to say, "In the absence of federal approval of the new use, there is nothing to preempt state law requirements.  And in light of the limited breadth courts afford a preemption defense, §360k should not be read as a broad assertion of exclusive federal power over all things having to do with medical devices.  Section 360k does not foreclose [Plaintiff]'s state law theory."[129]

291.    In summary, while manufacturers who *comply* with federal law may be entitled to certain protections, those who *violate* federal law are not entitled to preemption of state laws/immunity for their tortuous conduct and in fact are liable for their conduct that violates federal law. The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of Federal law that hurt patients is to say the least, counter-intuitive.

292.    Essentially, if a manufacturer does not abide by the federal requirements, it is not protected by them.[130]


## E. THE FDA'S LIMITED APPROVAL HISTORY OF INFUSE®

### 1. The FDA Advisory Committee Hearing Prior To Approval Expressed Concerns Regarding Unapproved Uses Of Infuse®

293.    The FDA Advisory Committee hearing involving the initial Pre-Market Approval of Infuse® took place on January 10, 2002.

294.    The transcript of the hearing makes it clear that the principal concern of the Committee members was that Infuse® *should not be used for "off-label" uses* due to its high potential for injury.

---

[127] *Id.* at 502.
[128] *Ramirez v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 118822 at 36-38.
[129] *Id.* at 38.
[130] The promotion of Infuse® for unapproved uses is akin to promoting a device that has never been approved by the FDA and therefore those unapproved uses cannot be protected by the FDA regulations since they have not received FDA approval.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

295.     Several Committee members expressed profound concern that the use of Infuse® through an approach other than anterior would potentially cause exuberant growth of bone into the spinal canal, thus ossifying the neural elements of the spine and injuring the patient in a significant number of cases. Additionally, Committee members expressed concern regarding the potential cancer risk associated with Infuse®.

296.     According to the FDA official transcript of the Committee meeting leading to the initial approval of Infuse® for ALIF procedures only, Committee Member Stephen Li, Ph.D., remarked that nine (9) clinical investigators with a financial interest in the product had reported success with Infuse® more often than investigators without financial interest "almost by a factor of two." The identity of these investigators is not apparent from the transcript.[131]

297.     Medtronic's secret agents, Thomas A. Zdeblick, M.D., Hallett Matthews, M.D.,[132] and Scott Boden, M.D., three of Medtronic's most highly paid consultants and royalty recipients, were present and testified on behalf of Medtronic at the hearing.

298.     Agents Zdeblick, Mathews and Boden assured the Committee (particularly through Medtronic's secret agent Scott Boden, M.D.) that the only approval sought, *i.e.*, use of Infuse® for the single level lumbar anterior approach, would prevent leakage of the BMP into the neural elements of the spine.[133]

299.     During the hearing, panel member Dr. Hanley questioned the sponsored physicians regarding "off-label" use and asked, *"[w]e have one question and that relates to one of those letters that was read earlier about putting the BMP adjacent to the nerve for a posterior approach. It doesn't relate*

---

[131] Orthopedics and Rehabilitation Devices Advisory Panel, at page 306, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http%3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=YaDuUfXnM5DhiwLaroCgCw&usg=AFQjCNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gwh4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").

[132] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, Milwaukee Journal Sentinel/MedPage Today (October 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551 (also attached hereto as Exhibit "L").

[133] Orthopedics and Rehabilitation Devices Advisory Panel, at page 78, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http%3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=YaDuUfXnM5DhiwLaroCgCw&usg=AFQjCNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gwh4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*to the indication being sought for here but any comments from people on that?"* [134]

300.    Medtronic's secret agent Scott Boden, M.D., dismissed this concern by responding:

> *[o]bviously, the risks and complications of the device are that of the surgery, the insertion of the cage and what's inside the cage, and this specific application before the panel today is through an anterior approach, either an open or a laparoscopic and to talk about safety issues that are related to a different surgical approach seems to me to be outside the scope of what we ought to be focusing on today.* [135]

301.    At the time of this hearing, Medtronic's secret agent Thomas A. Zdeblick, M.D. was a consultant for Medtronic, making $400,000 per year for eight (8) days of consulting (not including "royalties" he received from Medtronic).

302.    At the time of this hearing, Medtronic's secret agent Scott Boden, M.D. was receiving at least $100,000 per year in consulting fees from Medtronic (not including "royalties" he received from Medtronic).

303.    At the time of this hearing, Medtronic's secret agent Hallett Mathews, M.D. was making an average of at least $250,000 per year in consulting fees from Medtronic.

304.    At the time of this hearing, Medtronic's secret agents Dr. Polly, J. Kenneth Burkus, M.D., and Charles Branch, M.D. were all listed by Medtronic as *resources* for this hearing, and were presumably present, but did not speak (all received significant consulting and/or royalty payments from Medtronic) as discussed herein supra.

305.    Six months following the initial hearing, the Committee on July 2, 2002, voted to approve Infuse®, *but only with the tapered LT-Cage in a single level lumbar anterior approach*.  Any surgical approach other than the anterior requires the posterior barrier to the spinal canal to be intentionally compromised and such was not approved.

306.    Following obtaining the FDA approval of Infuse® for a specific intended use, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. actively worked to promote Infuse® for "off-label" uses within the medical community.

---

[134] *Id.* at 255-56.
[135] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

307.    During such period of time, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. failed to making adequate, if any, disclosure of their relationship or compensation from Medtronic,

308.    During such period of time, the FDA approved use of Infuse® only had an extremely small share of the fusion market.

309.    Medtronic's secret agent Scott Boden, M.D. received compensation from Medtronic between 1996 and 2010 of $28,796,034.00.

310.    During such period of time, Medtronic's secret agent Scott Boden, M.D. wrote extensively on the use of Infuse® in "off-label" procedures.

311.    By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. wrote that when Infuse® is used "off-label", rhBMP-2 is likely to be effective.  His article in *Orthopedic Nursing*, also praises the benefits of the product, noting that while rhBMP-2 "is quite expensive, [its] potential to lessen morbidity, accelerate healing and provide more consistent results undoubtedly justify these costs in appropriately selected patients."[136]

312.    By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. along with Drs. Paul A. Anderson, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in the *Journal of Bone and Joint Surgery* article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of Infuse® in an "off-label" Posterolateral Fusion procedure.  According to the authors, the study reported that Infuse® improved fusion rates when used in combination with iliac crest bone graft in an unapproved procedure in which the rhBMP-2 was wrapped around local bone as a bulking agent.  According to the authors, the study's findings suggested that "the current [Infuse] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft." [137]

313.    During such period of time, Medtronic's secret agent Thomas A. Zdeblick, M.D.*,* the

---

[136] Scott Boden, *The ABC's of BMPs*, 24 Ortho. Nursing, 49-52 (2005) (also attached hereto as Exhibit "M").

[137] Scott Boden et al., *What's New in Spine Surgery*, J Bone Joint Surg Am. 92(10):2017-28 (2010) (also attached hereto as Exhibit "N").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Chairman of the Department of Orthopedics and Rehabilitation at the University of Wisconsin, failed to properly disclose his financial relationship with Medtronic.

314.    The only disclosure made by Medtronic's secret agent Thomas A. Zdeblick, M.D. were annual payments exceeding $20,000 in University conflict of interest forms when, in truth and in fact, he actually received between $2.6 and $4.6 million per year.

315.    Medtronic paid their secret agent Thomas A. Zdeblick, M.D. an annual salary of $400,000 under a contract that only required him to work eight (8) days per year.[138]

316.    Medtronic's secret agent Thomas A. Zdeblick, M.D. received $34,168,739.81 from Medtronic between 1996 and 2010.[139]

317.    Medtronic's secret agent Thomas A. Zdeblick, M.D. also has been a significant contributor to Medtronic's promotion of Infuse®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of "off-label" uses of the product.

318.    Only a few months after Infuse® was approved, Medtronic's secret agent Thomas Zdeblick, M.D. authored a 2003 paper where he declared that the product could become "the new gold standard" in spine surgery and added that it was being used "exclusively" at his institution.  The paper was published in the *Journal of Spinal Disorders & Techniques,* where Zdeblick is the editor-in-chief, but failed to mention that Dr. Zdeblick received significant royalties on the Medtronic LT-Cage, which is the medical device component of Infuse®.

319.    On the website, www.Back.com, which is owned and operated by Medtronic, Medtronic's secret agent Thomas A. Zdeblick, M.D. he describes the advantages of Infuse® in "off-label" procedures and appears in an online video discussing the benefits of the product which he claims includes no adverse events.  Conspicuously, the video only discusses spinal surgery from the *posterior* approach of the spine, an "off-label" use of Infuse®, and fails to discuss or provide any merit to the *on-*

---

[138] *Medtronic Paid Researcher More than $20,000 – Much More,* The Wall Street Journal (Jan 16, 2009), *available at* http://online.wsj.com/article/SB123206035479087601.html (also attached hereto as Exhibit "O").

[139] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*label* approach.    In this video Medtronic's secret agent Thomas A. Zdeblick states " we looked at the safety concerns with Infuse® very carefully <u>and did not find any adverse events</u>, it's a naturally occurring protein and well accepted by patients." (emphasis added)

320.    Medtronic's secret agent J. Kenneth Burkus, M.D., is an orthopedic surgeon and a self-described "consultant" for Medtronic.

321.    Medtronic's secret agent J. Kenneth Burkus, M.D. received $6,380,336.83 from Medtronic between 1996 and 2010.[140]

322.    During such period of time, Medtronic's secret agent J. Kenneth Burkus, M.D. was the lead author of four of the original thirteen studies of Infuse® sponsored by Medtronic.[141]

323.    All of the studies by Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report any of the observed adverse events that were subsequently revealed by a recent independent review of his data and the publication of the misleading and false results discussed hereinafter.

### 2. As A Result Of Those Serious Concerns, The FDA Narrowly Tailored The Approval Of Infuse®

324.    The FDA reviewed Infuse®'s safety and effectiveness only for the uses Medtronic specified in its PMA application, and the regulations are premised on that specific review.[142]

325.    As presented in Medtronic's original PMA application, which was eventually approved by the FDA on July 2, 2002, Infuse® consists of two components: (1) the tapered LT-CAGE Lumbar Tapered Fusion Device Component, a thimble-sized hollow metal cylinder that keeps the vertebrae in place and provides a frame that contains and directs the development of new bone growth; and (2) The

---

[140] *Id.*

[141] Burkus JK, Gornet, MF, Dickman CA, Zdeblick TA, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages,* J. Spinal Disord. Tech, 2002; 15:337-49; Burkus JK, Transfedlt EE, Kitchel SH, et al. *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenetic protein-2,* Spine 2002; 27:1219-24;  Burkus JK, Sandhu HS, Gornet MF, Longely MC, *Use of rhBMP-2in Combination with Structural Cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion,* J. Bone Joint Surg. Am. 2005;87:1205-12; and Burkus JK, Heim SE, Gornet MF, Zdeblick TA, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-CAGE lumbar tapered fusion device,* J. Spinal Tech. 2003;16:113-22. (also attached hereto as Exhibit "Q").

[142] *See id.*  § 360c(a)(2) (stating that the FDA measures the "safety and effectiveness of a device… with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use."); id. § 360e(c)(1) (2012).

Infuse® Bone Graft Component, which includes an Absorbable Collagen Sponge ("ACS") that acts as a carrier and scaffold for the active ingredient in Infuse®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the ACS.

326.    Although these two components are sold separately, the initial approved labeling for the product indicates that Infuse® requires both components.

327.    The approved labeling for the product reads in part with bold and underlined formatting: **"These components <u>must</u> be used as a system. The Infuse<sup>®</sup> Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component."[143]** (emphasis added).

328.    The labeling also directs the specific manner in which both components are to be used in a fusion procedure.

329.    Infuse® was initially approved by the FDA for exclusive use in the lower lumbar region of the spine (at levels L4 through S1), via an anterior approach (where the spine is approached by going in through the patient's abdomen), and only at one level per surgery.[144]

330.    Infuse® was **NOT** approved for any other surgical approach or for use in any other region of the spine.[145]

331.    The original PMA dated July 2, 2002 from the FDA to Richard Treharne, Ph.D. Senior Vice President of Regulatory Affairs, provides in part that the approval of Infuse® is strictly limited as follows:

> The sale, distribution, and use of this device are restricted to prescription use in accordance with 21 C.F.R 801.109 within the meaning of section 520(e) of the Federal Food, Drug, and Cosmetic Act (the act) under the authority of section 515(d)(1)(B)(ii) of

---

[143] Infuse® Label, *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

[144] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

[145] While the Infuse® label remains substantially the same as that approved by the FDA in 2002, the FDA did make minor adjustments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-SI to L2-SI. Infuse® was also approved by the FDA to be used in dental procedures on March 9th, 2007 and in April of 2004 for repair to tibial fractures. These uses represent a relatively minor percentage of the product's overall sales.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

the act.  FDA has also determined that, to ensure the safe and effective use of the device, **the device is further restricted within the meaning of section 520(e)** under the authority of section 515(d)(1)(B)(ii), (1) insofar as the labeling specify the requirements that apply to the training of a practitioners who may use the device as approved in this order and (2) **insofar as the sale, distribution, and use must not violate sections 502(q) and (r) of the act.**[146] (emphasis added).

332.        The PMA also provides in part as follows:

> [i]n addition to the post-approval requirements outlined in the enclosure, you have agreed to provide the following data in a post approval report: 1. In order to assess the long-term performance of the InFUSE™ Bone Graft/LT-CAGE™ Lumbar tapered Fusion Device, please conduct a post-approval study to obtain a total of 6 years of postoperative data from a statistically-justified number of patients implanted with this device…2. Because of unknown long-term device performance, particularly the resulting bony fusion characteristics, the post approval study should also contain retrieval analyses of any InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device that is implanted and subsequently removed.  This section is not limited to the patient population as described in item 1 above…3. Perform post-approval studies, which assess the effects of rh-BMP2-2 on tumor promotion…4. Perform post-approval studies to investigate the potential for an immune response to rhBMP-2 to interfere in embryonic development in rabbits.  Observation from tis investigation may indicate a necessity to create a pregnancy monitoring database and/or modify your labeling.

333.        The PMA was accompanied by an attachment setting forth the general "Conditions of Approval."

334.        These general conditions (applicable to all Class III approved devices during 2002) require that Medtronic submit a PMA supplement for increased or unanticipated adverse events.  "A PMA supplement must be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification."

335.        These general conditions also require that Medtronic submit a PMA supplement if the device is modified, including expanding its intended uses. "A PMA supplement must be submitted if the device is to be modified and the modified device should be subjected to animal or laboratory or clinical testing designed to determine if the modified device remains safe and effective."

---

[146] Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B"); It should be noted that Infuse® was approved a "restricted device" within the meaning of the ACT.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

336.    These general conditions require Medtronic to provide a 'Special PMA Supplement – Changes Being Effected.'

337.    These general conditions specify that such supplement "is limited to the labeling, quality control and manufacturing process changes specified under 21 C.F.R. 814.39(d)(2) (2012).  It allows for the addition of, but not the replacement of previously approved, quality control specification and test methods.  These changes may be implemented before FDA approval upon acknowledgment by the FDA that the submission is being processed as a 'Special PMA Supplement – Changes Being Effected.'  This procedure is not applicable to changes in device design, composition, specifications, circuitry, software or energy source."

338.    The general "Conditions of Approval" section of the PMA also sets forth in part that "[c]ontinued approval of this PMA is contingent upon submission of post-approval reports required under 21 C.F.R. 814.84 (2012) at intervals of 1 year from the date of approval of the original PMA."

339.    Such post-approval reports must include "a. unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices includes devices which are the same or substantially similar to the applicant's device); and b. reports in the scientific literature concerning the device."

340.    Additionally, the FDA PMA contains requirements concerning Medtronic's reporting of adverse reactions and device defect.

341.    Medtronic, pursuant to the general conditions of approval, is required to provide the FDA within 10 days of receiving or having knowledge of information concerning: "[a]ny adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and; a. has not been addressed by the device's labeling; and b. has been addressed by the device's labeling but is occurring with unexpected severity or frequency."

342.    The general "Conditions of Approval" section of the PMA provided, in part that Medtronic must comply with The Medical Devices Reporting Regulation and "report to the FDA whenever they receive or otherwise become aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer or importer: 1. May have caused or contributed to a

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

death or serious injury; or 2. Has malfunctioned and such device or similar device marked by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."

343.    The PMA for Infuse® was expressly conditioned upon Medtronic's compliance with and satisfaction of the above general conditions and requirements.

344.    The FDA made clear in the PMA that "**[f]ailure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act**." (emphasis added).

345.    Infuse® has never been approved by the FDA for use in other parts of the spine or for use in any other type of spinal procedure.[147]   Therefore, all other uses are "off-label" uses.

346.    Physicians may use FDA-approved medical devices in any way they see fit, but the manufacturer is not permitted to promote in any way a medical device for uses other than the "intended uses" as set for in the premarket application.

347.    The promotion by a medical device manufacturer for any "off-label" uses for its devices or to pay doctors inducements or kickbacks so that they promote "off-label" uses is strictly unlawful and in violation of the PMA and federal regulations.

348.    Medtronic has aggressively over-promoted, as well as induced, uses other than "indicated uses" a/k/a "off-label" uses, of Infuse®.

### 3. <u>After</u> The Limited FDA Approval Of Infuse®, Medtronic Published a "Fact Sheet" About Infuse®

349.    <u>Following</u> the limited FDA approval of Infuse® in 2002, Medtronic published a "Fact Sheet". The Fact Sheet falsely represented, in part, the following:

---

[147] As further discussed herein, the FDA, in March of 2011, rejected Medtronic's application for Amplify, which is another rhBMP-2 bone growth protein used in Infuse® *see* Russolillo, Steven, *FDA Rejects Medtronic Spine Device,* Wall Street Journal (March 20120) http://online.wsj.com/article/SB10001424052748704823004576192593075897446.html; (also attached hereto as Exhibit "R")(emphasis added); Amplify contained three times the amount of rhBMP-2 found in Infuse®. The FDA reviewers stated "[t]he primary safety concern is the increased numbers of cancer events in patients treated with Amplify compared to the control group." Richwine, Lisa, *FDA staff: Cancer a concern with Medtronic device*, Reuters (July 2010) *available at* http://mobile.reuters.com/article/healthNews/idUKTRE66M2U820100723 (also attached hereto as Exhibit "S").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

**Fact Sheet**

***INFUSE® Bone Graft/LT-CAGE®*** Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures**, without the need for the additional surgery to harvest bone from the patient's hip. **Scientists determined** that rhBMP-2, with an absorbable collagen sponge as the carrier, (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative disc disease patients implanted with INFUSE® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complication**s that would require follow-up visits…[148] (emphasis added).

350.    In the "Fact Sheet" Medtronic made representations that Infuse® is essentially the same autograft procedures.

351.    In the "Fact Sheet" Medtronic states that "The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complication**s that would require follow-up visits…[149]".

352.    Medtronic does not reveal that its employees significantly altered the printed/reported results of those "studies" to reflect better outcomes for Infuse® and worse outcomes for the alternative procedures, than what was in truth observed.

353.    Nor did Medtronic disclose that **these "scientists" were extremely highly compensated** by Medtronic to the tune of millions and in some cases, tens of millions of dollars or that Medtronic actively edited, participated in the creation of, and/or **ghostwrote the text used in the published study**.

**F. ANY INFUSE® USES THAT WAS NOT SET FORTH IN MEDTRONIC'S PREMARKET APPLICATION AS THE "INTENDED USES" HAVE NOT BEEN APPROVED BY THE FDA AND ARE "OFF-LABEL" USES**

---

[148] Medtronic, Fact Sheet (2002) *available at* http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf (also attached hereto as Exhibit "A")(emphasis added).
[149] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

## 1. Description Of "Off-Label" Infuse® Uses

354.    To be considered an on-label use, Infuse® must be applied as follows:

a. Infuse® is impregnated on a supplied absorbable collagen sponge that is inserted inside an FDA approved Medtronic cage;[150]

b. This cage is placed via anterior approach;

c. Only a single level is fused; and

d. The fusion is performed between the L2 and S1 levels of the spine.

355.    If any one of these criteria is violated, the FDA considers Infuse® to have been applied in an "off-label" manner.

356.    The off-label use of Infuse® is outside the scope of the FDA's approval.

357.    There are many ways in which Infuse® is used "off-label".

358.    Generally speaking, Infuse® can be placed in three locations: inside an interbody cage, surrounding the cage within the disc space, and along the posterior elements of the spine.

359.    Only approved cages can be used; therefore, the use of any other cage constitutes an "off-label" fusion. There are numerous of models of cages manufactured by a variety of companies. An incomplete list of the most noted "off-label" models includes cages manufactured by Medtronic, Depuy Lordotic Cages, Striker Interbody Fusion Cages, NuVasive Spine Cages, and Zimmer Interbody Fusion PEEK Cages.[151]

---

[150] The FDA has only approved the LT-CAGE Lumbar Tapered Fusion Device (LT-Cage), the Inter Fix Threaded Fusion Device for use with Infuse® in Spinal Fusions, *see* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=2344 (also attached hereto as Exhibit "T"); The FDA also approved Mastergraft with the use of Infuse® for a humanitarian exception which was later withdrawn at the request of Medtronic in 2010, *available at* http://www.fda.gov/medicaldevices/productsandmedicalprocedures/deviceapprovalsandclearances/hdeapprovals/ucm161827.htm (also attached hereto as Exhibit "U")(emphasis added).

[151] Per Counsels' investigation, additional cages including but not limited to the following cages: Allograft Strut; Alphatec; Alphatec Novel; Alphatec PEEK; Alphatec Spine; Alphatec Zodiak; Altiva ArcTec LT; AVS Interbody; Axial Cage; AxiaLIF Cage; BAK; Bak Titanium Cage; Banana; Bengal Cage; Biomechanical Cage; Biomet PEEK; Biomet Solitaire PEEK; Blackstone; Blackstone PEEK Cage; Boomerang; Brantigan Carbon Fiber Cages; Bullet; Carbon Bullet Cage; Clydesdale Cage; Concord; Cornerstone; CoRoent; Crescent; Crosslink Medium; Custom Machine Biomechanical Femoral Allograft Prosthetic Space; Depuy; Depuy Acromed; DePuy Acromed Cage; DePuy Allograft Spacers; DePuy Anterior Lordotic Carbon Fiber Cages; DePuy Carbon Fiber Cage; Depuy Concode Bullet Cage; DePuy Cougar; DePuy Leopard; DePuy Lordotic Cage; Depuy Saber – PEEK; Femoral Ring Allograft; Geo; Global; Globus; Graftech Anterior Ramp; Harms Cage; Hollywood Interbody Fusion Device; HSR Graft; Hydrasorb Type Spacer; IC Graft Chamber; Implex; Infinity; InFix Innovasis X Box Cages; Innovasive; Innovation PEEK; Ionic; Ladotic; LANX Cage; Laris-Is Anteliys GX PEEK; LDR ROA

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

360.    If Infuse® is directly placed in this space between two vertebrae, without benefiting from the confinement of a cage, the application is considered "off-label". The surgeon's operative report will commonly refer to placing Infuse® in the anterior disc space prior to inserting a cage.  Similarly, Infuse® can be applied laterally or posteriorly to the cage after insertion, which is "off-label".

361.    The surgeon has a number of choices when selecting a surgical approach for cage insertion in an interbody fusion. The most common of these are the anterior approach, the posterior approach, transforaminal approach, and extreme lumbar approach.

362.    When adopting an anterior approach, the surgeon makes an incision in the abdomen with the patient in a supine (face-up) position.  He or she proceeds to insert the cage through the retroperitoneal space to the front face of the spine.  Spinal fusions that use a cage and adopt an anterior approach are called "anterior lumbar interbody fusions" or "ALIFs."  When combined with the three other criteria, this is the **only** approach that will constitute an **on-label** procedure.



Anterior Lumbar Fusion with Cages

©MMG 2002

363.    A cage can be inserted via a posterior approach when an incision is made in the back with

---

Cage; Leftnet; Legacy; Life Spine Spacer & Biomet Biologics Spacer; LifePlan Health VG2P; Linxx Peek; Long Vuc-Pod Cages Loop TLIF Cage AMT Loop Interbody Cages; Mesh Cage; Mobis PEEK Spacer; Novel; Nutech; NuVasive; Nuvasive Spine Wave; Nuvasive STD; Synthes CCALIF Biomechanical Device; Ocelot Cage; ODC Implant; Perimeter Cage; Pioneer Bullet; Pyramesh; Rabea 5 Peek; Rattlesnake-Eminent; Ray Cage; Redmed PEEK; Regeneration Tech Threaded Bone Dowel; RTI Biologics Cage; Scientx; Sea Spine PEEK Spacers Seaspine Hollywood; Shadow Mesh; Signature Peak; Signus Tetrus; SinMesh Interbody Cage; Sofamar Boomerang II; Sonoma; Sovereign Cage; Spinal USA Titanium; Spine Frontier; Synthes CCALIF; Spine Metrics PEEK Spacer; Spine Wave Expandable Cage; Spine Wave XD Cartridge; Spinefrontier S-LIFT PEEK Cage; Spineology; Spinewave Staxx XD Cartridge; StaXx - D PEEK Expandable Cage; Stryker; Synfix; Synthes OPAL; Synthes PEEK; T Lift; Tangent; Telemon; Tetris; Theken Interbody Cage; Theken Spine Non-Tapered Cage; Thekenspine Nontapered Cage; Thekon PEEK Spacer; Threaded Bone Dowell; Titan; Titan Endoskeleton; USA Cage System; Ventura;Versa Trac P Cage; Verte Stack; VG2C Lifenet Health; Vitoss; X Core Expandable XLIF Cage – Nuvasive; X2 Crescent PEEK; Zero-P Synthes Spacer; Zimmer Parallel Slotted; Zimmer Ardis P; Zimmer BAK; Zimmer Lucent; and Zimmer PEEK.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

the patient in the prone position (faced down). The cage is then implanted into the interbody space from the back face of the spine. This kind of fusion is called a "posterior lumbar interbody fusion" or "PLIF." This is an "off-label" use of Infuse®.



364.     A cage can be inserted from either the right or left face of the spine by modifying the PLIF. These fusions are called "transforaminal lumbar interbody fusions" or "TLIFs." A TLIF is accomplished by creating an incision in the back, reaching around the side of the spine, and inserting the cage from either the left or the right. This is "off-label" use of Infuse®.

365.     An additional procedure is also considered to be "off-label" when Infuse® is applied along the posterior or posterolateral elements of the spine, including the facet joints, posterolateral gutters, and transverse processes. When Infuse® is placed in any of these posterior elements the surgery is called a "posterior" or "posterolateral" fusion, and no cage is used.



366.    In fact, any use of Infuse® that was not set forth in the premarket application as the "intended uses" and thereafter approved by the FDA in any of the PMAs, is an "off-label" use.

367.    The spine consists of four general regions, cervical (neck), thoracic (chest), lumbar (low back), and sacral (lowest portion of the spine).  Each region consists of individual vertebra, which are described as "levels." These levels are numbered, with lower values corresponding to the vertebra that lay higher on the spine.

368.    The cervical spine consists of seven levels, designated C1-C7.  The thoracic spine consists of twelve levels, ranging from T1-T12.  The lumbar spine usually consists of five vertebras, ranging from L1-L5.  The sacrum is a structure immediately below the lumbar spine and consists of two levels, S1 and S2.

369.    To be considered an on-label use, Infuse® must be applied at only one level, from L2-S1 in the lumbar or lumbosacral spine.

370.    If Infuse® is used in more than one level, or outside L2-S1, then the FDA considers the procedure to be "off-label".

### 2. Medtronic Deliberately Breached Its Obligations Under Federal Law To Seek Supplemental FDA Approval For Non-Intended "Off-Label" Uses

371.    Medtronic did not seek a post-approval supplement to the PMA.

372.    Medtronic did not seek such a post-approval supplement because it wanted to avoid the lengthy and time-consuming supplemental PMA process.

373.    Medtronic did not seek such a post-approval supplement because it knew that the science would not support their application.

374.    Medtronic knew or had reason to know that based upon the results of prior Medtronic-sponsored clinical studies of  "off-label" uses, which were abruptly terminated as a result of observed complications, that "off-label" uses would be neither safe, nor effective.

375.    Medtronic knew or had reason to know that for that reason, the supplemental PMA would be rejected.

376.    Instead, Medtronic engaged in very active and concerted efforts to market, promote, and

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

sell Infuse® for "off-label" uses.

377.    In undertaking such effort, Medtronic totally disregarded the increased risks, dangers, and complications that Medtronic knew or should have known were associated with "off-label" use of Infuse®.

378.    Medtronic did not notify the FDA of the "off-label" uses, as required by federal law.

379.    Medtronic did not track and report the adverse events associated with the "off-label" uses, as required by federal law.

380.    Medtronic did not seek to strengthen or increase the labeling to warn of the known and/or knowable dangers associated with "off-label" uses of Infuse®, as required by federal law.

381.    Medtronic did not file a PMA Supplement to seek approval for the "off-label" uses they were promoting, as required by federal law.

382.    Medtronic did not file a new PMA application for the "off-label" uses, as required by federal law.

383.    Medtronic did not discontinue sales of the device that Medtronic knew, or had reason to know, were intended for "off-label" purposes.

384.    Medtronic did not report the "off-label" use to the hospital(s) where Medtronic knew Infuse® was being used "off-label", as required by federal law.

385.    Medtronic did not report the "off-label" use to the FDA where Medtronic knew Infuse® was being used "off-label", as required by federal law.

386.    Medtronic did not act as a reasonably prudent manufacturer of Class III medical devices in the promotion, sale, and distribution of Infuse®.

387.    Medtronic continued to illegally promote, market, and sell the Infuse® device for "off-label" uses in order to reap enormous profits from those sales for use on hundreds of thousands of unsuspecting and vulnerable patients, some of whom would later suffer irreparable, debilitating and life-altering injuries caused by the "off-label" of Infuse®.

388.    Medtronic prioritized market share and profit above the health and safety of patents and consumers, above FDA rules and regulations and above state common law duties.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

389.     Medtronic has violated federal law, FDA regulations, their PMA, state common law duties, breached the trust of physicians who relied on Medtronic to act as reasonably prudent manufacturers, breached the trust of patients who relied on Medtronic to act as reasonably prudent manufacturers.  Medtronic acted in concert with their secret agents and with other Defendants as set forth herein, and acted in conscious and willful disregard of the health and safety of Infuse® patients, including the Plaintiffs.

**3. Medtronic Failed To Satisfy Its Duties Its Imposed By The FDA Regulations and PMA Process, To Adequately Warn The FDA, Physicians, And Patients Of The Increased Risks, Dangers, And Adverse Events Associated With The "Off-Label" Use Of Infuse®**

390.     Medtronic failed to fully and adequately warn physicians and patients of the increased risks and dangers associated with the "off-label" uses of Infuse®.

391.     Medtronic had a duty to warn physicians of the possible increased risks and dangers associated with the "off-label" uses of Infuse® so that physicians could properly weigh the risks and benefits of the treatment and obtain proper informed consent from patients.

392.     Medtronic knew of additional risks and serious adverse events that they did not report to the FDA in violation of their federally mandated duties.

393.     By continuing to illegally promote, market, and sell Infuse® for "off-label" use, as well as failing to warn of and report increased dangers and adverse events associated with such off-label use and failing to seek approval for such off-label use, Medtronic therefore breached their duty to physicians, and their patients, wholly failed to act a reasonably prudent medical device manufacturer, all in violation of federal law, the PMA and state common law duties.

**G.   WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A DRUG – NOT A MEDICAL DEVICE - UNDER THE NAME INDUCTOS®), BUT MEDTRONIC AND WYETH FAILED TO TAKE SIMILAR ACTION IN THE UNITED STATES**

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

394.     Wyeth Pharmaceuticals in co-ownership with Medtronic gained authorization to market Infuse® under the name InductOs® in Europe in September of 2002.[152]

395.     InductOs® first received approval for use in the treatment of acute tibia fractures in adults to increase the probability that tibial fractures will heal faster and reduce the need for additional surgeries.[153]

396.     Subsequently, the European Commission expanded the approval of InductOs® in March of 2005 for use with the LT-Cage® Device for "single-level anterior (from the front) lumbar spinal fusion in adults with degenerative disc disease who had at least six months of non-operative treatment for this condition" at the L4 - S1 levels only.

397.     This is still a limitation in Europe today.[154]

398.     On March 23, 2007, less than two years after approval for use in the spine, Wyeth sent a letter to physicians in Europe warning that "[t]he unapproved use of InductOs® in posterior lumbar spine surgery or inappropriate use (e.g. overfilling of the implant/cage) has resulted in limited number of cases of localized fluid collection (e.g. pseudocysts, localized edema, implant suite effusion) some times encapsulated, regularly requiring intervention."[155]

399.      According to the letter, the majority of the reports of fluid collection occurred in surgeries where InductOs® was used in the "posterior lumbar approaches and/or in a manner inconsistent with the instruction for use, such as placing the sponge in places outside the cage and/or in overfilling of the implant/cage."

400.     The letter also specified that fluid collection could occur within days or months after the spinal fusion, and that in more than half of the reported cases, the fluid collection encapsulated, and "resulted in nerve compression, neurological deficit or pain."  In cases where the fluid collection persisted, clinical aspiration or surgical removal of the fluid was required.

---

[152] Medtronic Announces European Commission Approval of New Indication for InductOs® for Spinal Surgery (April, 19, 2005), *available at* http://thefreelibrary.com/_/print/printarticle.aspx?id=131684515 (also attached hereto as Exhibit "V").
[153] *Id.; see also* FDA news Device Daily Bulletin (April 21, 2005), *available at* http://www.fdanews.com/newsletter/article?issueId=7469&articleId=71339 (also attached hereto as Exhibit "W").
[154] *Id.*
[155] Important Safety Information, Wyeth  (March 23, 2007), *available at* http://www.cbg-meb.nl/NR/rdonlyres/F0155F2D-4488-49AF-A224-0B0498CFB201/0/DHPCL_InductosMar2007.pdf (also attached hereto as Exhibit "X").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

401.    The letter also explicitly recommended to surgeons that they use InductOs® exclusively in accordance with the instructions "paying attention to correct dosage and proper placement of the product within the LT-Cage."

402.    Finally, the letter heralds the benefits of InductOs® stating, "InductOs® is approved for use in anterior spine fusion surgery as an alternative to autologous bone graft, resulting in non-inferior rates of radiographic fusion and clinical improvement.  This potential post-operative adverse events needs to be placed in the context of reducing the need for autologous bone graft harvest."

403.    The Committee for Medicinal Products for Human Use ("CHMP"), a division of the European Medicines Agency, also approved and released a Summary of Product Characteristics for InductOs® in 2007.

404.    In Sections 4.2, 4.4, and 4.9 of this document, Wyeth directs surgeons to follow the instructions for InductOs®, exactly as provided ("Failure to follow the product preparation instructions for rhBMP-2/ACS may compromise its safety and effectiveness.  Care and caution should be used to prevent overfilling of the construct and/or intervertebral space.").

405.    In Sections 4.4, 4.8, and the Package Leaflet, Wyeth once again warns surgeons in detail of the formation of fluid collections, nerve compression, and pain when InductOs® is used in unapproved applications, where InductOs® is indicated exclusively for single-level (L4-S1) anterior lumbar spine fusion coupled with an LT-CAGE® in adults, or for acute tibia fractures.

406.    Conspicuously, neither the 2007 letter distributed to physicians in Europe regarding the dangerous effects of InductOs® when used in an "off-label" manner, nor the Summary of Product Characteristics approved by the CHMP, was provided to physicians in the United States.

## H. IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL" USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE

407.    On July 1, 2008, the FDA sent out a public health notification regarding the life-threatening complications associated with using Infuse® in cervical spine fusions.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

408.      In the letter, the FDA stated "[t]his is to alert you to reports of life-threatening complications associated with recombinant human Bone Morphogenetic Protein (rhBMP) when used in the cervical spine.  Note that the safety and effectiveness of rhBMP in the cervical spine have not been demonstrated and these products are not approved by FDA for this use."

409.      The FDA further stated, "complications were associated with swelling of the neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck. Anatomical proximity of the cervical spine to airway structures in the body has contributed to the seriousness of the events reported and the need for emergency medical intervention."

410.      With respect to unknown risks, the FDA stated that "[t]he mechanism of action is unknown, and characteristics of patients at increased risk have not been identified."

411.      The FDA warned that Infuse® was only approved by the FDA for the limited-use of only fusions of the lumbar spine, in skeletally mature patients with degenerative disc disease (DDD), at one level from L2-S1.

412.      The FDA emphasized that "off-label" use of Infuse® is dangerous and "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, the FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."[156]

413.      Medtronic has resolved at least one wrongful death civil case filed related to the use of Infuse® in the cervical spine.[157]  On August 21, 2008, Shirley Nisbet, a resident of Vista, California, underwent a cervical fusion procedure in which a Medtronic sales representative allegedly encouraged and recommended to her surgeon, prior to and during the surgery, that the surgeon use Infuse® in Ms. Nisbet's cervical spine.  Following the operation, Ms. Nisbet had difficulty breathing and swallowing, and experienced severe pain and swelling in her neck.  In the following days, her symptoms became progressively worse until her breathing became so compromised due to neck swelling and compression

---

[156]FDA Public Health Notification: Life-Threatening Complications Associated with Recombinant Human Bone Morphogenic Protein in Cervical Fusion (July 1, 2008), *available at* http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm (also attached hereto as Exhibit "Y").

[157] *Nisbet v. Medtronic,* Case No. 8:08-cv-01361-JVS-RNB (C.D. Calif. [Southern Div.-Santa Ana]) was filed on 12/2/2008 and terminated on 2/27/09 by the filling of a Notice of Voluntary Dismissal w/o Prejudice by plaintiffs on 2/27/09.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

of her airway that she stopped breathing and fell into a coma on August 23, 2008.  She remained in a vegetative state but was kept alive by artificial means for several days, until she died on August 30, 2008.[158]  It has been reported that Medtronic subsequently settled this wrongful death action.

## I.   THE "OFF-LABEL" SALE OF INFUSE® IS A VERY PROFITABLE PART OF MEDTRONIC'S BUSINESS AND PROVIDES LUCRATIVE COMPENSATION TO WYETH/PFIZER

414.     Infuse® has become a blockbuster product for Medtronic.

415.     Infuse® sales alone were nearly $900 million for the fiscal year of 2011.[159]

416.     Medtronic has depended heavily on Infuse®, since its sales in other market areas, such as cardiac defibrillators, have significantly slowed due to numerous product recalls of a wide-variety of defective Medtronic products.

417.     Medtronic's reliance on Infuse® for sales is exhibited by SEC filings and statements to analysts as well as the investing public, where Medtronic urged that Infuse® was a rapidly growing product and expected to greatly increase its market presence in the upcoming years.

418.     In the 2007 fiscal year alone, according to Medtronic's Second Quarter press release filed with the SEC in November of 2006, "Worldwide Infuse® 2007 Bone Graft revenue grew 36 percent, driven by expanded surgeon adoption."[160]

419.     In February of 2007, Arthur D. Collins, Jr., Medtronic Chairman of the board responded to Citigroup analyst, Matthew Dodds, about the performance of the Infuse®, stating that "Infuse® still grew 15%...**one of the biggest opportunities we have is continuing to expand the indication**." (emphasis added).[161]

---

[158] Medtronic Is Sued Over Bone Product (Dec 3, 2008), *available at* http://online.wsj.com/article/SB122827750515975273.html (also attached hereto as Exhibit "Z").
[159] Critique could put bigger drag on Infuse sales (Oct 25, 2012), *available at* http://www.startribune.com/business/175896771.html (also attached hereto as Exhibit "AA").
[160] Medtronic Reports Second Quarter Revenue Growth of 11 Percent (Nov 11, 2006), *available at* http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1164113830755&lang=fr_CH (also attached hereto as Exhibit "BB").
[161] Complaint, as alleged in the shareholder action at Paragraph 195, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota* (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

420.    During the Goldman Sachs 28th Annual Global Health Care Conference, June 13, 2007, Medtronic's CFO, Gary Ellis stated, "Infuse is…one of our big growth platforms over the next several years."[162]

421.    Additionally, Medtronic's Spinal Divisions Vice President for Clinical Affairs explained at an Investor and Analyst Meeting on June 20, 2007 that the company was sponsoring several clinical trials to obtain additional FDA approvals for Infuse®, including an ongoing Investigational Device Exemption ("IDE") trial examining the use of Infuse® in "off-label" Posterolateral Fusion and other studies using Infuse® in the cervical spine.

422.    FDA approval for these "off-label" uses was never procured.[163]

423.    In 2002, Infuse® was used in less than 1% of all spinal fusions.

424.    By 2006, the product was used in 25% of all spinal fusions.

425.    By 2007, as a result of Medtronic's over-aggressive promotion and concealment of dangers associated with Infuse®, over 40% of PLIF procedures employed the "off-label" use of Infuse®.

426.    The majority of growth enjoyed by Medtronic stems from "off-label" sales, which comprise 85-90% of the total annual revenue from Infuse®.[164]

## J. MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE®

427.    Medtronic has also been named as a defendant in two prior *qui tam*[165] actions related to

---

[162] *Id.* at 207 as alleged in the shareholder action.

[163] *Id.* at 208 as alleged in the shareholder action.

[164] *See also* Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacture and User Facility Device Experience Database,"* The Spine Journal, 12 (10): 894-899, October 2012 (also attached hereto as Exhibit "CC"); *see also* John Carreyrou and Tom McGinity, *Medtronic Surgeons Held Back, Study Says*, Wall St. J. June, 29, 2011, *available at* http://online.wsj.com/article/SB10001424052702303627104576413663395567784.html (also attached hereto as Exhibit "DD").

[165] *United States ex rei. (UNDER SEAL) v. Medtronic. Inc., et al.,* Civil Action No. 02-2709 (W. D. Tenn.)(also attached hereto as Exhibit "EE").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Infuse®, *United States ex rei. (UNDER SEAL)* v. *Medtronic. Inc., et al.,* Civil Action No. 02-2709 (W. D. Tenn.) (This action was commenced by a former Medtronic employee working as in-house counsel), and *United States ex rei. Poteet* v. *Medtronic, Inc., et al.,* Civil Action No. 03-2979 (W. D. Tenn.)[166] (collectively the *"qui tam* lawsuits").

428.     The Plaintiffs in both cases alleged that Medtronic violated the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2012), by paying illegal kickbacks to physicians in order to promote the "off-label" use of Infuse®, and by inducing the submission of false and fraudulent claims to federal health care programs like Medicare and Medicaid.

429.     In July 2006, Medtronic agreed to pay $40 million[167] to the federal government as part of its agreement to settle two *qui tam* actions under the False Claims Act, 31 U.S.C. §§ 3729-3733 (2012), the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a (2012), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12 (2012).[168]

430.     In these lawsuits, the United States Department of Justice ("DOJ") contended that between January 1, 1998 and April 30, 2003, Medtronic made payments to physicians and entities in connection with its spinal products, in the form of:  (1) payments and other remuneration for physicians' attendance and expenses at medical education events, "think tanks", VIP/Key Opinion Leader events, and meetings at resort locations (2) access for physicians to Medtronic's Healthcare Economic Services and eBusiness Departments; and (3) payments made to various physicians and entities, pursuant to consulting, royalties, fellowships, and research agreements associated with Medtronic products.

431.     Peter Keisler, Assistant Attorney General for the Department's Civil Division stated in response to the settlement that "*kickbacks to physicians are incompatible with a properly functioning health care system…They corrupt physicians' medical judgment and they cause overutilization and*

---

[166] *United States ex rei. Poteet v. Medtronic, Inc., et al.,* Civil Action No. 03-2979 (W. D. Tenn.)(also attached hereto as Exhibit "FF").
[167] Press Release, Department of Justice (July 18, 2006), *available at* http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").
[168] Medtronic also recently paid $23.5 million to settle allegations regarding Doctor kickbacks related to the sales of pacemakers.  *See* Minnesota-Based Medtronic Inc. Pays U.S. $23.5 Million to Settle Claims That Company Paid Kickbacks to Physicians (Dec. 12, 2011), *available at* http://www.justice.gov/opa/pr/2011/December/11-civ-1623.html (also attached hereto as Exhibit "HH").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*misallocation of vital health care resources.*"[169]

432.    Specifically, the *qui tam* brought forth by the former Medtronic counsel disclosed payments in the form of sham seminars and think tanks.

433.    Seminars included free travel and lodging for physicians and their families, were alleged to be without adequate training benefit.  The locations ranged from Cancun at the Ritz Carlton, Hawaii, Malaysia and Los Cabos.

434.    Additionally, Medtronic held all expenses-paid think tanks and study/discussion groups in Alaska, Amelia Island, Arnold Palmer Champions for Children Golf Tournament, New Orleans Mardi Gras including up to a $25,000 payment to allow physicians to ride on a float and $15,000 spent on Mardi Gras beads, Idaho, Teton Valley and New York comprising at least 30 think-tanks and groups.[170]

435.    Medtronic also entertained physicians at strip clubs in Memphis, Tennessee, home to Medtronic Sofamor Danek.[171]

436.    These trips were extravagant and the Medtronic funded visits to strip clubs inappropriate. As revealed hereinafter, the payments disclosed in these actions represented only the tip of the iceberg.

437.    Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper, and thus resulted in the submission of false or fraudulent claims.

438.    Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent claims in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), *et seq.* (2012), which prohibits individuals from offering, soliciting or making any payment or remuneration to induce business reimbursed under a federal or state health care program, and the False Claim Act, 31 U.S.C. § 3729, *et seq.* (2012), which provides penalties for the submission of false claims to the federal government.

---

[169] Press Release, Department of Justice (July 18, 2006), *available at* http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").

[170] *United States ex rel. (UNDER SEAL) v. Medtronic. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn.) (also attached hereto as Exhibit "EE").

[171] Lawsuit Says Medtronic Gave Doctors Array of Perks, (Sept 25, 2008), *The Wall Street Journal, available at* http://online.wsj.com/article/SB122230535985873827.html (also attached hereto as Exhibit "II").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

439.    Under the settlement, Medtronic and Medtronic Sofamor Danek also agreed to enter into a five-year Corporate Integrity Agreement with the U.S. Department of Health and Human Services' Office of Inspector General.[172]

440.    Medtronic explained in its July 18, 2006 press release that this agreement implemented substantial oversight structures and procedures meant to ensure "***top-level attention to corporate compliance measures***."[173]

441.    Among other items, the Corporate Integrity Agreement required Medtronic to establish an electronic database to capture and manage all non-sales related transactions between Medtronic's Spinal segment and its physicians or customers, with all transaction subject to an established set of internal controls and review processes, including monitoring by Medtronic senior management and Chief Compliance Officer.

442.    The settlement also provided for negotiations between Medtronic and representatives of the National Association of Medicaid Fraud Control Units for the purposes of distributing certain sums to several states which had been adversely affected by Medtronic's conduct.

**1. Despite Medtronic's Settlement With The Department of Justice (DOJ), Medtronic's Secret Agent Colonel Timothy Kuklo, M.D. Was Found To Have Published A Falsified Study On The Experimental Use Of Infuse® On War Veterans Without Their Knowledge Or Consent Nor The Knowledge Or Consent of The United States Army, Regarding Infuse® While Secretly Consulting For Medtronic And Without The Knowledge of Walter Reed National Military Medical Center**

443.    Medtronic's secret agent Timothy Kuklo, M.D., a physician who was a former, Army Colonel, retired from the military as Chief of Orthopaedic Surgery at Walter Reed Army Medical Center, the nation's premier military research hospital, in December 2006.

444.    Nonetheless, Timothy Kuklo, M.D. received hundreds of thousands of dollars per year in

---

[172] Corporate Integrity Agreement, *available at* http://oig.hhs.gov/fraud/cia/agreements/Medtronic_and_MSD_CIA.pdf also attached hereto as Exhibit "JJ")
[173] Press Release, Medtronic Resolves Qui Tam Suits (July 18, 2006), *available at* http://www.sec.gov/Archives/edgar/data/64670/000095013406013343/c06802exv99w1.htm (also attached hereto as Exhibit "KK").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

fees from Medtronic following the DOJ settlement.

445.    While still on active duty, Medtronic's secret agent Col. Kuklo was handsomely compensated by Medtronic.

446.    From 2001 to 2005, Medtronic's secret agent Timothy Kuklo, M.D. received a total of $42,295 from Medtronic.

447.    In 2006, his payments from Medtronic went up to $42,627 for the single year.

448.    Thereafter, Dr. Kuklo's payments skyrocketed. *The Wall Street Journal* revealed a substantial and dramatic increase in payments from Medtronic of $356,242 in 2007, $249,772 in 2008, and $132,453 in the first few months of 2009.[174]

449.    Medtronic's secret agent Timothy Kuklo, M.D. worked closely with Medtronic as an active promoter of the "off-label" uses of Infuse®.

450.    A U.S. Army investigation uncovered shocking misconduct by the former Army Colonel identifying a falsified study touting the benefits of Infuse® to treat wounded soldiers in Iraq, despite the fact that this use of Infuse® in the manner used in the study, was considered experimental.

451.    The experimental nature of the study was never disclosed to the soldiers who were operated on and in which Infuse® was used in this experimental fashion.

452.    The U.S. Army never approved the "study".

453.    The U.S. Army never received the funds that Medtronic paid to fund the "study".

454.    Colonel J. Edwin Atwood, an Army physician who led the Army's inquiry described Kuklo's conduct as "the ultimate tragedy and catastrophe in academic medicine."[175]

455.    Medtronic's secret agent Timothy Kuklo, M.D.'s "study" which purported to compare fusion results of 67 patients who received autogenous bone graft versus 62 that were treated with Infuse® to treat certain tibial (shin bone) fractures in injured soldiers (including "off-label" uses), reported that employing Infuse® resulted in "strikingly" better outcomes than a traditional (autogenous)

---

[174] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").
[175] *Doctor Falsified Study on Injured G.I.'s, Army Says, The New York Times,* (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit "MM").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

bone graft.

456.    Medtronic's secret agent Timothy Kuklo, M.D. reported that those receiving autogenous bone grafts had successful fusion in 76% of procedures, while the union rate for the Infuse® group was significantly better at 92%; he claimed that this was a "striking finding."[176]

457.    Not only were Medtronic's secret agent Timothy Kuklo, M.D.'s reported union rates claimed better with Infuse® than with an autograft, but, according to this falsified study, patients who received Infuse® also reportedly experienced favorable outcomes in other clinical measures.

458.    The study concluded that "the primary outcomes measures of union, rate of infection, and reoperation were all improved with rhBMP-2: and that those treated with Infuse® had a "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."[177]

459.    Dr. Kuklo's Medtronic-sponsored study was false, the falsity only uncovered when one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was congratulated on its publication by a colleague. After his discovery, Lt. Col. Andersen alerted Army investigators to the false claims.

460.    Dr. Kuklo had listed four other Army surgeons as "co-authors" without their knowledge, when these four physicians had neither participated in nor reviewed the article's preparation or submission for publication.

461.    The signatures of the four physicians listed as co-authors on the copyright release forms submitted to *The Journal of Bone and Joint Surgery* were <u>forged</u> by Dr. Kuklo.

462.    The number of cases cited by Dr. Kuklo in the article <u>differed</u> from the number of cases contained in the Wartime casualty database, with no explanation for the discrepancies in the articles.

463.    Contrary to Army policy, Dr. Kuklo did <u>not</u> obtain publication review or clearance from Walter Reed prior to submitting the article for publication.

464.    The published results of the article suggested a much higher efficacy rate for Infuse®

---

[176]Recombinant human bone morphogenetic protein-2 for grade III open segmental tibial fractures from combat injuries in Iraq, 1071, 1068-1072, *available at* http://graphics8.nytimes.com/packages/pdf/business/20090513kuklo-journal-article.pdf (also attached hereto as Exhibit "NN").
[177] *Id.* at 1068.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

than was supported by the experience of the purported co-authors.[178]

465.    One of the Army's investigators, Col. Norvell V. Coots, cited a higher number of patients and injuries in Dr. Kulko's study than the hospital could account for.  Coots stated "It's like a ghost population that were reported in the article as having been treated that we have no record of ever having existed…this really was all falsified information."[179]

466.    After receiving correspondence from Walter Reed dated November 6, 2008 stating that Medtronic's secret agent Timothy Kuklo, M.D. did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co-authors had questioned the study findings, *The Journal of Bone and Joint Surgery* formally <u>retracted</u> the article and banned Dr. Kuklo from submitting further papers to the Journal.[180]

467.    As noted in a May 19, 2009 follow-up article in *The New York Times,* when questioned about its ties to Medtronic's secret agent Timothy Kuklo, M.D., Medtronic repeatedly declined to disclose when it began its financial relationship with the former Army surgeon or the extent of funding it provided.[181]

468.    The funding for the study, which the Army never received, is, to date, unaccounted for.

469.    Medtronic's secret agent Timothy Kuklo, M.D. appeared as a "distinguished guest surgeon" at Medtronic's Spine Division Business Overview Conference Call on September 28, 2006, alongside another Medtronic consultant, Dr. Rick Sasso—who received $150,000 in consulting fees in 2006—as well as Gary L. Ellis, Medtronic Vice President, Corporate Controller and Treasure and Peter Wehrly ("Wehrly"), Medtronic Spinal Division Senior Vice President.

470.    During the call, a Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side effects with using INFUSE in the cervical region," and whether such "off-label" use was a concern for surgeons.

---

[178] *Doctor Falsified Study on Injured G.I.'s, Army Says,* The New York Times, (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit "MM").

[179] *Id.*

[180] Withdrawal of a paper, J. Scott, J Bone Joint Surg. Br. March 2009 91-B:285-286, *available at* http://www.bjj.boneandjoint.org.uk/content/91-B/3/285.extract (also attached hereto as Exhibit "OO").

[181] Senator Seeks Data on Doctor Accused by Army of Falsifying a Product Study, (May 18, 2009), *available at* http://www.nytimes.com/2009/05/19/business/19surgeon.html?_r=0 (also attached hereto as Exhibit "PP").

471.    Dr. Sasso responded by referring to a "Level 1, controlled randomized study which was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the appropriate dosage of Infuse®, you did not get problems with esophageal obstruction and problems swallowing."

472.    Medtronic's secret agent Timothy Kuklo, M.D. responded that the question "was well answered as far as appropriate dosage.  I think it's really the bottom line."[182]

473.    Medtronic's secret agent Timothy Kuklo, M.D.'s and Dr. Sasso's rendition of the medical literature was not accurate.

474.    Drs. Kuklo and Sasso intentionally and with the full knowledge of Medtronic misrepresented the seriousness of the adverse events that Medtronic knew were occurring in the cervical spine – their misrepresentations only hinted at the significant influence of Medtronic's payments had on its consultants' medical judgment.

475.    Additionally, Senator Grassley discovered that Medtronic's secret agent Timothy Kuklo, M.D.'s name did not appear on a list of paid consultants for Infuse® provided by Medtronic to Senator Grassley that the Senator had requested in a September 30, 2008 letter to the Medtronic.

476.    Senator Grassley disclosed the list Medtronic provided – which included 22 physicians who were paid a total of $943,000 from 2005 to 2008 – in a May 18, 2009 letter to Medtronic that was published in the *Congressional Record* the following day.

477.    According to the May 18, 2009 letter, Senator Grassley was "concerned" that Medtronic did not provide their secret agent Timothy Kuklo, M.D.'s name in response to his inquiry that specifically requested information regarding consultants whose work involves Infuse®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named in *The New York Times* as a consultant for Medtronic in regards to Infuse®.

478.    By this time, Medtronic's secret agent Timothy Kuklo, M.D. had given countless presentations promoting Infuse® on behalf of Medtronic, not to mention his fraudulent "studies".[183]

479.    On June 18, 2009, Medtronic disclosed to *The Wall Street Journal* that Medtronic's

---

[182] Complaint at 120, *Minneapolis Firefighters' Relief Association v. Medtronic, INC.*, et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[183] Letter, Letter to Medtronic, Inc. (May 18, 2009), *available at* http://www.gpo.gov/fdsys/pkg/CREC-2009-05-19/html/CREC-2009-05-19-pt1-PgS5609-2.htm (also attached hereto as Exhibit "QQ").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

secret agent Timothy Kuklo, M.D. had received almost $850,000 in payments from Medtronic over the past ten (10) years, the majority of which – nearly - $800,000 – were made in the preceding three (3) years when Dr. Kuklo was shopping his study to medical journals.

480.    Medtronic paid their secret agent Timothy Kuklo, M.D. $356,242 in 2007, the year their secret agent Timothy Kuklo, M.D. sought publication of the study in two medical journals.

481.    Medtronic paid Dr. Kuklo $249,772 in 2008, the year the study was published.[184]

482.    Medtronic made both of these payments <u>after</u> it announced its settlement with the DOJ in July of 2006.

483.    Medtronic only placed their secret agent Timothy Kuklo, M.D. on "inactive status" *after* reports that he falsified the study's data were published in *The New York Times.*

### K. MEDTRONIC PAYS $85 MILLION TO SETTLE A LAWSUIT BROUGHT BY ITS SHAREHOLDERS REGARDING ALLEGATIONS OF AGGRESSIVE MARKETING AND PROMOTION OF THE "OFF-LABEL" USE OF INFUSE®

484.    *Minneapolis Firefighters' Relief Association v Medtronic, INC, et.al,* 08-06324, U.S. District Court, District of Minnesota (Minneapolis)[185] was brought on behalf of institutional shareholders and arose from allegations of Medtronic's materially false, misleading, and incomplete public statements concerning Infuse®, notably including over-aggressive promotion of its "off-label" use.[186]

485.  Judge Magnuson in the United States District Court for the District of Minnesota described the shareholder action, in part, in his Memorandum and Order on December 12, 2011 as follows:

a. "Infuse is a surgically-implanted medical device containing a genetically engineered protein designed to stimulate bone growth." (Am. Compl.  (Docket No. 68)  ¶ 1.) Medtronic

---

[184] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").
[185] *See* Complaint *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").
[186] Jonathan Stempel, *Medtronic to pay $85 million to settle Infuse lawsuit*, Reuters, (March 31, 2012), *available at* http://206.132.6.104/article/2012/03/30/us-medtronic-settlement-idINBRE82T1A920120330 (also attached hereto as Exhibit "RR").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

received approval from the Food and Drug Administration ("FDA") for certain specific uses on Infuse®:  treatment of degenerative discs in the lower lumbar region of the spine, fractures of the tibia, and certain facial/oral surgeries." (*Id.*)

b. "Plaintiffs' claims arise from what they characterize as Medtronic's intentional promotion of off-label use for Infuse®.  A physician's use of a device in a manner not specifically approved by the FDA is not illegal.  It is illegal, however, for a manufacturer to promote device's off-label use.  Plaintiffs contend that Medtronic engaged in such promotion, and that eventually more than 85% of Infuse® sales involved off-label use.  (*Id.* ¶ 3)…[t]he Infuse product generated approximately $800 million annually or 6% of Medtronic's total corporate revenue. (*Id.* ¶ 40.) In the summer of 2008, the FDA issued a warning about a particular off-label use of Infuse® and several months later, Medtronic disclosed that it was the target of an investigation by the Department of Justice ("DOJ") regarding off-label use of Infuse®."

c. "Plaintiffs allege that Medtronic both implicitly and explicitly encouraged its sales force to promote the off-label use of Infuse®.  Plaintiffs rely on the testimony of 15 confidential witnesses to support this allegation."

d**. "The information provided by the confidential witnesses either established or implies that Medtronic actively promoted off-label uses for Infuse by, among other things, hosting physician meetings at which a Medtronic-paid consulting physician would give a presentation on off-label uses** (Am. Compl. ¶  93), **instructing its sales force in the off-label use of Infuse** (*Id.* ¶ 94), **giving physicians literature about off-label uses for Infuse** (*Id.* ¶ 96) **or directing physicians to other surgeons who used Infuse for off-label procedures** (*Id.* ¶ 102), **and advising physicians regarding the appropriated dosage of Infuse for off-label uses** (*Id.* ¶ 105).  Plaintiffs also claim that Medtronic set high sales targets for Infuse and knew or should have known that such high targets could be reached only through illegal promotion of off-label uses of Infuse."  (e.g., *Id.* ¶ 107).[187] (emphasis added).

---

[187] Memorandum and Order at 2-3, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "SS").

**1.  Medtronic Engaged In Active, Systematic "Off-Label" Over-Promotion Through Its Employees And Agents Without Seeking Prior Approval From The FDA Or In Furtherance Of The Safe Harbor Provisions**

486.  As noted by Judge Magnuson, according to former Medtronic employees in the shareholder action against Medtronic, Medtronic engaged in systematic "off-label" promotion.  Some of the techniques alleged in the shareholder action used by Medtronic include:  sponsoring "off-label" presentations by "opinion leaders;" providing sales representatives specific, step-by-step instructions regarding the dosage and techniques of "off-label" use of Infuse®, including how to roll the ACS (collagen sponge) like a "burrito" to optimize its fit in the spine (without the approved cage); directing physicians to other doctors who had alleged "success" using Infuse® "off-label"; sending Medtronic representatives, who were not medically-trained, into the operating room during surgical procedures involving Infuse®; and finally, setting sales quotas that would not have been met absent "off-label" sales.[188]

487.  These former employees worked for and represented Medtronic at various levels of management and sales at private meetings, conferences, and hospitals with physicians across the United States, demonstrating that these practices were widespread throughout Medtronic, rather than isolated to particular areas.

**a. Medtronic sponsored physician meetings and corporate visits focused on "off-label" training**

488.  Medtronic promoted the "off-label" use of Infuse® in several ways, often by sponsoring meetings targeted toward physicians.  A confidential witness who was employed by Medtronic as a territory sales manager in the southeastern United States from 2002 through 2005 disclosed that these sponsored events include meetings for local physicians to attend presentations on the "off-label" use of Infuse® given by a Medtronic-paid surgeon, as well as corporate visits for physicians to receive "off-label" training by guest surgeons, including those from the Norton Leatherman Spine Center, a clinic

---

[188] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

that had agreed to split royalties with Medtronic in exchange for helping to develop spinal implants.[189]

489.    Medtronic consistently hired and slotted surgeons at its national sales meetings to educate Medtronic sales representatives on the "off-label" uses of Infuse®, according to Kirk Riley, a Spinal sales representative who promoted Infuse® sales in the Northeast United States from 2002 until 2006.[190]

490.    Medtronic actively recruited doctor-experts to engage in peer-to-peer conversations with other doctors regarding Infuse®, according to Matt Tosch, another sales representative who promoted Infuse® sales in the Northeast United States in 2002 and 2003.[191]

**b. Medtronic instructed its sales representatives on particular dosage requirements for various "off-label" uses of Infuse®**

491.    Medtronic held regional and national sales team meetings during which sales representatives received specific instructions on how to administer Infuse® for various "off-label" uses, in order to convey these specifics to the doctors using Infuse® off-label, according to the confidential witness employed by Medtronic as a territory sales manager.  <u>These sales representatives were specifically instructed not to document any of the information they passed on to the doctors, and to limit communications to verbal form</u>.[192]

492.    Additionally, Chris Powell, a Biologics sales representative who promoted Infuse® sales in the Mid-Atlantic United States in 2005, confirmed that Medtronic showed its sales staff how to use Infuse® "off-label".[193]

**c. Medtronic sales representatives would cite data from Medtronic-sponsored published literature promoting "off-label" use and provide techniques for "off-label" procedures**

493.    Medtronic's response to physician inquiries on the "off-label" uses for Infuse® was to

---

[189] *See* Complaint at as alleged in the shareholder action Paragraph 93, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[190] *See id.* as alleged in the shareholder action at Paragraph 100; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[191] *See id.* as alleged in the shareholder action at Paragraph 107; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[192] *See id.* as alleged in the shareholder action at Paragraph 94.

[193] Memorandum and Order at 9, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota as alleged in the shareholder action (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

provide data from published literature and other information reinforcing the "off-label" use of Infuse®, according to Matthew Bine, a product manager for Medtronic's Biologics Marketing, who promoted Infuse® sales from 2005 to 2008.[194]  Medtronic did not seek the prior approval of the FDA, nor comply with the Safe Harbor provisions before distributing the promotional materials regarding the "off-label" use of Infuse®.  Nor did they disclose any part of Medtronic employees played in crafting the published articles.  Nor did they disclose the enormous sums paid to the "scientists" conducting the "studies" contained in the published articles they were citing.

### d. Medtronic sales representatives routinely directed doctors inquiring about the "off-label" use of Infuse® to surgeons who had previously used Infuse® "off-label"

494.    If a doctor inquired about the "off-label" use of Infuse®, Medtronic employees would suggest that the doctor making the inquiry talk directly to other surgeons using the product "off-label", according to Scott Baumer, a Spinal sales representative who promoted Infuse® sales in Northwestern United States from 1998 to 2003[195] and according to Mark Marchan, a clinical data director.[196]

495.    Additionally, if a doctor inquired into how to use Infuse® "off-label", a Medtronic sales representative would direct the doctor to other surgeons who had used the product "off-label", and the representative would also offer to demonstrate or explain the technique, according to Chris Powell, a Biologics sales representative.[197]

### e. Medtronic routinely informed surgeons regarding the dosage of Infuse® for "off-label" procedures in the cervical spine

496.    As early as 2006, doctors have reported adverse events associated with the "off-label" use of Infuse® in the cervical spine, including swelling, dysphagia and dysphonia, according to Matthew Bine, the product manager for Medtronic's Biologics Marketing.  Medtronic addressed the issue, not by

---

[194] Complaint as alleged in the shareholder action at Paragraph 96, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J"); *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[195] *See id.* as alleged in the shareholder action at Paragraph 103; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[196] *See id.* as alleged in the shareholder action at Paragraph 102; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[197] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

informing the surgeons that the use of Infuse® in the cervical spine was "off-label", but instead by assuring doctors that smaller doses of rhBMP-2 used in the cervical spine would alleviate the incidence of adverse events.  Bine reported that "our goal was to tell surgeons, don't put 2.8 on; put 1.4 or 0.7 [in "off-label" cervical applications]."  Furthermore, Bine noted that Infuse® kits are now available in these smaller sizes, even though the FDA-approved uses remain the same.[198]

497.    Medtronic instructed its sales representatives to advise doctors to use roughly half the indicated dosage of rhBMP-2 (or 1.4 cc) in cervical applications, according to Kirk Riley, another Spinal sales representative.  Riley also confirmed that Medtronic was aware of swelling in the neck caused by cervical applications of Infuse®, but that in response, Medtronic merely recommended that each surgeon prescribe steroids to treat these symptoms.[199]

498.    Mr. Riley further reported that when surgeons first began to use Infuse® in cervical fusion surgeries, they were not aware of the potential adverse consequences of using an entire sponge (or full rhBMP-2 dosage) in the cervical spine.  After Medtronic's national sales meetings, however, the instructions on how to use Infuse® in the cervical spine--even though the product was only FDA-approved for lumbar anterior fusion--became so widespread throughout the medical community that information on how to use "off-label" Infuse® was readily available.[200]

499.    One of the confidential witnesses disclosed that when adverse reactions were reported in conjunction with the cervical application of Infuse® in 2006, Medtronic organized a conference call with its sales representatives to instruct them that surgeons should not be using the "whole sponge" (or full rhBMP-2 dosage) in cervical fusion surgery.  Medtronic disregarded the fact that cervical surgeries with Infuse® were "off-label", not FDA-approved as it is not an "intended use" of Infuse® in the PMA and therefore it was a violation of federal law and the PMA for Medtronic to provide anyone with such instructions or information. [201]  This was also confirmed by Mark Marchan, a clinical data director who

[198] See id. as alleged in the shareholder action at Paragraph 97; see also Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").
[199] See id. as alleged in the shareholder action at Paragraph 100; see also Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").
[200] See id. as alleged in the shareholder action at Paragraph 100; see also Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").
[201] See id. as alleged in the shareholder action at Paragraph 102; see also Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

was employed by Medtronic from 2000 to 2007.[202]

**f. Medtronic representatives showed doctors how to roll the absorbable collagen sponge (ACS) "like a burrito" or "like a taco" to be placed in the spine for "off-label" procedures**

500.    Medtronic sales representative would show the doctor how to perform a specific procedure by rolling up the Infuse® material "like a burrito" to place into the lateral spine, according to Chris Powell, a Biologics sales representative.

501.    Further, according to Victor Harmon, a Medtronic sales associate from 2000 to 2004 in the Southwestern region of the United States, promoted Infuse® and recalled the "off-label" use of Infuse® where "[Medtronic's regional management] talked about rolling [it] into almost a little taco in the lateral gutters."[203]

**g. The vast majority of Infuse® sales (over 85-90%) were from "off-label" uses**

502.    The vast majority of Infuse® surgeries were "off-label" applications of the product, according to Sean Hirschkorn, a sales representative who promoted Infuse® sales in Southwestern United States and who was employed by Medtronic from 2004 through 2008.  The reason for this was because very few surgeons used the LT-CAGE or Anterior Lumbar Interbody Fusion ("ALIF") procedure, which would have constituted FDA-approved use of Infuse®.  According to Hirschkorn, the Posterior Lumbar Interbody Fusion ("PLIF") and Transforaminal Lumbar Interbody Fusion ("TLIF") "off-label" procedures were far more common surgeries than an ALIF surgery in the lumbar region.[204]

503.    Further, Chris Eddy, a regional sales manager in Northwestern United States from 2002 to 2004, also reported that the vast majority of Infuse® sales were for "off-label" uses, citing the high volume of sales coupled with very low numbers of ALIF procedures (the only FDA-approved spinal procedure) actually being performed.[205]

---

[202] *See Id.* as alleged in the shareholder action at Paragraph 102; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[203] *See id.* as alleged in the shareholder action at Paragraph 104; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[204] *See id.* as alleged in the shareholder action at Paragraph 105; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[205] *See id.* as alleged in the shareholder action at Paragraph 106; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

504.     Victor Harmon, a sales associate, corroborated these reports by disclosing that the vast majority of Infuse® procedures were in fact "off-label", and that the product was "tremendous" with regard to Medtronic's overall growth.[206]

### h. Medtronic packaged, sold, and distributed Infuse® and the LT-Cage separately, therefore knowing that Infuse® far out-sold the FDA required LT-Cage

505.     Sales of the Infuse® rhBMP-2 component far outsold sales of the LT-CAGE, according to sales representative Matt Tosch.  Further, Tosch reported that Medtronic pressured its sales representatives to reach high sales targets, which Medtronic increased every year,[207] thus proliferating the discrepancy of sales between the two components of Infuse® and therefore escalating use of Infuse® "off-label."

506.     Medtronic packaged and sold the two components of Infuse® separately, even though both parts were needed for each spinal surgery, as required by the FDA approval.

507.     Additionally, Matthew Bine, a product manager for Medtronic's Biologics Marketing, also reported that by the time he left Medtronic, Infuse® sales for "off-label" use accounted for the vast majority of total sales, with sales of the rhBMP-2 component of Infuse® greatly outpacing sales of the LT- CAGE, which were packaged and sold separately, although these components must be used together according the to Infuse® FDA-approved label.[208]

508.     Furthermore, Charles Koenig, a Spinal financial analyst, employed by Medtronic from 2002 through 2007, stated that it was his "impression that Infuse® was used in off-label procedures."[209]

### i. Medtronic set Infuse® sales quotas for its representatives that could not have been achieved without an aggressive, illegal "off-label" promotional campaign

509.     Medtronic set sales quotas for Infuse® that were much higher than what could possibly be reached by relying exclusively on FDA-approved uses of Infuse®, and that "there was no way" that

---

[206] *See id.* as alleged in the shareholder action at Paragraph 104; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[207] *See id.* as alleged in the shareholder action at Paragraph 107; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[208] *See id.* as alleged in the shareholder action at Paragraph 98; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[209] *See id.* as alleged in the shareholder action at Paragraph 108; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Medtronic executives could have expected the sales quotas to be met without "off-label" sales, according to the confidential witness who served as territory sales manager for southeastern United States.[210]

510.    The sales related to "off-label" use of Infuse® were necessary in order to satisfy sales quotas and the minimum 20% annual sales growth expected by Medtronic, according to Chris Powell, a Biologics sales representative.[211]

511.    Medtronic sales representatives knew that they could not reach Medtronic's sales targets without utilizing "off-label" sales, according to Chris Eddy, a Spinal regional sales manager, stated that.[212]

512.    Medtronic set very high sales targets with sales expected to grow 15-20% per year, and that Medtronic's Spine (and mainly) Biologics division were considered "one of the big growth engines of Medtronic," by Matthew Bine, a product manager for Medtronic's Biologics Marketing.  Bine further reported that 95% of Infuse® revenues related to spinal usage (cervical and lumbar), with only 5% allocated from trauma and oral maxillofacial applications.[213]

513.    Taken together, Medtronic profited extremely, exponentially, and directly from "off-label" Infuse® sales with each passing year.

### j. Medtronic trained its sales representatives to provide step-by-step instructions to doctors conducting "off-label" surgeries using Infuse® and in fact encouraged its representatives to attend "off-label" Infuse® surgeries in operating rooms across the country

514.    Medtronic's sales representatives participated in surgeries by providing surgeons with step-by-step instructions on how to use Infuse®, even when the product was used "off-label", according

---

[210] *See id.* as alleged in the shareholder action at Paragraph 95; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[211] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[212] Memorandum and Order at 16, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "SS").

[213] Complaint at Paragraph 98, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "J"); *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

to a confidential witness who was employed by Medtronic as an associate sales representative in the South, Southwest, and Midwest. The witness further disclosed that "off-label" use of Infuse® was far more common than "on-label" use, which was "few and far between."[214]

515.     It was common practice for Medtronic sales representatives to be present in the operating room for surgeries using Infuse®, and sales representatives were in fact encouraged by Medtronic to attend such surgeries, according to the associate sales representative.[215]

516.     Medtronic expected its sales representatives to be present in the operating room during procedures with Infuse® "to assist and direct and give advice when asked, according to the territory sales manager for Southeastern United States."[216] Matthew Bine, a product manager for Medtronic's Biologics Marketing division, corroborated Medtronic's policy of sending sales representatives into operating rooms.[217]

517.     Medtronic sales representatives were often present in the operating room to demonstrate to the doctor how to assemble the sponge, or to explain other procedures and assist with any issues that may arise, according to Chris Powell, a Biologics sales representative.[218] This was also confirmed by both Mark Marchan, a clinical data director,[219] as well as Kirk Riley, a Spinal sales representative.[220]

  **k.  Medtronic secret agents Defendant Lawrence G. Lenke, M.D. and Defendant Keith H. Bridwell, M.D. from Washington University St. Louis would train surgeons on the use of Infuse®, 85-90% of which was "off-label"**

518.     Medtronic secret agents, Defendant Lawrence "Larry" G. Lenke, M.D. and Defendent Keith H. Bridwell, M.D., two surgeons from Washington University in St. Louis, where Dr. Kuklo

---

[214] *See id.* as alleged in the shareholder action at Paragraph 101.

[215] *See id.* as alleged in the shareholder action at Paragraph 101.

[216] *See id.* as alleged in the shareholder action at Paragraph 95; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[217] *See id.* as alleged in the shareholder action at Paragraph 97; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[218] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[219] Memorandum and Order at 12, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "SS").

[220] *See id.* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS"); see also Complaint, as alleged in the shareholder action at Paragraph 99, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota* (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

worked as an associate professor, similarly acted as "Opinion Leaders" or "guest surgeons" during "corporate visits" in which Medtronic would invite targeted surgeons to attend training sessions in Memphis, Tennessee.  While in Memphis, the visiting surgeons met with Medtronic corporate officers, product managers, and guest surgeons, such as Lawrence "Larry" G. Lenke, M.D. and Keith H. Bridwell, M.D.  The visiting surgeons also received "hands-on training" on Infuse®, including instruction in cadaver labs.  The visiting surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest surgeons] would show them how to do it."  Medtronic chose which surgeons to invite to these corporate visits based, in part, upon the volume of Infuse® procedures they performed.[221]

### 2. U.S. District Court Judge Paul Magnuson Determined That Statements Made By Confidential Witnesses Supported Allegation Of Medtronic's "Off-Label" Promotion Activities

519. Judge Magnuson found that following statements were in fact made by former Medtronic employees:

a. "*Medtronic did provide information to doctors about appropriate doses of Infuse® for off-label use*," stated by Chris Powell ;[222]

b. "*Medtronic showed its sales staff how to use Infuse off-label so that they could support the safe use of the product, stated by Chris Powell*;"[223]

c. "*Medtronic instructed its sales representatives to refer doctors to the Office of Medical Affairs with questions about dosages in off-label uses, but that if a physicians had a question about dosage in the operating room, the sales representative could answer the question to "support patient safety,*" stated by Kirk Riley;[224]

d. "*[i]t is true that I attended surgical procedures involving Infuse in the operating room, and if asked questions by the doctors concerning the procedure, I would answer his questions*

---

[221] Complaint, as alleged in the shareholder action at Paragraph 140, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota.* (also attached hereto as Exhibit "J").
[222] Memorandum and Order at 8, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "SS").
[223] *Id. at* 9.
[224] *Id. at* 10.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*to the best of my ability as part of my role to support patient safety, stated by Kirk Riley*;"[225]

e. In reference to a doctor's inquiry about "off-label" uses with information about other surgeons using the product "off-label", Scott Baumer disclosed, *"that when faced with such questions about off-label use, his 'practice was simply to suggest that the doctor making the inquiry talk  directly to the other doctor;"*[226]

f. Chris Eddy disclosed, in relation to directing inquiring doctors to others who were using Infuse® "off-label," *"he and sales representatives he supervised would direct physicians to Medtronic's Office of Medical Affairs;"*[227]

g. Charles Koenig states his *"impression was that [Infuse] was used in off-label procedures;"*[228] and

h. Derek Crim, who worked for Medtronic in 2008 stated that Medtronic set sales quotas that were *"very, very, very aggressive."*[229]

520.    On February 1, 2012, Judge Magnuson upheld Chief Magistrate Judge Boylan's holding that Confidential Witness 2 had waived any Fifth Amendment privileges in the documents being sought.[230]

521.    Thereafter, on March 30, 2012, Medtronic agreed to pay $85 million to settle the shareholder lawsuit pertaining to alleged illegal "off-label" over-promotion of Infuse®.[231]

## L. "OFF-LABEL" USE OF INFUSE® IN THE LUMBAR SPINE IS NEITHER SAFE NOR EFFECTIVE AND IS UNREASONABLY DANGEROUS AND DEFECTIVE

522.    Susan Levine, a Vice President at Hayes, Inc., a company which evaluates medical technologies for insurers, expressed concern over Medtronic's handling of Infuse®.

523.    Upon her review of the research conducted on Infuse®, Ms. Levine stated that it is

---

[225] *Id. at* 11.

[226] *Id. at* 13.

[227] *Id. at* 10.

[228] *Id.* at 18.

[229] *Id.* at 20.

[230] Order at 1-2, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "TT").

[231] Medtronic to settle suit for $85 million, (Mar 30, 2012), *available at* http://www.startribune.com/business/145214355.html (also attached hereto as Exhibit "UU").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

"distressing to see something like this used in a potentially harmful way and without adequate evidence."[232]

524.    Prior Medtronic-sponsored studies demonstrated that the use of Infuse® outside of the PMA's limited approval presented serious adverse events and risks to patient safety.

525.    Dr. David Malone, a surgeon from Oklahoma involved with an earlier study (led by Medtronic's secret agent Regis Haid, M.D.) had first-hand experience with the adverse effects of "off-label" use.

526.    Dr. Malone had two patients who suffered from significant posterior bony over-growth impinging on their nerve roots as a result of "off-label" use of Infuse®, and who subsequently required revision surgeries.

527.    Dr. Malone noted these adverse events by stating, "BMP may lead to excessive bone growth and may cause significant neural impingement if placed in the posterior lumbar interbody space."[233]

528.    The study that Dr. Malone was involved in was abruptly discontinued due to bony overgrowth at the annulotomy site.

529.    A computed tomography scan evaluation detected new bone growth in the spinal canal or neuroforamina in 24 of 32 rhBMP-2 patients.[234]

530.    Subsequent studies have indeed shown that 25% to 50% of PLIF surgeries are riddled with complications and adverse events.[235]

531.    Medtronic was well aware of the dangers of "off-label" use.

532.    In a May 15, 2006 article in *The Spine Journal* notes, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces…Although this phenomenon has not been thoroughly studied, it implies that the release of

---

[232] Medtronic Product Linked to Surgery Problems, (Sept 4, 2008), *available at* http://online.wsj.com/article/SB122047307457096289.html (also attached hereto as Exhibit "VV").
[233] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 481, 463-468 (2011) (also attached hereto as Exhibit "WW").
[234] *Id.* at 480.
[235] *Id.* at 487.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction."[236]

533.    Thousands of patients have been reportedly harmed by "off-label" uses of Infuse®.

534.    At least 3,585 reports of adverse events involving Infuse® have been made to the FDA as of March 2013,[237] and approximately 85-90% of all surgeries using Infuse® are "off-label".[238]

535.    It is well know by the FDA that adverse events involving medical devices to be well underreported.  "A 1986 General Accounting Office (GAO) study showed that less than one percent of device problems occurring in hospitals are reported to FDA, and the more serious the problem with a device, the less likely it was to be reported. A GAO follow-up study in 1989 concluded that despite full implementation of the Medical Device Reporting (MDR) regulation, serious shortcomings still existed."[239]

## M. DESPITE THE LACK OF SAFETY AND EFFECTIVENESS AND THE UNREASONABLY DANGEROUSNESS OF "OFF-LABEL" USE OF INFUSE®, MEDTRONIC PROMOTED AND MARKETED "OFF-LABEL" USE OF INFUSE® TO PHYSICIANS INCLUDING THROUGH KEY OPINION LEADERS, WITHOUT OBTAINING FDA APPROVAL TO DO SO

536.    Medical device companies look for surgeons who are known as "Key Opinion Leaders" and who will use a high volume of their devices.

537.    Key Opinion Leaders are physicians whose opinions on medical procedures and medical devices are held in high regard.

538.    If these influential physicians are willing to promote the use of a certain device, it is thought that other surgeons will follow suit, even if the promoted use is "off-label" and not FDA-

---

[236] Patel W, et al., *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein Stimulated Bone Growth Using Fibrin Glue*, Spine Journal Vol. 31, 1201-1206 (2006) (also attached hereto as Exhibit "XX").
[237] MAUDE – Manufacturer and User Facility Device Experience, *available at* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.CFM.
[238] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies*, at 3, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").
[239] http://www.fda.gov/medicaldevices/safety/reportaproblem/default.htm (also attached hereto as Exhibit "YY").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

approved.

539.     Medtronic cultivated financial relationships with Key Opinion Leaders, paying them handsomely (in the case of Infuse®, these figures can exceed $30 million, per physician) for consulting fees, disguised royalties, travel expenses, seminars, and other perks, in order to encourage and reward these physicians for promoting the use of a particular medical device like Infuse®.

540.     Medtronic did not only engage in such activities with respect to Infuse® in general; it improperly paid doctors specifically to promote, both directly and indirectly, the "off-label" use of Infuse® in spinal fusion surgeries.

## N. MEDTRONIC DIRECTLY MARKETED, WARRANTED, AND MISREPRESENTED THE SAFETY AND EFFICACY OF "OFF-LABEL" USE OF INFUSE® ON MEDTRONIC-OWNED WEBSITES, WITHOUT OBTAINING FDA APPROVAL

### 1. Medtronic Misrepresented The Efficacy Of Infuse® On Medtronic.com And Infusebonegraft.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®

541.     Medtronic misrepresented the efficacy of Infuse® directly to physicians through its corporate sponsored websites.

542.     Medtronic misrepresented the efficacy of Infuse® directly to potential patients through its corporate sponsored websites.

543.     Medtronic through its website, www.Medtronic.com, falsely claims that "[b]one formation remote from the site of the implantation was not seen in the clinical trials."[240]  As of the date of the filing of this complaint, Medtronic holds this information out to the public.

544.     Medtronic is fully aware of multiple studies which have confirmed uncontrolled ectopic bone growth following a fusion using Infuse®.

---

[240] Questions and Answers – Infuse Bone Graft and LT Cage Device, *available at* http://www.medtronic.com/patients/lumbar-degenerative-disc-disease/surgery/questions-and-answers/index.htm (also attached hereto as Exhibit "ZZ").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

545.     Medtronic's website exaggerates the side effects of Infuse® alternatives.

546.     Medtronic misleads viewers through the bolded section "**I have heard people talk about hip pain after harvesting lasting up to 2 years or longer.  Is that true?**"[241]

547.     Medtronic knows or should know that it is a violation of federal law and the Infuse® PMA to make representations about the use of an approved Class III medical device that goes beyond the "intended uses" set forth in the premarket application as well as the approved labeling.

548.     A recent United States Senate Report, released October, 2012 uncovered that fears relating to "donor site" hip pain were manufactured by one of Medtronic's Vice Presidents and is quoted as saying "plant the seed of doubt" in regards to pain from autograft bone harvesting.[242]

549.     Medtronic warrants a 94.5% fusion rate with Infuse® compared to autograft's 88.7% on the company sponsored website www.infusebonegraft.com.[243]

550.     The purported success rates are derived from two studies provided on the website. Medtronic paid five of the seven authoring physicians of these articles collectively $76,603,827 in various forms of compensation.[244]  Medtronic did not adequately disclose their financial relationship with these physicians, and it failed to provide accurate and unbiased information to physicians and patients on its corporate sponsored website.

### 2. Medtronic Directly Marketed The "Off-Label" Use Of Infuse® On Back.com, Which Was A Violation Of Federal Law and The PMA Received for Infuse®

551.     Following FDA Approval of Infuse®, Medtronic published a website providing back pain resources, including surgical and non-surgical treatment options.  The website highlights the fact

---

[241] *Id.*

[242] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 2, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[243] Clinical Research – Infuse® Bone Graft LT-Cage® Device, *available at* https://www.infusebonegraft.com/clinical_research (also attached hereto as Exhibit "AAA").

[244] Dr. Burkus $6,380,336, Dr. Gornet $3,985,776, Dr. Dickman $3,272,942, Dr. Zdeblick $34,168,739, and Dr. Boden, $28,796,034; U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

that its information is "brought to you by Medtronic."[245]

552.     Surgical options described on the website include Spinal Fusion, ALIF, DLIF, PLIF, and TLIF.[246]

553.     Medtronic posted a section on June 27, 2002 entitled "Surgery from the Front or Back:  Is There a Difference?"

554.     The author, Dr. Thomas Schuler, discussed the benefits and complications related to ALIF (approved use of Infuse®) and PLIF (an "off-label" procedure when used with Infuse®).[247]

555.     Dr. Schuler first discussed the complications related to a PLIF surgery conducted without the advantages afforded by Infuse®.  He shares that PLIFs frequently require an autograft, which is bone generally removed from the pelvis or iliac crest of the patient using either chisels or different awls and further states:

> [t]he reason for taking the autograft is that it is very effective and is the gold standard for use in the fusion surgery that we have had to date.  **The problem with the removal of this bone is that it can be very painful.  In fact, around 25% of patients who have had this bone graft procedure have some sort of chronic pain associated with the graft site after surgery**.[248] (emphasis added)

556.     Dr. Schuler then describes the benefits of Infuse®, asserting the following:

> the **beauty of this substance is that it will allow us to obtain a solid fusion without any of the complications of harvesting bone graft.**  In essence, surgeons get the same or better results without the problems.
> For patients who are petrified of pain and bone grafts, this is wonderful news.[249]

557.     In February of 2009, Medtronic published an entire section on this website dedicated to the benefits of PLIF, a procedure that is "off-label" if used with Infuse®.[250]

558.     Medtronic wrote that "PLIF is a type of spine surgery that can be performed in a

---

[245] http://www.back.com (also attached hereto as Exhibit "BBB").

[246] Back,com, Treatment Options, Jan. 15, 2002, *available at* http://www.back.com/treatment.html (also attached hereto as Exhibit "CCC").

[247] Dr. Thomas Shuler, *Surgery from the Front or Back: Is There a Difference*, Back.com, June 27, 2002, *available at* http://www.back.com/article-schuler.html?infusebox=true (also attached hereto as Exhibit "DDD").

[248] *Id.*

[249] *Id.*

[250] *Posterior Lumbar Interbody Fusion (PLIF),* Back.com, Feb. 19, 2008, *available at* http://www.back.com/treatment-surgical-posterior.html (also attached hereto as Exhibit "EEE").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

minimally invasive way" and "involves approaching the spine from the back (posterior) of the body to place ***bone graft material*** between two adjacent vertebrae (interbody) to promote bone growth that joins together, or "fuses" the two structures (fusion)." (emphasis added).[251]

559.    Medtronic further asserted that this "minimally invasive procedure allows many patients to be discharged the day after surgery" and that "[m]any patients will notice immediate improvement of some or all of their symptoms."[252]

560.    In 2004 Medtronic-sponsored a study heralding the benefits of a PLIF surgery performed with Infuse®.[253]

561.    As of 2007, Infuse® was used in at least 40% of PLIF surgeries.[254]

562.    In 2010, Medtronic published a section on its sponsored website that was dedicated to Direct Lateral Interbody Fusion (DLIF), an "off-label" procedure when used with Infuse®.  Similar to PLIF, the article claimed that "DLIF is one of several minimally invasive spine procedures available today and is an approach to interbody fusion [that] offers surgeons and their patients a less invasive option for spine surgery."[255]

563.    The website also provides the corroborative insight of Dr. Richard Hynes, who declares that "DLIF is another 'next-generation' step in the process" of spinal fusion.

564.    Dr. Hynes enthusiastically recommends that a patient considering DLIF or any other spinal fusion should "[d]o you homework!" and "talk to your doctor, go to reputable Web sites such as Back.com to learn all about the procedure as well as any other options that are available."[256]

565.    Medtronic posted a section on its website dedicated to Transforaminal Lumbar Interbody Fusion (TLIF), stating "TLIF is a procedure that can be performed using minimally invasive spine

---

[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 472, 471-91 (2011) (also attached hereto as Exhibit "FFF").
[255] *Direct Lateral Interbody Fusion – A Minimally Invasive Approach to Spinal Stabilization* Back.com, Feb. 4, 2010*, available at* http://www.back.com/treatment-surgical-direct.html (also attached hereto as Exhibit "GGG").
[256] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

surgery."[257]

566.      The sections on the website related to PLIF, DLIF and TLIF do not refer to the use of ICBG harvested from the patient, but rather refers to "**_bone graft material_**" that can facilitate "**minimally invasive**" spinal surgery.

567.      According to Medtronic-sponsored studies on PLIF and the previously posted article published on Back.com, a surgery using ICBG is anything but "minimally invasive."

568.      According to Medtronic, ICBG is surgery accompanied by a litany of complications related to harvesting the bone graft from the patient's hip.

569.      Medtronic's omission of the need for bone harvesting and the existence of adverse effects related to PLIF, DLIF and TLIF on its sponsored website Back.com is thus an "off-label" promotion for Infuse®, since the procedures can only be accomplished as advertised through the "off-label" use of Infuse®.

570.      Medtronic has since used Back.com to actively promote the use of PLIF, DLIF, and TLIF as a surgical option while sponsoring studies that exaggerated the complications associated with non-Infuse® PLIFs, violating federal law and the PMA restrictions.

571.      Medtronic's misleading statements, along with repudiated Medtronic-sponsored studies regarding the "off-label" use of Infuse®, evidences Medtronic's over-promotion of the use of Infuse® in "off-label" spinal fusion, made with full knowledge that such statements are highly misleading.

### 3. Medtronic Directly Marketed And Misrepresented The Safety Of "Off-Label" Use Of Infuse® On Necksurgery.com, Another Medtronic-Owned Website, Which Was A Violation Of Federal Law And The PMA Received For Infuse®

572.      Medtronic published Necksurgery.com touting the website as "[t]he online resource for questions about neck pain, spinal health and treatment options."  This site conspicuously states that it is "brought to you by Medtronic."[258]

573.      Necksurgery.com lists several surgical options for the neck, which include Anterior Cervical Discectomy with Fusion (ACDF), an "off-label" surgery when performed with Infuse®.

---

[257] _Id._
[258] Neck Surgery http://www.necksurgery.com (also attached hereto as Exhibit "HHH").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

574.    Navigating the site brings a list of links "Articles."[259]

575.    One of these articles is entitled "INFUSE® Bone Graft/PEEK Interbody Spacer/Anterior Cervical Plate Clinical Trial Underway."  This page was published February 13, 2008 and updated September 7, 2011.  For nearly two pages, the article heralds the benefits of Infuse®, stating that "[o]ver 500,000 patients have been successfully treated since FDA approval in 2002," and that "[o]ver 15 FDA-approved clinical trials have been performed using INFUSE Bone Graft, making it the most studied biologic agent available to surgeons today."

576.    However, 13 of the 15 studies referenced have been repudiated for gross bias and inaccurate disclosures of adverse effects.[260]

### O. LEADING SPINE EXPERTS REPUDIATE MEDTRONIC STUDIES

577.    On June 1, 2011 *The Spine Journal,* a leading medical journal in the United States, published a special edition entirely dedicated to addressing serious patient safety and ethical concerns stemming from the use of rhBMP-2 (Infuse®) in spinal surgeries.[261]

578.    The Journal's articles discussed Medtronic's failure to accurately report the serious side effects from its clinical trials.

579.    The Journal's articles discussed Medtronic's failure to report that many of the authors had failed to disclose that they had received substantial compensation and had significant financial ties to Medtronic and that Infuse® can lead to severe side effects.

580.    This special edition analyzed thirteen peer-reviewed articles about rhBMP-2 by industry-sponsored authors, including many sponsored by Medtronic, finding that these articles had inaccurately reported the safety and risks associated with rhBMP-2.

581.    It is without precedent that the journal devoted **the entire issue** to setting the record straight by repudiating the prior Medtronic-sponsored Infuse® research.

---

[259] *See* http://www.necksurgery.com/treatment-surgical-fusion.html (also attached hereto as Exhibit "III").

[260] *See* Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 471, 471-91 (2011) (also attached hereto as Exhibit "FFF").

[261] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

582.    These studies universally touted the benefits of Infuse® and simultaneously failed to disclose the adverse events associated with its use.

583.    In an editorial summarizing the findings of the special issue, five prominent physicians--including spine surgeons at Stanford University--wrote that the earlier Medtronic-sponsored trials and reports were "remarkable for the complete absence of reported rbBMP-2-related clinical adverse events."  In fact, the initial studies did not report "a single adverse event associate with rhBMP-2 use in 780 protocol patients."[262]

584.    The leading physicians further remarked, "***none*** of the original estimates of safety for any of the rhBMP-2 applications proved accurate." (emphasis added).[263]

585.    And further, that the studies "underestimated the risks of rhBMP-2 use despite indication from the earliest trials."  For example, the Medtronic-sponsored articles falsely omitted mention of adverse events which were evident from the earliest trials, including "inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement."[264]

586.    The Medtronic-sponsored studies also omitted mention of sterility and cancer risks associated with rbBMP-2.[265]

587.    One of the most damaging aspects of this article was the disclosure that the risk of adverse events associated with rhBMP-2 is actually "***10 to 50 times the original estimates"*** reported in the Medtronic-sponsored peer-reviewed publications as revealed by the unbiased review of the data. (emphasis added).[266]

588.    According to the Medtronic-sponsored studies Infuse® adverse events are ***less than one-fortieth (1/40)*** the adverse events of a commonly used anti-inflammatory (such as ibuprofen or aspirin) or antibiotic medications.[267]

---

[262] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 464, 466, 463-468 (2011) (also attached hereto as Exhibit "WW").
[263] *Id.* at 463.
[264] *Id.* at 464.
[265] *Id.*
[266] *Id.*
[267] Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

589.    These Medtronic-sponsored trials suffered from multiple flaws, including idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.[268]

590.    According to *The Spine Journal* editorial, the thirteen Medtronic-sponsored articles reported only successful fusions and low rates of complications with Infuse®.  The reviewing physicians opined that the articles "may have promoted widespread and poorly-considered on-label and off-label use, along with eventual life-threatening complications and deaths."[269]

591.    The actions of Medtronic failed the medical industry and patients as Dr. Spengler, former Editor-in-Chief of the *Journal of Spinal Disorders*, contends, "the core of our professional faith…is to first do not harm.  It harms patients to have biased and corrupted research published.  It harms patients to have unaccountable special interests permeate medical research.  It harms patients when poor publication practices become business as usual.  Yet harm has been done."[270]

592.    One author asserts that industry sponsored studies, such as these by Medtronic, have "devolved into information laundering operation." [271]

593.    The table below shows that the original 13 studies performed by Medtronic influenced physicians reported zero adverse events out of 780 clinical patients.  According to these studies, not a single adverse event was attributed to Infuse®.  In other words, the product was falsely marketed as perfect.[272]

---

*protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 472, 471-91. (2011) (also attached hereto as Exhibit "FFF").

[268] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 463, 466, 463-468 (2011) (also attached hereto as Exhibit "WW").

[269] *Id.*

[270] *Id.* at 466.

[271] *Id.* at 466.

[272] *Id.* at 473.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Original industry-sponsored or industry-associated author rhBMP-2 clinical studies and reported adverse event rates because of rhBMP-2

| Authors | rhBMP-2 Placement | rhBMP-2, n | rhBMP-2 Adverse events (%) | Authors comment regarding rhBMP-2–related observed adverse events in study patients |
|---|---|---|---|---|
| Boden et al. [2] | Anterior interbody (LT-cage, lumbar, rhBMP-2) | 11 | 0 | "There were no adverse events related to the rhBMP-2 treatment" |
| Boden et al. [3] | Posterolateral (lumbar, ± instrumentation) | 20 | 0 | "There were no adverse effects directly related to the rhBMP-2…" |
| Burkus et al. [5] | Anterior interbody (LT-cage, lumbar, INFUSE) | 143* | 0 | "There were no unanticipated device-related adverse events…" |
| Burkus et al. [6] | Anterior interbody (bone dowel, lumbar, INFUSE) | [24]‡ | 0 | "There were no unanticipated adverse events related to the use of INFUSE Bone Graft." (2002) |
| Burkus et al. [39] | Anterior interbody (LT-cage, lumbar, INFUSE) | 79 | 0 | None reported (2005) |
| Burkus et al. [40] | Anterior interbody (LT-cage, lumbar, INFUSE) | 277 | 0 | None reported |
| Baskin et al. [7] | Anterior interbody (cervical, INFUSE) | 18 | 0 | "There were no device-related adverse events" |
| Haid et al. [8] | Posterior interbody fusion (lumbar, INFUSE) | 34 | 0 | "No unanticipated device-related adverse events occurred" |
| Boakye et al. [41] | Anterior interbody (cervical, INFUSE) | 24 | 0 | "Analysis of our results demonstrated the safety and efficacy of this combination of cervical spine fusion therapy…. a 100% fusion rate and nonsignificant morbidity" |
| Dimar et al. (2009) | Posterolateral (lumbar, INFUSE, pedicle screws) | 53 | 0 | None reported |
| Glassman et al. [42] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | [148]† | 0 | None reported |
| Dimar et al. [10] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | 239 | 0 | "No adverse event that was specifically attributed to the use of rhBMP-2 matrix in the study group was identified" |
| Dawson et al. [11] | Posterolateral (lumbar, INFUSE, and pedicle screws) | 25 | 0 | None reported |
| Total | All types | 780 | 0 | 99% CI <0.5% adverse event rate |

## 1. *The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agents Who Acted Ostensibly As "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"

594.    The median known financial compensation that Medtronic has paid to authors is $12 million-$16 million per study (range, $560,000-$23,500,000).[273]

595.    One or more authors were found to have financial relationships with Medtronic in excess of $1 million for all studies reporting more than 20 patients who received BMP-2.

596.    For studies reporting more than 100 patients receiving BMP-2, one or more authors had a financial relationship with Medtronic in excess of $10 million.[274]

597.    One such study has been openly criticized for inconsistencies thought to be attributed to Medtronic's financial involvement.  In response to the Haid, *et al* study regarding PLIF "off-label" uses,

---

[273] *Id.* at 473.
[274] *Id.* at 475.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Dr. Spengler, former Editor-in-Chief of the *Journal of Spinal Disorders* commented that he doubted "the [Haid, *et al.*] article would have been written in such positive terms by authors without financial ties to Medtronic."[275]

598.    Others have also suspected a fundamental bias in the reporting offered by Medtronic-sponsored studies of BMP-2, calling one article "more of a marketing paper than an objective scientific study."[276]

## 2. Medtronic-Sponsored Studies Exaggerated The Morbidity Of Traditional Auto-Graft Harvesting Fusion, Thereby Exaggerating The Relative Benefits Of Infuse®

599.    Two recent reports suggest that the morbidity of ICBG harvesting was exaggerated in the Medtronic-sponsored studies described immediately above.  Medtronic-sponsored trials estimated that the long-term harm associated with ICBG harvesting was 60%.[277]

600.    However, two subsequent independent reports have indicated that patients do not perceive more pain on the operative side of ICBG harvesting, compared with the non-operative side, even one year post-surgery.[278]

601.    Furthermore, an unsponsored study showed that at two years post-surgery, patients were actually less satisfied with their surgery when BMP was used, than when BMP was not used.  The unsponsored study demonstrated that patients had more bothersome symptoms, more functional impairment, and less satisfaction with BMP-2 surgery, than those who were treated with non-BMP-2, ICBG harvesting fusion.[279]

602.    The overestimation of morbidity rates by Medtronic-sponsored studies therefore inappropriately exaggerated the potential benefits of Infuse®.

## 3. Medtronic, In Their Sponsored Studies, Engaged In Various Activities That Resulted In The Published Studies Failing To Disclose The Actual Serious, Sometimes Life-Threatening Or Life-Altering Side-Effects Actually Observed In

---

[275] *Id.* at 486.
[276] *Id.* at 486.
[277] *Id.* at 485.
[278] *Id.* at 485.
[279] *Id.* at 480.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

**Those Medtronic-Funded "Studies"**

603.    An initial Medtronic-sponsored study failed to report any adverse events related to the use of BMP-2 in the cervical spine.

604.    Medtronic's failure to accurately report adverse events directly contributed to the prevalence of Infuse® in 2007, where 20% of all ACDF surgeries used Infuse®.

605.    The graph below demonstrates the overall "off-label" use of Infuse® in both the cervical and lumbar spine.[280]



606.    *The Spine Journal* reported that cervical fusions using BMP-2 carried a risk of complications approximately 40% to 50% higher than a cervical fusion conducted without BMP-2. A non-sponsored study also reported a 27.5% rate of "clinically significant" cervical swelling in cervical fusions where BMP-2 was used.[281]

607.    These significant and life-threatening complications arising from the use of BMP-2 in the

---

[280] Bozic, M.D., BMP Use: Evaluating Industry-Funded Trials, *available at* http://medicine.yale.edu/core/projects/yodap/463_117257_YODA_Project_Bozic BMP Use 02.06.12.pdf (also attached hereto as Exhibit "JJJ") *See also* U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 3, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[281] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 482, 463-468 (2011) (also attached hereto as Exhibit "WW").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

cervical spine prompted the FDA to issue a 2008 Public Health Notification regarding "off-label" use of Infuse® in the cervical spine.[282]

### P. MEDTRONIC, IN VIOLATION OF FEDERAL LAW AND THE INFUSE® PMA, CONCEALED AND/OR FAILED TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS, DANGERS, AND INCREASED RISKS, ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE®

#### 1. In Fact, A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)

608.    The pilot study comparing the use of Infuse® to ICBG in a PLF approach, was lead by Medtronic's secret agent Scott Boden, M.D.

609.    Medtronic's secret agent Scott Boden, M.D. reported, "*there were no complications attributable to the rhBMP-2.*"

610.    A subsequent review of the study's data by *The Spine Journal* showed that there were in fact adverse effect occurring with BMP-2 at a confidence of 80-90%.

611.    Wound problems were at least 10% higher with rhBMP-2 than ICBG in the pilot study, which is likely related to the inflammatory effect of rhBMP-2.

612.    A more recent study performed by the Scoliosis Research society found a 500% higher rate of both epidural hematoma and wound complications with rhBMP-2 when used in a posterior approach.[283]

613.    The human body can have a severe inflammatory response to bone morphogenetic protein. As the response progresses, fluid accumulates that causes damage to bone, resorption, cage migration, subsidence (sinking of the cage), compression to nerve roots, and/or leads to a non-union. The inflammatory response from a lumbar surgery and/or rhBMP-2 migrating can damage the cauda equina

---

[282] *Id.* at 482.
[283] *Id.* at 476.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

leading to neurogenic bladder, bowel/bladder incontinence, and retrograde ejaculation.

614.    An additional Medtronic-sponsored study published in 2009 reported that the posterolateral approach did not present any adverse events related to rhBMP-2.

615.    Subsequent review of the data revealed nearly three times as many back and leg pain adverse events with the use of rhBMP-2.[284]

### 2. Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption And Loss Of Alignment Related To The Use Of Infuse®

616.    Medtronic's secret agent Regis Haid, M.D. received $25,549,813[285] from Medtronic between 1996 and 2010.

617.    Medtronic's secret agent Regis Haid, M.D. led a Medtronic-sponsored study that was peremptorily halted.

618.    Medtronic's secret agent Regis Haid, M.D. reported, "no unanticipated device-related adverse events occurred."

619.    Medtronic's secret agent Regis Haid, M.D. asserted that no patient required reoperation because of an rhBMP-2 adverse event.

620.    Medtronic's secret agent Regis Haid, M.D. concluded that the study "confirmed the safety" of rhBMP-2 and suggested that the findings might "eliminate the need" for autograft in "successful PLIF."[286]

621.    These false and misleading statements and their promotion led to an increase in the use of "off-label" PLIF and TLIF fusions using Infuse®.[287]

622.    A subsequent review of this incomplete study renders a picture riddled with catastrophic

---

[284] *Id.* at 476.

[285] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[286] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 463-468 (2011) (also attached hereto as Exhibit "WW").

[287] *Id.* at 480.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

adverse events that were not reported by the authors.  In fact, ectopic bone growth in the spinal canal or neuroforamina occurred in 24 of 32 rhBMP-2 patients.[288]

623.    Shockingly, the physicians noted, "[a]lthough not desirable, bone formation in the spinal canal does not appear to have a discernable effect on the patient outcomes," and "the de novo rhBMP-formed bone occurred predictably, not compressing the neural structures."  The authors surprisingly did not find the incidents of bony overgrowth to be a clinically significant concern.[289]

624.    An independent surgeon, Dr. Neil Kahanovitz, questioned the authors' interpretations, suggesting that they may have been "overwhelmed by their enthusiasm of using" rhBMP-2 in a PLIF procedure.  Dr. Kahanovitz further noted:

> while there are lengthy discussion of various trends throughout this study, which imply the superiority of rhBMP over autograft…one fact remains: in every clinical measure examined in this study, there were no statistically superior outcomes in the rhBMP group except one, and the clinical significance of this one statistically significant finding is unclear.[290]

625.    Further, Dr. Kahanovitz disagreed with the authors' conclusion that the presence of bone growth in the spinal canal and foramina (the two apertures between vertebrae) in those patients who received rhBMP-2 had no clinical implications.  Rather, Dr. Kahanovitz stated that, "most surgeons would be less than enthusiastic to see this statistically significant variable present in the majority of their patients."[291]

626.    Ectopic bone growth occurs when bone emerges exuberantly from the rhBMP-2 application site.  This bone can compress the spinal cord or exiting nerve roots causing severe pain that radiates to the extremities, numbness/paralysis, urologic, or gastrointestinal injury.

627.    A review of the data at two (2) years post-surgery showed patients were less satisfied with

---

[288] *Id.* at 480.
[289] *Infuse cited in patients' painful bone overgrowth,* Journal Sentinel (June 2011), *available at* http://www.jsonline.com/watchdog/watchdogreports/124630959.html (also attached hereto as Exhibit "KKK").
[290] Commentary, Neil Kahanovitz, M.D., Haid RW, Branch CL, Alexander JT, Burkus JK. Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages. Spine J. 2004, 538, 527-538, Commentary *available at* *http://www.bmp2.com.br/BMPLiteraturas/Spine/Spine 2004 Haid INTERFIX PLIF commentary.pdf* (also attached hereto as Exhibit "LLL").
[291] *Id.* at 538-539.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

rhBMP-2 surgery than those with the traditional ICBG fusion.   Patients within the study who were exposed to rhBMP-2 appeared to have more adverse events than the ICBG patients, including functional impairment.[292]  Functional impairment can range from complete immobility to neuro deficit.  Neuro deficit can progress to paraplegia and occurs when a nerve has been damaged to the point that it is no longer capable of carrying an electrical impulse.  This can manifest as paralysis, paresthesia, dysesthesia, numbness, tingling, pins and needles, loss of fine motor skills, or falling down.

628.     Medtronic's secret agent Regis Haid, M.D. failed to include **<u>any</u>** data pertaining to patients requiring an additional surgery to remove ectopic bone growth.  Dr. Malone reported that two of his patients involved in the study "had significant posterior bony over-growth impinging on their nerve roots requiring additional surgery."  One of these patients required two surgeries "to clear excessive bone formation from his spinal canal."  Rather than disclose this critical safety information, Medtronic's secret agent Regis Haid, M.D. chose to contrive the findings of his study and "confirmed the safety" of rhBMP-2.[293]

### 3. Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®

629.     Medtronic-sponsored studies related to rhBMP-2 failed to report adverse events that occurred within the trial period.

630.     Subsequent independent reviews of Medtronic-sponsored studies showed osteolysis, subsidence, and reoperation occurred in patients exposed to rhBMP-2.

631.     End-plate failure, a catastrophic destruction of the spine, was observed within the first four (4) months after surgery using rhBMP-2 and was not reported by the sponsored authors.[294]

632.     Aggressive resorption or osteolysis keeps hardware from attaching to bone, thus leading to a non-union. This can affect the interbody cages or the rods and screws that support a posterolateral fusion.  Without the underlying structural support of the fusion hardware, the spine can become grossly unstable, exacerbating degenerative changes and injuring adjacent levels.  When the interbody cages fail

---

[292] *Id.* at 480.
[293] *Id.* at 480-481.
[294] *Id.* at 477.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

to fuse to the spine, they can migrate, impinging on the spinal cord or exiting nerve roots, or sink (subside) into the vertebra causing disc space collapse.

633.    A further review of an original study lead by Medtronic's secret agent J. Kenneth Burkus, M.D. published in 2002 and 2004 revealed that subsidence, which occurred in seven patients within two years of the surgery, was not disclosed in the original or initial follow-up study, but rather were only parenthetically reported nearly six years later.

634.    In fact, subsidence was not listed at all in the 2002 study.  However, four of the seven non-reported patients with subsidence required an additional surgery directly related to their fusion with rhBMP-2.  Strikingly, 22 additional surgeries were required for patients in this Burkus study specifically relating to device failure.

635.    Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report **any** of these adverse events or revision surgeries in his Medtronic-sponsored study.[295]

### 4. Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®

636.    Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report the association of retrograde ejaculation with Infuse® in ALIF procedures.[296]   Retrograde ejaculation is an injury that affects a male while engaging in sexual intercourse.  With retrograde ejaculation, semen is not expelled through the penis, rather it is diverted into the urinary bladder.  This process is painful, and can lead to sterility and infection.

637.    When Medtronic's secret agent J. Kenneth Burkus, M.D. was questioned about this in a "Letter to the Editor Inquiry" he dismissed any relationship between Infuse® and retrograde ejaculation and instead attributed the debilitating adverse event to surgical complication/approach.

638.    Data was eventually disclosed regarding the Burkus studies showing a 7.2% rate of retrograde ejaculation among men in ALIF procedures utilizing Infuse® in comparison to .06% rate in ALIF procedures using ICBG!

639.    The data regarding retrograde ejaculation related to three studies led by Medtronic's secret

---

[295] *Id*. at 480.
[296] *Id*. at 478.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

agent J. Kenneth Burkus, M.D., who did not release the data until seven years following the original publication. Subsequent studies corroborate a finding of approximately 6% to 7% of men are afflicted with retrograde ejaculation following an ALIF procedure using ICBG.[297]

### 5. Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG

640.    Four original Medtronic-sponsored studies related to ALIF procedures and Infuse® failed to report urogenital adverse events. A subsequent review of the data showed that 7.9% of ALIF procedures performed resulted in a urogenital adverse event.[298] Urogenital adverse events consist of bladder incontinence, neurogenic bladder, retrograde ejaculation, sterility, and erectile dysfunction. Urogenital injuries are caused when the lumbar spine is exposed to Infuse®, and/or the cauda equina is damaged.

641.    When a person suffers from urinary incontinence, the nerves are damaged to a point that the urinary sphincters are never triggered to close properly. This renders a person incapable of controlling the flow of urine out of the body.

642.    With neurogenic bladder, the effect is the opposite. The nerves are damaged to the point that they cannot release the sphincter, forcing urine to be retained in the bladder. If left untreated, urine can back up into the kidneys, causing a condition called hydronephrosis. When this occurs, the kidneys become saturated with urine causing lasting, and possibly life threatening kidney damage.

643.    Similarly, damage to the cauda equina by Infuse® following an ALIF procedure can also result in gastrointestinal injuries. Gastrointestinal injuries caused by Infuse® consist of bowel incontinence, neurogenic bowel (chronic constipation), gastroparesis, and Gastroesophageal reflux disease known as GERD (acid reflux). Like bladder incontinence, bowel incontinence occurs when injury is severe enough that the nerves that controlling the rectal sphincters no longer function properly. This makes it difficult or impossible for the person to retain stool.

644.    With neurogenic bowel, the opposite effect occurs, whereby the nerves that propel stool through the intestine no longer function properly. The stool remains in the intestine, causing severe and

---

[297]*Id.* at 478-479.
[298]*Id.* at 479.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

chronic constipation.

645.    With gastroparesis, stomach motility is diminished, crippling the body's ability to move food from the stomach into the intestine.

646.    With GERD, the nerves are no longer able to regulate the amount of stomach acid that is secreted into the stomach.  This stomach acid can erode away at the lower esophagus causing pain and difficulty swallowing, and an increased risk of esophageal cancer.

### 6. Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify", A Higher Dosed rhBMP-2 (Infuse®) Product

647.    In anticipation of seeking FDA approval, Medtronic sponsored a study of Amplify, another product manufactured by Medtronic that uses the same rhBMP-2 bone growth protein used in Infuse®.[299]  This study was led by Medtronic's secret agent John Dimar, M.D.  Amplify is a tripled dose of rhBMP-2 and was meant to be used in posterolateral spinal fusions.

648.    Similar to the previous Medtronic-sponsored studies, Medtronic's secret agent John Dimar, M.D. reported, "no adverse event that was specifically attributed to the use of rhBMP-2 matrix in the study was identified."

649.    A subsequent review of the trial published in 2010 identified several classes of serious adverse events, which appeared to be associated with Amplify but were not reported as such by Medtronic's secret agent John Dimar, M.D.[300]

650.    Medtronic's secret agent John Dimar, M.D. failed to report the "notably increased cancer rates in the Amplify group."  During the study using the higher dose of rhBMP-2, nine (9) new cancers were diagnosed.  The sponsored authors did not reveal this finding of increased cancer.

651.    In March of 2011, Medtronic disclosed that in December 2010, the FDA sent Medtronic a

---

[299] *U.S. nixes Medtronic bone graft product, shares down* (March 10, 2011) *available at* http://www.reuters.com/article/2011/03/10/medtronic-amplify-idUSN1016154820110310 (also attached hereto as Exhibit "MMM").
[300] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-483 (2011) (also attached hereto as Exhibit "WW").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

non-approval letter regarding Amplify.[301]  The FDA reviewers stated "[t]he primary safety concern is the increased numbers of cancer events in patients treated with Amplify compared to the control group."[302]  A Medtronic spokesman stated that there is "no plausible biological mechanism for cancer induction."  However, lead authors of *The Spine Journal* report, "**the basic biology of growth factor signaling in carcinogenesis suggests that categorical denial is not supportable**." [303]

652.    Importantly, doctors often administer Infuse® for "off-label" use at levels significantly higher than the recommended dosage for on-label procedures, without being informed by Medtronic of the increased risks and dangers, such that the amount of rhBMP-2 in certain Infuse® approaches or exceeds that of Amplify®.

653.    Furthermore, Dr. Carragee of *The Spine Journal* described the stunning risks of cancer as, "*[a]lmost certainly this is cancer promoting and not a carcinogenic*," he told Reuters in an interview, noting that exposure to a carcinogen takes many more years to result in disease as opposed to a cancer promoting  and enabling mechanism found within rhBMP-2.  More recent studies show that there is a 2.5 times greater risk of developing cancer one year after the product was used and a five (5) times greater risk after three years.[304]

### Q. UNITED STATES SENATORS QUESTION MEDTRONIC ABOUT UNREPORTED SIDE EFFECTS, FINANCIAL TIES TO CLINICAL INVESTIGATORS, AND "OFF-LABEL" PROMOTION AND MARKETING OF INFUSE®

654.    Despite Medtronic's $40 million dollar settlement in July 2006 settlement with the

---

[301] *U.S. nixes Medtronic bone graft product, shares down* (March 10, 2011) *available at* http://www.reuters.com/article/2011/03/10/medtronic-amplify-idUSN1016154820110310 (also attached hereto as Exhibit "MMM").
[302] *FDA staff: Cancer a concern with Medtronic device* (Jul 23, 2010), *available at* http://www.reuters.com/article/2010/07/23/us-medtronic-spine-idUSTRE66M2U820100723 (also attached hereto as Exhibit "NNN").
[303] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-483 (2011) (also attached hereto as Exhibit "WW").
[304] *Researcher sees cancer risk for Medtronic's Infuse,* Reuters (November 3, 2011), *available at* http://www.reuters.com/article/2011/11/03/us-medtronic-infuse-idUSTRE7A27GT20111103 (also attached hereto as Exhibit "OOO").

Department of Justice and Medtronic's $85 million dollar settlement in March 2012 with a group of shareholders, the United States Senate remained concerned with Medtronic's "off-label" marketing activities and related payments to doctors.   Both the United States Senate Special Committee on Aging and the Committee on Finance have directed Medtronic to answer their questions regarding Infuse.

### 1. Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse® "Off-Label" Sales Prompts Individual Inquiries From United States Senators

655.    On September 30, 2008, U.S. Senator Herb Kohl, chairman of the Special Committee on Aging, sent a letter to Medtronic expressing concern over Medtronic's compliance with the July 2006 Settlement Agreement.[305]

656.    Senator Kohl's letter expressed several concerns:

*Earlier this year, your company's outside counsel provided the Committee with a written account of Medtronic's efforts to comply with the settlement agreement it reached with the United States Department of Justice (DOJ) concerning allegations that Medtronic and its subsidiary improperly compensated surgeons and physicians.  That account also addressed the corporate integrity agreement (CIA) that Medtronic and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those allegations.*

*In that same letter…Medtronic and its subsidiary both denied that "improper payments were made to physicians in the first place…much less that improper payments 'have continued.'"*

***Consequently, it was with concern that I read recent articles, in the Wall Street Journal and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by Medtronic to surgeons and physicians.***

*[C]ontinuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the medical device industry.  All of the major orthopedic device companies that settled with the DOJ over such allegations were required to publicly reveal information related to their payments to physicians.  **Medtronic has articulated no specific reasons as to why it should be excused from making the same disclosures**.* (emphasis added).

---

[305] Letter, U.S. Senate, Senate Special Committee on Aging, Herb Kohl to Bill Hawkins, CEO Medtronic (Sep 30. 2008), *available at* http://www.pharmalive.com/sites/default/files/blogs/attachments/kohl-to-medtronic.pdf (also attached hereto as Exhibit "PPP").

657.     Senator Kohl requested documentation of Medtronic's efforts to comply with the July 2006 Settlement Agreement, as well as interviews with corporate witnesses, *"given the ongoing, serious concerns publicly raised regarding the integrity and transparency of Medtronic's physician compensation practices."*

658.     Senator Kohl asked Medtronic to explain *"the circumstances that led Medtronic's former counsel to file suit against the company [alleging improper payments to physicians] and how that matter was subsequently settled."*

659.     On September 30, 2008 U.S. Senator Charles Grassley, on behalf of the Committee on Finance, sent a similar letter[306] to Medtronic expressing concern over its marketing of Infuse® and allegations that it had provided kickbacks to physicians who actively promoted Infuse®, noting that:

> Last week, the Wall Street Journal (WSJ)[307] reported allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in." I would appreciate your assistance in better understanding these allegations and would like to take this opportunity to lay out my specific concerns and questions.
>
> [O]ne of the incentives Medtronic provided physicians was to include them on patents for medical devices and reward them with royalties, even though the physicians may not have contributed to the development of the product.

660.     Senator Grassley specifically addressed issues related to Medtronic's marketing of Infuse®:

> It was reported that Medtronic gave payments to physicians, in the form of consulting agreements, as a means of increasing sales of Infuse®. The allegations that Medtronic has been disguising these consulting agreements as inducements or kickbacks for physicians to use Infuse® are equally troubling. Likewise, this is a practice that I would like to better understand and I would like to know what if anything has changed since these reported events.

661.     Senator Grassley also questioned why several lawsuits against Medtronic pertaining to

---

[306]Senator Grassley's Letter to Medtronic Regarding Financial Relationships with Physicians, (Oct. 2, 2008), *available at* http://www.finance.senate.gov/newsroom/ranking/release/?id=10014db8-2710-44e9-8398-6bda246f08df.http://www.finance.senate.gov/newsroom/ranking/release/?id=10014db8-2710-44e9-8398-6bda246f08df (also attached hereto as Exhibit "QQQ").

[307] David Armstrong, *Lawsuit Says Medtronic Gave Doctors Array of Perks,* Wall St. J, Sept. 25, 2008, *available at* http://online.wsj.com/article/SB122230535985873827.html (also attached hereto as Exhibit "II").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Infuse® remained under seal, and indicated that he would like to *"better understand the status of these lawsuits and the procedural process that has led to the current situation."*

> **2. The U.S. Senate Committee On Finance Launches An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events**

662.    The Senate Committee on Finance investigated whether Medtronic continued to misrepresent the adverse events caused by Infuse® and rhBMP-2, as well as the possibility that Medtronic improperly influenced the reporting of results collected from clinical trials and reporting regarding rhBMP-2.

663.    On June 21, 2011, Senators Charles Grassley and Max Baucus sent a letter to Medtronic on behalf of the Senate Committee on Finance requesting that Medtronic produce documents and communication pertaining to "adverse postoperative events and/or medical complications" resulting from the use of rhBMP-2.[308]  The letter also requested that Medtronic provide *"[a] detailed account of payments that Medtronic made to all Infuse® clinical investigators."*

664.    In the June 21 letter, Senators Grassley and Baucus state:

> *We're extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of Infuse® on behalf of Medtronic were aware that Infuse®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature. This issue is compounded by the fact that some clinical investigators have substantial financial ties to Medtronic.*

665.    The Senators' letter also addressed concern related to inconsistencies arising from a Medtronic-funded study asserting:

> *that 75% of bone morphogenic protein 2 (BMP-2) patient experienced ectopic growth, where potentially harmful bone growth occurs outside of the fusion area. The authors, who had financial ties to Medtronic, 'concluded that 'although not desirable,' the ectopic bone growth "did not appear to have an ill effect on patients."  However, in a separate*

---

[308] Letter from Charles Grassley & Max Baucus to Medtronic (June 21, 2011), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=a7e974b6-b4b6-4e2c-a738-edefac30fcb6 (also attached hereto as Exhibit "RRR").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*2008 study conducted without financial ties to Medtronic, 'neurological impairment occurred in five patients who had the same ectopic bone formation.'*

666.        The Senators cited an article in *The New York Times* that reported a recent study "found that men treated with Infuse developed a condition that causes temporary or permanent sterility at a far higher rate than men who received a bone graft." The Senators noted that this link to sterility was not reported in the original Medtronic-funded study.

667.        The Senators added:

> *We are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by Medtronic may have been unreported or under-reported in clinical literature.  Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain.  Concerns have also been expressed about a potential link to cancer.*

### 3. The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events

668.        Senators Herb Kohl, Charles E. Grassley, and Richard Blumenthal addressed further concerns over Medtronic's oversight of recalls and post-market surveillance of Infuse®, in a letter dated December 13, 2011:[309]

> *We take seriously our responsibility to protect the interests of our nation's health care consumers.  We are writing today to request information on how your company handles recalls and post-marketing surveillance on your products…All health care consumers in the United States depend on companies such as Medtronic to deliver high-quality, safe, and effective products.  Recently, your company has experienced safety issues, such as with your product Infuse.  A researcher at Stanford University School of Medicine found a higher risk of cancer associated with Infuse, and there have been allegations that researchers who received funds from Medtronic, sometimes millions of dollars, did not report negative finding from clinical trials. We are concerned that consumers who have long relied on your products, are being adversely affected by these issues, both through the on-label and off-label use of the product.*

669.        Further, the Senators requested additional information pertaining to Medtronic's promotion of the "off-label" use of Infuse®

---

[309] Letter from US Senate to Omar Ishrak, Medtronic CEO (Dec.13, 2011), *available at* http://www.grassley.senate.gov/about/upload/Medtronic.pdf (also attached hereto as Exhibit "SSS").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

a. *How does your company derive failure rates or rates of serious adverse events of medical devices?*

b. *What is the current estimate of the serious adverse event rate of Infuse? Please give rates for both on-label and off-label.*

c. *How many individual complaints has your company received about Infuse to date? What percentage of these complaints were for off-label usage?*

d. *Do you require physicians who receive funds from your company to disclose those payments to their patients before the patients receive one of your medical devices? If not, why not?*

## R. UNITED STATES SENATORS BAUCUS AND GRASSLEY'S INVESTIGATION OF MEDTRONIC REVEALS IN A U.S. SENATE REPORT RELEASED OCTOBER 2012 THAT MEDTRONIC MANIPULATED SCIENTIFIC STUDIES RELATING TO INFUSE® AND DISCLOSED THE PAYMENTS OF HUNDREDS OF MILLIONS OF DOLLARS TO THE "RESEARCHERS"

670.     In October 25, 2012, the U.S. Senate concluded its official investigation of Medtronic, which sought to determine whether it had improperly influenced peer-reviewed studies on Infuse®.  In response to demands made during the investigation, Medtronic provided over 5,000 documents related to the 13 BMP studies identified by *The Spine Journal* as sponsored by Medtronic.[310]

671.     The 16-month inquiry led the U.S. Senate to conclude:

a. "Medtronic was heavily involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic.  The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.  Medical journals should ensure industry role contributions be fully disclosed."

---

[310] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 1, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1b112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

b. "Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements."

c. "An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events possibly associate with Infuse in a 2005 Journal of Bone and Joint Surgery articles."

d. "Medtronic officials inserted language into studies that promoted InFuse as a better technique than taking a bone graft from the pelvic bone (autograft technique) by emphasizing the pain of the autograft technique."

e. Documents indicate that Medtronic prepared Dr. Hal Mathew's remarks to the U.S. Food and Drug Administration (FDA) advisory panel meeting prior to InFuse being approved.  At the time, Dr. Mathews was a private physician but was hired as a vice president at Medtronic in 2007.

f. Medtronic documents show the company unsuccessfully attempted to adopt weaker safety rules for a clinical trial studying InFuse in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck. [311]

672.    These findings prompted Senator Baucus to state "patients are at serious risk when companies distort the facts the way Medtronic has." [312]

673.    The U.S. Senate Report revealed the following multi-million dollars payments to physicians, totaling approximately $210,000,000 paid by Medtronic in the below chart. [313]

---

[311] U.S. Senate, Committee on Finance, Press Release, *Baucus-Grassley Investigation into Medtronic Reveals Manipulated Studies, Close Financial Ties with Researchers,* (October 2012), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "TTT").

[312] *Id.*

[313] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 6, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

| Year | Scott D. Boden | Charles L. Branch | J. Kenneth Burkus | Concept Properties, LLC [18] | Curtis A. Dickman |
|---|---|---|---|---|---|
| 1996 | $18,750.00 | — | — | — | — |
| 1997 | $75,000.00 | — | — | — | $5,003.70 |
| 1998 | $75,000.00 | $140,703.15 | $18,700.00 | — | $73,239.25 |
| 1999 | $86,957.00 | $49,238.87 | $34,712.12 | — | $130,352.64 |
| 2000 | $75,000.00 | $104,495.00 | $29,285.75 | — | $41,419.50 |
| 2001 | $73,750.00 | $150,000.00 | $149,920.00 | $636,182.00 | $56,960.00 |
| 2002 | $80,000.00 | $201,997.75 | $220,539.50 | $1,028,882.00 | $72,881.00 |
| 2003 | $82,500.00 | $180,219.99 | $268,742.50 | $1,226,179.00 | $316,215.00 |
| 2004 | $138,500.00 | $175,473.78 | $360,447.78 | $4,992,137.00 | $320,045.99 |
| 2005 | $1,364,100.00 | $127,087.44 | $331,070.44 | $13,141,165.00 | $339,338.00 |
| 2006 | $1,782,550.00 | $136,390.58 | $613,849.71 | $8,842,157.00 | $401,138.77 |
| 2007 | $3,400,875.00 | $114,159.39 | $719,281.84 | $9,683,098.00 | $383,192.00 |
| 2008 | $21,543,052.00 | $487,688.50 | $1,928,503.35 | $9,159,891.00 | $388,248.00 |
| 2009 | — | $460,319.35 | $732,563.85 | $7,117,112.00 | $355,809.00 |
| 2010 | — | $827,851.81 | $972,719.99 | $9,004,465.00 | $389,099.00 |
| Total | $28,796,034.00 | $3,155,625.61 | $6,380,336.83 | $64,831,268.00 | $3,272,941.85 |

| Year | John R. Dimar, III | Steven D. Glassman | Matthew F. Gornet | Regis W. Haid, Jr. | John G. Heller |
|---|---|---|---|---|---|
| 1996 | $6,250.00 | $6,250.00 | — | — | — |
| 1997 | $27,000.00 | $25,000.00 | $1,880.00 | $27,500.00 | — |
| 1998 | $50,000.00 | $50,000.00 | — | $216,842.44 | $10,892.00 |
| 1999 | $52,022.65 | $52,216.41 | $29,900.00 | $1,019,832.54 | $70,817.57 |
| 2000 | $50,000.00 | $50,976.43 | $16,369.97 | $1,507,242.15 | $30,000.00 |
| 2001 | $188,428.00 | $194,528.00 | $15,128.00 | $1,394,390.61 | $37,975.10 |
| 2002 | $100,100.00 | $71,750.00 | $4,762.00 | $1,669,745.11 | $1,161.73 |
| 2003 | $116,283.65 | $138,941.44 | $10,194.00 | $1,957,742.86 | $49,191.50 |
| 2004 | $104,043.67 | $146,137.07 | $17,924.00 | $2,484,450.94 | $42,957.44 |
| 2005 | $147,207.99 | $248,019.59 | $67,763.93 | $2,473,518.00 | $154,835.70 |
| 2006 | $236,306.95 | $155,753.16 | $238,787.49 | $2,454,569.00 | $149,215.39 |
| 2007 | $130,767.60 | $257,926.16 | $649,542.33 | $2,626,576.07 | $330,792.15 |
| 2008 | $234,094.50 | $187,605.50 | $1,181,039.87 | $2,467,911.23 | $288,957.11 |
| 2009 | $160,551.00 | $88,139.80 | $892,500.87 | $2,525,743.88 | $255,236.24 |
| 2010 | $163,310.20 | $75,019.80 | $859,983.76 | $2,723,749.13 | $352,404.36 |
| Total | $1,766,366.21 | $1,748,263.36 | $3,985,776.22 | $25,549,813.96 | $1,774,436.29 |

| Year | Inspire, LLC [19] | Gerald E. Rodts, Jr. | Volker Sonntag | Ensor E. Transfeldt | Thomas A. Zdeblick |
|---|---|---|---|---|---|
| 1996 | — | — | — | $12,500.00 | $95,185.34 |
| 1997 | — | — | $34,745.92 | $50,000.00 | $422,668.65 |
| 1998 | — | $25,065.54 | $207,622.16 | $56,196.00 | $838,794.89 |
| 1999 | — | $44,748.08 | $795,053.91 | $61,219.28 | $1,131,463.17 |
| 2000 | — | $ 152,496.47 | $1,756,041.55 | $56,170.90 | $1,037,381.49 |
| 2001 | — | $140,343.39 | $1,036,993.00 | $71,117.56 | $1,984,356.45 |
| 2002 | — | $172,278.04 | $1,646,050.49 | $115,315.16 | $3,471,930.41 |
| 2003 | — | $142,025.68 | $1,904,689.00 | $258,912.62 | $4,580,361.62 |
| 2004 | — | $161,149.02 | $2,728,639.00 | $299,477.72 | $4,447,269.00 |
| 2005 | — | $303,877.98 | $2,202,595.00 | $30,474.70 | $3,950,516.08 |
| 2006 | — | $396,139.57 | $2,090,998.00 | $206,388.76 | $3,469,863.71 |
| 2007 | $247,365.00 | $629,451.53 | $2,163,661.90 | $722,779.00 | $2,961,272.00 |
| 2008 | $329,998.00 | $581,984.26 | $2,271,477.00 | $548,584.74 | $2,521,170.00 |
| 2009 | $698,829.00 | $432,403.00 | $1,772,361.00 | $483,254.00 | $1,582,156.00 |
| 2010 | $1,632,813.00 | — | $2,241,156.00 | $589,930.00 | $1,674,351.00 |
| Total | $2,909,005.00 | $3,181,962.56 | $22,852,083.93 | $3,562,320.44 | $34,168,739.81 |

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

674.     In response to the Senate's finding that Medtronic failed to disclose payments of enormous sums of money to physicians, many of whom were responsible for publishing articles regarding Infuse®, articles which have now been exposed by the U.S. Senate investigation to have been manipulated by Medtronic intentionally omitting the reporting of adverse events, Michael Heggeness and Charles Mick, president and first vice president of the North American Spine Society, applauded the Senate Committee's report.

675.     Significantly, the two preeminent surgeons' remarks directly debunked what is claimed by Medtronic to be the "learned intermediary" defense, "If surgeons had known that the lead authors of the 13 original studies on InFuse had received payments ranging from $1.7 million to $64 million from Medtronic and that its marketing employees were co-authors and co-editors, would they have been so eager to use InFuse on their patients?"[314]

676.     As Doctors Michael Heggeness and Charles Mick observed, there is no way that a surgeon making the decision on what procedure and/or medical device to use for their patients, would use a procedure and/or medical device where the manufacturer of the device had paid the lead authors of the studies amounts ranging from $1.7 million to $64 million, and where the manufacturers own marketing employees were "secret" co-authors and co-editors of those very studies and resulting in the material distortion of the actual findings and results of those "studies."

677.     The federal judiciary has recognized a genuine risk that financial conflicts of interest induce bias in scientific research.  The Federal Judicial Center's key reference guide for judges considering scientific issues in their cases explains, "[j]udges and juries . . . must consider financial conflicts of interest when assessing scientific testimony.  The threshold for pursing the possibility of bias must be low."  Reference Manual on Scientific Evidence (Third) Preface (2011).[315]

678.     Research published in the *New England Journal of Medicine*, as well as other surveys, show that information brought by industry representatives to physicians impacts medical decision-

---

[314] McCarthy, Michael, *US firm accused of manipulating journal articles and paying millions to authors,* (Oct 2012), BMJ 2012, *available at* http://www.bmj.com/content/345/bmj.e7299 (also attached hereto as Exhibit "UUU").
[315]Reference Manual on Scientific Evidence, 13, (2011) *available at* http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf (also attached hereto as Exhibit "VVV").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

making.[316]  Medtronic's misleading marketing of Infuse® to physicians, including Plaintiffs' surgeon, was designed to impact surgeons selections with the goal of expanding the market for Infuse® beyond FDA-approved uses.  Medtronic consciously created this misleadingly marketing campaign even though they knew that it would expose patients, including Plaintiffs, to increased risks of danger and serious injuries.

679.    The published articles listed below were repudiated by *The Spine Journal* and the authors' financial relationships with Medtronic were only discovered through their investigation and disclosed by the U.S. Senate Report.

680.    **Medtronic paid its Secret Agent Scott Boden, M.D. $28,796,034.00 from 1996-2010.**

a. **Scott Boden** and Thomas A. Zdeblick et al., *The use of rhBMP-2 in interbody fusion cages.  Definitive evidence of osteoinduction in humans*, 25 J. Spinal Disord. 376 (2000).

b. **Scott Boden** and John G. Heller et al., *Use of recombinant human bone morphogenetic protein-2 to achieve posterolateral lumbar spine fusion in humans: a prospective, randomized clinical pilot trial: 2002 Volvo Award in clinical studies*; 27 Spine 2662 (2002).

c. **Scott Boden**, Steven Glassman, John Dimar, Kenneth Burkus et al., *The efficacy of rhBMP-2 for posterolateral lumbar fusion in smokers*, 32 Spine 1693 (2007).

681.    **Medtronic paid its Secret Agent Charles Branch, M.D. $3,155,625.61 from 1996-2010.**

a. **Charles Branch**, Regis Haid, Kenneth Burkus and J.T. Alexander., *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

682.    **Medtronic paid its Secret Agent J. Kenneth Burkus, M.D. $6,380,336.83 from 1996-2010.**

a. **J. Kenneth Burkus**, Michael F. Gornet, Curtis A. Dickman and Thomas A. Zdeblick, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J.

---

[316] Bernard Lo, M.D., *Serving Two Masters – Conflicts of Interest in Academic*, *N Engl J Med 2010, available at* http://www.nejm.org/doi/full/10.1056/NEJMp1000213 (also attached hereto as Exhibit "WWW").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Spinal Disord. Tech. 337 (2002).

b. **J. Kenneth Burkus**, Ensor E. Transfeldt et al., *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenic protein-2*, 27 Spine 2396 (2002).

c. **J. Kenneth Burkus**, S.E. Heim, Michael F. Gornet and Thomas A. Zdeblick, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

d. **J. Kenneth Burkus**, Charles Branch, J.T. Alexander and Regis Haid, *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

e. **J. Kenneth Burkus** and Matthew Gornet et al., *Use of rhBMP–2 in combination with structural cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion*, 87 J. Bone Joint Surg. Am. 1205 (2005).

f. John R. Dimar, Steven D. Glassman, **J. Kenneth Burkus** and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

g. **J. Kenneth Burkus**, Steven Glassman and John Dimar et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*, 32 Spine 1693 (2007).

h. John Dimar, Steven Glassman, **J. Kenneth Burkus**, et al. *Clinical and radiographic analysis of an optimized rhBMP–2 formulation as an autograft replacement in posterolateral lumbar spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

h. **J. Kenneth Burkus** and Steven Glassman et al., *Recombinant human bone morphogenetic protein–2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized trial*, 9 J. Bone Joint Surg. Am. 1604 (2009).

683.    **Medtronic paid its Secret Agent Curtis Dickman, M.D. $3,272,941.85 from 1996-**

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

2010.

    a. J. Kenneth Burkus, Michael F. Gornet, **Curtis A. Dickman** and Thomas A. Zdeblick, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

684.    **Medtronic paid its Secret Agent John Dimar, M.D. $1,766,366.21 from 1996-2010. Medtronic also paid Concept Properties, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent John Dimar, M.D. $64,831,268.00 from 1996-2010.**

    a. **John R. Dimar**, Steven D. Glassman, J. Kenneth Burkus and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

    b. Steven D. Glassman, J. Kenneth Burkus and **John R Dimar** et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*. 32 Spine 1693 (2007).

    c. **John R Dimar**, Steven D Glassman, J Kenneth Burkus, Philip W Pryor, James W Hardacker and Leah Y. Carreon, *Clinical and radiographic analysis of an optimized rhBMP-2 formulation as an autograft replacement in posterolateral spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

685.    **Medtronic paid its Secret Agent Steven Glassman, M.D. $1,748,263.36 from 1996-2010. Medtronic also paid Concept Properties, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent Steven Glassman, M.D. received $64,831,268.00 from 1996-2010.**

    a. John R. Dimar, **Steven D. Glassman**, Kenneth J. Burkus and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

    b. **Steven D. Glassman**, J. Kenneth Burkus and John Dimar et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*. 32 Spine 1693 (2007).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

c. John R Dimar, **Steven D Glassman**, J Kenneth Burkus, Philip W. Pryor, James W Hardacker and Leah Y. Carreon, *Clinical and radiographic analysis of an optimized rhBMP-2 formulation as an autograft replacement in posterolateral spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

d. J. Kenneth Burkus and **Steven Glassman** et al., *Recombinant human bone morphogenetic protein–2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized trial*, 9 J. Bone Joint Surg. Am. 1604 (2009).

686.    **Medtronic paid its Secret Agent Matthew Gornet, M.D. $3,985,776.22 from 1996-2010.  Gornet Enterprises, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent Matthew Gornet, M.D.**

a. J. Kenneth Burkus, **Matthew F. Gornet**, Curtis A. Dickman and Thomas A. Zdeblick, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

b. J. Kenneth Burkus, S.E. Heim, **Michael F. Gornet** and Thomas A. Zdeblick, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

c. J. Kenneth Burkus and **Matthew Gornet** et al., *Use of rhBMP–2 in combination with structural cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion*, 87 J. Bone Joint Surg. Am. 1205 (2005).

687.    **Medtronic paid its Secret Agent Regis Haid, M. D. $25,549,813.96 from 1996-2010.**

a. Charles Branch, **Regis Haid**, Kenneth Burkus and J.T. Alexander., *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

b. Gerald E. Rodts, **Regis Haid** et al., *Anterior cervical discectomy and fusion involving a polyetheretherketone spacer and bone morphogenetic protein*, 2 J. Neurosurg. Spine 521 (2005).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

688.    **Medtronic paid its Secret Agent John G. Heller, M.D. $1,774,436.29 from 1996-2010.**

a. Scott Boden and **John G. Heller** et al., *Use of recombinant human bone morphogenetic protein-2 to achieve posterolateral lumbar spine fusion in humans: a prospective, randomized clinical pilot trial: 2002 Volvo Award in clinical studies*; 27 Spine 2662 (2002).

689.    **Medtronic paid its Secret Agent Gerald E. Rodts, Jr., M.D. $3,181,962.56 from 1996-2010.**

a. **Gerald E. Rodts,** Regis Haid et al., *Anterior cervical discectomy and fusion involving a polyetheretherketone spacer and bone morphogenetic protein*, 2 J. Neurosurg. Spine 521 (2005).

690.    **Medtronic paid its Secret Agent Volker Sonntag, M.D. $22,852,083.93 from 1996-2010.**

a. **Volker Sonntag**, et al., *A prospective, randomized, controlled cervical fusion study using recombinant human bone morphogenetic protein–2 with the CORNERSTONE–SR allograft ring and the ATLANTIS anterior cervical plate*, 28 Spine 1219 (2003).

691.    **Medtronic paid its Secret Agent Ensor Transfeldt, M.D. $3,562,320.44 from 1996-2010.  Additionally, Medtronic paid Inspire, LLC a limited liability corporation owned in part by Medtronic's Secret Agent Ensor Transfeldt, M.D. $2,909,005.00.**

a. J. Kenneth Burkus, **Ensor E. Transfeldt** et al., *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenic protein-2*, 27 Spine 2396 (2002).

692.    **Medtronic paid its Secret Agent Thomas A. Zdeblick, M.D. $34,168,739.81 from 1996-2010.**

a. Scott Boden and **Thomas A. Zdeblick** et al., *The use of rhBMP-2 in interbody fusion cages. Definitive evidence of osteoinduction in humans*, 25 J. Spinal Disord. 376 (2000).

b. J. Kenneth Burkus, Michael F. Gornet, Curtis A. Dickman and **Thomas A. Zdeblick**,

*Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

c. J. Kenneth Burkus, S.E. Heim, Michael F. Gornet and **Thomas A. Zdeblick**, *Is INFUSE bone graft superior to autograft bone? An intergrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

### 1. High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious Adverse Events From Medtronic-Funded Published "Studies"

693.       Medtronic officials recommended against publishing "a complete list of adverse events possibly associated with Infuse."[317]  In 2004, Dr. Julie Bearcroft, the Director of Technology Management in Medtronic's Biologics Marketing Department, wrote an email to other high-level Medtronic employees stating:

> *I have made some significant changes to this document (some at the request of Dr. Burkus) both in format and content. . . .How much information should we provide relative to adverse events?. . .You will see my [note] in the attached document but I don't think significant detail on this section is warranted.*

| From: | Bearcroft, Julie, PhD |
|---|---|
| Sent: | Wednesday, June 16, 2004 10:04:33 AM |
| To: | Treharne, Rick; Beals, Neil; Lipscomb, Bailey; McKay, Bill |
| CC: | Ma, Guorong; Peckham, Steve, Ph.D.; King, Vanja, Ph.D.; Woodward, Lyndsay; Hood, Tara |
| Subject: | Combined pilot & pivotal rhBMP-2/TCBD draft manuscript |
| Attachments: | Bone Dowel BMP superiority revision without tracking changes 061104.doc |

Please find attached a revised version of the combined bone dowel data paper.  I have made some significant changes to this document (some at the request of Dr Burkus) both in format and content.

---

[317] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 2, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

694.     The prior draft of the paper included material adverse events.  However, Medtronic's secret agent J. Kenneth Burkus, M.D., deliberately and intentionally deleted these adverse events from the final published report.

695.     This was confirmed by the findings of the Senate Investigation.  The U.S. Senate Committee on Finance found that "**the adverse events were observed in the clinical trial and formatted in a detailed table.  But following the advice of Bearcroft, this table of adverse events was not included in the published paper by J. Kenneth Burkus, M.D.**"[318]

696.     *The Spine Journal* scrutinized this particular Medtronic-sponsored study for failing to report any adverse events and for neglecting to mention that Medtronic funded three of the physician authors with more than $12 million.

697.     According to the Senate Report, "**Medtronic recommended against including information in the study** that was ultimately revealed to have an association between Infuse® and weakening that could lead to collapse of the bone and implant and required patients undergo additional surgery."[319]

### 2. Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies"

698.     Medtronic directly edited and even ghostwrote publications, which to the outside medical world, were ostensibly written by the named authors, promoting the use of Infuse® over the use of a bone graft by over stressing the pain at the donor site when using a bone graft and omitting the injuries that were actually observed when Infuse® was used.

699.     The Senate Report uncovered documents that show "**Medtronic edited draft publication to stress the pain patients experienced from undergoing a bone graft procedure** instead of receiving Infuse."

700.     Neil Beals, Medtronic's Vice President of Biologic Marketing, sent emails to authoring physicians in two separate studies suggesting that more emphasis be placed on the elimination of "donor

---

[318] *Id.* at 2, as confirmed in the United States Senate Report.
[319] *Id.* at 9-10, as confirmed in the United States Senate Report.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

site" pain when the surgeon elected to use Infuse® instead of a bone graft.[320]

701.     Following these studies, Medtronic's website promoted the benefits of Infuse® over traditional iliac crest bone grafts stating, that "[a]ccording to numerous studies, the harvesting procedure is actually more painful than the fusion itself, and nearly a third of patient experience hip pain two years following surgery."[321]  However these studies only included such information after persistent insistence by the Medtronic's Vice President.

702.     Vice President Beals worked directly with Medtronic's secret agent J. Kenneth Burkus, M.D. and encouraged him to include information emphasizing the pain related to the "donor site."

703.     After reviewing a draft of Medtronic's secret agent J. Kenneth Burkus, M.D.'s study, Vice President Beals emailed Dr. Burkus stating "a bigger deal should be made of elimination of donor site pain with Infuse."

704.     Nearing publication, Vice President Beals again sent an email suggesting, **"would it be appropriate to make a bigger deal out of donor site pain."**



705.     A sentence, at the apparent direct request of Vice President Beals was incorporated into the final published study stating, "[t]he use of rhBMP-2 is associated with high fusion rates without the need for harvesting bone graft from the iliac crest and exposing the patient to adverse effects associated with that procedure."[322]

---

[320] *Id.* at 11, as confirmed in the United States Senate Report.

[321] Fact Sheet, Medtronic Sofamor Danek, *available at* http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf (also attached hereto as Exhibit "A").

[322] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 12 S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached

706.    Again, Vice President Beals inserted comments encouraging discussion of donor site pain on a draft article co-authored by another Medtronic's secret agent Volker Sonntag, M.D.

707.    According to the Senate Report, Medtronic paid their secret agent Volker Sonntag, M.D. nearly $23 million dollars.  The article stated, "[b]y 12 months after surgery, the patients [sic] graft-site pain resolved…and no patient complained about the graft-site appearance."

708.    Despite this finding, Vice President Beals inserted comments on the draft stating, *"ALTHOUGH THE PATIENTS DID NOT COMPLAIN ABOUT APPEARANCE DIDN'T SOME STILL EXPERIENCE PAIN AT THE DONOR SITE? SEEMS LIKE RESIDUAL EFFECT OF DONOR SITE SHOULD BE NOTED."* (emphasis in original).[323]

709.    And if secret agent Volker Sonntag, M.D. didn't get it from the above communication from Vice President Beals, Beals wrote a subsequent email further thrusting Medtronic's involvement in the ghostwriting of the published studies.  In this subsequent email, Medtronic's Vice President wrote, *"I would also add in more discussion on donor site pain and need for osteogenetic graft **material (plant seed of doubt for just using allograft by itself)**."*(emphasis added).

| From: | Neil Beals |
|---|---|
| Sent: | Friday, August 30, 2002 01:23:35 PM |
| To: | Mark Marchan |
| CC: | Julie Bearcroft; Jim Van Hoeck; Bill McKay; Missy Taylor |
| Subject: | FW: Revised BMP paper and response |
| Attachments: | Resubmission Cervical BMP Paper 082902.doc; Resubmission Cervical BMP Paper 082302.doc; Response letter 2.doc; Rev 1.jpg |

- I would also add in more discussion on donor site pain and need for osteogenic graft material (plant seed of doubt for just using allograft by itself)

710.    These suggestions were incorporated into the final published version of the scientific article without mention of the nearly $23 million dollars Medtronic's paid their secret agent Volker Sonntag or of Medtronic's significant participation in the ghostwriting of the study.[324]

---

hereto as Exhibit "P").
[323] *Id.* at 5, 12.
[324] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

711.     Despite the two studies augmented by Medtronic's Vice President, the Senate Report cited studies that are in direct contrast with Medtronic's initial publications.  The Senate Report revealed that "spinal surgeons are beginning to question whether the "the oft-cited 'painful iliac crest donor site' is less serious and frequent than BMP enthusiasts would have us believe."[325]

712.     A 2011 study included in the Senate Report found that "[t]he incidence of pain over the iliac crest was similar in patients in which iliac crest was harvested and those in which no graft was harvested."  This study, and those like it, are in direct contrast with what is said in the Medtronic's sponsored studies and therefore not only cast serious doubt on the benefits of using Infuse® over traditional iliac crest bone graft, but the veracity of Medtronic in general.[326]

### 3. Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies"

713.     The Senate Report found that "*Medtronic employees not only edited the draft manuscript to include comments supportive of Infuse®, they also covertly participated in the peer-reviewers on behalf of the physician authors named on the paper.*"

714.     Medtronic's secret agent J. Kenneth Burkus, M.D. "*sent a draft manuscript of the study to Medtronic officials asking for assistance with "further data analysis*."

715.     Bill Martin, Vice President for Spinal Marketing Global Communications, and Medical Education at Medtronic made it clear to other employees that Medtronic would play a '***supporting cast'*** ***in assisting Dr. Burkus.***"

716.     Medtronic's secret agent J. Kenneth Burkus, M.D. informed Bill Martin that he "***wanted his name last (and all the neruo's first) so that it would be well accepted by the Neurosurgical community.***"[327] (emphasis added).

---

[325] *Id.* at 11.

[326] Hu, Serena S., *Commentary: Illiac crest bone graft: are the complications overrated? The Spine Journal,* June 2011, *available at* http://www.spine.org/Documents/TSJJune2011_Hu_Commentary.pdf (also attached hereto as Exhibit "XXX")*;* Howard *et. al., Posterior iliac crest pain after posterolateral fusion with or without iliac crest graft harvest, The Spine Journal, June 2011, available at* http://www.ncbi.nlm.nih.gov/pubmed/20947439 (also attached hereto as Exhibit "YYY").

[327] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 15 S. Prt. 112-38

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

-----Original Message-----
**From:**  Martin, Bill
**Sent:**  Wednesday, January 01, 2003 8:06 AM
**To:**  Beals, Neil; Wehrly, Peter [ITD Div. Pres.]
**Cc:**  Bearcroft, Julie; Charlton, Clark; Martin, Bill; DeMane, Michael; Lipscomb, Bailey
**Subject:**  RE: PLIF Study Manuscript

A word of caution.
I'm pretty sure that on this paper Dr. Burkus just wants us to provide him the data he requested. Dr. Burkus mentioned that his plan for this paper was to do all the work, put Drs Haid, Branch and Alexander's names first, and then he plans to route it to them "as is" for approval.  If they don't agree with the data, then they may of course take their name off.  Dr. Burkus has done ground work with Charlie and Reg and they have indicated initially that they seem to be fine with this - I don't anticipate any issues between them.  Dr. Burkus wanted his name last (and all the neuro's first) so that it would be well accepted by the Neurosurgical community. I know that he has talked in depth with Charlie about what the paper *should*, and equally important, *should not* include.

717.      Vice-President Richard Treharne also instructed Medtronic's secret agent Steven

Glassman, M.D. to dramatically downplay references to what he referred to as complications, related to

Infuse® by stating in an email,  *"[a]gain its probably too late, but page 14 line 13 says "The high*

*complication rate is alarming and warrants intense scrutiny."  I think what you are trying to say is that*

*the occurrence adverse events (not effects as in the title) in these patients was higher than expected and*

*warrants further investigation."* [328]

| From: | Treharne, Rick |
|---|---|
| Sent: | Wednesday, December 15, 2004 04:29:48 PM |
| To: | Steve Glassman (E-mail) ▮▮▮▮▮▮▮▮ |
| Subject: | Article Reminder |

Again it is probably too late, but page 14 line 13 says "The high complication rate is alarming and warrants intense scrutiny." I think what you are trying to say is that the occurrence adverse events (not effects as in the title) in these patients was higher than expected and warrants further investigation.

718.      Vice President Richard Treharne (recipient of the original FDA approval letter for

Infuse® in 2002) wrote an email to Medtronic's secret agent J. Kenneth Burkus, M.D. stating,  *"[i]n*

---

Washington: U.S. Government Printing Office (October 2013), *available at*
http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").
[328] *Id.* at 1055.

*looking over the data, I was impressed with how well the BMP patients actually did.  So much so that I added a few paragraphs at the end that you may not agree with."*[329]

| | |
|---|---|
| **From:** | Treharne, Rick |
| **Sent:** | Friday, January 10, 2003 04:42:15 PM |
| **To:** | Burkus, J. Kenneth |
| **BCC:** | Lipscomb, Bailey; Ma, Guorong |
| **Subject:** | PLIF Study Paper |
| **Attachments:** | PLIF BMP paper.1.doc; Burkus PLIF Paper 01-09-03.doc |

In looking over the data, I was impressed with how well the BMP patients actually did.  So much so that I added a few paragraphs at the end that you may not agree with, but which basically say that future studies are needed.  I think the data support such a conclusion.  I also took the liberty to add a paragraph about the neuro results and a discussion of the iliac crest pain vs. the anterior study.  I also added an Acknowledgement section. Take a look and see what you think. You can delete or edit as you wish, or send it out for review by your co-authors.

719.    The additions to Medtronic's secret agent J. Kenneth Burkus, M.D.' study by Vice President Richard Treharne read in part:  *"[i]n conclusion, this detailed, **independent review** of the results which represent the first of use osteoinductive proteins in a PLIF procedure are encouraging."*[330]

720.    All of the above were unknown to The Spine Journal's peer-review committee. However, following submission of the initial draft to *The Spine Journal,* the peer-reviewing physicians were critical of the article's "presentation of the study result."  The bias added by Medtronic was so apparent that critiques by the peer-reviewers included:  *"**[u]nless the authors can discuss the results of this study in an unbiased manner, which they have not been able to do in its present form, this data should not be published**."*  Another reviewing physician stated, *"**The manuscript is full of biased statements that are a reflection of the data evaluators-the company that markets the product…As it stands it is an advertisement for a specific product without significant scientific merit**."*[331]

---

[329] *Id.*
[330] *Id.*
[331] *Id.* at 16.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

721.    In response to the concerns expressed by the peer-reviewing physicians, Medtronic's letter "**seemingly misled *The Spine Journal*"** according to the U.S. Senate Report.  In response to the letter from one of *The Spine Journal's* peer-reviewers, Medtronic assisted in a draft response noting, "[t]o help eliminate any potential bias, only one of the co-authors was a clinical investigator – the other three were independent reviewers of the data.  Since these data are taken from a clinical IDE study sponsored by a company, only the company would have all the data in its database – data that is reviewed by FDA auditors.  We don't believe any discussion of bias is needed for the text."[332]

722.    The U.S. Senate Report found that these "**independent reviewers**" - Medtronic's secret agents Regis Haid, M.D. and J. Kenneth Burkus, M.D. - received $7,793,000 and $722,000, respectively by the end of 2003 and a total of $31,930,150.79 by 2010.

723.    According to the Senate Report, the "draft letter, written at least in part by Medtronic on behalf of Dr. Burkus, did not disclose the company's role in directly editing the paper, nor did it disclose the magnitude of financial payments made to the supposed '**independent reviewers**.'"[333]

724.    The U.S. Senate Report also uncovered an email, between Medtronic's Senior Vice President and President for Europe, Canada, Latin America and Emerging Market, Michael Demane to Medtronic's Vice President Bill Martin.  Realizing that Medtronic's significant involvement in editing and ghostwriting had been uncovered, Demane stated, "this is going to hurt more than help because of the reviewers [sic] comments.  Too late to turn back tho [sic]," in response to an upcoming editorial criticizing the study.[334]

725.    Without shame or any sense of remorse or wrongdoing, Medtronic defends its secret collaboration with physician authors in two ways; first, Medtronic claims that "[s]ome of the employees who reviewed these articles resided nominally in the "Marketing" Department, but the employees are technically and scientifically trained who have earned doctoral or other advanced degrees in relevant disciplines and draw on deep expertise in the science of bone morphogenetic proteins."[335]

726.    Second, Medtronic had the temerity to attempt to defend its practice ghostwriting journal

---

[332] *Id.* at 17.
[333] *Id.*
[334] *Id.*
[335] *Id.* at 8.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

articles by asserting that "physicians – not Medtronic personnel-prepare draft manuscripts, select content, approve suggested modifications, and are responsible for the final article content that they submit for publication and review by the scientific community."[336]

727.    However, Medtronic paid authors such as their secret agent "authors" J. Kenneth Burkus, M.D. and Volker Sonntag $ 6.38 million and $28.85 million, respectively, between 1998 and 2010 in the form of consultant fees, royalties, and other compensation.[337]

728.    Medtronic's secret agent J. Kenneth Burkus, M.D. acting on behalf of Medtronic, co-authored 10 of the original 13 false studies.[338]

729.    Both Medtronic and the authoring physicians failed to disclose these financial relationships to the scientific community when they published these highly biased and now shown to be false "studies".

### S. THE YALE STUDY, PUBLISHED IN JUNE 2013, FUNDED WITH MILLIONS OF DOLLARS FROM MEDTRONIC, CONFIRMS THE LACK OF SCIENTIFIC INTEGRITY OF PREVIOUS COMPANY SPONSORED "STUDIES" OF MEDTRONIC'S INFUSE®

730.    Following the unprecedented findings by *The Spine Journal*, Medtronic under its new CEO, Omar Ishrak commissioned a subsequent review of the effectiveness of Infuse® and the integrity of their previously funded studies of Infuse® that had become the subject of significant controversy.

731.    In August 2011, Medtronic provided a $2.5 million grant to Harlan Krumholz, M.D. to fund the Yale University Open Data Access Project (YODA).[339]

732.    YODA's stated goal was to "increase transparency and enhance the public trust in industry-funded clinical trials by facilitating the independent assessment and dissemination of data relevant to the benefits and harms of drugs and devices."[340]

---

[336] *Id.* at 8.
[337] *See id.* at 5.
[338] *See id.* at 6-7.
[339] Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/index.aspx (also attached hereto as Exhibit "ZZZ").
[340] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

733.    Through YODA, Yale led independent and systematic reviews conducted simultaneously by two (2) independent teams of the entire body of scientific evidence regarding the safety and effectiveness of Medtronic's recombinant bone morphogenetic protein-2 (rhBMP-2) product.  Each team reviewed all of the data independently of each other.

734.    In a public response to the initiation of the YODA study, twenty-one (21) preeminent spine surgeons voiced their concern about Medtronic's corruption of the independent study process.  In an editorial, *A biologic without guidelines: the YODA project and the future of bone morphogenetic protient-2 research*, published in *The Spine Journal* in October 2012 the surgeons stated in part:

> [a]s a specialty, ***it is painful to consider how early prudent reporting of even the most obvious and suspicious adverse events might well have prevented a decade of serious complications*** related to the use of rhBMP-2.  In retrospect, we can see how false confidence in a reportedly perfect safety profile promoted a period of BMP-2 application in areas of greater and greater potential danger. . . And yet, given the legacy of questionable research and limitations in the primary body of rhBMP-2 data, there is a possibility that expectations of YODA have been exaggerated.[341] (emphasis added).

735.    The editorial by these twenty-one (21) preeminent spine surgeons further noted that: "clinical researchers cannot act as financially engaged business associates, and dispassionate investigators cannot be both credible authors and entrepreneurs in research involving human subjects**…[m]any principal investigators in the Medtronic-sponsored trials had financial conflicts of unprecedented magnitude**, the effect of which will be difficult to estimate, but **nearly impossible to overestimate**, in post hoc analyses."[342] (emphasis added).

736.    Even Dr. Krumholz, the creator of YODA, when told of the findings in the U.S. Senate Report (October, 2012) and while the YODA studies were still in progress, expressed his concerns stating, "This sounds eerily familiar to many of the transgressions we've read about from the pharmaceutical industry…It paints a picture of a company very heavily involved in the science; marketing contaminating the science; and the medical profession and researchers being complicit."[343]

---

[341] Carragee EJ, *A biologic without guidelines: the YODA project and the future of bone morphogenetic protein-2 research,* 12 Spine J. 878, 877-80 (2012) (also attached hereto as Exhibit "AAAA").
[342] *Id.* at 878-79
[343] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, (Oct 25, 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551 (also attached hereto as Exhibit "L").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

(emphasis added).

737.    In hopes to quell concerns of further impropriety, two academic teams, Oregon Health and Science University and University of York, conducted an independent review, on behalf of YODA, with full access to all of Medtronic's clinical trials, post-marketing and safety data regarding rhBMP-2.[344]

738.    Oregon Health and Science University stated that "[t]he primary aims of this report are 1) to estimate the effectiveness and harms of rhBMP-2 in spinal fusion in a systematic review using the individual patent data (IPD) when available, and 2) to assess reporting biases in published articles of industry-sponsored studies."[345]

739.    Oregon Health and Science University released their findings in June of 2013 and found that:

> a.    "**there was serious selective reporting and underreporting of adverse events in the published articles** for both rhBMP-2 and ICBG groups, especially in the Medtronic trials published early.
>
> b.    **The actual rates of adverse events were much higher than reported**."[346] (emphasis added).

740.    More specifically, the Oregon Health and Science University reported that the individual patent data (IPD) data contained "315 adverse events in the rhBMP-2 group and 274 adverse events in the autograft group two years after surgery."[347]

741.    These findings are in direct contrast with the published version of the Medtronic-sponsored studies, which simply reported either "no unanticipated device-related adverse events" or "no adverse events directly or attributable to rhBMP-2."[348]

---

[344] rhBMP-2 Project, Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/overview.aspx (also attached hereto as Exhibit "BBB").

[345] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, Executive Sumary -1 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCC").

[346] *Id.* at Executive Summary - 9.

[347] *Id.*

[348] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

742.    The study defined reporting bias as "…[the] incomplete or inaccurate reporting of study outcomes and encompasses publication bias, outcome reporting bias, multiple publication bias, location bias, language bias, time lag bias, citation bias, and others (e.g. ghostwriting, misrepresentation of facts, reframing)."[349]

743.    After comparing results reported in the published literature to individual patient data, the authors concluded that "[e]vidence of reporting bias in the published articles of industry-sponsored trials is *substantial*."[350]

744.    Dr. Rongwei Fu, the lead author of the Oregon Health and Science University study, stated *"[w]e found a lot of reporting bias in [Medtronic's] published papers that tends to overstate the benefits and played down the risks*." Further, Dr. Fu said "*it was difficult to identify "clear indications" for using the product, as Infuse*® offered no additional benefits beyond the normal benefits of the spine surgery*."[351] (emphasis added).

745.    The misrepresentations and bias were not contained only to the "benefits" of Infuse®. The authors noted that some publications overemphasized "donor site hip pain," which was only assessed in the control group patients and only on the side of their ICBG.[352]

746.    The authors recognized the consequences of this widespread reporting bias by stating "[s]uch underreporting and practice could affect the spine surgeons' ability to evaluate the balance between the benefits and harms of using rhBMP-2 and prevent informed consent."

747.    Following an independent review of Medtronic's data, Oregon Health and Science

---

*living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-83, 463-468 (2011) (also attached hereto as Exhibit "RR").

[349] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, 10 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCCC").

[350] *Id.* at Executive Summary 9.

[351] Christopher Weaver, *Studies Fail to Back Medtronic Spine Product*, The Wall Street Journal, (June 17, 2013), *available at* http://online.wsj.com/article/SB10001424127887323383650457855180169098558.html (also attached hereto as Exhibit "DDDD").

[352] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, Executive Summary - 9 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCCC").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

University study found that Infuse® had <u>more adverse events and an increased risk</u> associated with its use, when compared to the gold standard traditional ICBG.

748.    Specifically, the YODA reviewers from Oregon found that Infuse® resulted in:

a. an overall risk of cancer almost triple that of ICBG;[353]

b. contrary to a previously published Medtronic-sponsored study, Infuse® does not have a higher rate of success in Posterolateral fusions;[354]

c. Subsidence occurred in four times as many patients using Infuse® in comparison to ICBG;[355]

d. a cohort study reported more aggressive resorption of the graft and endplates in the rh-BMP-2 group compared with ICBG;[356]

e. 315 adverse events where found within studies in direct contrast to published results stating "no unanticipated device-related adverse events."[357]

749.    Furthermore, a meta-analysis of the IPD showed that "there was moderate strength of evidence of ***no consistent differences between rh-BMP-2 and ICBG in overall success of fusion***."[358] (emphasis added).

750.    This finding directly contradicts the false and misleading marketing materials provided by Medtronic directly to physicians and consumers on their websites which touted a greater fusion rates with Infuse® when compared to ICBG.

751.    The Oregon Health and Science University concluded "[there was] substantial evidence of reporting bias, no evidence that rhBMP2 is more effective than ICGB in spinal fusion, and some evidence of an association with important harms."[359]

752.    Further, Mark Helfand, MD, co-author of the report from Oregon Health & Science University discussed the results regarding Infuse® stating **"[i]t is hard to find a clear advantage for**

---

[353] *Id.* at 62.
[354] *Id.* at Executive Summary - 9.
[355] *Id.* at 30-31.
[356] *Id.*
[357] *Id.*
[358] *Id.*
[359] *Id.* at 86

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

using it…When you add in the potential harms, it tips the scale further toward not using it."[360]

753.    Similarly, YODA reviewers from the University of York, in York England stated that the three objectives of their independent review of Medtronic's data were to "1) [e]xamine the potential benefits of rhBMP-2; 2) Examine the potential harms of rhBMP-2; and 3) Assess the reliability of the published evidence base."[361]

754.    University of York, in June of 2013, published results that were similar to those of Oregon Health and Science University.  Their review found:

> a. The use rhBMP-2 in spinal surgery had modest benefits when compared with ICBG surgery 24 months after surgery;[362]
>
> b. a near doubling in number of cancers with rhBMP-2;[363]
>
> c. heterotopic bone growth was 5.57 times more likely to occur in PLIF and TLIF spinal fusions using Infuse® as opposed to ICBG;[364]
>
> d. osteolysis or bone destruction was 4.26 times more likely to occur in a TLIF and 3.17 times more likely in PLIF using Infuse® than in a spinal fusion using ICBG;[365]
>
> e. retrograde ejaculation was 4.76 times more likely with Infuse® than with ICBG;[366]
>
> f. hardware failure was as high as 8.37 times more likely to occur using Infuse® than with ICBG with a comparator like the Maverick disc system.[367]
>
> g. Analyses of adverse event IPD from the Medtronic-sponsored trials showed some adverse events to be more common among rhBMP-2 patients…Arthritis, implant-related events, retrograde ejaculation, adverse wound events and neurological, urogenital and

---

[360] John Fauber, *Reports question benefit of Medtronic's spine* surgery product, (June 2013) *available at* http://www.jsonline.com/watchdog/watchdogreports/reports-question-benefit-of-medtronics-spine-surgery-product-b9935439z1-211874181.html (also attached hereto as Exhibit "EEEE").

[361] Jennifer V.E. Brown et al., Systemic review and meta-analysis of the safety and efficacy of recombinant human bone morphogenic protein-2 (rhBMP-2) for spinal fusion, Centre for Reviews and Dissemination University of York, 49 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158787_York rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "FFFF").

[362] *Id.* at 49.

[363] *Id.* at xvi.

[364] *Id.* at 75.

[365] *Id.* at 76.

[366] *Id.* at 55.

[367] *Id.* at 79.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

vascular events were also more common among rhBMP-2 patients;[368] and finally

h. University of York showed further concern stating, "[s]tudies published in the wider literature and post marketing data raise concerns about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia.  Owing the non-randomised nature of the studies and difference between them, the strength of this body of evidence is weak and findings should be interpreted cautiously."[369]

755.    University of York commented specifically on the reliability of Medtronic's published evidence stating, **"we found adverse events to be incompletely and inadequately described in the trial publications."[370]**

756.    Additionally, "comparing the CSR categories against the adverse events described in published journal articles suggests that *adverse event reporting across the Medtronic publications is relatively sparse and inconsistent*."[371](emphasis added).

757.    Further, University of York found that the *"[p]ublished papers provided far less information than was available* in the confidential CSRs (or in the supplied IPD).  The way in which the adverse data were presented in the literature was *highly inconsistent and the rationale for presenting some adverse events and not others was rarely clear*.  Brief, vague statements in some publications that simply noted 'no unanticipated device-related adverse events' were inadequate and unhelpful.  In our view, such statements, without supporting evidence, should not be considered acceptable for publication."[372](emphasis added).

758.    University of York stated further that *"[s]tudies published in the wider literature and post marketing data raise concerns* about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia.  Owing the non-randomised nature of the studies and difference between them, ***the***

---

[368] *Id.* at xvi
[369] *Id.* at 119.
[370] *Id.* at xvi.
[371] *Id.* at 100.
[372] *Id.* at 118.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*strength of this body of evidence is weak and findings should be interpreted cautiously*."[373]

759.    The main conclusion the University of York arrived at was that "rhBMp-2 seems to increase the chance of successful fusion, ***according to Medtronic definitions***, but this does not translate to clinically meaningful benefits in pain reduction, function or quality of life."[374](emphasis added).

760.    The findings of the YODA reviewers did not go unnoticed. Medtronic manipulated the studies by creating a threshold definition of what constituted a fusion that is not accepted by the spine community but permitted Infuse® to have positive results in the "studies."  Medtronic defined spinal fusion as a success or failure according to their own made-up definition.  Medtronic's definition allowed for "translation of less than or equal to 3 mm and angulation of less than 5 degrees."[375] The Mayo Clinic defines spinal fusion as "…surgery to permanently connect two or more vertebrae in your spine, eliminating motion between them".[376]

761.    Other preeminent researchers and scientific journals also weighed in on the study results. Dr. Krumholz of Yale commented on the study findings stating that "***[e]vidence suggests that some data are not missing at random.***"[377]

762.    Christine Laine, editor-in-chief of *Annals*, said it now will be difficult for doctors to recommend BMP-2 since it was shown to offer no meaningful benefit over the traditional method used for spinal fusion.[378] Dr. Laine's statement also further emasculates any claimed, learned intermediary defense.

763.    Further, U.S. Senator Max Baucus, chairman of the Senate Committee on Finance, said the new reports amounted to more evidence of "collusive relationships" between Medtronic and the doctors who wrote the questionable papers about Infuse.  "If not for those relationships and the

---

[373] *Id.* at xvi.

[374] *Id.* at 119.

[375] Burkus JK, Gornet, MF, Dickman CA, Zdeblick TA, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages,* J. Spinal Disord. Tech. 2002; 15:337-39; (also attached hereto as Exhibit "Q").

376Spinal Fusion, Mayo Clinic *available at* http://www.mayoclinic.com/health/spinal-fusion/my01235 (also attached hereto as Exhibit "GGGG").

[377] Eugene Caragee, *Response to Long-Awaited YODA Report on Controversial Spinal Fusion Products,* The Spine Journal. (June 17, 2003), *available at* http://www.spine.org/Documents/Carragee_Statement_YODA_Reports_061713.pdf (also attached hereto as Exhibit "HHHH").

[378] John Fauber, *Medtronic $$$ Buy Reports That Slam Spine Product,* (Jun 17, 2013), *available at* http://www.medpagetoday.com/PainManagement/BackPain/39903 (also attached hereto as Exhibit "IIII").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

misleading studies they produced, patients might have gotten more effective treatments and avoided harmful side effects," Baucus said in a statement. "The bottom line is ailing patients should never have to fear they're being sold a bill of goods."

764.     In a press release following the release of the YODA study results, *The Spine Journal* announced, ***"[i]n a triumph of understatement, the YODA group informs us that ten years after its development 'it is difficult to identify a clear indication for BMP-2 use in spinal fusion.'"***

765.     Dr. Carragee, Chief Editor of *The Spine Journal* further explained in part:

> *To put the YODA finding in perspective, one must understand the carnival-like promotion that preceded BMP-2's fall from grace. **Market boosters advertised** that BMP-2 went beyond all other medical innovations. Perhaps confusing Infuse® with penicillin or the polio vaccine, one zealot proclaimed: '**Infuse, the single most successful biologic product ever launched in orthopedics and possibly ever in medicine**.'*

> *It is astonishing to recall the lavish praise for BMP-2 use by some Medtronic-associated surgeons just a few years ago. . .**Dr. Scott Boden declared, '[t]he age of BMP has arrived.'** Then within three months of FDA approval in July of 2002, **Dr. Thomas Zdeblich and Dr. J. Kenneth Burkus reported that Infuse had become their exclusive bone grafting method for anterior lumbar fusions:** "With it superiority, **InFuse Bone Graft may now become the new gold standard** for replacing autograft bone.*

> *[A]n **extraordinary merry-go-round of comprehensively conflicted faces are found where independent checks should have provided critical review.** In some instances, it seems the principal investigator with strong financial ties helped design a trial, and then acted as surgeons who monitored their own complications. To complete the circuit the same surgeon/investigator would co-author the paper and then submit the manuscript for review to…well…himself as chief or section editor of the journal. In some cases the editor in chief of the journal approving his own paper was also the developer and the royalty holder on products being investigated.*

> *And now the [Yale Open Data Access Project] group – echoing The Spine Journal's critical review from 2 years ago – tells us that important concerns about BMP-2 complications were 'underreported' or just missing. As YODA project director Harlan Krumholz, MD, SM, delicately puts it, '**Evidence suggests that some data are not missing at random.**' Annals editors are more blunt: '**Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting.' Ouch**.*

766.     Dr. Carragee concludes:

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

*[i]t's ultimately disappointing that after 15 years of largely self-congratulatory research, we have only indirectly discovered BMP-2' many potential complications…The suggested gap in our understanding if true, is simply appalling:  these complications were systematically, 'misrepresented,' 'underreported' or just 'missing' from the first decade of publications.*[379] (emphasis added).

767.      However, Medtronic's reaction to the YODA results was, not surprisingly misleading and disingenuous.

768.      Following the release of the YODA studies, Omar Ishrak, CEO of Medtronic, publicly announcing as if YODA supported their methodology and past behavior, that over one million patients have used Infuse® and that the YODA study results "add to a growing body of evidence regarding INFUSE Bone Graft as a safe and effective treatment option for patients in approved indications for use." [380]

769.      In making this public announcement, CEO Ishrak deliberately ignored the undisputed fact that over 85-90% of Infuse® surgeries were "off-label", as a result of Medtronic's illegal marketing, promotion, and distribution of Infuse®.  Nor did CEO Ishrak disclose that YODA, the United States Senate, and independent leading experts in the spine community, severely criticized Medtronic for their actions and even questioned the use of Infuse® in light of the serious adverse risks with a lack of any increased benefit or advantage over other available techniques.

770.      *The Journal of the American Medical Association* ("JAMA") published an article that appeared in the July 23, 2013 edition.  JAMA is the most widely circulated medical journal in the world. The article addressed the YODA study. The title of the article accurately sums up the results: "Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device."

771.       The article reports that YODA revealed Infuse® as product "has no clinical advantage over the traditional bone grafting methods."  It further reports that both independent Universities found similar results, quoting York University's lead author Mark C. Simmonds; "[w]e think although we had

---

[379] *Id.*

[380] Press Release, Infuse Bone Graft Remains Important Treatment Option (June 17, 2013), *available at* http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&id=1830515 (also attached hereto as Exhibit "JJJJ").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

different approaches, we did come up with similar findings [as the Oregon team]." The article reports that "[c]linically, Simmonds could not recommend using rhBMP-2." Finally, the Oregon Health and Science University study team noted "earlier release of all relevant data would have better-informed clinicians and patients making medical decisions."[381] The *JAMA* article is further recognition by the leaders of the medical community that Infuse® was misrepresented by Medtronic and its secret agent authors.

### T. RECENT STUDIES, RELEASED SEPTEMBER 4, 2013, RECOGNIZED RHBMP-2 EXPOSURE LEADS TO A FIVE- FOLD INCREASE IN CANCER

772.    Doctors Eugene J. Carragee, Bradley K. Weiner, and other esteemed authors in the most recent study published in the September 4, 2013 edition of *The Journal Of Bone And Joint Surgery,* looking into the connection of rhBMP-2 and cancer, determined that the patients exposed to a 40 milligram dose of Infuse® experienced a 7.77% increase in risk of developing cancer in comparison to ICBG spinal fusions. When multiple cancers in a single patient were not considered, five-fold (5) more patients developed one or more cancers when compared to ICBG. Therefore, for every 17.4 patients, one patient developed cancer within two years of their spinal fusion using Medtronic's rhBMP-2. More specifically, rhBMP-2 may play a role in the tumor progression of pancreatic and breast cancer cells and the epithelial-to-mesenchymal, enabling the tumor to penetrate more deeply in lung cancer.[382]

773.    Notably the population for this cancer study was selected based upon its low risk or likelihood for developing cancer from other external factors. The physician authors warn, "the cancer risk associated with rhBMP-2 may be greater in populations with a higher prevalence of indolent or in situ cancer (e.g., older individuals, those with a history of cancer or known concurrent cancer, and those with genetic or exposure-related predisposition)."[383]

---

[381] Mike Mitka, MSJ, *Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device,* 359-340, (July 24, 2013) JAMA (also attached hereto as Exhibit "KKKK").

[382] Eugene J. Carragee, et al., *Cancer Risk After Use of Recombinant Bone Morphogenetic Protein-2 for Spinal Arthrodesis,* The Journal of Bone and Joint Surgery 1537-1544, (July 2013) (also attached hereto as Exhibit "LLLL").

[383] *Id.*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

## U. ARTICLES FROM THE RECENT SEPTEMBER 2013 ISSUE OF THE SPINE JOURNAL DISCUSSES THE LACK OF EFFICACY, INCREASED RISKS, SAFETY CONCERNS, AND THE CORRUPTED INFUSE® STUDIES

774.    The September 2013 *The* Spine *Journal* editorial entitled "Moving forward after YODA", written by Eugene J. Carragee, M.D., Bradley K. Weiner, M.D., Eric L. Hurwitz, DC, Ph.D., and Mark L. Schoene, BS examined the safety concerns and the lessons learned of rhBMP-2.[384]  In this article the authors stated the following in their conclusions:

- Our review discovered that rhBMP-2 appeared to work no better than iliac crest bone graph for fusion but that the potent growth factor did appear to have a number of potential drug- and implant- associated adverse events, including some very serious complications.

- The YODA findings confirmed the *TSJ* findings and, indeed, identified several additional research problems *including the apparent misrepresentation of effectiveness and safety in the early articles through selective and incomplete reporting and the fact that the research design limited the ability of the studies to precisely assess safety.  They concluded that 'rhBMP-2 provided little or no benefit compared to bone graft and may be associated with more harms, possibly including cancer.'* (emphasis added).

- [W]e note that some of the YODA and the *Annals* editors suggest that there may be *no clear* indications for use.

- The YODA findings suggest that the entire research system, at least for commercial products, has broken down in a fundamental way and needs to be redesigned.

- It provides the clearest argument for reform of the current system and open access to data, to protect the health and safety of patients, and the ability of health-care providers to provide humane and effective treatment.  *The BMP-2 issue is just the most recent example (eg Vioxx, Tamiflu, Paxil, Avandia) to show that questionable behavior has been going on in the medical research for years, resulting in publication/reporting bias, biased systematic reviews, and public health and patient harm."* (emphasis added).

- For all:  Really, it is about putting patient safety ahead of personal financial profit, professionalism pride/ego, and surgical convenience.

---

[384] Eugene J. Carragee, et al., *Moving forward after Yoda,* The Spine Journal 995 -997 (September 2013) (also attached hereto as Exhibit "MMMM").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### *The Spine Journal* "When Money Talks"

775.     The September 2013 issue of *The Spine Journal*, has an article written by David J. Rothman, PhD and Shelia M. Rothman, PhD entitled "When money talks."[385]  In the article the authors concluded the following:

- Despite the explicit and detailed reports of extensive financial ties between physicians and researchers on the one hand and device and drug companies on the other hand… some recipients of industry largess continue to deny that these relationships are in any way problematic.

- *One outstanding case in point involves Medtronic-funded studies on BMP-2, as examined in 2011 in this journal.*  As many readers will know, critics found the results of the Medtronic studies so self-serving and incomplete that the company funded and released all its BMP-2 research data to the Yale University Open Data Access Project.  (emphasis added).

- In June 2013, the findings of two independent research teams were published, and one of them (Fu et al.) was particularly troubled by the effects of company-sponsored research.  'No trials were truly independent of industry sponsorship,' its author concluded.  'Earlier disclosure of all relevant data would have better informed clinicians and the public then the initial published trial reports did' [9].  So too, the editors of the Annals of Internal Medicine concluded that '*Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication and underreporting.*'  In other words, just as gifts bias the recipient, so apparently do research grants and consulting [10].  (emphasis added).

- In most cases, recipients of company largess are not being 'bribed'—they are being 'gifted.'

- The Yale University Open Data Access Project groups critical assessment of decade-old research was not only relevant to the company but also reflected back in stark terms on the original authors…

- *Patient welfare and scientific integrity are too important to allow bias to affect the research reports in journal articles, the prescribing habits of physicians, the content of lectures, the decisions of professional associations' guideline committees, and the choice made by formularies for drugs and devices.*  (emphasis added).

- Those denying or qualifying the reality and scope of the problem are in a losing position.  To be sure, scandals will inevitably recur.  The drive for income and profit, no matter what the cost, cannot be completely contained.

---

[385] David J. Rothman, et al. *When Money Talks*, The Spine Journal 998-1000 (September 2013) (also attached hereto as Exhibit "NNNN").

*The Spine Journal* **"Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2?"**

776.    In the September 2013 issue of *The Spine Journal* an NASS review article written by Christopher M. Bono, M.D., F. Todd Wetzel, M.D., on behalf of the North American Spine Society Executive Committee, endorsed by the North American Spine Society Section on Biologics entitled "Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2?" examined the outcomes and adverse events of BMP-2 comparing the studies and data used from the Yale University YODA study and the Spine Journal 2011study.[386]

777.    The publications reviewed were: (a) The 2011 The Spine Journal article by Dr. Carragee et al. entitled "A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned"; (b) The YODA article by Dr. Simmonds et al. entitled "Safety and effectiveness of recombinant human bone morphogenetic protein-2 for spinal fusion"; and (c) The article by Dr. Fu et al. entitled "Effectiveness and harms of recombinant human bone morphogenetic protein-2 in spine fusion".

778.    The authors reviewed the original Dr. Carragee studies because Dr. Carragee "concluded that 'Level I and Level II evidence from *original FDA summaries, original published data, and subsequent studies suggest possible study design bias in the original trials, as well as a clear increased risk of complications and adverse events to patients receiving rhBMP-2 in spinal fusion.*'  Furthermore, they documented that the '*risk of adverse events associated with rhBMP-2 is 10 to 50 times the original estimates reported in the industry-sponsored peer reviewed publications.*'" (emphasis added).

779.    In this recent article comparing the results of the Carragee studies with the YODA publications, the authors concluded that Carragee's original review was correct and was further corroborated by the YODA findings.  They stated:

> With careful examination of these findings, it appears that the concern of Carragee et al. [2] about leg pain in the early postoperative after surgery is substantiated by both reviews.  Regarding cancer risk, Fu et al. [5] found a stronger association than both

---

[386] Christopher M. Bono, et al., *Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2,* The Spine Journal 1001-1005 (also attached hereto as Exhibit "OOOO").

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Caragee et al. [2] and Simmonds et al…

780.    The authors went on to say:

Simmonds et al. [3] appear to be in agreement with Carragee et al. [2] regarding concerns of retrograde ejaculation, urogenital complications, subsidence, infections, and implant-related adverse events (if this can be used as a proxy for osteolysis). Fu et al. [5] seem to corroborate these concerns, finding that retrograde ejaculation, subsidence, and urogenital problems were more common with BMP…

The common conclusion of the three groups was that heterotopic (i.e., ectopic) bone formation was much more common with rhBMP-2...

781.    Finally, the authors said, "Suffice it to say that Fu et al. [5], similar to Carragee et al. [2], found instances in which 'no adverse events because of rhBMP-2' were reported when in fact IPD analysis found that they in fact did occur (and were recorded)."

## V. MEDTRONIC'S PARTICIPATION IN THE COVERING UP OF AND FAILURE TO ADEQUATELY WARN OF SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE® CAUSED PLAINTIFFS' INJURIES

782.    A manufacturer has the duty to provide adequate and timely warnings regarding increased risks and dangers associated with the foreseeable uses of its product.

783.    Medtronic knew that Infuse® was being widely used for non-approved uses, in non-approved ways, by untrained surgeons and in violation of federal law and the restrictions set forth in the PMA.

784.    Medtronic actively encouraged such use through its illegal promotional scheme and other illegal activities.

785.    Medtronic grossly failed to satisfy their duty mandated by federal law, the PMA, and state common law duties.

786.    Medtronic did not provide adequate and timely warnings or instructions regarding the "off-label" uses of Infuse®

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

787.    Medtronic directed/encouraged and helped to disseminate misleading and false information concerning the "off-label" use of Infuse®.

788.    Medtronic provided undisclosed financial incentives to lecturing physicians, authors of scientific and medical articles, and sales representatives.

789.    Medtronic purposefully concealed the serious increased risks and complications associated with "off-label" use of Infuse®;

790.    **Medtronic failed to take the required action when it learned that Infuse® was being used in ways and in a manner that was not approved and required by the PMA**, all of which is in direct violation of federal law and the PMA.

791.    Medtronic cannot and should not be permitted to absolve itself from liability by pointing to the "off-label" use of its device by physicians or by pointing to the FDCA or the MDA, claiming preemption, when it is Medtronic who chose to violate the law deliberately concealed its knowledge of the increased risks, complications, and the serious and dangerous adverse side effects associated with "off-label" use of Infuse®.

792.    Medtronic cannot and should not be permitted to absolve itself from liability by pointing to the off-label use of its device by physicians, when it is Medtronic who, in violation of federal law and the PMA, distorted the actual facts of the studies so as to conceal the true adverse events observed with the use of Infuse® as compared to that of other types of procedures and techniques, all while concealing Medtronic's involvement in that scheme.

793.    A medical device manufacturer only gets the benefits afforded by federal law, *i.e.* the FDCA and MDA, when it abides by federal law.

794.    Federal law requires that a medical device manufacturer submit to the FDA a premarket application for approval of a class III medical device, include proposed labeling, setting forth the proposed "intended uses" of the medical device.

795.    It is only the "intended uses" set forth by the device manufacturer in the premarket application that the FDA put through the premarket approval review process and ultimately passes on.

796.    If a medical device manufacture markets, promotes, distributes and/or sells a medical

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

device for uses other than the "intended use" that went through the FDA premarket approval process, those unapproved and un-reviewed uses are not afforded any of the benefits of federal law including the FDCA and MDA.

797.    Medtronic's aggressive marketing efforts influenced Plaintiff's physician to use Infuse® in an "off-label" manner.

798.    The degree to which Medtronic secretly promoted "off-label" Infuse® was so permanent and pervasive that "off-label" use in fact represented nearly 90% of all Infuse® sales.

799.    Medtronic's illegal promotion of Infuse® for "off-label" use and its concealment of material information regarding the risks associated with "off-label" use of Infuse® was therefore the proximate cause of Plaintiffs' injuries.

800.    Not only did Medtronic not provide the Plaintiffs' physician nor Plaintiffs with the necessary information in order to make an informed decision in the best interests of Plaintiffs' health, Medtronic intentionally and purposefully deceived Plaintiffs' physicians and the Plaintiffs as to the safety and efficacy of Infuse®.

801.    Medtronic did not discharge its duty, required by federal law, the PMA, and state common law duties to adequately and fully warn and inform Plaintiffs' physician and Plaintiffs of the known dangers and increased risks associated with the "off-label" use of Infuse® nor did Medtronic provide Plaintiffs' physician with adequate instructions for its use.

802.    Plaintiffs' physician and Plaintiffs reasonably relied, and did rely, on Defendants' misrepresentations and concealments.

803.    Moreover, Plaintiffs would not have consented to the "off-label" use of Infuse® had they been fully informed of its increased dangers, risks, and adverse consequence.

804.    As a direct and proximate result of Medtronic's fraudulent concealment and misrepresentations concerning material health and safety risks related to Infuse®, as well as Medtronic's reckless and irresponsible "off-label" promotion and marketing practices, Plaintiffs were permanently injured and suffered and will continue to suffer injuries, damages, and economic loss.

805.    As the direct, proximate and legal result of Medtronic's fraudulent concealment and

misrepresentations concerning material health and safety risks related to Infuse®, as well as Medtronic's reckless and irresponsible "off-label" promotion and marketing practices, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the quality and enjoyment of life as a result.

## VI. EQUITABLE TOLLING/FRAUDULENT CONCEALMENT

806.  Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

807.    Medtronic's failure to document or follow up on the known defects of its products, and concealment of known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiffs herein.

808.    Medtronic and the defendants named herein are estopped from relying on any statute of limitations defense because they continued to refute and deny reports and studies questioning the safety of Infuse®, actively and intentionally concealed the defects, suppressed reports and adverse information, crafted the published reports to falsely increase the benefits of Infuse® while falsely increase the adverse event profile of the alternative procedures and methods, failed to satisfy FDA and PMA requirements, failed to satisfy FDA and PMA notification requirements, and failed to disclose known dangerous defects and serious increased risks and complications to physicians and the Plaintiffs.

809.    Instead, Medtronic continued to represent Infuse® was/is safer, more effective and the best alternative for spinal fusion all the while they knew that this was absolutely false and not true, even after the United States Senate report and the YODA study were released.

810.    Medtronic and the defendants named herein did the above acts which were and are illegal under federal law, the PMA and parallel state law, to encourage surgeons to use Infuse® in "off-label" manners.

811.    Medtronic and the defendants named herein did the above acts which were and are illegal under federal law, the PMA and parallel state law, to encourage patients to permit their surgeons to use

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Infuse® in "off-label" manners.

812.    At all relevant times, Medtronic was under a continuing duty under federal law, the PMA and parallel state laws to disclose the true character, quality, and nature of the increased risks and dangers associated with Infuse®.

813.    As a result of Medtronic's concealment of the true character, quality and nature of their product, they are estopped from relying on any statute of limitations defense.

814.    Medtronic furthered their fraudulent concealment through act and omission, including misrepresenting known dangers and/or defects in Infuse® and/or arising out of the use of Infuse® and a continued and systematic failure to disclose and/or cover-up such information from/to the Plaintiffs, Plaintiffs' physicians, and the public.

815.    Medtronic's acts and omissions, before, during and/or after the act causing Plaintiffs' injury, prevented Plaintiffs and/or Plaintiffs physicians from discovering the injury or cause thereof until recently.

816.    Medtronic's conduct, because it was purposely committed, was known or should have been known by them to be dangerous, heedless, reckless, and without regard to the consequences or the rights and safety of the Plaintiffs.


## VII. GENERAL ALLEGATIONS

817.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

818.    At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold and distributed by Medtronic.

819.    Medtronic negligently, carelessly, and/or recklessly manufactured, marketed, advertised, promoted, sold and distributed Infuse® as a safe and effective device to be used for spinal fusion surgery.

820.    Medtronic knew, and/or had reason to know, that Infuse® was defective, unreasonably dangerous, and not safe for off-label non-intended uses.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

821.    Medtronic knew, and/or had reason to know, that Infuse® was defective, unreasonably dangerous and not safe for off-label non-intended uses because the adverse events reported and scientific studies performed showed substantially increased risks of serious dangers.

**Representations**

822.    Medtronic promoted Infuse® for off-label surgeries that are outside of the intended uses approved by the FDA.

823.    Medtronic negligently, carelessly, recklessly, and/or intentionally promoted Infuse® for off-label surgeries that are outside of the intended uses approved by the FDA to physicians and patients, including the Plaintiffs and Plaintiffs' physicians.

824.    Medtronic downplayed to physicians and patients, including Plaintiffs and Plaintiffs' physicians the dangerous side effects of Infuse®, including downplaying the dangers of off-label use.

825.    Medtronic misrepresented the safety of Infuse® to physicians and patients, including Plaintiffs and Plaintiffs' physicians.

826.    Medtronic willfully and/or intentionally failed to warn and/or alert physicians and patients, including Plaintiffs and Plaintiffs' physicians, of the increased risks and significant dangers resulting from the off-label use of Infuse®.

827.    Medtronic knew and/or had reason to know, that their representations and suggestions to physicians that Infuse® was safe and effective for off-label use were materially false and misleading that physicians and patients including Plaintiffs and Plaintiffs' physicians, would rely on such representations.

828.    Medtronic and its secret agents knew or should have known and/or recklessly disregarded the materially incomplete, false, and misleading nature of the information that they caused to be disseminated to the public and to physicians, including Plaintiffs and Plaintiffs' physicians, as part of Medtronic's surreptitious campaign to promote Infuse® for off-label surgeries were outside of the intended uses approved by the FDA.

829.    Any warnings Medtronic may have issued concerning the dangers of off-label surgeries outside of the intended uses approved by the FDA of Infuse® or regarding the specific risks of those

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

uses were inadequate and insufficient in light of Medtronic's contradictory prior, contemporaneous and continuing illegal promotional efforts and over-promotion of Infuse® for non-FDA-approved off-label uses in the spine and contemporaneous efforts to hide or downplay the true increased risks and serious dangers of the off-label uses of Infuse®.

830.    The ongoing scheme described herein could not have been perpetrated over a substantial period of time, as has occurred here, without knowledge and complicity of personnel at the highest level of Medtronic, including the corporate officers.

831.    Medtronic knew and/or had reason to know of the likelihood of serious injuries caused by the off-label use of Infuse®, but they concealed this information and did not warn Plaintiff or Plaintiffs' physicians, preventing Plaintiff and Plaintiffs' physicians from making informed choices in selecting other treatments or therapies prior to Plaintiffs' implantation surgery and preventing Plaintiff and Plaintiffs' physicians from timely discovering Plaintiffs' injuries.

**Causation**

832.    Plaintiffs would not have consented to be treated with the off-label use of Infuse® had Plaintiffs known of or been fully and adequately informed by Medtronic of the true increased risks and serious dangers of the off-label use of Infuse®.

833.    Plaintiff and Plaintiffs' physician reasonably relied on Medtronic's representations and omissions regarding the safety and efficacy of Infuse® in Plaintiffs' spine surgeries.

834.    Plaintiffs and Plaintiffs' physicians did not know of the specific increased risks and serious dangers, and/or were misled by Medtronic, who knew or should have known of the true risks and dangers, but consciously chose not to inform Plaintiffs or their spine surgeons of those risks and to actively misrepresent those risks and dangers to the Plaintiffs and Plaintiffs' physicians.

835.    Medtronic's off-label promotion and marketing of Infuse® caused Plaintiffs' surgeons to decide to implant Infuse® in Plaintiffs using it in off-label non-intended uses.

**Damages**

836.    Plaintiffs have suffered serious personal injuries as a direct and proximate result of Medtronic's misconduct.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

837.     As a direct and proximate result of Medtronic's wrongful conduct and the use of Infuse® in these surgeries, Plaintiffs have suffered and will suffer continue to suffer from severe injuries and damages, including but not limited to severe pain, great emotional distress, and mental anguish.

838.     As a result of the off-label use and failure to warn of the risks associated with the off-label use of Infuse® as manufactured, promoted, sold and supplied by Medtronic, and as a result of the negligence, callousness and the other wrongdoing and misconduct of Medtronic's as described herein:

> a. Plaintiffs have been injured and suffered injuries to their body and mind, the exact nature of which are not completely known to date;
>
> b. Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown;
>
> c. Plaintiffs have incurred and will be required to incur additional medical expenses in the future to care for themselves as a result of the injuries and damages Plaintiffs have suffered;
>
> d. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interests thereon and costs.

839.     Plaintiffs had no reason until recently to suspect that their chronic pain and injuries were caused by Infuse®.  Thus, Plaintiffs did not know and could not have known and through the exercise of reasonable diligence, that the off-label use of Infuse® caused their injuries.

840.     Each of the Plaintiffs herein brings their respective actions within the applicable statutes of limitations.  Specifically, Plaintiffs bring their actions within the prescribed time limits following their injuries and their knowledge of the wrongful cause.  Prior to such time, Plaintiffs did not know nor have reason to know of their injuries and/or the wrongful cause thereof.

## VIII. SPECIFIC PLAINTIFF ALLEGATIONS

841.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follow:

### 1. Dennis Brian Anders and Lara Anders

842.     Plaintiff Dennis Brian Anders resides in Jonesboro, Arkansas.  Plaintiff was born on June 19, 1973.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF), a Posterolateral Fusion, and a Posterior Fusion.

#### a. Initial Infuse® Surgery

843.     On January 3, 2012, Plaintiff Dennis Brian Anders was admitted to Barnes Jewish Hospital in St. Louis, Missouri where Plaintiff's surgeon performed a spine fusion surgery on the Lumbosacral region of his spine from vertebrae L5 to S1.

844.     During the surgery, Infuse® was used in Plaintiff Dennis Brian Anders off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space, facet joints, along the sacral ala, and across the transverse processes)

   c.  Infuse® was used in a TLIF, Posterolateral, and Posterior surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

845.     Plaintiff Dennis Brian Anders' post-operative period has been marked by increasingly severe low back pain that radiates into the lower extremities, nerve injury, and bone overgrowth.

#### c. Plaintiff's Current Condition

846.      Since Plaintiff Dennis Brian Anders' Infuse surgery he suffers from increasing and excruciating lower back pain, which radiates to his lower extremity and left leg due to nerve injury caused by severe bony overgrowth on his spine.  This negatively impacts Plaintiffs ability to function in his daily life, increases his mental anguish, and he has otherwise suffered serious injuries.

#### d. Plaintiff Spouse

847.     Plaintiff, Lara Anders, resides in Jonesboro, Arkansas.

848.     Plaintiff, Lara Anders, is the spouse of Plaintiff Dennis Brian Anders.

849.     Plaintiff, Lara Anders, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 2. Regina Autrey

850.     Plaintiff Regina Autrey resides in Moore Haven, Florida.  Plaintiff was born on February 16, 1970.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

#### a. Initial Infuse® Surgery

851.     On November 1, 2007, Plaintiff Regina Autrey was admitted to Naples Community Hospital in Naples, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

852.     During the surgery, Infuse® was used in Plaintiff Regina Autrey off-label in the following fashion:

   a.   Infuse® was used without the mandatory approved LT-cage.

   b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed across the transverse processes).

   c.   Infuse® was used to fuse more than one level of the spine.

   d.   Infuse® was used in a Posterolateral surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

853.     Plaintiff Regina Autrey's post-operative period has been marked by ectopic bone growth and increasingly severe pain and weakness in her legs.

#### c. Plaintiff's Current Condition

854.      Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from increasing burning pain down through her legs.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 3. Diana Banks-Joiner

855.     Plaintiff Diana Banks-Joiner resides in Jackson, Michigan.  Plaintiff was born on April 1, 1955.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

spinal fusion with Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

856.     On November 15, 2007, Plaintiff Diana Banks-Joiner was admitted to University of Michigan Medical Center in Ann Arbor, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L3 to L5.

857.     During the surgery, Infuse® was used in Plaintiff Diana Banks-Joiner off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a TLIF and Posterior surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

858.     Plaintiff Diana Banks-Joiner's post-operative period has been marked by decreased muscular strength in the lower extremities, lower back pain, and pain radiating to the legs.

### c. Plaintiff's Current Condition

859.     Plaintiff continues to experience consistent back pain, radiating pain to both of her legs, numbness in both of her legs, and difficulty sleeping.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 4. Catherine Barbee and Mark Barbee

860.     Plaintiff Catherine Barbee resides in Taylor, Michigan.  Plaintiff was born on June 22, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

861.     On October 10, 2006, Plaintiff Catherine Barbee was admitted to Henry Ford Wyandotte Hospital in Wyandotte, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Lumbar region of her spine from vertebrae L3 to L5.

862.    During the surgery, Infuse® was used in Plaintiff Catherine Barbee off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a PLIF and Posterolateral surgical approach.

**b. Post-Infuse® Surgery Care and Treatment**

863.    Plaintiff Catherine Barbee's post-operative period has been marked by increasingly severe pain and weakness in her legs.

864.    Plaintiff Catherine Barbee underwent a revision surgery on October 23, 2007 for non-union of her L4 to L5 vertebrae.  She underwent an additional revision surgery on February 24, 2009 to decompress her L4 to L5 nerve roots due to ectopic/exuberant bone growth.

**c. Plaintiff's Current Condition**

865.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from numbness and weakness in her legs.  Plaintiff falls multiple times a week and now requires the assistance of a walker or wheelchair to ambulate.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

**d. Plaintiff's Spouse**

866.    Plaintiff, Mark Barbee, resides in Taylor, Michigan.

867.    Plaintiff, Mark Barbee, is the spouse of Plaintiff Catherine Barbee.

868.    Plaintiff, Mark Barbee, is bringing a claim for loss of consortium.

**5. Eula Berry**

869.    Plaintiff Eula Berry resides in Providence, Rhode Island.  Plaintiff was born on August 24, 1942.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Anterior Cervical Discectomy and Fusion (ACDF) surgery.

### a. Initial Infuse® Surgery

870.     On May 26, 2005, Plaintiff Eula Berry was admitted to Rhode Island Hospital in Providence, Rhode Island where Plaintiff's surgeon performed a spine fusion surgery on the Cervical region of her spine from vertebrae C4 to C7.

871.     During the surgery, Infuse® was used in Plaintiff Eula Berry off-label in the following fashion:

     a.   Infuse® was used without the mandatory approved LT-cage.

     b.   Infuse® was used in an ACDF surgical approach.

     c.   Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

872.     Plaintiff Eula Berry's post-operative period has been marked by increasingly severe pain, weakness, numbness and neurological deficit in her upper extremities.  Additionally, she suffers from difficulty breathing and swallowing.  She suffered from an aggressive inflammatory response that developed into a lingering fluid collection that ultimately compromised her fusion hardware.  Plaintiff suffers from ectopic/exuberant bone growth emerging from the Infuse® application site that constricts her spinal cord and exiting nerve roots.

873.     Plaintiff Eula Berry has since required revision surgeries to repair and replace hardware, decompress the spinal cord and nerve roots, and aspirate a large fluid collection.

### c. Plaintiff's Current Condition

874.      Plaintiff Eula Berry suffered from a severe fluid collection that displaced her airway and esophagus, causing difficulty swallowing that persists to the present day. Plaintiff suffers from severe pain that radiates into her upper extremities, causing her to have difficulty grasping.  Plaintiff's ability to ambulate has been compromised, necessitating the use of a cane, and she has otherwise suffered serious injury.

### 6. Linda Betcher

875.    Plaintiff Linda Betcher resides in Inkster, Michigan.  Plaintiff was born on October 11, 1947.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lateral Interbody Fusion (PLIF) and Posterolateral fusion surgery.

#### a. Initial Infuse® Surgery

876.    On July 28, 2009, Plaintiff Linda Betcher was admitted to Oakwood Hospital and Medical Center in Dearborn, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L2 to S1.

877.    During the surgery, Infuse® was used in Plaintiff Linda Betcher off-label in the following fashion:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or lateral gutters).

   c.  Infuse® was used to fuse more than one level of the spine.

   d.  Infuse® was used in a PLIF and Posterolateral surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

878.    Plaintiff Linda Betcher's post-operative period has been marked by increasingly severe pain and weakness in her legs.

#### c. Plaintiff's Current Condition

879.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from ectopic/exuberant bone growth, gastrointestinal complications, and nerve injury. This prevents her from practicing the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 7. Sheila Bottorf

880.    Plaintiff Sheila Bottorf resides in Aurora, Nebraska.  Plaintiff was born on October 18, 1974.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

fusion surgery.

### a. Initial Infuse® Surgery

881.     On March 28, 2012, Plaintiff Sheila Bottorf was admitted to Nebraska Spine Hospital in Omaha, Nebraska where Plaintiff's surgeon performed a spine fusion surgery on the Sacroiliac region of her spine on vertebrae S1.

882.     During the surgery, Infuse® was used in Plaintiff Sheila Bottorf off-label in the following fashion:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or lateral gutters).

    c.   Infuse® was used in a Posterior surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

883.     Plaintiff Sheila Bottorf's post-operative period has been marked by right-sided ectopic bone growth and increasingly severe pain that radiates into her legs.

### c. Plaintiff's Current Condition

884.      Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from sharp and burning pain down through her legs.  The pain and cramping is particularly pronounced in her right foot.  Plaintiff is unable to sit or stand for long periods following her surgery with Infuse®.  This prevents her from practicing the activities of daily life that she enjoyed pre-operatively, and from participating in the labor market, and she has otherwise suffered serious injuries.

### 8. Margaret Brown and Eddie Brown

885.     Plaintiff Margaret Brown resides in Laurel, Mississippi.  Plaintiff was born on June 17, 1961.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

886.     On June 15, 2005 Plaintiff Margaret Brown was admitted to Wesley Medical Center in Hattiesburg, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

region of her spine from vertebrae L5 to S1.

887.    During the surgery, Infuse® was used in Plaintiff Margaret Brown off-label in the following fashion:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

   c. Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

888.    Plaintiff Margaret Brown's post-operative period has been marked by increasingly severe pain in her legs.

889.    Plaintiff Margaret Brown underwent a revision surgery on May 28, 2008 due to non-union of her L5 to S1 vertebrae.  Because her pain continued to progress, Plaintiff presented for another surgery to implant an intrathecal pain pump.  This pain pump was ineffective, and had to be surgically removed.

### c. Plaintiff's Current Condition

890.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities. Plaintiff cannot sit, stand, walk, or recline for more than a few minutes at a time, making it impossible for her to find lasting comfort. This prevents her from practicing and enjoying the activities of daily living that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

891.    Plaintiff, Eddie Brown, resides in Laurel, Mississippi.

892.    Plaintiff, Eddie Brown, is the spouse of Plaintiff Margaret Brown.

893.    Plaintiff, Eddie Brown, is bringing a claim for loss of consortium.

### 9. Bradley Burdette

894.    Plaintiff Bradley Burdette resides in Union City, Michigan.  Plaintiff was born on July 22, 1962.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

895.    On March 22, 2012 Plaintiff Bradley Burdette was admitted to Borgess Health in Kalamazoo, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

896.    During the surgery, Infuse® was used in Plaintiff Bradley Burdette off-label in the following fashion:

  a.  Infuse® was used without the mandatory approved LT-cage.

  b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or transverse processes).

  c.  Infuse® was used in a TLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

897.    Plaintiff Bradley Burdette's post-operative period was followed by a temporary period of relief from pain and has subsequently been marked by increasingly severe pain and weakness in his legs.

### c. Plaintiff's Current Condition

898.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 10. Westley Christian and Tracy Christian

899.    Plaintiff Westley Christian resides in Live Oak, Florida.  Plaintiff was born on July 8, 1974.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) fusion surgery.

### a. Initial Infuse® Surgery

900.    On April 7, 2010 Plaintiff Westley Christian was admitted to Shands Hospital at the University of Florida in Gainesville, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to L4.

901.    During the surgery, Infuse® was used in Plaintiff Westley Christian off-label in the

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

following fashion:

      a.   Infuse® was used without the mandatory approved LT-cage.

### b. Post-Infuse® Surgery Care and Treatment

902.     Plaintiff Westley Christian's post-operative period has been marked by increasingly severe pain and weakness in his legs.

### c. Plaintiff's Current Condition

903.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  He suffers periodic falls due to numbness and loss of feeling throughout his right leg.  Plaintiff is unable to sit or stand for long periods following his surgery with Infuse®.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

904.     Plaintiff, Tracy Christian, resides in Live Oak, Florida.

905.     Plaintiff, Tracy Christian, is the spouse of Plaintiff Westley Christian.

906.     Plaintiff, Tracy Christian, is bringing a claim for loss of consortium.

## 11. Lisa Conroy and Jeffrey Conroy

907.     Plaintiff Lisa Conroy resides in Livonia, Michigan.  Plaintiff was born on April 26, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

908.     On December 17, 2008, Plaintiff Lisa Conroy was admitted to St. John Providence Health System: Providence Hospital in Southfield, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

909.     During the surgery, Infuse® was used in Plaintiff Lisa Conroy off-label in the following fashion:

      a.   Infuse® was used without the mandatory approved LT-cage.

      b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

disc space or lateral gutters).

c.   Infuse® was used to fuse more than one level of the spine.

d.   Infuse® was used in a PLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

910.     Plaintiff Lisa Conroy's post-operative period has been marked by increasingly severe pain and weakness in her legs.

911.     Plaintiff Lisa Conroy underwent a revision surgery on March 29, 2012 to decompress her L4 through S1 nerve roots, due to significant overgrown bone.  The bone morphogenic protein material leaked into her spinal canal causing significant nerve root compression at the L4-5 and L5-S1 levels. Further, the L5-S1 nerve root was completely encased in bone that grew into the nerve, causing discoloration and severe compression.

### c. Plaintiff's Current Condition

912.      Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from numbness and burning down through her legs.  Plaintiff is unable to sit or stand for long periods following her surgery with Infuse®.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

913.     Plaintiff, Jeffrey Conroy, resides in Livonia, Michigan.

914.     Plaintiff, Jeffrey Conroy, is the spouse of Plaintiff Lisa Conroy.

915.     Plaintiff, Jeffrey Conroy, is bringing a claim for loss of consortium.

### 12. Linda Coombs and Donald Coombs

916.     Plaintiff Linda Coombs resides in New Bern, North Carolina.  Plaintiff was born on April 11, 1949.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior instrumented fusion surgery.

### a. Initial Infuse® Surgery

917.     On July 8, 2008, Plaintiff Linda Coombs was admitted to Pitt County Memorial Hospital

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

in Greenville, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L2 to L4.

918.    During the surgery, Infuse® was used in Plaintiff Linda Coombs off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a Posterior surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

919.    Plaintiff Linda Coombs' post-operative period has been marked by increasingly severe back pain that radiates into her lower extremities.

920.    On October 24, 2008, Plaintiff Linda Coombs underwent a revision surgery.

### c. Plaintiff's Current Condition

921.    Plaintiff continues to experience severe back pain. This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

922.    Plaintiff, Donald Coombs, resides in New Bern, North Carolina.

923.    Plaintiff, Donald Coombs, is the spouse of Plaintiff Linda Coombs.

924.    Plaintiff, Donald Coombs, is bringing a claim for loss of consortium.

### 13. Carolyn Davis and Rickey Davis

925.    Plaintiff Carolyn Davis resides in North Little Rock, Arkansas. Plaintiff was born on April 13, 1967. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

926.    On May 11, 2009, Plaintiff Carolyn Davis was admitted to St. Vincent Medical Center in

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Sherwood, Arkansas where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

927.     During the surgery, Infuse® was used in Plaintiff Carolyn Davis off-label in the following fashion:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

   c. Infuse® was used in a Posterolateral surgical approach.

   d. Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

928.     Plaintiff Carolyn Davis' post-operative period has been marked by increasingly severe pain in her legs.

### c. Plaintiff's Current Condition

929.      Plaintiff Carolyn Davis continues to experience severe and unrelenting pain that radiates into her lower extremities.  Plaintiff suffers from numbness and weakness throughout her lower extremities.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

930.     Plaintiff, Rickey Davis, resides in North Little Rock, Arkansas.

931.     Plaintiff, Rickey Davis, is the spouse of Plaintiff Carolyn Davis.

932.     Plaintiff, Rickey Davis, is bringing a claim for loss of consortium.

### 14. Joseph Dressler, Jr.

933.     Plaintiff Joseph Dressler, Jr. resides in Point Pleasant, West Virginia.  Plaintiff was born on February 20, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in Posterolateral and Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

934.     On October 10, 2002, Plaintiff Joseph Dressler, Jr. was admitted to Mary Black Health

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

System in Spartanburg, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

935.    During the surgery, Infuse® was used in Plaintiff Joseph Dressler, Jr. off-label in the following fashion:

    a. Infuse® was used without the mandatory approved LT-cage.

    b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c. Infuse® was used in a PLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

936.    Plaintiff Joseph Dressler, Jr.'s post-operative period has been marked by radiating pain to his legs, nerve injury, and chronic back pain.

### c. Plaintiff's Current Condition

937.    Plaintiff continues to experience pain, numbness, burning, and tingling that radiates from his lower back into his lower extremities. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 15. Mark Durand and Tracie Durand

938.    Plaintiff Mark Durand resides in Billings, Montana. Plaintiff was born on March 22, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) fusion surgery.

### a. Initial Infuse® Surgery

939.    On January 14, 2010, Plaintiff Mark Durand was admitted to St. Vincent Healthcare in Billings, Montana where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to L5.

940.    During the surgery, Infuse® was used in Plaintiff Mark Durand off-label in the following manners:

    a. Infuse® was used without the mandatory approved LT-cage

    b. Infuse® was used to fuse more than one level of the spine.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

c.  Infuse® was used in a TLIF surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

941.    Plaintiff Mark Durand's post-operative period was marked by increasingly severe pain and numbness in his lower extremities, urinary incontinence, and chronic constipation.

### c. Plaintiff's Current Condition

942.    While Plaintiff Mark Durand felt a brief period of relief following his spinal surgery, he has since experienced uncontrolled bone growth inflicting severe pain and numbness that radiates from the lower back to the lumbar extremities, bladder incontinence, and chronic constipation.  His chronic constipation requires routine digital disimpaction. His bladder incontinence severely limits his social interactions. The simplest activities of daily living cause him to experience severe unrelenting pain and mental anguish.  His pain precludes him from driving, walking, standing, sitting, or lying down for any extending period of time rendering him permanently uncomfortable and often incapacitated and he has otherwise suffered serious injuries.

### d. Plaintiff Spouse

943.    Plaintiff, Tracie Durand, resides in Billings, Montana.

944.    Plaintiff, Tracie Durand, is the spouse of Plaintiff Mark Durand.

945.    Plaintiff, Tracie Durand, is bringing a claim for loss of consortium.

## 16. Angela Edwards and Michael Heller

946.    Plaintiff Angela Edwards resides in Butte, Montana.  Plaintiff was born on February 13, 1971.  Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

947.    On April 29, 2010, Plaintiff Angela Edwards was admitted to St. James Healthcare in Butte, Montana where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

948.    During the surgery, Infuse® was used in Plaintiff Angela Edwards off-label in the following manners:

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

c. Infuse® was used in a PLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

949.    Plaintiff Angela Edward's post-operative period was marked by increasingly severe pain, weakness, and numbness in her lower extremities.

950.    Plaintiff Angela Edwards underwent a revision surgery on September 20, 2011, for debridement of her left L5-S1 disc space fusion mass.

951.    Plaintiff Angela Edwards underwent an additional revision surgery on November 22, 2011 to free the exiting L5 and S1 nerve roots from bony impingement.

### c. Plaintiff's Current Condition

952.     Plaintiff Angela Edwards feels increasingly severe pain and weakness in her lower extremity.  Plaintiff continues to suffer from an inflammatory reaction at the Infuse® application site which exacerbates her pain.  Plaintiff is restricted to ambulating with a cane and left foot brace rendering her highly impaired and unable to work.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff Spouse

953.    Plaintiff, Michael Heller, resides in Butte, Montana.

954.    Plaintiff, Michael Heller, is the spouse of Plaintiff Angela Edwards.

955.    Plaintiff, Michael Heller, is bringing a claim for loss of consortium.

### 17. John Fairley and Clara Bridget-Fairley

956.    Plaintiff John Fairley resides in Lumberton, Mississippi.  Plaintiff was born on May 16, 1949.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior fusion surgery.

### a. Initial Infuse® Surgery

957.    On November 13, 2006, Plaintiff John Fairley was admitted to Wesley Medical Center in

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Hattiesburg, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to S1.

958.    During the surgery, Infuse® was used in Plaintiff John Fairley off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c.  Infuse® was used in a Posterior surgical approach.

    d.  Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

959.    Plaintiff John Fairley's post-operative period was followed by a temporary period of relief from pain and has subsequently been marked by increasingly severe pain that radiates to his legs.

### c. Plaintiff's Current Condition

960.    Plaintiff John Fairley continues to experience severe and unrelenting pain that radiates into his lower extremities. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

961.    Plaintiff, Clara Bridget-Fairley, resides in Lumberton, Mississippi.

962.    Plaintiff, Clara Bridget-Fairley, is the spouse of Plaintiff John Fairley.

963.    Plaintiff, Clara Bridget-Fairley, is bringing a claim for loss of consortium.

### 18. John Fowler and Jennifer Fowler

964.    Plaintiff John Fowler resides in Clifton Park, New York.  Plaintiff was born on December 22, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior fusion surgery.

### a. Initial Infuse® Surgery

965.    On May 2, 2011 Plaintiff John Fowler was admitted to Saratoga Hospital in Saratoga Springs, New York where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

his spine from vertebrae L3 to S1.

966.     During the surgery, Infuse® was used in Plaintiff John Fowler off-label in the following fashion:

>    a.   Infuse® was used without the mandatory approved LT-cage.
>
>    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed across the transverse processes and sacral ala).
>
>    c.   Infuse® was used in a Posterior surgical approach.
>
>    d.   Infuse® was used to fuse more than one level of the spine.

**b. Post-Infuse® Surgery Care and Treatment**

967.     Plaintiff John Fowler's post-operative period was followed by a temporary period of relief from pain and has subsequently has been marked by increasingly severe pain that radiates to the legs.

968.     Plaintiff John Fowler underwent an attempted surgical implantation of a spinal cord stimulator, however, due to the extent of the bony overgrowth emerging from the Infuse® exposure site, this was abandoned.

**c. Plaintiff's Current Condition**

969.      Plaintiff John Fowler continues to experience severe and intractable pain, numbness and tingling that radiates into his lower extremities. His legs give out, causing him to collapse. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

**d. Plaintiff's Spouse**

970.     Plaintiff, Jennifer Fowler, resides in Clifton Park, NY.

971.     Plaintiff, Jennifer Fowler, is the spouse of Plaintiff John Fowler.

972.     Plaintiff, Jennifer Fowler, is bringing a claim for loss of consortium.

**19. Leslie Foxworth**

973.     Plaintiff Leslie Foxworth resides in Cottondale, Florida.  Plaintiff was born on October 13, 1966.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Fusion and a Transforaminal Lumbar Interbody Fusion (TLIF) spinal surgery.

### a. Initial Infuse® Surgery

974.     On July 17, 2006, Plaintiff Leslie Foxworth was admitted to Capital Regional Medical Center in Tallahassee, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

975.     During the surgery, Infuse® was used in Plaintiff Leslie Foxworth off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

    c.  Infuse® was used in a TLIF and Posterior surgical approaches.

### b. Post-Infuse® Surgery Care and Treatment

976.     Plaintiff Leslie Foxworth's post-operative period has been marked by chronic lower back pain and neck pain.

### c. Plaintiff's Current Condition

977.      Plaintiff continues to experience chronic and severe lower back pain and numbness that radiates into her lower extremities.  Since her Infuse® surgery, her lower extremity strength has diminished to the point she has difficulty ambulating. Plaintiff can no longer enjoy the activities of daily living that she could perform preoperatively, and she has otherwise suffered serious injuries.

### 20. Karen Freeman

978.     Plaintiff Karen Freeman resides in Charleston, South Carolina.  Plaintiff was born on September 8, 1957.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral and Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

979.     On July 3, 2008, Plaintiff Karen Freeman was admitted to Trident Medical Center in Charleston, South Carolina where Plaintiff's surgeon performed a spinal fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

980.     During the surgery, Infuse® was used in Plaintiff Karen Freeman off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a PLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

981.     Plaintiff Karen Freeman's post-operative period has been marked by increasingly severe pain in her legs and nerve injury.

### c. Plaintiff's Current Condition

982.      Plaintiff continues to experience radiating pain to the legs, nerve injury, numbness in both legs, and constant lower back pain.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 21. Mell Furman and Richard Furman

983.     Plaintiff Mell Furman resides in Lady's Island, South Carolina.  Plaintiff was born on April 11, 1942.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral and Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

984.     On February 17, 2004, Plaintiff Mell Furman was admitted to East Cooper Medical Center in Mt. Pleasant, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

985.     During the surgery, Infuse® was used in Plaintiff Mell Furman off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and transverse processes).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

    c.   Infuse® was used to fuse more than one level of the spine.

    d.   Infuse® was used in a PLIF and Posterolateral surgical approach

**b. Post-Infuse® Surgery Care and Treatment**

986.      Plaintiff Mell Furman's post-operative period has been marked by severe pain that radiates into her bilateral lower extremities.  Since her operation, Plaintiff required that a spinal cord stimulator be implanted in her spine.

**c. Plaintiff's Current Condition**

987.       Plaintiff continues to experience severe pain, which radiates from her back to her legs. Plaintiff has difficulty ambulating more than household distances, and requires the assistance of a cane. This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

**d. Plaintiff's Spouse**

988.      Plaintiff, Richard Furman, resides in Lady's Island, South Carolina.

989.      Plaintiff, Richard Furman, is the spouse of Plaintiff Mell Furman.

990.      Plaintiff, Richard Furman, is bringing a claim for loss of consortium.

**22. Julia Gabino**

991.      Plaintiff Julia Gabino resides in Richland, Washington.  Plaintiff was born on July 27, 1967.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) fusion surgery.

**a. Initial Infuse® Surgery**

992.      On November 15, 2003, Plaintiff Julia Gabino was admitted to Scripps Memorial Hospital in La Jolla, California where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

993.      During the surgery, Infuse® was used in Plaintiff Julia Gabino off-label in the following fashion:

    a.   Infuse® was used without the mandatory approved LT-cage.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

**b. Post-Infuse® Surgery Care and Treatment**

994.　　Plaintiff Julia Gabino's post-operative period has been marked by increasingly severe pain and weakness in her legs.

**c. Plaintiff's Current Condition**

995.　　 Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities. She suffers from numbness, tingling, and loss of sensation down through her legs. This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

**23. Clifton Groves**

996.　　Plaintiff Clifton Groves resides in Jackson, Mississippi. Plaintiff was born on February 5, 1959. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

**a. Initial Infuse® Surgery**

997.　　On May 5, 2011, Plaintiff Clifton Groves was admitted to St. Dominic-Jackson Memorial Hospital in Jackson, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to L5.

998.　　During the surgery, Infuse® was used in Plaintiff Clifton Groves off-label in the following fashion:

　　　　a. Infuse® was used without the mandatory approved LT-cage.

　　　　b. Infuse® was used to fuse more than one level of the spine.

**b. Post-Infuse® Surgery Care and Treatment**

999.　　Plaintiff Clifton Grove's post-operative period was marked by dystrophic bone causing central canal and bilateral foraminal stenosis that impinges upon the spinal cord and exiting nerve roots.

1000.　　Plaintiff Clifton Groves underwent the surgical implantation of a spinal cord stimulator on October 11, 2012 as a palliative measure.

**c. Plaintiff's Current Condition**

1001.　　 Plaintiff Clifton Groves continues to experience severe and unrelenting pain that radiates

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

into his lower extremities. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 24. Horace Harshaw

1002.    Plaintiff Horace Harshaw resides in Lenoir, North Carolina.  Plaintiff was born on March 12, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior and Posterior Lumbar Interbody Fusion (PLIF) surgery.

#### a. Initial Infuse® Surgery

1003.    On August 25, 2006, Plaintiff Horace Harshaw was admitted to Catawba Valley Medical Center in Hickory, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1004.    During the surgery, Infuse® was used in Plaintiff Horace Harshaw off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in a PLIF and Posterior surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1005.    Plaintiff Horace Harshaw's post-operative period has been marked by increasingly severe pain and weakness in his legs.

1006.    Plaintiff Horace Harshaw underwent a revision surgery on September 11, 2008 for hardware removal.

1007.    Plaintiff Horace Harshaw underwent an additional revision surgery on April 30, 2009 due to nerve root impingement from bony encroachment at the Infuse® exposure site.

#### c. Plaintiff's Current Condition

1008.    Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 25. Ronald Hatchell and Sondra Hatchell

1009.    Plaintiff Ronald Hatchell resides in Darlington, South Carolina.  Plaintiff was born on February 23, 1953.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

#### a. Initial Infuse® Surgery

1010.    On February 27, 2009 Plaintiff Ronald Hatchell was admitted to Carolinas Hospital System in Florence, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5-S1.

1011.    During the surgery, Infuse® was used in Plaintiff Ronald Hatchell off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in a TLIF surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1012.    Plaintiff Ronald Hatchell's post-operative period was followed by bony overgrowth emerging from the Infuse® application site. This causes severe pain that radiates from the lower back into the bilateral lower extremities.

#### c. Plaintiff's Current Condition

1013.     Plaintiff Ronald Hatchell continues to experience severe and unrelenting pain that radiates into his lower extremities. Plaintiff's pain precludes him from being employed, and he is confined to a back brace. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

#### d. Plaintiff's Spouse

1014.    Plaintiff, Sondra Hatchell, resides in Darlington, South Carolina.

1015.    Plaintiff, Sondra Hatchell, is the spouse of Plaintiff Ronald Hatchell.

1016.    Plaintiff, Sondra Hatchell, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 26. Jason Hatcher and Cynthia Hatcher

1017.    Plaintiff Jason Hatcher resides in Clinton, Indiana.  Plaintiff was born on October 17, 1973.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion and a Posterior Fusion surgery.

#### a. Initial Infuse® Surgery

1018.    On August 10, 2012, Plaintiff Jason Hatcher was admitted to Union Hospital in Terre Haute, Indiana where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to S1.

1019.    During the surgery, Infuse® was used in Plaintiff Jason Hatcher off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and facet joints).

    c.    Infuse® was used to fuse more than one level of the spine.

    d.    Infuse® was used in a Posterior surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1020.    Plaintiff Jason Hatcher's post-operative period has been marked by increasingly severe radiating pain and numbness in his hips and difficulty and weakness in his legs.

1021.    Plaintiff Jason Hatcher underwent a revision surgery on October 12, 2012 to remove extruded bone graft material that compressed his spinal thecal sac.  Following a severe inflammatory response to Infuse®, the bone morphogenic protein material leaked into his spinal canal causing bone destruction and migration of his bone graft.

#### c. Plaintiff's Current Condition

1022.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  He suffers from numbness and burning down through her legs along with sharp electric shocking pains.  Plaintiff suffers from increasing weakness in his legs that makes most positions highly uncomfortable with worse pain upon standing or walking, following his surgery with Infuse®, and he

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1023.    Plaintiff, Cynthia Hatcher, resides in Clinton, Indiana.

1024.    Plaintiff, Cynthia Hatcher, is the spouse of Plaintiff Jason Hatcher.

1025.    Plaintiff, Cynthia Hatcher, is bringing a claim for loss of consortium.

### 27. Anthony Hawkins and Delores Hawkins

1026.    Plaintiff Anthony Hawkins resides in Rock Hall, Maryland.  Plaintiff was born on May 22, 1953.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1027.    On January 2, 2007, Plaintiff Anthony Hawkins was admitted to Anne Arundel Medical Center in Annapolis, Maryland where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to S1.

1028.    During the surgery, Infuse® was used in Plaintiff Anthony Hawkins off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c.    Infuse® was used to fuse more than one level of the spine.

    d.    Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1029.    Plaintiff Anthony Hawkins's post-operative period has been marked by increasingly severe pain that radiates into his legs and down to his feet.  His symptoms have become progressively worse and include numbness, tingling, and weakness in his legs and feet.  Plaintiff's symptoms ultimately necessitated a revision surgery.

1030.    Following his exposure to Infuse®, Plaintiff Anthony Hawkins has suffered narrowing of the spinal canal with effacement of the thecal sac and impingement of his S1 nerve root secondary to

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

bony overgrowth.

### c. Plaintiff's Current Condition

1031.    Plaintiff Anthony Hawkins continues to experience pain and discomfort in his lower back.  Plaintiff's worsening condition following his Infuse® surgery, which causes him severe pain and numbness from his lower back to his feet.  The numbness, pain and unrelenting discomfort limit his ability to ambulate and have diminished his overall quality of life.  These symptoms leave Plaintiff with no recourse but to undergo an extensive revision surgery including removal of previously implanted hardware and decompression of the lower lumbar spine, and he has otherwise suffered serious injury.

### d. Plaintiff's Spouse

1032.    Plaintiff, Delores Hawkins, resides in Rock Hall, Maryland.

1033.    Plaintiff, Delores Hawkins, is the spouse of Plaintiff Anthony Hawkins.

1034.    Plaintiff, Delores Hawkins, is bringing a claim for loss of consortium.

### 28. Jerome Hicks

1035.    Plaintiff Jerome Hicks resides in Miami, Florida.  Plaintiff was born on June 7, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Cervical Diskectomy and Fusion (ACDF) surgery.

### a. Initial Infuse® Surgery

1036.    On May 5, 2011, Plaintiff Jerome Hicks was admitted to Jackson Memorial Hospital in Miami, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Cervical region of his spine from vertebrae C3 to C6.

1037.    During the surgery, Infuse® was used in Plaintiff Jerome Hicks off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used to fuse more than one level of the spine.

    c.  Infuse® was used in a Cervical fusion surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1038.    Plaintiff Jerome Hicks's post-operative period has been marked by ectopic bone growth

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

and increasingly severe pain in his neck with difficulty swallowing and speaking and increasingly painful headaches.

### c. Plaintiff's Current Condition

1039.    Plaintiff Jerome Hicks continues to experience severe and unrelenting pain.  He suffers from difficulty speaking, swallowing, and breathing.  Plaintiff is beset with severe pain and increasing migraine headaches since his surgery with Infuse®.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 29. Tammy Jeans and Jason Jeans

1040.    Plaintiff Tammy Jeans resides in Jacksonville, Florida.  Plaintiff was born on July 4, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) and Posterior fusion surgery.

### a. Initial Infuse® Surgery

1041.    On June 26, 2009, Plaintiff Tammy Jeans was admitted to Riverview Hospital in Wisconsin Rapids, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

1042.    During the surgery, Infuse® was used in Plaintiff Tammy Jeans off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or lateral gutters).

    c.    Infuse® was used in a Posterior surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1043.    Plaintiff Tammy Jeans' post-operative period has been marked by increasingly severe pain, weakness, and numbers in her legs.

1044.    Plaintiff Tammy Jeans underwent a revision surgery on May 28, 2010 to decompress her L5 and S1 nerve roots.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### c. Plaintiff's Current Condition

1045.    Plaintiff continues to experience severe and unrelenting radiating pain, weakness, and numbness in her lower extremities.  She is forced to use a cane and is significantly disabled as a result of her Infuse® spine fusion.  Furthermore, Plaintiff suffers from bowel incontinence. This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1046.    Plaintiff, Jason Jeans, resides in Jacksonville, Florida.

1047.    Plaintiff, Jason Jeans, is the spouse of Plaintiff Tammy Jeans.

1048.    Plaintiff, Jason Jeans is bringing a claim for loss of consortium.

## 30. Lorenzo Johnson and Marion Johnson

1049.    Plaintiff Lorenzo Johnson resides in Scooba, Mississippi.  Plaintiff was born on November 14, 1957.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1050.    On April 14, 2003, Plaintiff Lorenzo Johnson was admitted to Rush Foundation Hospital in Meridian, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to S1.

1051.    During the surgery, Infuse® was used in Plaintiff Lorenzo Johnson off-label in the following fashion:

      a.  Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

1052.    Plaintiff Lorenzo Johnson's post-operative period has been marked by increasingly severe lower back and radiating leg pain.

1053.    Radiographic imaging examined by Plaintiff's physician reveals that increased bone growth within the spinal interspace pushed one of the interbody cages causing it to extrude anteriorly into Plaintiff's retroperitoneal space.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### c. Plaintiff's Current Condition

1054.    Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities down to his legs, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1055.    Plaintiff, Marion Johnson, resides in Scooba, Mississippi.

1056.    Plaintiff, Marion Johnson, is the spouse of Plaintiff Lorenzo Johnson.

1057.    Plaintiff, Marion Johnson, is bringing a claim for loss of consortium.

## 31. Amanda Keeton

1058.    Plaintiff Amanda Keeton resides in Casa Grande, Arizona.  Plaintiff was born on December 16, 1979.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1059.    On January 16, 2012, Plaintiff Amanda Keeton was admitted to Banner Desert Medical Center in Mesa, Arizona where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

1060.    During the surgery, Infuse® was used in Plaintiff Amanda Keeton off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

    c.    Infuse® was used in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1061.    Plaintiff Amanda Keeton's post-operative period was marked by increasingly severe pain to her lower back and bilateral lower extremities.

### c. Plaintiff's Current Condition

1062.    Plaintiff continues to experience severe and unrelenting pain that radiates into her lower

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

extremities.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 32. Trisha Keim

1063.    Plaintiff Trisha Keim resides in Albuquerque, New Mexico.  Plaintiff was born on March 28, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral Fusion and a Posterior Lumbar Interbody Fusion (PLIF) surgery.

#### a. Initial Infuse® Surgery

1064.    On June 2, 2006, Plaintiff Trisha Keim was admitted to Presbyterian Health Care Services in Albuquerque, New Mexico where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

1065.    During the surgery, Infuse® was used in Plaintiff Trisha Keim off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a PLIF and Posterolateral surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1066.    Plaintiff Trisha Keim's post-operative period has been marked by significant pain and nerve injury. Ectopic/exuberant bone growth has been identified emerging from the Infuse® application site and compressing the exiting nerve roots causing pain, numbness, and tingling that radiates into the lower extremities.

#### c. Plaintiff's Current Condition

1067.     Plaintiff continues to experience nerve injury, radiating pain to the legs, significant pain, and ectopic/exuberant bone growth.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 33. Wesley Kercheval

1068.    Plaintiff Wesley Kercheval resides in Miles City, Montana.  Plaintiff was born on August 31, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Cervical Discectomy and Fusion (ACDF) surgery.

#### a. Initial Infuse® Surgery

1069.    On January 29, 2007 Plaintiff Wesley Kercheval was admitted to St. Vincent Healthcare in Billings, Montana where Plaintiff's surgeon performed a spine fusion surgery on the Cervical region of his spine from vertebrae C5 to C7.

1070.    During the surgery, Infuse® was used in Plaintiff Wesley Kercheval off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in an ACDF surgical approach.

    c.    Infuse® was used to fuse more than one level of the spine.

#### b. Post-Infuse® Surgery Care and Treatment

1071.    Plaintiff Wesley Kercheval's post-operative period has been marked by increasingly severe pain, weakness, numbness and neurological deficit in his upper extremities.  Plaintiff suffers from ectopic/exuberant bony overgrowth that impinges on his spinal canal and exiting nerve roots.

#### c. Plaintiff's Current Condition

1072.     Plaintiff Wesley Kercheval continues to experience severe pain and numbness that radiates into his left arm. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 34. Douglas Kolhoff

1073.    Plaintiff Douglas Kolhoff resides in Sioux Falls, South Dakota.  Plaintiff was born on January 17, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

#### a. Initial Infuse® Surgery

1074.    On July 28, 2004, Plaintiff Douglas Kolhoff was admitted to Sioux Falls Surgical Center

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

in Sioux Falls, South Dakota where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1075.    During the surgery, Infuse® was used in Plaintiff Douglas Kolhoff off-label in the following manners:

      a.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

**b. Post-Infuse® Surgery Care and Treatment**

1076.    Plaintiff Douglas Kolhoff's post-operative period has been marked by increasingly severe pain and discomfort that radiates into his lower extremities.

1077.    On May 16, 2012 Plaintiff underwent a revision surgery to decompress the S1 nerve root.

**c. Plaintiff's Current Condition**

1078.    Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 35. Jason Kost and Molly Savage-Kost

1079.    Plaintiff Jason Kost resides in Astoria, Oregon.  Plaintiff was born on March 10, 1982. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

**a. Initial Infuse® Surgery**

1080.    On January 17, 2012, Plaintiff Jason Kost was admitted to Oregon Health & Science University Hospital in Portland, Oregon where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to L5.

1081.    During the surgery, Infuse® was used in Plaintiff Jason Kost off-label in the following fashion:

      a.    Infuse® was used without the mandatory approved LT-cage.

      b.    Infuse® was used to fuse more than one level of the spine.

      c.    Infuse® was used in a TLIF surgical approach.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### b. Post-Infuse® Surgery Care and Treatment

1082.　　Plaintiff Jason Kost's post-operative period has been marked by intractable lower back pain that radiates into the lower extremities.  Following surgery, Plaintiff suffered a persistent and severe inflammatory reaction to Infuse® that led to a failure of his spinal hardware.

### c. Plaintiff's Current Condition

1083.　　 Plaintiff Jason Kost continues to experience severe and unrelenting pain.  Plaintiff requires the use of a service animal to assist him in normal activities of daily living which he used to enjoy preoperatively.  Most recently, Plaintiff suffers from urinary dysfunction and lower extremity numbness and he has otherwise suffered serious injury.

### d. Plaintiff's Spouse

1084.　　Plaintiff, Molly Savage-Kost, resides in Astoria, Oregon.

1085.　　Plaintiff, Molly Savage-Kost, is the spouse of Plaintiff Jason Kost.

1086.　　Plaintiff, Molly Savage-Kost, is bringing a claim for loss of consortium.

### 36. Walter LaCroix

1087.　　Plaintiff Walter LaCroix resides in Lapeer, Michigan.  Plaintiff was born on April 10, 1974.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral Spinal Fusion.

### a. Initial Infuse® Surgery

1088.　　On April 26, 2005, Plaintiff Walter LaCroix was admitted to St. Mary's Hospital in Saginaw, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to S1.

1089.　　During the surgery, Infuse® was used in Plaintiff Walter LaCroix off-label in the following manners:

　　　　a.　Infuse® was used without the mandatory approved LT-cage.

　　　　b.　Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

　　　　c.　Infuse® was used to fuse more than one level of the spine.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

    d.  Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1090.    Plaintiff Walter LaCroix's post-operative period has been marked by significant pain. Plaintiff suffers from a persistent seroma at the Infuse® application site that compresses the exiting nerve roots.

### c. Plaintiff's Current Condition

1091.    Plaintiff continues to experience nerve injury, radiating pain to the legs, and significant pain.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 37. Steven Lenhart and Tammy Jones-Lenhart

1092.    Plaintiff Steven Lenhart resides in Saginaw, Michigan.  Plaintiff was born on March 13, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1093.    On March 9 2004, Plaintiff Steven Lenhart was admitted to Saint Joseph Mercy Health System in Ann Arbor, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1094.    During the surgery, Infuse® was used in Plaintiff Steven Lenhart off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

### b. Post-Infuse® Surgery Care and Treatment

1095.    Plaintiff Steven Lenhart's post-operative period has been marked by increasingly severe pain and weakness in his legs.

1096.    Plaintiff Steven Lenhart underwent a revision surgery on March 9, 2005 to decompress the S1 nerve root, due to significant overgrown bone.

### c. Plaintiff's Current Condition

1097.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

extremities.  He suffers from numbness and burning down through his legs.  Plaintiff is unable to sit or stand for long periods following his surgery with Infuse®.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1098.    Plaintiff, Tammy Jones-Lenhart, resides in Saginaw, Michigan.

1099.    Plaintiff, Tammy Jones-Lenhart, is the spouse of Plaintiff Steven Lenhart.

1100.    Plaintiff, Tammy Jones-Lenhart, is bringing a claim for loss of consortium.

### 38. Mark Lester

1101.    Plaintiff Mark Lester resides in Helena, Montana.  Plaintiff was born on May 20, 1960. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Cervical Discectomy and Fusion (ACDF) surgery.

### a. Initial Infuse® Surgery

1102.    On February 7, 2005, Plaintiff Mark Lester was admitted to St. James Healthcare in Butte, Montana where Plaintiff's surgeon performed a spine fusion surgery on the Cervical region of his spine from vertebrae C4 to C6.

1103.    During the surgery, Infuse® was used in Plaintiff Mark Lester off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

    c.  Infuse® was used in an ACDF approach.

    d.  Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

1104.    Plaintiff Mark Lester's post-operative period was followed by a severe inflammatory response with marked cervical swelling that caused him to be hospitalized for difficulty swallowing and breathing.  Plaintiff additionally suffers from heterotopic bone growth.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### c. Plaintiff's Current Condition

1105.    Plaintiff continues to experience severe and unrelenting pain and numbness that radiates into his upper extremities. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 39. Mozell Lynch

1106.    Plaintiff Mozell Lynch resides in Castalia, North Carolina.  Plaintiff was born on January 15, 1955.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral spinal fusion surgery.

### a. Initial Infuse® Surgery

1107.    On July 19, 2011 Plaintiff Mozell Lynch was admitted to Nash General Hospital in Rocky Mount, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L3 to L5.

1108.    During the surgery, Infuse® was used in Plaintiff Mozell Lynch off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the posterolateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine.

    d.  Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1109.    Plaintiff Mozell Lynch's post-operative period has been marked by increasingly severe pain that radiates to her legs.

### c. Plaintiff's Current Condition

1110.    Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities that stems from uncontrolled bone growth and osteolysis following her Infuse® fusion.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 40. Mayme Martin

1111.    Plaintiff Mayme Martin resides in Turners Station, Kentucky.  Plaintiff was born on July 17, 1954.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

#### a. Initial Infuse® Surgery

1112.    On December 4, 2007, Plaintiff Mayme Martin was admitted to Norton Hospital in Louisville, Kentucky where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

1113.    During the surgery, Infuse® was used in Plaintiff Mayme Martin off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space)

#### b. Post-Infuse® Surgery Care and Treatment

1114.    Plaintiff Mayme Martin's post-operative period has been marked by increasingly severe low back pain that radiates into her lower extremities, nerve injury, and bone overgrowth.

#### c. Plaintiff's Current Condition

1115.     Since Plaintiff Mayme Martin's Infuse® surgery she suffers from increasing and excruciating lower back pain, which radiates to her lower extremities due to nerve injury caused by severe bony overgrowth on Plaintiff's spine.  This negatively impacts Plaintiff's ability to function in her daily life, inflicts mental anguish, and she has otherwise suffered serious injuries.

### 41. Sophronia McCord

1116.    Plaintiff Sophronia McCord resides in Mitchellville, Maryland.  Plaintiff was born on November 22, 1951.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

#### a. Initial Infuse® Surgery

1117.    On November 12, 2009, Plaintiff Sophronia McCord was admitted to Sibley Memorial

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Hospital in Washington D.C. where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1118.    During the surgery, Infuse® was used in Plaintiff Sophronia McCord off-label in the following manners:

      a.  Infuse® was used without the mandatory approved LT-cage.

      b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

      c.  Infuse® was used in a TLIF surgical approach.

**b. Post-Infuse® Surgery Care and Treatment**

1119.    Plaintiff Sophronia McCord's post-operative period has been marked by increasingly severe pain and discomfort in her lower extremities, thighs, and legs.

**c. Plaintiff's Current Condition**

1120.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  Plaintiff's pain radiates from her lower back, to her lower extremities, thighs, and legs.  The debilitating nature of this pain prevents her from fully enjoying her life and daily activities, and has otherwise suffered serious injuries.

**42. Gwendolyn Menard and Joseph Fleming**

1121.    Plaintiff Gwendolyn Menard resides in Agawam, Massachusetts.  Plaintiff was born on November 11, 1958.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

**a. Initial Infuse® Surgery**

1122.    On July 7, 2006, Plaintiff Gwendolyn Menard was admitted to Sisters of Providence Health System in Springfield, Massachusetts where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1123.    During the surgery, Infuse® was used in Plaintiff Gwendolyn Menard off-label in the following manners:

      a.  Infuse® was used without the mandatory approved LT-cage.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space or lateral gutters).

### b. Post-Infuse® Surgery Care and Treatment

1124.    Plaintiff Gwendolyn Menard's post-operative period has been marked by increasingly severe pain and weakness in her legs.

### c. Plaintiff's Current Condition

1125.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities and legs.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1126.    Plaintiff, Joseph Fleming, resides in Agawam, Massachusetts.

1127.    Plaintiff, Joseph Fleming, is the spouse of Plaintiff Gwendolyn Menard.

1128.    Plaintiff, Joseph Fleming, is bringing a claim for loss of consortium.

## 43. Dennis Mojica and Grismilda Mojica

1129.    Plaintiff Dennis Mojica resides in Vineland, New Jersey.  Plaintiff was born on November 25, 1964.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1130.    On April 16, 2009, Plaintiff Dennis Mojica was admitted to Thomas Jefferson University Hospital in Philadelphia, Pennsylvania where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1131.    During the surgery, Infuse® was used in Plaintiff Dennis Mojica off-label in the following fashion:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

c. Infuse® was used in a Posterolateral surgical approach.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### b. Post-Infuse® Surgery Care and Treatment

1132.     Plaintiff Dennis Mojica's post-operative period has been marked by ectopic bone growth emerging from the Infuse® application site that causes severe radiating pain and numbness in his legs.

1133.     Plaintiff Dennis Mojica underwent surgery on June 19, 2012 to implant a spinal cord stimulator.

### c. Plaintiff's Current Condition

1134.      Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  He suffers from numbness and burning down through his legs. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1135.     Plaintiff, Grismilda Mojica, resides in Vineland, New Jersey.

1136.     Plaintiff, Grismilda Mojica, is the spouse of Plaintiff Dennis Mojica.

1137.     Plaintiff, Grismilda Mojica, is bringing a claim for loss of consortium.

### 44. William Muirhead and Jenny Muirhead

1138.     Plaintiff William Muirhead resides in Vicksburg, Mississippi.  Plaintiff was born on March 25, 1954.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF).

### a. Initial Infuse® Surgery

1139.     On August 14, 2003, Plaintiff William Muirhead was admitted to Central Mississippi Medical Center in Jackson, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to S1.

1140.     During the surgery, Infuse® was used in Plaintiff William Muirhead off-label in the following fashion:

   a.   Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

1141.     Plaintiff William Muirhead's post-operative period has been marked by increasingly

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

severe pain in his legs.

1142.    On August 12, 2005, Plaintiff William Muirhead presents for a revision surgery to remove ectopic/exuberant bone growth that was impinging on the central canal and exiting nerve roots. This compression is the underlying etiology of Plaintiff's pain and numbness that radiates into the lower extremities

1143.    On July 28, 2011, Plaintiff presents for excision of a cancerous mass on his left forearm.

### c. Plaintiff's Current Condition

1144.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1145.    Plaintiff, Jenny Muirhead, resides in Vicksburg, Mississippi.

1146.    Plaintiff, Jenny Muirhead, is the spouse of Plaintiff William Muirhead.

1147.    Plaintiff, Jenny Muirhead, is bringing a claim for loss of consortium.

## 45. Juvenal Nieves

1148.    Plaintiff Juvenal Nieves resides in Tampa, Florida.  Plaintiff was born on October 11, 1975.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) and Posterior fusion surgery.

### a. Initial Infuse® Surgery

1149.    On September 3, 2009, Plaintiff Juvenal Nieves was admitted to Morton Plant Hospital in Clearwater, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to S1.

1150.    During the surgery, Infuse® was used in Plaintiff Juvenal Nieves off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the facet joints and transverse processes).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

     c.   Infuse® was used to fuse more than one level of the spine.

     d.   Infuse® was used in a Posterior surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1151.    Plaintiff Juvenal Nieves' post-operative period has been marked by increasingly severe low back pain that radiates to his legs. Plaintiff has continued to suffer neuroforaminal and central canal narrowing at his Infuse® exposure site.

### c. Plaintiff's Current Condition

1152.    Plaintiff suffers from numbness and shooting pain through his lower back and legs. Plaintiff has developed difficulty with coordination, disturbances in his gait, and difficulty ambulating even short distances. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 46. Caldonia Patrick

1153.    Plaintiff Caldonia Patrick resides in Carthage, Mississippi. Plaintiff was born on April 15, 1960. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery and a Posterolateral spinal fusion.

### a. Initial Infuse® Surgery

1154.    On January 28, 2009, Plaintiff Caldonia Patrick was admitted to Crossgates River Oaks Hospital in Brandon, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1155.    During the surgery, Infuse® was used in Plaintiff Caldonia Patrick off-label in the following manners:

     a.   Infuse® was used without the mandatory approved LT-cage.

     b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

     c.   Infuse® was used in Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1156.    Plaintiff Caldonia Patrick's post-operative period has been marked by increasing

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

radicular symptoms in her right leg and severe mechanical lower back pain.

1157.   On December 2, 2011 Plaintiff Caldonia Patrick underwent a revision surgery.

### c. Plaintiff's Current Condition

1158.    Plaintiff Caldonia Patrick continues to experience severe back pain.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### 47. Donna Poole and Joey Poole

1159.   Plaintiff Donna Poole resides in Amory, Mississippi.  Plaintiff was born on March 15, 1958.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1160.   On May 30, 2003 Plaintiff Donna Poole was admitted to North Mississippi Medical Center in Tupelo, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1161.   During the surgery, Infuse® was used in Plaintiff Donna Poole off-label in the following fashion:

   a.   Infuse® was used without the mandatory approved LT-cage.

   b.   Infuse® was used in a TLIF surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1162.   Plaintiff Donna Poole's post-operative period has been marked by increasingly severe pain, weakness, and numbness in her legs.

### c. Plaintiff's Current Condition

1163.    Plaintiff suffers from significant nerve injury and continues to experience severe and unrelenting radiating pain and numbness in her lower extremities.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### d. Plaintiff's Spouse

1164.    Plaintiff, Joey Poole, resides in Amory, Mississippi.

1165.    Plaintiff, Joey Poole, is the spouse of Plaintiff Donna Poole.

1166.    Plaintiff, Joey Poole, is bringing a claim for loss of consortium.

### 48. Lerisce Powell and Erick Powell

1167.    Plaintiff Lerisce Powell resides in Greenville, Mississippi.  Plaintiff was born on February 1, 1971.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral Fusion and Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1168.    On August 29, 2008, Plaintiff Lerisce Powell was admitted to St. Dominic-Jackson Memorial Hospital in Jackson, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1169.    During the surgery, Infuse® was used in Plaintiff Lerisce Powell off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

c.  Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1170.    Plaintiff Lerisce Powell's post-operative period has been marked by increasingly severe pain radiating to her lower extremity.  In addition, Plaintiff has suffered from an inflammatory fluid collection and cystic changes following her surgery. She has since required the surgical implantation of a spinal cord stimulator, followed by its explantation when it failed to control Plaintiff's pain.

### c. Plaintiff's Current Condition

1171.     Plaintiff continues to experience severe and unrelenting pain, numbness, and weakness that radiates into her lower extremities.  This neurologic deficit has since developed into chronic foot-drop.  Plaintiff's severe pain is exacerbated when she stands or walks. This prevents Plaintiff from

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1172.    Plaintiff, Erick Powell, resides in Greenville, Mississippi.

1173.    Plaintiff, Erick Powell, is the spouse of Plaintiff Lerisce Powell.

1174.    Plaintiff, Erick Powell, is bringing a claim for loss of consortium.

### 49. Doris Randle and Walter Randle, Jr.

1175.    Plaintiff Doris Randle resides in Woodland, Mississippi.  Plaintiff was born on December 18, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1176.    On August 23, 2005, Plaintiff Doris Randle was admitted to North Mississippi Medical Center in Tupelo, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

1177.    During the surgery, Infuse® was used in Plaintiff Doris Randle off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

    c.    Infuse® was used in a TLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1178.    Plaintiff Doris Randle's post-operative period has been marked by lower back and leg pain.  Plaintiff suffers extreme pain when lifting, standing, and walking secondary to narrowing of the L5 to S1 interspace level.

### c. Plaintiff's Current Condition

1179.     Plaintiff continues to experience pain and burning in her lower back that radiates into the lower extremities.  This prevents her from practicing and enjoying the activities of daily life that she

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1180.    Plaintiff, Walter Randle, Jr., resides in Woodland, Mississippi.

1181.    Plaintiff, Walter Randle, Jr., is the spouse of Plaintiff Doris Randle.

1182.    Plaintiff, Walter Randle, Jr., is bringing a claim for loss of consortium.

### 50. Eddie Roberson and Jessica Roberson

1183.    Plaintiff Eddie Roberson resides in Lynchburg, South Carolina.  Plaintiff was born on September 8, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1184.    On March 28, 2006 Plaintiff Eddie Roberson was admitted to McLeod Regional Medical Center in Florence, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1185.    During the surgery, Infuse® was used in Plaintiff Eddie Roberson off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

    c.    Infuse® was used in a TLIF surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1186.    Plaintiff Eddie Roberson's post-operative period has been marked by increasingly severe pain and in his legs.

1187.    Plaintiff Eddie Roberson underwent a revision surgery on March 19, 2012 for hardware removal and decompression of the bilateral L5 nerve roots.

### c. Plaintiff's Current Condition

1188.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1189.    Plaintiff, Jessica Roberson, resides in Lynchburg, South Carolina.

1190.    Plaintiff, Jessica Roberson, is the spouse of Plaintiff Eddie Roberson.

1191.    Plaintiff, Jessica Roberson, is bringing a claim for loss of consortium.

### 51. Kendra Williams Russell-El and John Russell-El

1192.    Plaintiff Kendra Williams Russell-El resides in Omaha, Nebraska.  Plaintiff was born on June 13, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Cervical Lateral Mass fusion surgery.

### a. Initial Infuse® Surgery

1193.    On May 24, 2006, Plaintiff Kendra Williams Russell-El was admitted to St. Joseph Hospital-Creighton University Medical Center in Omaha, Nebraska, where Plaintiff's surgeon performed a spine fusion surgery on the Cervical region of her spine from vertebrae C3 to C7.

1194.    During the surgery, Infuse® was used in Plaintiff Kendra Williams Russell-El off-label in the following fashion:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed along the lateral vertebral masses).

c.    Infuse® was used to fuse more than one level of the spine.

d.    Infuse® was used in a Lateral Cervical fusion surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1195.    Plaintiff Kendra Williams Russell-El's post-operative period has been marked by heterotopic bone growth and increasingly severe pain and numbness in her neck and right hand.

### c. Plaintiff's Current Condition

1196.     Plaintiff continues to experience severe and unrelenting pain that radiates into her hand. She suffers from worsening neck pain that leaves her numb to her right hand.  These worsening pains and complications prevent her from practicing and enjoying the activities of daily life that she enjoyed

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1197.    Plaintiff, John Russell-El, resides in Omaha, Nebraska.

1198.    Plaintiff, John Russell-El, is the spouse of Plaintiff Kendra Williams Russell-El.

1199.    Plaintiff, John Russell-El, is bringing a claim for loss of consortium.

### 53.    Jennifer Shanedling

1200.    Plaintiff Jennifer Shanedling is an individual who resides in Stillwater, Minnesota. Plaintiff Jennifer Shanedling was born on July 15, 1970.  Plaintiff Jennifer Shanedling underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF).

### a. Initial Infuse® Surgery

1201.    On July 16, 2008 Plaintiff Jennifer Shanedling was admitted to Health East Care System: Woodwinds Health Campus in Woodbury, Minnesota where Plaintiff Jennifer Shanedling's surgeon performed a spine fusion on the Lumbar region of her spine from vertebrae L4 to S1.

1202.    During the surgery, Infuse® was used in Plaintiff Jennifer Shanedling off-label in the following fashion:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

c.    Infuse® was used to fuse more than one level of the spine.

### b. Post-Infuse® Surgery Care and Treatment

1203.    Plaintiff Jennifer Shanedling's post-operative period was followed by a temporary period of relief from pain and subsequently has been marked by increasingly severe pain in her legs.

### c. Plaintiff's Current Condition

1204.    Plaintiff Jennifer Shanedling continues to experience severe and unrelenting pain that radiates into her lower extremities as well as numbness causing her difficulties ambulating.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively,

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

and she has otherwise suffered serious injuries.

### 54. Sharon Sharp

1205.    Plaintiff Sharon Sharp resides in Wyandanch, New York.  Plaintiff was born on November 27, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral Fusion and a Posterior Lumbar Interbody Fusion (PLIF).

#### a. Initial Infuse® Surgery

1206.    On March 17, 2010, Plaintiff Sharon Sharp was admitted to Stony Brook University Hospital in Stony Brook, New York where Plaintiff's surgeon performed a spine fusion surgery on the Lumbosacral region of her spine from vertebrae L4 to S1.

1207.    During the surgery, Infuse® was used in Plaintiff Sharon Sharp off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed along the transverse processes and sacral ala).

c.  Infuse® was used to fuse more than one level of the spine.

d.  Infuse® was used in a PLIF and Posterolateral surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1208.    Plaintiff Sharon Sharp's post-operative period has been marked by nerve injury and significant pain.

#### c. Plaintiff's Current Condition

1209.     Plaintiff Sharon Sharp continues to experience nerve injury, significant pain, difficulty swallowing, bone overgrowth, localized edema, and pain in the hips.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and has otherwise suffered serious injuries.

### 54. Scott Shepherd and Tammy Lynn Shepherd

1210.    Plaintiff Scott Shepherd resides in Marcellus, Michigan.  Plaintiff was born on March 22, 1961.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1211.    On October 18, 2006 Plaintiff Scott Shepherd was admitted to Borgess Medical Center in Kalamazoo, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

1212.    During the surgery, Infuse® was used in Plaintiff Scott Shepherd off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

c.    Infuse® was used in a Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1213.    Plaintiff Scott Shepherd's post-operative period was followed by a temporary period of relief from pain and has subsequently been marked by increasingly severe pain and weakness in his legs.

### c. Plaintiff's Current Condition

1214.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  Plaintiff suffers from ectopic/exuberant bone growth leading to foraminal encroachment with bilateral foraminal stenosis at his L4-L5 vertebrae.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1215.    Plaintiff, Tammy Lynn Shepherd, resides in Marcellus, Michigan.

1216.    Plaintiff, Tammy Lynn Shepherd, is the spouse of Plaintiff Scott Shepherd.

1217.    Plaintiff, Tammy Lynn Shepherd, is bringing a claim for loss of consortium.

### 55. Stephen Sparagno and Margie Sparagno

1218.    Plaintiff Stephen Sparagno resides in Moses Lake, Washington.  Plaintiff was born on May 24, 1952.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1219.    On September 20, 2004, Plaintiff Stephen Sparagno was admitted to Valley Medical Center in Renton, Washington where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to S1.

1220.    During the surgery, Infuse® was used in Plaintiff Stephen Sparagno off-label in the following fashion:

      a.    Infuse® was used without the mandatory approved LT-cage.

      b.    Infuse® was used to fuse more than one level of the spine.

      c.    Infuse® was used in a TLIF surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1221.    Plaintiff Stephen Sparagno's post-operative period has been marked by increasingly severe pain in his legs.

### c. Plaintiff's Current Condition

1222.    Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1223.    Plaintiff, Margie Sparagno, resides in Moses Lake, Washington.

1224.    Plaintiff, Margie Sparagno, is the spouse of Plaintiff Stephen Sparagno.

1225.    Plaintiff, Margie Sparagno, is bringing a claim for loss of consortium.

## 56. Wilbur Spaulding

1226.    Plaintiff Wilbur Spaulding resides in Whiteville, North Carolina.  Plaintiff was born on February 8, 1970.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Spinal Fusion surgery.

### a. Initial Infuse® Surgery

1227.    On August 18, 2008, Plaintiff Wilbur Spaulding was admitted to New Hanover Regional

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Medical Center in Wilmington, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L3 to L5.

1228.    During the surgery, Infuse® was used in Plaintiff Wilbur Spaulding off-label in the following manners:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed across the transverse processes).

c. Infuse® was used to fuse more than one level of the spine.

d. Infuse® was used in a Posterior surgical approach.

**b. Post-Infuse® Surgery Care and Treatment**

1229.    Plaintiff Wilbur Spaulding's post-operative period has been marked by persistent back pain that radiates to his lower extremities.  Postoperatively, Plaintiff suffered a severe inflammatory reaction that destabilized his fusion and ultimately caused his hardware to fail.  More recently, Plaintiff suffers from ectopic bone growth that emerges from the Infuse® application site and compresses the exiting nerve roots, resulting in severe pain.

**c. Plaintiff's Current Condition**

1230.     Plaintiff continues to experience chronic lower back and leg pain.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

**57. Richard Steinman, Jr. and Sandra Steinman**

1231.    Plaintiff Richard Steinman, Jr. resides in Carleton, Michigan.  Plaintiff was born on August 1, 1963.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

**a. Initial Infuse® Surgery**

1232.    On September 17, 2008, Plaintiff Richard Steinman, Jr. was admitted to William Beaumont Hospital in Royal Oak, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1233.    During the surgery, Infuse® was used in Plaintiff Richard Steinman, Jr. off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

    c.  Infuse® was used in a TLIF surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1234.    Plaintiff Richard Steinman, Jr.'s post-operative period has been marked by increasingly severe pain and weakness in his legs.

### c. Plaintiff's Current Condition

1235.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  Plaintiff suffers from ectopic/exuberant bone growth leading to disc space narrowing at his L5-S1 vertebrae causing lower extremity paresthesia and lumbosacral radiculopathy.   This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1236.    Plaintiff, Sandra Steinman, resides in Carleton, Michigan.

1237.    Plaintiff, Sandra Steinman, is the spouse of Plaintiff Richard Steinman, Jr.

1238.    Plaintiff, Sandra Steinman is bringing a claim for loss of consortium.

## 58. Dellarine Takieddine

1239.    Plaintiff Dellarine Takieddine resides in South Lyon, Michigan.  Plaintiff was born on March 5, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1240.    On December 27, 2006, Plaintiff Dellarine Takieddine was admitted to George Washington University Hospital in Washington, D.C., where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1241.    During the surgery, Infuse® was used in Plaintiff Dellarine Takieddine off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

    c.  Infuse® was used in a PLIF and Posterolateral surgical approach.

**b. Post-Infuse® Surgery Care and Treatment**

1242.    Plaintiff Dellarine Takieddine's post-operative period was followed by a temporary period of relief and has subsequently been marked by increasingly severe radiating pain in her legs.

1243.    Plaintiff suffers from ectopic bone growth at the Infuse® application site.

**c. Plaintiff's Current Condition**

1244.     Plaintiff continues to experience severe and unrelenting radiating pain in her lower extremities.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

**59. Cynthia Taylor**

1245.    Plaintiff Cynthia Taylor resides in Wilson, North Carolina.  Plaintiff was born on May 23, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior and Posterior Lumbar Interbody Fusion (PLIF) surgery.

**a. Initial Infuse® Surgery**

1246.    On March 4, 2009, Plaintiff Cynthia Taylor was admitted to Vidant Edgecombe Hospital in Tarboro, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L5 to S1.

1247.    During the surgery, Infuse® was used in Plaintiff Cynthia Taylor off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and facet joints)

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

   c. Infuse® was used in a PLIF and Posterior surgical approach.

   **b. Post-Infuse® Surgery Care and Treatment**

1248. Plaintiff Cynthia Taylor's post-operative period has been marked by severe narrowing of her spinal canal at L5-S1 secondary to bony overgrowth. This manifests as pain and weakness in both her legs as well as numbness and pain in her feet.

   **c. Plaintiff's Current Condition**

1249. Plaintiff continues to experience severe and unrelenting serious pain, which greatly limits her mobility, and prevents her from performing the activities of daily life that she enjoyed preoperatively, and she has otherwise suffered serious injuries.

  **60. Linda Tinney and James Tinney**

1250. Plaintiff Linda Tinney resides in Gibsonton, Florida.  Plaintiff was born on April 16, 1954.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterior Fusion surgery.

   **a. Initial Infuse® Surgery**

1251. On August 6, 2007, Plaintiff Linda Tinney was admitted to Tampa General Hospital in Tampa, Florida where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

1252. During the surgery, Infuse® was used in Plaintiff Linda Tinney off-label in the following fashion:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and spinous processes).

   c. Infuse® was used to fuse more than one level of the spine.

   d. Infuse® was used in a Posterior and TLIF surgical approach.

   **b. Post-Infuse® Surgery Care and Treatment**

1253. Plaintiff Linda Tinney's post-operative period has been marked by increasingly severe pain in her legs.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### c. Plaintiff's Current Condition

1254.    Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  She suffers from nerve damage and uncontrolled bone growth causing burning down through her legs.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1255.    Plaintiff, James Tinney, resides in Gibsonton, Florida.

1256.    Plaintiff, James Tinney, is the spouse of Plaintiff Linda Tinney.

1257.    Plaintiff, James Tinney, is bringing a claim for loss of consortium.

## 61. Trever Towne

1258.    Plaintiff Trever Towne resides in Sheridan, Michigan.  Plaintiff was born on October 11, 1985.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1259.    On April 21, 2009, Plaintiff Trever Towne was admitted to Saint Mary's Health Care in Grand Rapids, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

1260.    During the surgery, Infuse® was used in Plaintiff Trever Towne off-label in the following fashion:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and lateral gutters).

   c.  Infuse® was used in a TLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1261.    Plaintiff Trever Towne's post-operative period has been marked by increasingly severe pain and numbness in his legs secondary to narrowing of the spinal canal at the L4 to L5 level and impingement of the left L5 nerve root.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### c. Plaintiff's Current Condition

1262.     Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  He suffers from numbness and burning down through his legs. This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 62. Reggie Waddle and Barbara Waddle

1263.     Plaintiff Reggie Waddle resides in Fulton, Mississippi.  Plaintiff was born on October 27, 1948.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1264.     On February 2, 2007, Plaintiff Reggie Waddle was admitted to North Mississippi Health Services in Tupelo, Mississippi where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

1265.     During the surgery, Infuse® was used in Plaintiff Reggie Waddle off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.   Infuse® was used in a TLIF surgical approach.

    c.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space).

### b. Post-Infuse® Surgery Care and Treatment

1266.     Plaintiff Reggie Waddle's post-operative period has been marked by increasingly severe pain radiating from his lower back to his legs.

### c. Plaintiff's Current Condition

1267.     Plaintiff Reggie Waddle still experiences severe and unrelenting pain that radiates into his lower extremities and legs.  This severe pain prevents Plaintiff from enjoying and completing daily activities and severely detracts from the quality of his life, and he has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

#### d. Plaintiff's Spouse

1268.    Plaintiff, Barbara Waddle, resides in Fulton, Mississippi.

1269.    Plaintiff, Barbara Waddle is the spouse of Plaintiff Reggie Waddle.

1270.    Plaintiff, Barbara Waddle, is bringing a claim for loss of consortium.

### 63. Sheryl Jacqueline Whitmire

1271.    Plaintiff Sheryl Jacqueline Whitmire resides in Myrtle Beach, South Carolina.  Plaintiff was born on July 7, 1949.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgery.

#### a. Initial Infuse® Surgery

1272.    On March 16, 2009, Plaintiff Sheryl Jacqueline Whitmire was admitted to Georgetown Memorial Hospital in Georgetown, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

1273.    During the surgery, Infuse® was used in Plaintiff Sheryl Jacqueline Whitmire off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space and lateral gutters).

    c.   Infuse® was used to fuse more than one level of the spine.

    d.   Infuse® was used in a Posterolateral and PLIF surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1274.    Plaintiff Sheryl Jacqueline Whitmire's post-operative period has been marked by increasingly severe pain and weakness in her legs, leaving her greatly disabled.

#### c. Plaintiff's Current Condition

1275.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  Her mobility is greatly restricted by her pain and she must use a walker and is unable to lift or bend.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 64. Daniel Williams

1276.     Plaintiff Daniel Williams resides in North Charleston, South Carolina.  Plaintiff was born on June 4, 1966.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

#### a. Initial Infuse® Surgery

1277.     On July 23, 2004 Plaintiff Daniel Williams was admitted to Trident Health System in Charleston, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

1278.     During the surgery, Infuse® was used in Plaintiff Daniel Williams off-label in the following fashion:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space and transverse processes).

    c.  Infuse® was used in a TLIF and Posterolateral surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1279.     Plaintiff Daniel Williams' post-operative period was followed by a temporary period of relief from pain and has subsequently been marked by increasingly severe pain and weakness in his legs.

1280.     Plaintiff Daniel Williams underwent a revision surgery on May 9, 2005 to remove uncontrolled bone growth and decompress his L4 through L5 nerve roots.

#### c. Plaintiff's Current Condition

1281.      Plaintiff continues to experience severe and unrelenting pain that radiates into his lower extremities.  This prevents him from practicing and enjoying the activities of daily life that he enjoyed pre-operatively, and he has otherwise suffered serious injuries.

### 65. Leah Winzer and Christopher Winzer

1282.     Plaintiff Leah Winzer resides in Newport News, Virginia.  Plaintiff was born on November 17, 1971.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1283.    On June 18, 2012 Plaintiff Leah Winzer was admitted to Bon Secours Mary Immaculate Hospital in Newport News, Virginia where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

1284.    During the surgery, Infuse® was used in Plaintiff Leah Winzer off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used to fuse more than one level of the spine.

    c.    Infuse® was used in a TLIF and Posterolateral surgical approach.

### b. Post-Infuse® Surgery Care and Treatment

1285.    Plaintiff Leah Winzer's post-operative period has been marked by increasingly severe pain and weakness in her legs.

1286.    On June 25, 2013 Plaintiff Leah Winzer endured a revision surgery to decompress the exiting nerve roots at the level of her Infuse® surgery.

### c. Plaintiff's Current Condition

1287.     Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities.  Due to swelling and pain, Plaintiff is unable to sit or stand for long periods following her surgery with Infuse®.  She also suffers from bladder incontinence.  This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and she has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1288.    Plaintiff, Christopher Winzer, resides in Newport News, Virginia.

1289.    Plaintiff, Christopher Winzer, is the spouse of Plaintiff Leah Winzer.

1290.    Plaintiff, Christopher Winzer, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### 66. Thomas Yellowwolf, Jr.

1291.    Plaintiff Thomas Yellowwolf, Jr. resides in Bismark, North Dakota.  Plaintiff was born on February 4, 1978.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

#### a. Initial Infuse® Surgery

1292.    On April 18, 2011, Plaintiff Thomas Yellowwolf, Jr. was admitted to St. Alexius Medical Center in Bismarck, North Dakota where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L5 to S1.

1293.    During the surgery, Infuse® was used in Plaintiff Thomas Yellowwolf, Jr. off-label in the following fashion:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in a TLIF surgical approach.

#### b. Post-Infuse® Surgery Care and Treatment

1294.    Plaintiff Thomas Yellowwolf, Jr.'s post-operative period was marked by a period of relief followed by ectopic bone growth and increasingly severe pain and weakness in his lower extremities along with episodes of bowel incontinence.

#### c. Plaintiff's Current Condition

1295.     Plaintiff Thomas Yellowwolf, Jr. continues to experience severe and unrelenting pain that radiates into his lower extremities.  The severity of the pain causes chills and vomiting.  Plaintiff continues to suffer the effects of overgrown bone following his surgery with Infuse®.  This prevents him from practicing and fully enjoying the activities of daily life to the extent he did preoperatively, and he has otherwise suffered serious injuries.

### IX. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES

1296.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1297.    As a result of Medtronic's oppression, fraudulent concealment, wantonness, malice, and

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

reckless disregard for Plaintiffs' safety, Plaintiffs are entitled to punitive or exemplary damages to the fullest extent necessary as plead in detail below.

# X. CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Negligence

1298.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1299.    Plaintiffs underwent spine fusion surgeries where Infuse® was used "off-label".

1300.    Each Plaintiff's surgeon performed these "off-label" spine fusion surgeries and implanted Infuse® into Plaintiffs' vertebrae "off-label".

1301.    Medtronic falsely represented the results of scientific studies regarding Infuse®.

1302.    Medtronic concealed material information related to the safety of "off-label" use of Infuse®.

1303.    Medtronic covertly edited scientific studies to falsely enhance the purported benefits of Infuse®.

1304.    Medtronic deceptively and falsely underreported the dangerous propensities and increased risks of Infuse®.

1305.    The Infuse® that was implanted in Plaintiffs were promoted, distributed, and used in an unapproved, "off-label" manner that is in violation of federal law, including the FDCA, MDA and regulations related thereto as well as parallel state laws.

1306.    Plaintiffs were injured due to an "off-label" use of Infuse® that resulted from Medtronic's practice of promoting such uses.  By engaging in "off-label" promotion, Medtronic caused the device to be misbranded.[387]

---

[387] A device is misbranded if its labeling fails to bear "adequate directions for use," 21 U.S.C. § 352(f) (2012), which FDA regulations define as "directions under which the layman can use a device safely and for the purposes for which it is intended," 21 C.F.R. § 801.5 (2012) (emphasis added).  The FDA then defines intended use by reference to "the objective intent of the persons legally responsible for the labeling of devices," which may be demonstrated by, among other evidence, "oral or written statements by such persons or their representatives…" Id. § 801.4 (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1307.    Advertising Infuse® "in a manner that is inconsistent with any conditions to approval specified in the PMA approval order the device, renders the medical device "misbranded"."[388]

1308.    Medtronic violated federal law by engaging in "off-label" promotion that damaged Plaintiffs.  This "off-label" promotion misbranded Infuse®.[389]

1309.    Pursuant to the Conditions of Approval, Medtronic was required to submit a PMA supplement, i.e. "must be when adverse effects, increases in the anticipated adverse effects, on device failures necessitate a labeling, manufacturing, a device modification."

1310.    Moreover, "[a] PMA Supplement must be submitted if the device is to be modified and the modified device should be subjected to animal in laboratory in clinical testing designed to determine if the modified device remains safe and effective."

1311.    Despite the known increases in adverse effects and that Infuse® was being used in an off-label unapproved manner as a modified device (i.e. one not approved or tested for safety) Medtronic failed to submit a PMA supplement as required by the Conditions of Approval and the applicable federal regulations.

1312.    The Conditions of Approval expressly provided that "continued approval of this PMA is contingent upon the submission of postapproval reports required under 21 C.F.R. § 814.84…"

1313.    The information required to be submitted included, in part, information that is known or reasonably should be known to the applicant and shall include "unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices."

1314.    Medtronic failed to submit the required information regarding the abandoned clinical studies related to posterior/off-label uses of Infuse® as well as information related to the corrupted Medtronic studies referenced herein.

1315.    It was the duty of Medtronic to comply with federal law, the FDCA, the MDA and the regulations, notwithstanding this duty, Medtronic violated federal law, the FDCA, the MDA, and the

---

[388] 21 U.S.C. § 331 (a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a "device may not be … advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")

[389] Federal regulations provide that misbranding can also be shown by "the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised."  21 C.F.R. § 801.4 (2012).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

regulations, including but not limited to, in one or more of the following ways:

a. Medtronic violated federal regulation 21 U.S.C. § 360e because it failed to submit PMA.

Application for the intended uses of Infuse® that they promoted "off-label".

b. Medtronic violated federal regulation 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the regulation.

c. Medtronic violated federal regulation 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d. Medtronic violated federal regulation 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e. Medtronic violated federal regulation 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f. Medtronic violated federal regulation 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed

g. Medtronic violated federal regulation 21 U.S.C. § 352(q) because it created and distributed false and misleading advertising for Infuse®, which is a "Restricted Device."

h. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

i. Medtronic violated federal regulation Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal regulations 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal regulation 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal regulations 21 U.S.C. §§ 360(q); 360(r) because it created and distributed false and misleading advertising.

o. Medtronic violated federal regulations 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p. Medtronic violated federal regulation 21 C.F.R. § 820. 198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse.

q. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal regulation 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

inconsistent with the conditions for approval specified in the PMA approval for it.

t. Medtronic violated federal regulation 21 C.F.R. § 801.109(c) because the labeling for Infuse® including the purposes for which it is advertised or represented were outside of the intended uses approved by the FDA.

u. Medtronic violated federal regulation 21 C.F.R. § 801.6, rendering Infuse® misbranded, because the representations Medtronic made in the labeling (including its advertising) were false and/or misleading with respect to non-approved uses.

1316.    As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1317.    Medtronic failed to exercise due care and failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter of Infuse®.

1318.    This cause of action is based entirely on the contention that Medtronic violated federal safety statutes and regulations. Plaintiffs do not bring the underlying action as an implied statutory cause of action but rather Plaintiffs are pursuing parallel state common law claims based on Medtronic violations of the applicable federal regulations. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1319.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

1320.    Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1321.    As a direct result of Infuse® each Plaintiff suffered severe injuries, including intense physical pain and severe mental and emotional distress, as further described in the Plaintiff Party Section of this complaint.

1322.    Medtronic marketed their Infuse® product to and for the benefit of Plaintiffs, and additionally marketed it to Plaintiffs' physicians. Medtronic knew or should have known that Plaintiffs and Plaintiffs' physicians would use their product in the way that they marketed it, including for "off-label" use of spine fusion surgeries.

1323.    Medtronic owed Plaintiffs and Plaintiffs' physicians the duty to exercise reasonable or ordinary care under the circumstances, in light of the generally-recognized and prevailing best scientific knowledge.

1324.    Medtronic had a confidential and special relationship with Plaintiffs due to (a) Medtronic's vastly superior knowledge of the health and safety risks relating to Infuse®, and (b) Medtronic's sole and/or superior knowledge of their dangerous and irresponsible practices of improperly promoting to physicians the "off-label" use of Infuse® for spine fusion surgeries.

1325.    As a result, Medtronic had an affirmative duty to fully and adequately warn Plaintiffs and Plaintiffs' physicians of the true health and safety risks related to the "off-label" use of Infuse®, and Medtronic had a duty to disclose their dangerous and irresponsible practices of improperly promoting to physicians the "off-label" use of Infuse® for spine fusion surgery.  Independent of any special relationship of confidence or trust, Medtronic had a duty not to conceal the dangers of the "off-label" use of Infuse® to Plaintiffs and Plaintiffs' physicians.

1326.    Misrepresentations made by Medtronic about the health and safety of Infuse® independently imposed a duty upon Medtronic to fully and accurately disclose to Plaintiffs and Plaintiffs' physicians the true health and safety risks related to Infuse®, and a duty to disclose their dangerous and irresponsible "off-label" promotion and marketing practices.

1327.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Medtronic breached their duties to Plaintiffs and to Plaintiffs' physicians.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1328.    The following sub-paragraphs summarize, *inter alia,* Medtronic's breaches of duties to Plaintiffs and Plaintiffs' physicians and describe categories of acts or omissions constituting breaches of duty by Medtronic. Each and/or any of these acts or omissions establishes an independent basis for these Medtronic's liability in negligence:

a.    Unreasonable and improper promotion and marketing of Infuse® to physicians, including but not limited to the promotion and marketing of Infuse® for "off-label" use in spine fusion surgeries;

b.    Failure to warn physicians and Plaintiffs of the dangers associated with the increased risks and dangers of Infuse® when used "off-label" in posterior-approach lumbar spine surgery including, but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and poorer global outcomes than alternative treatments; or

c.    Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Infuse®.

d.    Failure to remove Infuse® from the marketplace after knowledge and/or notice of the predominance of "off-label" use and the severity of the associated health and safety risks from "off-label" use.

1329.    Moreover, Medtronic routinely had Medtronic sales representatives present during the Infuse® surgeries wherein they would provide technical support and recommendations to "assist" Plaintiffs' surgeons in using Infuse® in off-label procedures.  Moreover, surgeons implanting Infuse® would be recommended to call and would call the Medtronic Infuse® physician help center to obtain advice and recommendations regarding the techniques and procedures for implanting Infuse® in an off-label and non-approved manner.

1330.     Medtronic assumed a duty to provide the support and recommendation in a reasonable, prudent, and safe manner.  Medtronic failed to exercise reasonable care in providing the technical support and recommendations concerning the off-label uses of Infuse® which procedures increased the dangers, complications, and/or risks of harm to patients, including Plaintiffs.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1331.     Plaintiffs will amend this petition, as may be appropriate, following discovery of the names of the Medtronic representatives who were present during the respective Plaintiff Infuse® surgeries who provided support, made recommendations, representations and/or omissions concerning the techniques, methods, appropriateness, risks and/or dangers associated with the off-label Infuse® surgeries performed on Plaintiffs.

1332.     Under federal law, Medtronic had a continuing duty to monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences that are or may be attributable to the product.

1333.     Medtronic violated its duties under federal law to report adverse event information to the FDA.  Because Medtronic failed to comply with its duty under federal law, it breached its duty to use reasonable care under parallel state laws.

1334.     Settled state common laws protect the safety and health of its citizens by imposing a general duty of reasonable care on product manufacturers.  Moreover, state common laws include causes of action for failure to warn.  A product is unreasonably dangerous in the absence of adequate warnings under applicable state common laws.

1335.     Medtronic failed to use reasonable care and failed to adequately warn as to the increased risks and unreasonably dangerous of using Infuse® in an off-label and non-approved manner.  As a result of Medtronic's wrongful actions, the Plaintiffs were caused to suffer sever injuries and to incur significant damages.

1336.     Medtronic knew, or should have known, that due to their failure to use reasonable care, Plaintiffs and Plaintiffs' physicians would use and did use Infuse®, to the detriment of Plaintiffs' health, safety and well-being.

1337.     As the direct, producing, proximate and legal cause and result of Medtronic's negligence, Plaintiffs suffered severe injuries.

1338.     Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1339.     Medtronic's conduct, as alleged above, was malicious, intentional and outrageous and

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## SECOND CAUSE OF ACTION

### Negligence Per Se

1340.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1341.    Medtronic violated federal statutes and regulations, including but not limited to 21 C.F.R. § 803, relating to medical devices.

1342.    The Infuse® that was implanted in Plaintiff was promoted, distributed, and used in an unapproved, "off-label" manner that is in violation of federal law, including the FDCA, MDA and regulations related thereto as well as parallel state laws.

1343.    It was the duty of Medtronic to comply with the FDCA and the regulations promulgated pursuant to it, notwithstanding this duty, Medtronic violated the FDCA, including but not limited to, in one or more of the following ways:

a. Medtronic violated federal regulation 21 U.S.C. § 360(e) because it failed to submit a PMA Application for the intended uses of Infuse® that it promoted "off-label".

b. Medtronic violated federal regulation 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that it promoted as is required by the regulation.

c. Medtronic violated federal regulation 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d. Medtronic violated federal regulation 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e. Medtronic violated federal regulation 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

f. Medtronic violated federal regulations 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated 21 C.F.R. § 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which was approved as a "Restricted Device."

h. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it promoted new, "off-label" intended uses.

i. Medtronic violated federal regulation Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal regulations 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal regulation 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal regulations 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o. Medtronic violated federal regulations 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p. Medtronic violated federal regulation 21 C.F.R. § 820. 198 because it failed to

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse.

q. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal regulation 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

t. Medtronic violated federal regulation 21 C.F.R. § 801.109(c) because the labeling for Infuse® including the purposes for which it is advertised or represented were outside of the intended uses approved by the FDA.

u. Medtronic violated federal regulation 21 C.F.R. § 801.6, rendering Infuse® misbranded, because the representations Medtronic made in the labeling (including its advertising) were false and/or misleading with respect to non-approved uses.

1344.    As a direct and proximate result of Medtronic's violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure serious injuries, as defined in 21 C.F.R. § 803.3.

1345.    Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.  All of these injuries are permanent.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1346.    Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1347.    Plaintiffs are not seeking to enforce these provisions in our action.  Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions.  Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1348.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence per se in tort under state common law.

1349.    Thus, for violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1350.    Medtronic's violations of these federal statutes and regulations caused Plaintiffs' injuries.

1351.    Plaintiffs' injuries resulting from an occurrence the laws and regulations were designed to prevent.

1352.    Plaintiffs are persons whom these statutes and regulations were meant to protect.

1353.    Medtronic's violation of these statutes or regulations constitutes negligence per se.


### THIRD CAUSE OF ACTION

### Negligence – Misrepresentation

1354.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1355.    Specific defects in the Infuse® product, as specified above in this Complaint, rendered it defective and unreasonably dangerous.

1356.    Medtronic made untrue representations and omitted material information to Plaintiffs and their physicians by sponsoring biased medical trials, reports, and articles that concluded that the dangers inherent to "off-label" use of Infuse® did not exist or were significantly less than the actual dangers.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1357.    Had Medtronic complied with their duties to the FDA as described under the Medical Device Reporting procedure, 21 C.F.R. § 803, the necessary and resultant actions by the FDA and/or appropriate government agencies, would have precluded the use of the product in the surgery giving rise to all causes of action.

1358.    Plaintiffs and their physicians would not have made "off-label" use of Infuse® for posterior-approach lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

1359.    Medtronic was negligent in making the untrue misrepresentations and omitting material information because Medtronic knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

1360.    Medtronic intended to induce Plaintiffs and their physicians to rely on their misrepresentations and omissions to use Infuse® in an "off-label" manner.

1361.    Plaintiffs and their physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Infuse® in deciding to make "off-label" use of Infuse® for spine fusion surgery.

1362.    Plaintiffs and Plaintiffs physicians were justified in their reliance on Medtronic's representations and marketing. Plaintiffs actually did undergo "off-label" spine fusion surgeries utilizing Infuse® in an "off-label" manner, which caused Plaintiffs serious physical injury.

1363.     In agreeing to undergo a procedure whereby Infuse® was implanted, Plaintiff and Plaintiff's physician justifiably relied on such misrepresentations by Medtronic, the referenced Medtronic employees/agents, including the Medtronic sales representative who sold Plaintiff's physician Infuse®. As the direct, producing, proximate and legal cause and result of Medtronic's misrepresentations, Plaintiffs have suffered severe physical pain, medical and hospital expenses, pain and suffering, and pecuniary loss.

1364.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1365.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## FOURTH CAUSE OF ACTION

### Strict Liability – Failure To Warn

1366.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1367.     Medtronic at all times herein was a medical device manufacturer and is subject to the Medical Device Reporting regulations under 21 C.F.R. § 803.

1368.     Medtronic had a duty to warn the FDA, about the dangers of all of their Infuse® devices, under 21 C.F.R. § 803.50 (2012), which they knew, or in the exercise of ordinary care, should have known, at the time Infuse® left Medtronic's control.  Medtronic did know of these increased risks and serious dangers of "off-label" use of Infuse®, and breached their duty by failing to warn the FDA of the dangers of the "off-label" use of Infuse®.

1369.     The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder as well as parallel state laws.

1370.     At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

        a.  Medtronic violated federal regulation 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

        b.  Medtronic violated federal regulation 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the regulation.

        c. Medtronic violated federal regulation 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

d. Medtronic violated federal regulation 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e. Medtronic violated federal regulation 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f. Medtronic violated federal regulations 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated federal regulation 21 C.F.R. § 352 because it created and distributed false and misleading promotions and advertisements for Infuse® which was a "Restricted Device."

h. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it promoted new "off-label intended" uses.

i. Medtronic violated federal regulation Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal regulation 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after they had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal regulations 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal regulation 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal regulations 21 U.S.C. §§ 352(q); 352® because it created and distributed false and misleading advertising.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

o. Medtronic violated federal regulations 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p. Medtronic violated federal regulation 21 C.F.R. § 820.198 (2012) because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

q. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal regulation 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

t. Medtronic violated federal regulation 21 C.F.R. § 801.109(c) because the labeling for Infuse® including the purposes for which it is advertised or represented were outside of the intended uses approved by the FDA.

u. Medtronic violated federal regulation 21 C.F.R. § 801.6, rendering Infuse® misbranded, because the representations Medtronic made in the labeling (including its advertising) were false and/or misleading with respect to non-approved uses.

1371.    As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

caused to endure serious injuries, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1372.    Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1373.    Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1374.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1375.    Thus, for violations of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1376.    The warnings accompanying their Infuse® products did not adequately warn Plaintiffs and Plaintiffs' physicians, in light of its scientific and medical knowledge at the time, of the increased risks and serious dangers associated with Infuse® when used "off-label" in Plaintiffs' spinal fusion surgery including, but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, neurological injury, and poorer global outcomes than alternative treatments.

1377.    In direct violation of 21 C.F.R. § 803.50 as well as State regulations and/or common law, Medtronic either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to the "off-label" use of Infuse®, when reporting to the FDA, including but not limited to these risks of ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury.

1378.    The FDA was unaware of Medtronic's omissions and this led to Plaintiffs and Plaintiffs' physicians' reliance on Medtronic's inadequate warnings in deciding to use Infuse® in an "off-label"

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

manner.

1379.     If Medtronic had met their duty under 21 C.F.R. § 803.50, the FDA would have had the information necessary to warn the public of the increased risks and serious dangers associated with the "off-label" use of Infuse®.

1380.     Plaintiffs and Plaintiffs' physicians would not have made "off-label" use of Infuse® for their spine fusion surgeries if the FDA had they been fully and adequately informed of the material and necessary information to be able to communicate the safety risks related to Infuse®.

1381.     As a direct and proximate result of one or more of the above listed dangerous conditions and defects, and of Medtronic's failure to provide adequate warnings about them, as required under 21 C.F.R. § 803.50, Plaintiffs sustained serious injuries of a personal and pecuniary nature.

1382.     Plaintiffs have sustained extreme pain, suffering, and anguish from the date of Plaintiffs' spine fusion surgeries with Infuse® until present and have otherwise suffered serious injuries and damages.

1383.     Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## FIFTH CAUSE OF ACTION

### Strict Liability - Design Defect

1384.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1385.     A design defect cause of action is a claim that the product sold to the plaintiff was defective because the original design was unreasonably dangerous and in its defective condition it caused the Plaintiffs injuries.

1386.     The original design for a Class III medical device is the product that is approved by the FDA.  This FDA approval includes not only the physical components of the product, but the labeling, advertising, and intended use of the product as well.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1387.    Under federal regulations, a manufacturer who wants to change the design of a product, including its intended uses, must seek supplemental approval.

1388.    If a manufacturer redesigns a product post approval and does not seek supplemental approval for the new design then not only is it a violation of federal regulations, but the new design has not been determined to be safe and effective by the FDA.

1389.    Without a supplemental approval, the FDA has not approved the product for any expanded intended uses.  Therefore, without FDA approval, a product promoted, sold, and/or distributed for use in a new unapproved manner is not protected by any federal regulations.

1390.    Here, Medtronic post approval changed their design of Infuse® by greatly expanding the intended uses of the product.  Medtronic never sought a supplemental PMA for the new expanded intended uses of the product.  The new intended uses of the product were never approved by the FDA and therefore never determined by the FDA to be safe and effective.

1391.    At all times mentioned herein, Medtronic placed Infuse® on the market.

1392.    At all times mentioned herein, Medtronic supplied the Infuse® used during Plaintiffs' spine fusion surgeries.

1393.    The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder as well as parallel state laws.

1394.    Defendant's Infuse® device was defectively designed because it was redesigned for sale after its limited FDA approval, to be marketed and intentionally sold for off-label use (including, but not limited to, being used without the required LT-Cage) and by promoting and selling it as such, Medtronic has unlawfully designed, manufactured, marketed and sold a new device for which the FDA never weighed the risk versus the benefit and never approved.  Moreover, this new device presents risks and dangers that render it defective.

1395.    Medtronic's Infuse® was defectively designed because the design was unsafe when used in the manner promoted by Medtronic and/or in a manner reasonably foreseeable by Medtronic.  The

Infuse® product failed to perform as safely as an ordinary consumer would expect when used, as it was promoted by Medtronic for use "off-label."

1396.    At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

a.    Medtronic violated federal regulation 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

b.    Medtronic violated federal regulation 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the regulation.

c.    Medtronic violated federal regulation 21 U.S.C. §352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d.    Medtronic violated federal regulation 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e.    Medtronic violated federal regulation 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f.    Medtronic violated federal regulation 21 C.F.R. § 801.5 because it failed to provide adequate direction for the unapproved off-label uses it promoted and distributed.

g.    Medtronic violated federal regulation 21 C.F.R. 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which is a "Restricted Device".

h.    Medtronic violated federal regulation 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

i.    Medtronic violated federal regulation Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

j.  Medtronic violated federal regulation 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k.  Medtronic violated federal regulations 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l.  Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m.  Medtronic violated federal regulation 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n.  Medtronic violated federal regulations 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o.  Medtronic violated federal regulations 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p.  Medtronic violated federal regulation 21 C.F.R. § 820.198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

q.  Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r.  Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew,

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s.   Medtronic violated federal regulation 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

t.   Medtronic violated federal regulation 21 C.F.R. § 801.109(c) because the labeling for Infuse® including the purposes for which it is advertised or represented were outside of the intended uses approved by the FDA.

u.   u. Medtronic violated federal regulation 21 C.F.R. § 801.6, rendering Infuse® misbranded, because the representations Medtronic made in the labeling (including its advertising) were false and/or misleading with respect to non-approved uses.

1397.   As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1398.   Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1399.   Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1400.   Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1401.   Thus, for violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1402.    The "off-label" use of Infuse® in Plaintiffs' spinal fusion procedure was defective, unreasonably dangerous, unsafe, and ineffective, and Medtronic knew or should have known that it was unsafe and ineffective when used in an "off-label" manner as promoted, instructed, and supplied by Medtronic, and utilized in Plaintiffs' surgery.

1403.    Had Medtronic complied with its duties to the FDA in regards to marketing and distribution as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgery giving rise to all causes action.

1404.    At all times herein mentioned, Medtronic had specific knowledge of the increased risks and dangers involved in the "off-label" use of Infuse® when used in surgery.

1405.    At all times herein mentioned, Plaintiffs relied upon the misrepresentations and omissions of material facts of Medtronic, in and utilized the product in an "off-label" manner as promoted and instructed by Medtronic.

1406.    At all times herein mentioned, the "off-label" use of Infuse® produced serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and Medtronic knew or should have known that said usage could be unsafe because of said side effects.

1407.    Plaintiffs were given Infuse® in a manner that had been illegally promoted, marketed, and intended by Medtronic.

1408.    Medtronic promoted the "off-label" use of Infuse® with the knowledge of its increased risks and dangers to patients.

1409.    The "off-label" use of Infuse®, as given to Plaintiffs, was ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Medtronic, who is strictly liable for the injuries arising from its use. The increased risks attendant to the "off-label" use of Infuse® greatly outweighed the benefits to be expected from said use as promoted by Medtronic.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1410.    The "off-label" use of Infuse® failed to perform in a manner that a reasonable consumer would expect it to perform.

1411.    Medtronic knew that Infuse®, when used "off-label" in the manner described above and as promoted and instructed by Medtronic, was defective and dangerous in the manner hereinbefore described; that Medtronic knew that, because said use was dangerous and defective when so used "off-label", the product could not be safely used for the purpose intended; that Medtronic, knowing that said product when used "off-label" was defective and dangerous, acted in conscious disregard of the safety of the public, including Plaintiffs, when it placed the product on the market without warning of the defect, and knew when so placed that it would be used without inspection for defect when so used.

1412.    By placing said product on the market and promoting said "off-label" use, Medtronic impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations.  Plaintiffs and Plaintiffs' doctors did rely on each of said misrepresentations, all to their damage as hereinabove alleged.

1413.    In doing the things aforementioned, Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitle to recovery of exemplary or punitive damages in the sum according to proof at trial.

## SIXTH CAUSE OF ACTION

### Strict Liability - Manufacturing Defect

1414.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1415.    A manufacturing defect cause of action is a claim that the product sold to the plaintiff was defective because it deviated from the original design and in its defective condition it caused the Plaintiffs injuries.

1416.    The original design for a Class III medical device is the product that is approved by the FDA.  This FDA approval includes not only the physical components of the product, but the labeling and intended use of the product as well.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1417.    Under federal regulations, a product that does not comply with the FDA approval is considered "adulterated" and/or "misbranded."  Under state law, a product that does not comply with the FDA approval is considered a "manufacturing defect."  Therefore, any product sold that is not in compliance with the FDA approval is both misbranded and/or adulterated under federal law and a manufacturing defect under State common law.  Therefore, the same underlying defect and/or actions of the manufacturer that have given rise to a federal violation are also a parallel state violation.

1418.    There are multiple manufacturing defects of Infuse® that were implanted in the Plaintiffs, including but not limited to:

a. Physical Components: The FDA approval of Infuse® requires that the bone morphogenic protein be used with an approved cage.  Here, for some of the Plaintiffs the manufacturer sold only the bone morphogenic protein without an approved cage.  This is a two-part component and one of the parts was missing from the sale. The product sold to the plaintiff does not comply with the FDA approved original design and therefore is ultimately a manufacturing defect.

b. Labeling: The FDA defines the term "labeling" broadly, so as to include not just the product packaging but also all of the promotional materials and/or efforts for the product as well.  Medtronic's promotional campaign for Infuse® included illegal "off-label" uses.[390] These promotions for "off-label" uses are in violation of the original FDA approved design because they are outside of the "intended uses" approved by the FDA.  The product sold to the Plaintiffs does not comply with the FDA approved original design because it was over promoted for and used in an "off-label" manner outside of the approved intended uses and therefore is ultimately a manufacturing defect.

c. Reporting Requirements: As part of the FDA approval, a manufacturer must abide by

---

[390] As further discussed herein, Plaintiffs, allege that Medtronic's "off-label" promotional efforts included impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, in house corporate paid doctors operating phone banks to instruct outside surgeons over the phone when they call Medtronic headquarters on how to perform off label procedures, as well as drafting, editing and ghostwriting the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

general reporting requirements that are included in the conditions for approval. These conditions include reporting to the FDA any adverse events or new scientific findings about the product that are later learned of. The failure to do so violates the FDA approval. Given the nature of the information that is required to be reported in the conditions of approval and the relationship of the manufacturer to the FDA and ultimately to the consumer, reporting to the FDA provides reasonable assurance that the information will reach those whose safety depends on their having it. Here, not only did Medtronic not report required information, but they actively concealed such relevant safety information from the FDA, the medical community, and consumers, including Plaintiffs and Plaintiffs' physicians. Violating the conditions of approval for the FDA approval is another way of saying that the manufacturer violated the original design of the product and therefore creates a viable manufacturing defect claim.

1419.    The Products implanted in Plaintiffs were not reasonably safe for their intended uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Medtronic's design and manufacturing specifications in such a manner as to pose unreasonable increased risks of serious bodily harm to Plaintiffs.

1420.    Infuse® was defectively manufactured because it deviated in a material way from the Medtronic's specifications and/or form otherwise identical units manufactured with the same specifications; including but not limited to: the manufacture of Infuse® to be used in conjunction with "off-label" componentry; the manufacturer of Infuse® to be used in/on "off-label" sections of the spine; and the manufacture of Infuse® to be used "off-label" with reduced amounts of rhBMP-2.

1421.    At all times mentioned herein, Medtronic placed Infuse® on the market.

1422.    At all times mentioned herein, Medtronic supplied the Infuse® used during Plaintiffs' spine fusion surgeries.

1423.    The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, the FDCA, the MDA, and regulations promulgated thereunder.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1424.    At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

a.  Medtronic violated federal regulation 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

b.  Medtronic violated federal regulation 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the regulation.

c.  Medtronic violated federal regulation 21 U.S.C. §352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d.  Medtronic violated federal regulation 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e.  Medtronic violated federal regulation 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f.  Medtronic violated federal regulation 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated federal regulation 21 C.F.R. 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which is a "Restricted Device".

h.  Medtronic violated federal regulation 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

l.  Medtronic violated federal regulation Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j.  Medtronic violated federal regulation 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

k.  Medtronic violated federal regulations 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l.  Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m.  Medtronic violated federal regulation 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n.  Medtronic violated federal regulations 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o.  Medtronic violated federal regulations 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p.  Medtronic violated federal regulation 21 C.F.R. § 820.198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

q.  Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r.  Medtronic violated federal regulations 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s.  Medtronic violated federal regulation 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

t. Medtronic violated federal regulation 21 C.F.R. § 801.109(c) because the labeling for Infuse® including the purposes for which it is advertised or represented were outside of the intended uses approved by the FDA.

u. Medtronic violated federal regulation 21 C.F.R. § 801.6, rendering Infuse® misbranded, because the representations Medtronic made in the labeling (including its advertising) were false and/or misleading with respect to non-approved uses.

1425.    As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.  Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.  All of these injuries are permanent.

1426.    Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1427.    Plaintiffs are not seeking to enforce these provisions in this action.  Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions.  Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1428.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1429.    Thus, for violations of federal law, including, the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1430.    The "off-label" use of Infuse® in Plaintiffs' spinal fusion procedure was defective, unreasonably dangerous, unsafe, and ineffective, and Medtronic knew or should have known that it was unsafe and ineffective when used in an "off-label" manner as promoted, instructed, and supplied by Medtronic, and utilized in Plaintiffs' surgery.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1431.     Had Medtronic complied with its duties to the FDA in regards to marketing and distribution as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgery giving rise to all causes action.

1432.     At all times herein mentioned, Medtronic had specific knowledge of the increased risks involved in the "off-label" use of Infuse® when used in surgery.

1433.     At all times herein mentioned, Plaintiffs relied upon the misrepresentations of Medtronic, in and utilized the product in an "off-label" manner as promoted and instructed by Medtronic.

1434.     At all times herein mentioned, the "off-label" use of Infuse® produced serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and Medtronic knew or should have known that said usage could be unsafe because of said side effects.

1435.     Plaintiffs were given Infuse® in a manner that had been illegally promoted, marketed, and intended by Medtronic.

1436.     Medtronic promoted the "off-label" use of Infuse® with the knowledge of its risk to patients.

1437.     The "off-label" use of Infuse®, as given to Plaintiffs, was ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Medtronic, who is strictly liable for the injuries arising from its use. The increased risks and dangers attendant to the "off-label" use of Infuse® greatly outweighed the benefits to be expected from said use as promoted by Medtronic.

1438.     The "off-label" use of Infuse® failed to perform in a manner that a reasonable consumer would expect it to perform.

1439.     Medtronic knew that Infuse®, when used "off-label" in the manner described above and as promoted and instructed by Medtronic, was defective and unreasonably dangerous in the manner hereinbefore described; that Medtronic knew that, because said use was unreasonably dangerous and

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

defective when so used "off-label", the product could not be safely used for the purpose intended; that Medtronic, knowing that said product when used "off-label" was defective and unreasonably dangerous, acted in conscious disregard of the safety of the public, including Plaintiffs, when it placed the product on the market without warning of the defect, and knew when so placed that it would be used without inspection for defect when so used.

1440.    By placing said product on the market and promoting said "off-label" use, Medtronic impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations.  Plaintiffs and Plaintiffs' doctors did rely on each of said misrepresentations and material omissions, all to their damage as hereinabove alleged.

1441.    In doing the things aforementioned, Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitle to recovery of exemplary or punitive damages in the sum according to proof at trial.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud

1442.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1443.    Plaintiff brings a claim against Medtronic for knowingly concealing information in "off-label" promotion.

1444.     Medtronic committed fraud by concealing and/or making fraudulent representations during its promotional practices concerning the "off-label" use of Infuse® and concealing its practice of "off-label" promotion.

1445.     In connection with their Infuse® products, Medtronic fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and Plaintiff's physicians, all as alleged in this Complaint.  The specifics regarding the content of the misrepresentations, when and where Medtronic made them, and to whom they were made, as well as what aspects of the statements were misleading and why, are alleged above in the body of this

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Complaint.

1446.    Plaintiff and Plaintiff's physicians would not have decided to use Infuse® "off-label" had they known of the real increased risks and dangers, related to Infuse®.

1447.    Any of the following is sufficient to independently establish Medtronic's liability for fraudulent misrepresentation and/or fraud in the inducement:

> a. Medtronic fraudulently concealed and misrepresented the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the "off-label" use of Infuse®;

> b. Medtronic fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiff's physicians, the "off-label" practice of using Infuse®.

> c. Medtronic fraudulently concealed and misrepresented information about the known increased risks and dangers as well as the limited benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1448.    As a medical device manufacturer, Medtronic had an affirmative continuing duty to warn the public, including Plaintiffs and Plaintiffs' physicians regarding the increased risks and dangers it knew, learned, or should have known about associated with its medical devices.

1449.    Had Medtronic complied with their duties to the FDA as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgeries giving rise to all causes of action.

1450.    Medtronic omitted material adverse information and provided inaccurate, false, or misleading information which was material to treating surgeons' treatment decisions, which misled surgeons and patients who were relying on those surgeons' professional judgment, including Plaintiffs and their treating surgeons. The misleading information as well as omission of material facts related to Infuse®'s safety and effectiveness caused health care providers, patients and the general public including Plaintiffs and their surgeons to be misled about Infuse®'s increased risks and benefits and deprived surgeons from making a proper risk/benefit assessment as to the use and "off-label" use of

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Infuse®.

1451.    Through internal adverse event reports and studies, Medtronic knew that the "off-label" use of Infuse® was unreasonably dangerous, and not effective and could lead to serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury. Medtronic failed to take any measures whatsoever to alert surgeons or the public regarding these increased risks and dangers and instead continued to promote the "off-label" use of Infuse® as safe and effective.

1452.    Despite knowing that the "off-label" promotion of Infuse® was illegal, Medtronic, through its sales representatives/consultants and Key Opinion Leaders, promoted the "off-label" use of Infuse® to Plaintiffs and Plaintiffs' physicians and concealed that the "off-label" use of Infuse® could result in injuries including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury.

1453.    Medtronic's sales representatives were intentionally present and in the operating rooms, to "instruct" physicians on the "off-label" use of Infuse®.

1454.    Medtronic made payments to physician authors in excess of $210 million who went on to produce bias and fraudulent studies.

1455.    The above physicians collaborated with Medtronic in publishing biased journal articles. These published journal articles concealed, misrepresented, and omitted the serious increased risks and dangers associated with Infuse® from the public, including Plaintiffs, Plaintiffs' physician, and the medical community.

1456.    As noted in the Senate Finance Committee Report, Medtronic was involved in the drafting, editing, and manipulation of published studies.

1457.    As reported by the United States Senate Committee on Finance, there were several Medtronic employees/agents who provided inaccurate or misleading information. Dr. John Kenneth Burkus, a Medtronic consultant, admitted via email that he expected a Medtronic study to be endorsed

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

by authors who did not author the article. Julie Bearcroft, a Medtronic employee, asked that reports of adverse events associated with Infuse® be omitted. Richard Treharne, a Medtronic employee, admitted via email that he helped author a spinal surgery study, even though he is not a medical doctor. Bill Martin, a Medtronic employee, stated via email that "off-label" surgeries should not be discouraged.

1458.    When Medtronic engaged in this deceptive campaign and made the above representations and/or omissions, they knew those representations and/or omissions to be false, or willfully and wantonly and recklessly disregarded whether the representations and/or omissions were true. These representations and/or omissions were made by Medtronic with the intent of defrauding and deceiving the public, including Plaintiffs, Plaintiffs' physicians, and the medical community.

1459.    Medtronic made the above representations with the intent of inducing surgeons and hospitals to use and recommend the "off-label" use of Infuse®.

1460.    At the time the aforesaid representations and/or omissions were made by Medtronic, Plaintiffs and their medical providers were unaware of the falsity of said representations and/or omissions and reasonably relied upon Medtronic's assertions, promulgated through aggressive sales tactics as set forth herein, that the "off-label" use of Infuse® was safe and effective when in fact, it was neither.

1461.    In reliance upon Medtronic's representations, each Plaintiff's physician used Infuse® in an off-label unapproved manner during each Plaintiff's spine fusion surgery.

1462.    As a direct and proximate result of said misrepresentations and/or material omissions, each Plaintiff's physician used Infuse® in an "off-label" spine fusion surgery.

1463.    Had Plaintiffs' physicians been made fully and adequately aware of the inefficacy and serious increased risks and dangers associated with such use, they would not have used it.

1464.    Had Plaintiff known of the actual dangers of and inefficacy of the "off-label" use of Infuse® Plaintiffs would not have consented to its use in their surgeries.

1465.    Had the FDA known of the actual dangers of and inefficacy of the "off-label" use of Infuse® they would have initiated a recall of the product, dear doctor letter, or safety signal and/or warned the public of the danger.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1466.    Medtronic's motive in failing to advise surgeons, the public, Plaintiffs, and the FDA of these increased risks and inefficacies was for financial gain and fear that, if it provided proper and adequate information, Infuse® would lose sales and market share.

1467.    The actions of Medtronic, its agents, servants, and/or employees were wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of Plaintiffs in particular, and to the public generally, in that Medtronic did willfully and knowingly promote the "off-label" use of Infuse® with specific knowledge that it would be used by surgeons without adequate instructions and without adequate knowledge regarding its efficacy, increased risks, dangers, and serious side effects.

1468.    Despite its specific knowledge regarding the increased risks and dangers as set forth above, Medtronic intentionally and deliberately recommended the "off-label" use of Infuse® and promoted it as being safe and effective.

1469.    At all times relevant herein, Medtronic's conduct was malicious, fraudulent, and oppressive towards Plaintiffs in particular and the public generally, and Medtronic conducted itself in a willful, wanton, and reckless manner by actively violating federal regulations.

1470.    Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery of exemplary or punitive damages in sum according to proof at trial.


## EIGHTH CAUSE OF ACTION

### Constructive Fraud

1471.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1472.    Medtronic marketed its Infuse® product to and for the benefit of Plaintiffs, and marketed it to their physicians, and Medtronic knew or had reason to know of the unreasonable dangers and serious defects in their Infuse® product, and that Plaintiffs and their physicians would use the product.

1473.    Medtronic owed Plaintiffs a duty to exercise reasonable or ordinary care under the circumstances, in light of the generally recognized and prevailing best scientific knowledge, and to

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

produce and market Infuse® in as safe a manner and condition as possible.

1474.    Specific defects, as specified above in this Complaint, in the Infuse® product, rendered it defective and unreasonably dangerous.

1475.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Medtronic breached their duties to Plaintiffs.  Such breaches exhibited willful and wanton conduct, and a reckless disregard for the safety of others.

1476.    By breaching their duties to Plaintiffs, Medtronic gained an advantage by wrongfully profiting from the sale of Infuse® for "off-label" use.

1477.    Plaintiffs and their physicians justifiably relied on Medtronic's misrepresentations and material concealment of the actual increased risks and dangers of "off-label" use of Infuse®.

1478.    As the direct, producing, proximate and legal cause and result of Medtronic's breach of their duties, Plaintiffs have suffered severe injuries, great mental and emotional distress, physical pain, pecuniary loss and were otherwise seriously injured and damaged.

1479.    As the direct, producing, proximate and legal cause and result of Medtronic's breach of their duties, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, and pain and suffering.

1480.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1481.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## NINTH CAUSE OF ACTION

### Fraudulent Concealment

1482.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1483.    In connection with their Infuse® products, Medtronic fraudulently and intentionally

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

concealed and suppressed material and important health and safety product risk information from Plaintiffs and Plaintiffs' physicians, all as alleged in this Complaint. Plaintiffs and Plaintiffs' physician would not have made "off-label" use of Infuse® for spine fusion surgeries had they known of the increased safety risks and dangers related to Infuse®.

1484.    Any of the following is sufficient to independently establish Medtronic's liability for fraudulent concealment:

a.    Medtronic fraudulently concealed and misrepresented the increased health and safety risks, dangers, hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the use of their Infuse® product to physicians, including Plaintiffs' physicians;

b.    Medtronic fraudulently concealed and misrepresented their practice of over-promoting and marketing the "off-label" use of Infuse® to physicians, including Plaintiffs' physicians; and

c.    Medtronic fraudulently concealed and misrepresented material safety information about the known increased risks and dangers of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1485.    Medtronic knew, or should have known, that they were concealing, suppressing, and misrepresenting true information about the known increased risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1486.    Medtronic knew that Plaintiffs and Plaintiffs' physicians would regard the matters Medtronic concealed, suppressed, and misrepresented to be important in determining the course of treatment for the Plaintiffs, including Plaintiffs and Plaintiffs' physicians' decision whether or not to use Infuse® in Plaintiffs' spine fusion surgeries.

1487.    Medtronic intended to cause Plaintiffs and Plaintiffs' physicians to rely on their concealment of material safety information, suppression, and misrepresentations about the increased risks and dangers related to Infuse®, in order to induce them to use "off-label" Infuse® for spine fusion surgery.

1488.     Plaintiffs and Plaintiffs' physicians were justified in relying, and did rely, on Medtronic's concealment of information and misrepresentations about the increased safety risks and dangers related to Infuse® in deciding to make "off-label" use of Infuse® for spine fusion surgery.

1489.     As a direct and proximate result of Medtronic's fraudulent concealment, suppression, and misrepresentations of material increased health and safety risks and dangers relating to Infuse® and Medtronic's dangerous and irresponsible "off-label" promotion and marketing practices, Plaintiffs suffered injuries and economic loss, and Plaintiffs will continue to suffer injuries, damages and economic loss.

1490.     As the direct, proximate, and legal cause and result of Medtronic's false, deceptive, dangerous and irresponsible marketing and promotion practices related to "off-label" use of Infuse®, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the enjoyment of life.

1491.     Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1492.     Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.


## TENTH CAUSE OF ACTION

### Breach of Express Warranty

1493.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1494.     Medtronic utilized journal articles, advertising media, sales representatives, and paid Key Opinion Leaders to promote, encourage, and urge the use purchase, and utilization of the "off-label" use of its product, Infuse®, representing the quality to health care professionals, the FDA, Plaintiffs, and the public in such a way as to induce its purchase or use, thereby making an express warranty that Infuse® would conform to the representations.  More specifically, Medtronic represented that Infuse® was safe

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

and effective, that it was safe and effective for use by individuals such as Plaintiffs, and/or that it was safe and effective to treat Plaintiffs' condition.

1495.    Medtronic manipulated studies, crafted by both lucratively paid physicians and Medtronic agents/employees, as promotional materials, which created express written representations of Infuse®'s safety and efficacy including that device related adverse events did not exist or were significantly reduced. These specific misrepresentations went beyond mere puffery as they were published in reputable peer-reviewed scientific journals.

1496.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

1497.    Infuse® did not conform to the representations made by Medtronic, as Infuse® was not safe and effective, was not safe and effective for use by individuals such as Plaintiffs, and/or was not safe and effective to treat in individuals, such as Plaintiffs.

1498.    At all relevant times, Plaintiffs used Infuse® for the purpose and in the manner intended by Medtronic.

1499.    Plaintiffs and Plaintiffs' physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its hidden increased risks and it unreasonable dangers.

1500.    Defendants' breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2013);

- Alaska St. § 45.02.313 (effective 2013);

- Ariz. Rev. Stat. Ann. § 47-2313 (2013);

- Ark. Code Ann. § 4-2-313 (2013);

- Cal. U. Com. Code § 2313(1) (2013); Cal. Civ. Code §1791.2(a) (2013).

- Co. Rev. St. § 4-2-316 (2013);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2013);

- 6 Del. C. § 2-313 (2013);

- D.C. Code Ann. § 28:2-313 (2013);

- Fla. Stat. Ann. § 672.313 (2013);

- O.C.G.A. § 11-2-318 (2013);

- Haw. Rev. Stat. § 490:2-313 (2013);

- Id. Code § 28-2-314(2)(c) (2013).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2013);

- Ind. Code Ann. § 26-1-2-313 (2013);

- Iowa Code Ann. § 554.2313 (2013);

- Kans. Stat. Ann. § 84-2-313 (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c) (2013).

- Ky. Rev. Stat. § 355.2-318 (2013);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2013);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2013); 14 M.R.S. § 221 (2013).

- Md. Code Ann., Com. Law § 2-318 (2013);

- Mass. M.G.L. c. 106, § 2-313 (2013);

- Mich. Comp. Laws Ann. § 440.2313 (2013);

- Minn. Stat. Ann. § 336.2-313 through 315 (2013);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2013);

- Mo. Rev. Stat. Ann. § 400.2-313 (2013);

- Mont. Code Ann. § 30-2-313 (2013);

- Neb. Rev. Stat. U.C.C. § 2-313 *et seq*. (2012)

- Nev. Rev. Stat. U.C.C. § 104.2313, *et seq*. (2012); Nev. Rev. Stat. §§ 104.2312-104.2318 (2012).

- N.H. Rev. Stat. Ann. § 382-A:2-313, *et seq*. (2013);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); *see also* UJI 13-1428 to 1433 NRMA.

- N.Y. U.C.C. Law 2-313, *et seq*. (2013);

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

- N.C. Gen. Stat. Ann. § 25-2-313, *et seq.* (2013);

- N.D. Cent. Code § 41-02-30, *et seq.* (2013);

- Ohio Rev. Code Ann. § 1302.26, *et seq.* (2013);

- Okla. Stat. tit. 12A, § 2-313 *et seq.* (2013);

- Or. Rev. Stat. § 72.3130, *et seq.* (2013);

- 13 Pa. Stat. Ann. § 2313, *et seq.* (2013);

- R.I. Gen. Laws § 6A-2 (2013);

- S.C. Code. Ann. § 36-2-313, *et seq.* (2012);

- S.D. Stat. 57A-2-313, *et seq.* (2013);

- Tenn. Code Ann. § 47-2-313, *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. § 2.313, *et seq.* (2013);

- Ut. Code Ann. § 70A-2-313, *et seq.* (2013);

- Va. Code Ann. § 8.2-318, *et seq.* (2013);

- Vt. Stat. Ann. tit. 9A, § 2-313, *et seq.* (2013);

- Wa. Rev. Code § 62A.2-108, *et seq.* (2013); § 7.72.030(2) (2013);

- W.Va. Code § 46A-6-108, *et seq.* (2013);

- Wis. Stat. Ann. § 402.313, *et seq.* (2013); and

- Wyo. Stat. § 34.1-2-313 through 315 (2013).

1501.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Medtronic's acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, sale, promotion, and distribution of Infuse®, Plaintiff was implanted with Infuse® and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, immobility, pain and suffering, and mental and emotional distress for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

### ELEVENTH CAUSE OF ACTION

#### Breach of Implied Warranty

1502.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

1503.    Infuse® was not reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manner. Nor was Infuse® minimally safe for its expected purpose.

1504.    At all relevant times, Plaintiffs used Infuse® for the purpose and in the manner intended by Medtronic.

1505.    Plaintiffs and Plaintiffs' physicians, by the use of reasonable care could not have discovered the breached warranty and realized its danger.

1506.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.

1507.    Defendants breached their implied warranty to Plaintiffs in that Medtronic's Infuse® product was not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of State Common Law principles and the following statutory provisions as applicable:

- Ala. Code §§ 7-2-314, *et seq*. (2013);

- Alaska. Stat. §§ 45.02.314, *et seq*. (2013);

- Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq*. (2013);

- Ark. Code Ann. §§ 4-2-314, *et seq*. (2013);

- Cal. Uniform Comm. Code §§ 2314, e2315; Cal. Civ. Code §§ 1791.1(b), 1792.1, and 1792.2 (2013).

- Colo. Rev. Stat. §§ 4-2-316, *et seq*. (2013);

- Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq*. (2013);

- Del. Code Ann. tit. 6, §§ 2-314, *et seq*. (2013);

- D.C. Code Ann. §§ 28:2-314, *et seq*. (2013);

- Fla. Stat. Ann. §§ 672.314, *et seq*. (2013);

- O.C.G.A. §§ 11-2-318, *et seq*. (2013);

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

- Haw. Rev. Stat. §§ 490:2-314, *et seq*. (2013);

- Idaho Code § 28-2-314(2)(c) (2013).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq*. (2013);

- Indiana Code Ann. §§ 26-1-2-314, *et seq*. (2013);

- Iowa Code Ann. §§ 554.2314, *et seq*. (2013);

- Kan. Stat. Ann. §§ 84-2-314, *et seq*. (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c) (2013).

- Ky. Rev. Stat. Ann. §§ 355.2-318 (2013), *et seq*.;

- La. Civ. Code Ann. art. 9:2800:58, *et seq*. (2013) and is liable for redhibition under this statute;

- Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq*. (2013); 14 M.R.S. § 221 (2013).

- Md. Code Ann., Com. Law §§ 2-314, *et seq*. (2013);

- Mass. M.G.L. c. 106, § 2-314 (2013);

- Mich. Comp. Laws Ann. §§ 440.2314, *et seq*. (2013);

- Minn. Stat. Ann. §§ 336.2-313 through 315 (2013);

- Miss. Code Ann. §§ 11-1-63(i)(3) and §§ 75-2-313; 75-2-314 (2013);

- Mo. Rev. Stat. Ann. §§ 400.2-314, *et seq*. (2013);

- Mont. Code Ann. §§ 30-2-314, *et seq*. (2013);

- Neb. Rev. Stat. §§ 2-314, *et seq*. and Common Law (2012);

- Nev. Rev. Stat. §§ 104.2312-104.2318 (2012);

- N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq*. (2013);

- N.J. Stat. Ann. §§ 12A:2-314, *et seq*. (2013);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); *see also* UJI 13-1428 to 1433 NRMA (2013);

- N.Y. U.C.C. Law §§ 2-314, *et seq*. (2013);

- N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq*. (2013);

- N.D. Cent. Code §§ 41-02-31, *et seq*. (2013);

- Ohio Rev. Code Ann. §§ 1302.27, *et seq*. (2013);

- Okla. Stat. tit. 12A, §§ 2-314 *et seq*. (2013);

- Or. Rev. Stat. §§ 72.3140, *et seq.*; 72.3150 (2013);

- 13 Pa. Stat. Ann. §§ 2314 *et seq.* (2013);

- R.I. Gen. Laws §§ 6A-2-314, *et seq.* (2013);

- S.C. Code Ann. §§ 36-2-314, *et seq.* (2012);

- S.D. Codified Laws §§ 57A-2-314, *et seq.* (2013);

- Tenn. Code Ann. §§ 47-2-314, *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. §§ 2.314, *et seq.* (2013);

- Utah Code Ann. §§ 70A-2-314, *et seq.* (2013);

- Va. Code Ann. §§ 8.2-318, *et seq.* (2013);

- Vt. Stat. Ann. §§ 9A-2-314, *et seq.* (2013);

- Wash. Rev. Code §§ 62A.2-314, *et seq.*; § 7.72.030(2) (2013);

- W.Va. Code §§ 46A-6-108, *et seq.* (2013);

- Wis. Stat. Ann. §§ 402.314, *et seq.* (2013); and

- Wyo. Stat. Ann. §§ 34.1-2-313 through 315 (2013).

1508.     As a direct and proximate result of Medtronic's acts and omissions, including their failure to exercise ordinary care in the promotion, marketing, formulation, testing, sale, and distribution of Infuse®, Plaintiffs was implanted with Infuse® and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, neurological injury, pain and suffering and great emotional and mental distress and anguish for which they are entitled to compensatory, special, and equitable damages in an amount to be proven at trial.


**TWELFTH CAUSE OF ACTION**

**Violation of Consumer Protection Laws**

1509.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1510.    Plaintiffs purchased and used the Medtronic Infuse® product for personal use and thereby suffered ascertainable losses as a result of Medtronic's actions in violation of the applicable State consumer protection laws, including but not limited to the following, as applicable:

- Ala. Code §§ 8-19-1 *et seq.* (2013);

- Alaska Stat. §§ 45.50.471 *et seq.* (2013);

- Ariz. Rev. Stat. Ann. §§ 44-1522 *et seq.* (2013);

- Ark. Code Ann. §§ 4-88-101 *et seq.* (2013);

- Cal. Civ. Code §§ 1770 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.* (2013);

- Colo. Rev. Stat. §§ 6-1-105 *et seq.* (2013);

- Conn. Gen. Stat. §§ 42-110a *et seq.* (2013);

- Del. Code Ann. tit. 6, §§ 2511 *et seq.* and §§ 2531 *et seq.* (2013);

- D.C. Code Ann. §§ 28-3901 *et seq.* (2013);

- Fla. Stat. Ann. §§ 501.201 *et seq.* (2013);

- O.C.G.A. §§ 10-1-372 *et seq.* (2013);

- Haw. Rev. Stat. §§ 480-1 *et seq.* (2013);

- Id. Code Ann. §§ 48-601 *et seq.* (2013);

- Ill. Comp. Stat. Ann ch. 815, 505/1 *et seq.* (2013);

- Ind. Code Ann. §§ 24-5-0.5-1 *et seq.* (2013);

- Iowa Code Ann. §§ 714.16 *et seq.* (2013);

- Kan. Stat. Ann. §§ 50-623 *et seq.* (2013);

- Ky. Rev. Stat. Ann. §§ 367.170 *et seq.* (2013);

- La. Rev. Stat. Ann. §§ 51:1401 *et seq.* (2012);

- Me. Rev. Stat. Ann. tit. 5, §§ 205A *et seq.* (2013);

- Md. Code Ann., Com. Law §§ 13-101 *et seq.* (2013);

- Mass. Gen. Laws Ann. Ch. 93A *et seq.* (2013);

- Mich. Comp. Laws §§ 445.901 *et seq.* (2013);

- Minn. Stat. §§ 325D.43 *et seq.* and §§ 325F.67 *et seq.* (2013);

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

- Miss. Code Ann. §§ 75-24-1 *et seq.* (2013);

- Mo. Ann. Stat. §§ 407.010 *et seq.* (2013);

- Mont. Code Ann. §§ 30-14-101 *et seq.* (2013);

- Neb. Rev. Stat. §§ 59-1601 *et seq.* (2012);

- Nev. Rev. Stat. §§ 598.0903 *et seq.* (2012);

- N.H. Rev. Stat. Ann. §§ 358-A:1 *et seq.* (2013);

- N.M. Stat. Ann. §§ 57-12-1 *et seq.* (2013);

- N.Y. Gen. Bus. Law §§ 349 *et seq.* and §§ 350-e *et seq.* (2013);

- N.C. Gen. Stat. §§ 75-1.1 *et seq.* (2013);

- N.D. Cent. Code §§ 51-12-01 *et seq.* and §§ 51-15-01 *et seq.* (2013);

- Ohio Rev. Code Ann. §§ 1345.01 *et seq.* (2013);

- Okla. Stat. tit. 15 §§ 751 *et seq.* (2013);

- Or. Rev. Stat. §§ 646.605 *et seq.* (2013);

- 73 Pa. Stat. §§ 201-1 *et seq.* (2013);

- R.I. Gen. Laws. §§ 6-13.1-1 *et seq.* (2013);

- S.C. Code Ann. §§ 39-5-10 *et seq.* (2012);

- S.D. Codified Laws §§ 37-24-1 *et seq.* (2013);

- Tenn. Code Ann. §§ 47-18-101 *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.* (2013);

- Utah Code Ann. §§ 13-11-1 *et seq.* (2013);

- Vt. Stat. Ann. tit. 9, §§ 2451 *et seq.* (2013);

- Va. Code Ann. §§ 59.1-196 *et seq.* (2013);

- Wash. Rev. Code. §§ 19.86.010 *et seq.* (2013);

- W.Va. Code §§ 46A-6-101 *et seq.* (2013);

- Wis. Stat. Ann. §§ 100.20 *et seq.* (2013); and

- Wyo. Stat. Ann. §§ 40-12-101 *et seq.* (2013).

1511.    Had Medtronic not engaged in the deceptive conduct described herein, Plaintiffs

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

physicians could not have used Infuse® and Plaintiffs would not have purchased and/or paid for Medtronic's Infuse® product and would not have incurred related medical costs and injury.

1512.    Medtronic engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiffs for Infuse® that would not have been paid had Medtronic not engaged in unfair and deceptive conduct.

1513.    Unfair methods of competition or deceptive acts or practice that were proscribed by law, including the following:

a.    Representing that goods or services have characteristic ingredients, uses benefits or quantities that they do not have;

b.    Advertising goods or services with the intent not the sell them as advertised; and,

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

1514.    Medtronic used manipulated studies, crafted by both lucratively paid physicians agents and Medtronic's agents/employees, as promotional materials to aggressively market and misrepresent Infuse®'s efficacy and safety to the Plaintiffs, Plaintiffs' physicians, the public and the medical community.

1515.    Plaintiffs were injured by the cumulative and indivisible nature of Medtronic's conduct. The cumulative effect of Medtronic's conduct directed at patients, physicians and consumers was to create demand for and sell the Medtronic's Infuse® product.  Each aspect of Medtronic's conduct combined to artificially create sales of Medtronic's Infuse® product.

1516.    Medtronic had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Medtronic's Infuse® product.

1517.    Had Medtronic not engaged in the deceptive conduct described above, Plaintiffs' physicians would not have used Infuse® and Plaintiffs would not have purchased and/or paid for Infuse® and would not have incurred related medical costs.

1518.    Medtronic's deceptive, unconscionable, and fraudulent representations and material

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

omissions to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statute listed.

1519.     Medtronic's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, trade practices in violation of the state consumer protection statute listed below.

1520.     Medtronic has engaged in unfair competition or unfair or deceptive acts or trade practices or have made faces representations in violation of the above listed consumer fraud statutes.

1521.     Under the respective state statutes, including the statute listed above, to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Medtronic is the supplier, manufacturer, advertiser, and seller, who is subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

1522.     Medtronic violated the State statutes that was enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade practices and false advertising, by knowingly and falsely representing that the Medtronic's Infuse® product was fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein.  These representations were made in marketing and promotional materials.

1523.     The actions and omissions of Medtronic alleged herein are uncured or incurable deceptive acts under the State statutes enacted to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices, and false advertising.

1524.     Medtronic had actual knowledge of the defective and unreasonably dangerous condition of Medtronic's Infuse® product and failed to take any action to cure such defective and dangerous conditions.

1525.     Plaintiffs' physician relied upon Medtronic's misrepresentations and material omissions in determining whether to use Infuse® and the method by which it should be implanted.

1526.     Medtronic's deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1527.    Medtronic's conduct and acts of unfair competition are ongoing and present a continuing threat of harm to the general public.

1528.    By reason of unlawful acts engaged in by Medtronic, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

1529.    As a direct and proximate result of Medtronic's violations of the State's consumer protection laws, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory, damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### Violation of the Missouri Merchandising Practices Act

1530.    Plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

1531.    The Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. § 407.020 provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice . . ..  Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

1532.    At all relevant times and as described herein, Medtronic, through their representatives, paid Key Opinion Leaders, agents, servants and/or employees acting within the course and scope of their employment, knowingly directly and indirectly represented to the public, to Plaintiffs, and Plaintiffs' physicians that "off-label" application of Infuse® were safe and effective to treat the Plaintiffs' medical conditions and that, when so used, Infuse® was not defective.

1533.　　Medtronic's advertising, promotions, and representations contained therein were false and misleading and constituted unfair or deceptive acts and practices declared unlawful by the MMPA. Medtronic's knowingly made false representations for the purpose of deceiving the Plaintiff and other consumers regarding "off-label" applications of Infuse® in violation of the MMPA.

1534.　　In the course of knowingly promoting Infuse® for "off-label" posterior uses, Medtronic failed to fairly and adequately disclose to the public, to the Plaintiffs, and to Plaintiffs' physicians that such uses were ineffective, unreasonably dangers, and defective.

1535.　　Medtronic sold Infuse® to Plaintiffs for a fee.

1536.　　Had Medtronic disclosed the true facts concerning the increased risks and damages they knew or should have known to be associated with "off-label" applications of Infuse®, Plaintiff and her physicians would not have chosen to purchase and use Infuse®.

1537.　　Medtronic engaged in the unlawful practices set forth in this Complaint in the sale of merchandise in trade or commerce.

1538.　　Medtronic's concealment, misrepresentations and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiffs regarding Medtronic's products.

1539.　　In violation of the MMPA, Medtronic employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of Infuse® in the State of Missouri.

1540.　　Medtronic engaged in the concealment, suppression, misrepresentations and/or omission of the aforementioned material facts with the intent that others, such as Plaintiffs, their physicians, and/or the general public would rely upon the concealment, suppression, misrepresentation and/or omission of such material facts and purchase Infuse®.

1541.　　The concealment, suppression, misrepresentation and/or omission of the aforementioned material facts had the capacity to, was reasonably foreseeable that it would, and did so deceive.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1542.    At all times material hereto, it was reasonably foreseeable that Plaintiffs and/or their physicians would rely on the false and fraudulent promotion, advertising, marketing, and packaging made by Medtronic.  Said reliance has caused Plaintiffs to be damaged.

1543.    Plaintiffs physicians would not have used in Plaintiffs and Plaintiffs would not have purchased Infuse® absent the concealment, suppression, or omission of the aforementioned material facts.

1544.    Plaintiffs suffered actual and ascertainable loss of money and damages as an actual and proximate result of Medtronic's intentional misrepresentation and concealment of material facts.

1545.    Medtronic's conduct described herein actually and proximately caused Plaintiffs to suffer damages as described throughout this Complaint.

1546.    Plaintiffs are entitled to recover their actual damages, attorneys' fees, and other equitable relief, pursuant to Missouri law, including Mo. Ann. Stat. § 407.025.

1547.    Furthermore, Defendants' unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Medtronic's actions and for the rights of Plaintiffs and warrants an award of punitive damages to deter Medtronic, and others in similar circumstances, from committing such actions in the future.

## FOURTEENTH CAUSE OF ACTION

### Loss of Consortium

1548.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1549.    At all times relevant hereto the Plaintiffs' spouses ("Spouse Plaintiffs"), who are specifically identified in the Plaintiff Party Section of this complaint, have suffered injuries and losses as a result of Plaintiffs' injuries.

1550.    For the reasons set forth herein, Spouse Plaintiffs have necessarily paid and/or have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as approximate result of Medtronic's misconduct.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1551.    For the reason set forth herein, Spouse Plaintiffs have suffered and will continue to suffer damages to and/or the loss of their loved one's support, companionship, services, society, and affection.

1552.    Spouse Plaintiffs have suffered great emotional pain and mental anguish.

1553.    As a direct and proximate result of Medtronic's wrongful conduct and failure to comply with applicable federal standards Spouse Plaintiffs have sustained and will continue to sustain severe emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages in an amount to be proven at trial.  Medtronic is liable to Spouse Plaintiffs for all general and special damages to which Spouse Plaintiffs are entitled by law.

## FIFTEENTH CAUSE OF ACTION

### Gross Negligence/Punitive Damages

1554.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1555.    At all times material hereto, Defendant knew or should have known that Infuse® was inherently more dangerous with respect to the increased risks and dangers, including but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury than alternative spinal fusion procedures available to Plaintiffs and Plaintiffs' physician.

1556.    At all times material hereto, Medtronic attempted to misrepresent and did misrepresent material facts concerning the safety of Infuse®.

1557.    Medtronic's misrepresentations included knowingly withholding material information from the medical community and the public, including the Plaintiffs and Plaintiffs' physicians, concerning the safety and efficacy of Infuse®.

1558.    At all times material hereto, Medtronic knew and recklessly disregarded the fact that Infuse® was subject to increased risks and dangers, including but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury than alternative spinal fusion procedures.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1559.    Notwithstanding the foregoing, Medtronic continued to aggressively market Infuse® without disclosing the aforesaid increased risks, dangers and serious side effects when there were safer alternative methods.

1560.    Medtronic knew of Infuse®'s defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, promote, distribute and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiffs, in conscious and/or negligent disregard of the foreseeable harm.

1561.    Medtronic's intentional and/or reckless, fraudulent and malicious failure to disclose material safety information deprived the Plaintiffs and their surgeons of important and necessary information to enable them to weigh the true risks of using the subject product against its benefits.

1562.    As a direct and proximate result of Medtronic's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, the Plaintiffs suffered severe and permanent physical injuries and great mental and emotional distress and anguish as set forth above.

1563.    The aforesaid conduct of Medtronic was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish Medtronic and deter them from similar conduct in the future.

1564.    Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant to State Common Law principles including but not limited to the following statutory provisions as applicable:

- Ala. Code §§ 6-11-20 (2013);

- Alaska Stat. § 09.17.020(b) (2013);

- Ark. Code Ann. § 4-2-313; § 16-55-206 (2013);

- Cal. Civ. Code §§ 1770 *et seq*. and Cal. Civ. Code § 3294; Cal. U. Com. Code §§ 2314-2315 (2013).

- Colo. Rev. Stat. § 13-21-102 (2013);

- Conn. Gen. Stat. §§ 52-240b *et seq*. (2013);

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

- Del. Code Ann. tit. 6, §§ 6855 *et seq*. (2013);

- Fla. Stat. Ann. §§ 768.72 (2013);

- O.C.G.A. §§ 51-12-5.1 (2013);

- Idaho Code § 6-1601(9); § 6-1604 (2013);

- Ill. Comp. Stat. Ann ch. 735, 5/2-604.1 (2013);

- Ind. Code Ann. §§ 34-51-3 *et seq*. (2013);

- Iowa Code Ann. § 668A.1 (2013);

- Kan. Stat. Ann. §§ 60-3702(a) and (e) (2013);

- Ky. Common Law (2013);

- Mass. Gen. Laws Ann. c. 229, § 2; M.G.L. c. 93A, § 9(3) (2013);

- Mich. Comp. Laws (2013);

- Minn. Stat. Ann. § 549.191; § 549.20, subd.1(a); § 549.20, subd. 4 (2013);

- Mo. Rev. Stat. § 510.265 (2013);

- Mont. Code Ann. § 27-1-221(2) (2013);

- Nev. Rev. Stat. § 42.005 (2012);

- N.M. Rules Ann. § 13-1827 and UJI 13-861 (2013);

- N.C. Gen. Stat. §§ 1D-1 *et seq*. (2013);

- N.D. Cent. Code §§ 51-12-01 (2013);

- Ohio Rev. Code Ann. §§ 1345.01 (2013);

- Okla. Stat. tit. 23 § 9.1 (2013);

- Or. Rev. Stat. § 30.925 (2013);

- 73 Pa. Stat. §§ 201-1 *et seq*. (2013);

- S.C. Code Ann. §§ 15-33-135 (2013);

- S.D. Codified Laws (2013);

- 2011 Tenn. Public Acts ch. 510 (2013);

- Utah Code Ann. § 78B-8-2-3 (2013); and

- Wis. Stat. Ann. § 895.043 (2013).

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

1565.     Plaintiffs seek actual and punitive damages from Medtronic as alleged herein.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and each of them, respectfully demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

a.   Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, great pain and suffering and emotional distress and anguish, for severe and permanent personal injuries sustained by Plaintiffs, health and medical care costs, together with interest and costs as provided by law;

b.   For general damages in a sum exceeding this Court's jurisdictional minimum.

c.   For specific damages according to proof;

d.   For all ascertainable economic and non-economic damages according to proof in a sum exceeding this Court's jurisdictional minimum;

e.   For Restitution and disgorgement of profits;

f.   For Punitive and Exemplary damages according to proof;

g.   For pre-judgment interest and post-judgment interest as allowed by law;

h.   For reasonable attorneys' fees;

i.   For the costs of these proceedings; and

j.   For such other and further relief as this Court deems just and proper.

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM

Respectfully submitted,


Date:  __December 26__, 2013        _____


s/ Eric D. Holland
Eric D. Holland
*(Mo. Bar # 39935)*
**HOLLAND, GROVES,
SCHNELLER & STOLZE, LLC**
300 N Tucker, Suite 801
St. Louis, Missouri 63101
TEL: (314) 241-8111
FAX: (314) 241-5554

Nicholas J. Drakulich, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108
Tel:  (858) 755-5887
Fax: (858) 755-6456
njd@draklaw.com

Richard J. Arsenault, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**NEBLETT, BEARD & ARSENAULT**
2220 Bonaventure Court
Alexandria, Louisiana 71309
TEL: (800) 256-1050
FAX: (318) 561-2592
rarsenault@nbalawfirm.com

Jerrold S. Parker, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**PARKER WAICHMAN LLP**
3301 Bonita Beach Road
Bonita Springs, Florida 34134
TEL: (239) 390-8610
FAX: (239) 390-0055
jerry@yourlawyer.com

W. Mark Lanier
*(Pro Hac Vice Applicant Anticipant)*
**LANIER LAW FIRM**
6810 FM 1960 West
Houston, Texas
TEL: (713) 659-5200
FAX: (713) 659-2204
wml@lanierlawfirm.com

*Attorneys for Plaintiffs*

Electronically Filed - City of St. Louis - December 26, 2013 - 08:46 AM